# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **RAMIRO HERNANDEZ- LLANAS** | ) | |
| Petitioner, | ) | |
| | ) | **CIVIL NO. SA-08-CA-805-XR** |
| **v.** | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | **CAPITAL CASE.** |
| **RICK THALER,** | ) | |
| **Director of the Texas** | ) | |
| **Department of Criminal Justice** | ) | |
| **Institutional Division** | ) | |
| | ) | |
| Respondent. | ) | |

## AMENDED PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

# TABLE OF CONTENTS

I.  **PRELIMINARY STATEMENT OF FACTS**                          **1**

II.  **RELEVANT PROCEDURAL HISTORY**                            **9**

III.  **GROUNDS FOR GRANTING HABEAS CORPUS RELIEF**            **24**

   **GROUND A**                                                 **24**
   BECAUSE PETITIONER IS MENTALLY RETARDED, HIS EXECUTION
   WOULD VIOLATE THE CRUEL AND UNUSUAL PUNISHMENT CLAUSE
   OF THE EIGHTH AMENDMENT.

   **GROUND B**                                                 **75**
   PETITIONER WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE
   ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AND
   FOURTEENTH AMENDMENTS DURING THE PENALTY PHASE DUE TO
   COUNSEL'S FAILURE TO DEVELOP AND PRESENT EVIDENCE IN
   MITIGATION, INCLUDING EVIDENCE OF EXTRAORDINARY
   CHILDHOOD DEPRIVATION, EXPOSURE TO TOXINS, AND PHYSICAL
   ABUSE AND BY COUNSEL'S FAILURE TO DISPROVE THE STATE'S
   PENALTY PHASE CLAIM THAT PETITIONER HAD STABBED A MAN IN
   AN UNRELATED INCIDENT.

   **GROUND C**                                                 **121**
   PETITIONER WAS DEPRIVED OF HIS RIGHT TO THE CONFLICT-FREE
   ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AND
   FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
   BY HIS TRIAL COUNSEL'S PRIOR REPRESENTATION OF THE TRUE
   PERPETRATOR OF AN ASSAULT ATTRIBUTED TO PETITIONER BY THE
   STATE IN THE PENALTY PHASE OF HIS CAPITAL TRIAL.

   **GROUND D**                                                 **140**
   THE ADMISSION OF A FOREIGN CONVICTION FROM A JURISDICTION
   LACKING FUNDAMENTAL FAIR TRIAL SAFEGUARDS, INCLUDING THE
   RIGHT TO JURY TRIAL, THE REQUIREMENT OF PROOF BEYOND A
   REASONABLE DOUBT, THE RIGHT TO CROSS-EXAMINATION BY
   DEFENSE COUNSEL, THE RIGHT AGAINST COMPELLED SELF-
   INCRIMINATION, AND THE PROHIBITION AGAINST DOUBLE
   JEOPARDY, VIOLATED PETITIONER'S SIXTH, EIGHTH, AND
   FOURTEENTH AMENDMENT RIGHTS.

**GROUND E**                                                                  168
PETITIONER WAS DEPRIVED OF HIS RIGHT TO DUE PROCESS UNDER
THE FOURTEENTH AMENDMENT TO THE UNITED STATES
CONSTITUTION WHEN THE PROSECUTOR WITHHELD INFORMATION
THAT THE VICTIM OF AN ASSAULT, ATTRIBUTED TO PETITIONER AND
USED AS EVIDENCE OF HIS FUTURE DANGEROUSNESS, HAD IN FACT
IDENTIFIED ANOTHER MAN AS THE ASSAILANT AND AT NO TIME
IMPLICATED PETITIONER IN THE ASSAULT, AND WITHHELD
INFORMATION THAT THE MURDER VICTIM'S WIFE DID NOT WANT
PETITIONER TO RECEIVE THE DEATH PENALTY.

**GROUND F**                                                                  178
TEXAS LAW ENFORCEMENT VIOLATED PETITIONER'S PERSONAL
RIGHTS UNDER THE VIENNA CONVENTION ON CONSULAR
RELATIONS AND HIS DUE PROCESS AND EQUAL PROTECTION RIGHTS
UNDER THE FIFTH AND FOURTEENTH AMENDMENTS BY FAILING TO
NOTIFY PETITIONER THAT HE WAS ENTITLED TO CONTACT THE
MEXICAN CONSULATE PRIOR TO SPEAKING WITH LAW
ENFORCEMENT.

**GROUND G**                                                                  181
THE TEXAS STATUTORY DEFINITION OF MITIGATION AS FACTORS
THAT RENDER A CAPITAL DEFENDANT LESS "BLAMEWORTHY"
PLACES AN UNCONSTITUTIONAL LIMIT ON THE EIGHT AMENDMENT
CONCEPT OF MITIGATION.

**GROUND H**                                                                  184
THE "PENRY" SPECIAL ISSUE USED IN THE TEXAS SENTENCING
STATUTE VIOLATES THE EIGHT AND FOURTEENTH AMENDMENTS BY
FOSTERING THE TYPE OF OPEN-ENDED ARBITRARINESS
CONDEMNED BY THE SUPREME COURT IN *FURMAN V. GEORGIA*.

**GROUND I**                                                                  186
THE TEXAS CAPITAL SENTENCING STATUTE VIOLATES THE SIXTH,
EIGHTH, AND FOURTEENTH AMENDMENTS BECAUSE IT
IMPERMISSIBLY ALLOCATES THE BURDEN OF PROOF, REQUIRING
THE DEFENDANT TO PROVE MITIGATION RATHER THAN REQUIRING
THE STATE TO PROVE THE EXISTENCE OF AGGRAVATING FACTORS,
AND BECAUSE IT DOES NOT REQUIRE A UNANIMOUS JURY TO FIND
BEYOND A REASONABLE DOUBT THAT THE DEFENDANT SHOULD BE

**SENTENCED TO DEATH.**

## I.  PRELIMINARY STATEMENT OF FACTS

Petitioner, Ramiro Hernanez Llanas is a Mexican national currently on death row in Texas.  In 1997, Petitioner was arrested for the murder of Glen Lich.  He was tried before Judge Stephen B. Ables in Bandera County after requesting a change of venue from Kerr County.  At trial, Petitioner was represented by Steven J. Pickell and Jose Antonio "J.A." Garcia.  He was convicted of capital murder on February 8, 2000 and sentenced to death on February 10, 2000.

### A.      Guilt-or-Innocence Phase

At the guilt-or-innocence phase of Petitioner's trial, the state's evidence showed that at the time of Mr. Lich's death, Petitioner was working for Mr. Lich.  As part of his compensation for his labor, Petitioner was allowed to stay on the Lich property.  Also living on the Lich property at the time of Petitioner's crime was Mr. Lich's wife, Lera Lich,[1] their daughter, and Mrs. Lich's elderly mother.

Lera Lich testified that around 10:30 p.m., on October 14, 1997, Petitioner knocked on the front door of the house and Mr. Lich went outside to speak with him. Mrs. Lich subsequently saw her husband and Petitioner walk away from the house.

---

[1] Trial transcripts reflect that Mr. Lich's wife is referred to as Mrs. Lera Lich; Mrs. Lich however, also uses her maiden name, Lera Tyler.

1

A short time later, Petitioner returned to the house with blood on his hands and face and a knife in his hand. Mrs. Lich testified that Petitioner held the knife to her neck, undressed her, and sexually assaulted her twice. Following the assaults, Petitioner permitted Mrs. Lich to use the bathroom, but accompanied her there, still holding the knife. Petitioner then tied Mrs. Lich's hands and feet to the bedposts with towels he tore up and put a blanket over her head.

According to the testimony of Mrs. Lich, Petitioner then rummaged through jewelry boxes in a chest of drawers next to the bed and placed some of the jewelry in a plastic bag. In addition, he made telephone calls from the Lich home. He then went outside where he started a jeep owned by the Lich family. Petitioner however, did not leave the property; rather, he returned to the house, tied Mrs. Lich's hands and feet more securely with wire, and made additional telephone calls before going outside a second time. Petitioner then, once again, returned to the house, where he untied Mrs. Lich and sexually assaulted her. At this time, Mrs. Lich observed Petitioner wearing Mr. Lich's watch as well as her wedding band and several of her necklaces. After threatening to harm Mrs. Lich's mother and daughter if Mrs. Lich called the police, Petitioner fell asleep on the bed next to her.

While Petitioner slept soundly, Mrs. Lich freed herself and walked to a

2

neighbor's house where she called 911. Law enforcement officers who responded to the call found Petitioner still asleep on the bed.  Petitioner violently resisted arrest. The officers subsequently located the body of Mr. Lich behind a generator shed on the property.  The evidence showed that Mr. Lich had been repeatedly bludgeoned with a crowbar and that his death was caused by traumatic injury to the head and brain.

Other trial witnesses testified that Petitioners made statements that implicated himself in the offense. Maria del Carmen Serrano, a "friend," testified that Petitioner called her from jail and told her that he had killed a man and raped a woman.  Martin Salinas, one of Petitioner's cousins, also testified that Petitioner had threatened to harm his employer.

Defense counsel did not call any witnesses at the guilt or innocence phase of the trial.

**B.    Penalty Phase**

During the penalty phase of Petitioner's trial, the state presented evidence emphasizing the violence of Petitioner's crime and his history of violent acts.  The state introduced evidence that Petitioner was convicted of murder in Mexico; that Petitioner told a friend he had escaped from a Mexican prison where he was held for that murder; that he stabbed a man outside a bar in Kerrville; that he sexually assaulted

a 15-year old female at knifepoint; and that he threatened a guard and twice possessed a makeshift shank while in jail awaiting trial.

Petitioner's trial counsel however, presented little mitigating evidence and did not call even one witness with personal knowledge of Petitioner's life history.  In fact, trial counsel called only three witnesses at punishment: psychiatrists Dr. Robert Cantu and Dr. Michael Arambula, and clinical psychologist Dr. Gilbert Martinez.  Drs. Cantu and Arambula each testified that Petitioner was mentally ill, but disagreed on the appropriate diagnosis.  Dr. Martinez testified that the results of the standardized tests he administered to Petitioner established that Petitioner had low intellectual functioning, but lacking a family and social history, was unable to conclude that Petitioner was an individual with mental retardation.

### C. State Habeas Corpus Proceedings

Petitioner was initially represented in state habeas corpus proceedings by court appointed counsel Albert L. Rodriguez, but after the filing of the petition for writ of habeas corpus, Mr. Rodriguez withdrew from the case.  Richard E. Langlois was then appointed to represent Petitioner.  Langlois made a motion for funding for mitigation investigation, which was denied by Judge Ables.  Even without adequate funding, post-conviction counsel unearthed and documented a wealth of mitigating evidence

regarding Petitioner's horrifying childhood, and compelling evidence of his mental retardation. Counsel moved for a hearing on Petitioner's mental retardation and ineffective assistance of counsel claims, but the court denied those motions, and denied relief on all of Petitioner's claims. The Texas Court of Criminal Appeals reversed and remanded for an evidentiary hearing, but only on Petittioner's mental retardation claim.

Ultimately evidence was presented to the state court that Petitioner has scored in the mentally retarded range on *six* separate I.Q. tests, and has never scored in the normal range on an instrument professionally approved for the diagnosis of mental retardation. In addition to this overwhelming evidence that Petitioner suffers from significant limitation in intellectual functioning, Petitioner presented compelling evidence that his adaptive functioning is substantially impaired. Petitioner was expelled from school in the third grade because he was unable to learn. Throughout his life Petitioner was unable to master the skills of reading, writing and math beyond the most basic level. As a result of his intellectual impairment and substandard academic skills, Petitioner was repeatedly taken advantage of by others and failed navigate social and work situations. None of this evidence—readily obtained from Petitioner's family members—had been presented by trail counsel to the jury. Defense expert Antonio

E. Puente, a renowned neuropsychologist, opined that Petitioner meets the diagnostic criteria of mental retardation.

At the hearing focused on mental retardation, evidence was also presented regarding Petitioner's tortured childhood, one marked by abject poverty, sustained exposure to neurotoxins, severe physical abuse ,and neglect. Petitioner was raised in a dump on the outskirts of Nuevo Laredo, Mexico, where "chemicals" and "spray containers" were secretly emptied at night. Petitioner and his family lived in a ramshackle hut made from scavenged cardboard, metal, and wood. Rodents ran through the house. The family made a living scavenging through the trash and was forced to *eat* from the toxic trash they sorted. Petitioner suffered severe abuse at the hands of his parents; as a young child, he was frequently beaten with electrical wires, ropes, belts, and hoses.

In light of the new evidence uncovered at the hearing on mental retardation, counsel for Petitioner renewed his motion for a hearing on the ineffective assistance of counsel claim. Judge Ables denied that motion, and denied Petitioner's mental retardation claim. The Texas Court of Criminal Appeals then affirmed the lower court's denial of Petitioner's application.

Following the close of state proceedings, undersigned counsel were appointed

6

to represent Petitioner in federal habeas corpus proceedings. They discovered that Petitioner's trial counsel not only failed to present any of the mitigating evidence relating to Petitioner's his tragic life and adaptive functioning deficits, but also labored under a conflict of interest that should have disqualified him from representing Petitioner altogether. Pickell, had— three days before his appointment to Petitioner's case—represented, Fransico Espino, the husband of Maria Serrano, the woman who testified that she had seen Petitioner stab a man in a bar. It was Espino who was first charged with assault for the stabbing. And it was Pickell who was able to get Espino's charges dismissed after Serrano, coached by Pickell, convinced Petitioner to take full blame for the stabbing. Worst of all, Petitioner was not the true perpetrator: An eyewitness to the crime identified Espino – not Petitioner – as the assailant, and the victim himself picked Espino out of a photographic line-up. Pickell stood by in the penalty phase of Petitioner's trial as the state, calling Serrano as a witness, used this crime to prove Petitioner's history of violence and future dangerousness.

Finally, undersigned counsel have discovered that the victim's wife, Lera Lich, who provided so many of the gruesome details of Petitioner's crime during the guilt or innocence phase of the trial, was and is morally and religiously opposed to the

death penalty, and would have told trial counsel that had he asked.  But, once more, trial counsel did not inquire.  Based on these newly discovered facts, Petitioner filed a successor motion in state court on September 8, 2009.[2]

---

[2] While the evidence regarding Mrs. Lich's desire that Petitioner not receive the death penalty and trial counsel's clear conflict of interest came to the attention of Petitioner shortly before the filing of the Petition for Writ of Habeas Corpus in this Court, the state had evidence revealing both of these facts throughout Petitioner's state proceedings, but never turned this evidence over to Petitioner.

# I.  RELEVANT PROCEDURAL HISTORY

Mr. Hernandez Llanas was convicted of capital murder in Bandera County, Texas, and on February 10, 2000, was sentenced to death.  Petitioner raised the following issues on direct appeal:

a) TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY <u>NOT</u> INFORMING APPELLANT'S OWN DEFENSE EXPERT THAT APPELLANT WAS NOT UNDER THE INFLUENCE OF ANY INTOXICANTS AT THE TIME THE ALLEGED OFFENSE OCCURRED;

b) TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO REQUEST A COMPETENCY HEARING;

c) TRIAL COUNSEL WAS INEFFECTIVE BECAUSE TRAIL COUNSEL FAILED TO SUBJECT THE STATE'S CASE TO MEANINGFUL ADVERSARIAL TESTING IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION;

d) THE TRIAL COURT COMMITTED ERROR AT THE PENALTY PHASE OF APPELLANT'S TRIAL BY ADMITTING EVIDENCE OF A PURPORTED FOREIGN CONVICTION AND THE FACTS UNDERLYING SAID CONVICTION WHICH VIOLATED APPELLANT'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS;

e) THE TRIAL COURT COMMITTED ERROR BY ALLOWING THE ADMISSION OF DR. GRIGSON'S EXPERT TESTIMONY OF FUTURE DANGEROUSNESS WHICH IS NO LONGER CONSTITUTIONALLY VALID IN LIGHT OF

9

<u>DAUBERT V. MERRELL DOW PHARMACEUTICALS, INC.</u>
AND <u>KUMHO TIRE V. CARMICHAEL</u>

SUBPOINT OF ERROR

TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE
OF COUNSEL BY NOT OBJECTING TO THE TESTIMONY
OF THE STATE'S WITNESS DOCTOR GRIGSON
REGARDING THE FUTURE DANGEROUSNESS OF
APPELLANT;

f)    THE TRIAL COURT COMMITTED ERROR BY
      COMMENCING THE CAPITAL TRAIL AGAINST
      APPELLANT, A MEXICAN NATIONAL, WITH THE PLEDGE
      OF ALLEGIANCE TO THE UNITED STATES FLAG IN
      VIOLATION OF APPELLANT'S STATE AND FEDERAL
      CONSTITUTIONAL RIGHTS;

g)    THE TRIAL COURT COMMITTED ERROR BY FAILING TO
      HOLD A COMPETENCY HEARING SUA SPONTE FOR
      APPELLANT;

h)    THE STATE'S NON-COMPLIANCE WITH THE VIENNA
      CONVENTION ON CONSULAR RELATIONS DEPRIVED
      APPELLANT OF HIS RIGHTS OF DUE PROCESS AND
      EQUAL PROTECTION UNDER THE FIFTH AMENDMENT
      AND FOURTEENTH AMENDMENT OF THE UNITED
      STATES CONSTITUTION, AND ARTICLE 1 § 19 TEXAS
      CONSTITUTION AND ARTICLE 1 § 3 OF THE TEXAS
      CONSTITUTION;

i)    THE TRIAL COURT COMMITTED ERROR BECAUSE THE
      IMPOSITION OF THE DEATH PENALTY AND EXECUTION
      OF APPELLANT WOULD VIOLATE THE EIGHTH
      AMENDMENT OF THE U.S. CONSTITUTION AND
      INTERNATIONAL LAW BECAUSE APPELLANT IS

MENTALLY RETARDED;

j)  THE TRIAL COURT COMMITTED ERROR BECAUSE THE SECURITY MEASURES ORDERED BY THE COURT IN THE TRIAL OF APPELLANT WERE EXCESSIVE AND PREJUDICIAL;

k)  THE TRIAL COURT COMMITTED ERROR BY NOT ENTERING A FINDING OF NOT GUILTY TO CAPITAL MURDER AT CLOSE OF THE STATE'S CASE BECAUSE THERE WAS AN INSUFFICIENT NEXUS BETWEEN THE HOMICIDE AND THE UNDERLYING FELONIES ALLEGED IN THE INDICTMENT;

l)  THE PROSECUTOR'S COMMENT IN CLOSING ARGUMENT THAT APPELLANT REFUSED TO DISCUSS FACTS OF CRIME WITH COURT APPOINTED PSYCHIATRIST WAS IMPROPER;

m)  THE TEXAS CAPITAL SENTENCING STATUTE'S FAILURE TO INFORM THE JURY THAT A SINGLE HOLDOUT JUROR ON ANY SPECIAL ISSUE WOULD RESULT IN AN AUTOMATIC LIFE SENTENCE VIOLATES THE EIGHT AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION;

n)  THE ALLOCATION OF PRODUCTION AND PERSUASION UNDER THE TEXAS CAPITAL SENTENCING STATUTE IS UNCONSTITUTIONAL;

o)  TRIAL COURT COMMITTED ERROR BY ALLOWING INTO EVIDENCE PREJUDICIAL PHOTOS AND VIDEOS OVER OBJECTION OF APPELLANT'S COUNSEL; AND

p)  THE CAPITAL SENTENCING SCHEME IS UNCONSTITUTIONAL IN THAT IT PERMITS, BUT DOES

11

NOT     REQUIRE,   THE   JURORS   TO   CONSIDER MITIGATING EVIDENCE.

The Texas Court of Criminal Appeals affirmed Petitioner's conviction and sentence in an unpublished opinion on December 18, 2002. *Hernandez v. State*, AP-73,776 (Tex. Crim. App. 2002).   The Supreme Court of the United States denied Petitioner's petition for certiorari on June 27, 2003. *Hernandez v. Texas*, 539 U.S. 962 (2003).

Prior to the denial of certiorari, Petitioner had properly filed an application for state habeas corpus relief.  His application presented the following grounds for relief:

a)   THE TRIAL COURT DID NOT GIVE THE JURY ADEQUATE INSTRUCTIONS REGARDING THE SPECIAL ISSUES FOR A DEATH SENTENCE;

b)   APPLICANT   WAS   DENIED   DUE   PROCESS   AS GUARANTEED BY THE EIGHTH AND FOURTEENTH AMENDMENTS   TO   THE   UNITED   STATES CONSTITUTION;

c)   TEXAS CODE OF CRIMINAL PROCEDURE ART. 44.251(A), WHEN INTERPRETED IN CONJUNCTION WITH TEXAS CODE OF CRIMINAL PROCEDURE ART. 37.071 § 2(E), IS FACIALLY UNCONSTITUTIONAL UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION;

d)   THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION

12

REQUIRES THIS COURT TO ENGAGE IN PROPORTIONALITY REVIEW IN DEATH PENALTY CASES;

e) THE TEXAS CAPITAL SENTENCING STATUTE'S DEFINITION OF "MITIGATING EVIDENCE" IS UNCONSTITUTIONAL BECAUSE IT LIMITS THE EIGHTH AMENDMENT CONCEPT OF "MITIGATION" TO FACTORS THAT RENDER A CAPITAL DEFENDANT LESS MORALLY "BLAMEWORTHY" FOR COMMISSION OF THE CAPITAL MURDER;

f) THE STATUTORY "PENRY" SPECIAL ISSUE IS FACIALLY UNCONSTITUTIONAL UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE IT PERMITS THE VERY TYPE OF OPEN-ENDED DISCRETION CONDEMNED BY THE UNITED STATES SUPREME COURT IN FURMAN V. GEORGIA;

g) THE STATUTORY "PENRY" SPECIAL ISSUE IN THE TEXAS CODE OF CRIMINAL PROCEDURE ART. 37.071 UNCONSTITUTIONAL BECAUSE IT FAILS TO PLACE THE BURDEN OF PROOF ON THE STATE REGARDING AGGRAVATING EVIDENCE. IT THEREFORE VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNTIED STATES CONSTITUTION;

h) THE TEXAS DEATH PENALTY IS CRUEL AND UNUSUAL PUNISHMENT UNDER ART.1 § 13 TEXAS CONSTITUTION;

i) THE DEATH PENALTY AS ADMINISTERED IN TEXAS IS CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION;

13

j)   ARTICLE 37.071OF THE TEXAS CODE OF CRIMINAL PROCEDURE IS UNCONSTITUTIONAL BECAUSE ITS 12-10 RULE MAY ARBITRARILY FORCE THE JURY TO CONTINUE DELIBERATING AFTER A JUROR VOTED TO ANSWER A SPECIAL ISSUE IN FAVOR OF APPLICANT. THE SENTENCING STATUTE'S FAILURE TO INFORM THE JURY THAT A SINGLE HOLDOUT JUROR ON ANY SPECIAL ISSUE WOULD RESULT IN AN AUTOMATIC LIFE SENTENCE VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION;

k)   THE STATE'S NON-COMPLIANCE WITH THE VIENNA CONVENTION ON CONSULAR RELATIONS DEPRIVED APPLICANT OF HIS RIGHTS OF DUE PROCESS AND EQUAL PROTECTION UNDER THE FIFTH AMENDMENT AND FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION, AND ARTICLE 1 § 19 OF THE TEXAS CONSTITUTION AND ARTICLE 1 § 3 OF THE TEXAS CONSTITUTION;

l)   THE EXECUTION OF THE MENTALLY RETARDED IS UNCONSTITUTIONAL;

m)   THE TRIAL COURT VIOLATED APPLICANT'S RIGHT TO DUE PROCESS OF LAW WHEN IT PERMITTED THE STATE TO OFFER INTO EVIDENCE AT THE GUILT PHASE AN ATTRACTIVE PHOTOGRAPH OF THE VICTIM WHEN ALIVE, TOGETHER WITH A SERIES OF HORRIFYING AND GROTESQUE PHOTOGRAPHS AND A VIDEOTAPE OF THE VICTIM AFTER HIS DEATH. THE PROBATIVE VALUE OF THIS COMPARATIVE EVIDENCE, IF ANY, WAS OUTWEIGHED BY ITS UNFAIR PREJUDICE AND ITS GOAL AT INFLAMING THE JURY'S PASSION AGAINST APPLICANT;

14

n)   THE TRIAL COURT ARBITRARILY APPLIED STATE LAW AND THEREBY DENIED APPLICANT DUE PROCESS OF LAW UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION WHEN IT FAILED TO ENTER A NOT GUILTY VERDICT AT THE CLOSE OF THE STATE'S CASE BASED ON LEGALLY INSUFFICIENT EVIDENCE THAT THE MURDER WAS COMMITTED IN THE COURSE OF COMMITTING OR ATTEMPTING TO COMMIT BURGLARY [AND/OR] ROBBERY AS REQUIRED BY TEX. PENAL CODE § 19.03(a)(2);

o)   THE ADMISSION OF EXPERT TESTIMONY OF "FUTURE DANGEROUSNESS" IS NO LONGER CONSTITUTIONALLY VALID IN LIGHT OF DAUBERT V. MERRELL DOW PHARMACEUTICALS, INC. AND KUMHO TIRE V. CARMICHAEL;

p)   APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF ARTICLE I § 10 OF THE TEXAS CONSTITUTION BECAUSE HIS TRIAL COUNSEL PERFORMED DEFICIENTLY, AND BECAUSE THAT DEFICIENT PERFORMANCE PREJUDICED APPLICANT WHEN TRIAL COUNSEL FAILED TO REQUEST A DAUBERT/KELLY HEARING PRIOR TO THE TESTIMONY OF DR. GRIGSON, EXPERT WITNESS FOR THE STATE;

q)   APPLICANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE HIS TRIAL COUNSEL PERFORMED DEFICIENTLY, AND BECAUSE THAT DEFICIENT PERFORMANCE PREJUDICED APPLICANT WHEN TRIAL COUNSEL FAILED TO REQUEST A DAUBERT/KELLY HEARING PRIOR TO THE TESTIMONY OF DR. GRIGSON, EXPERT WITNESS FOR THE STATE;

15

r)   APPLICANT WAS DENIED THE EFFECTIVE ASSISTANCE
OF COUNSEL IN VIOLATION OF ARTICLE I, § 10 OF THE
TEXAS CONSTITUTION BECAUSE HIS TRIAL COUNSEL
PERFORMED DEFICIENTLY, AND BECAUSE THAT
DEFICIENT PERFORMANCE PREJUDICED APPLICANT
WHEN COUNSEL FAILED TO ADEQUATELY
INVESTIGATE AND PRESENT APPLICANT'S ONLY
VIABLE LEGAL AND FACTUAL DEENSE;

s)   APPLICANT WAS DENIED THE EFFECTIVE ASSISTANCE
OF COUNSEL IN VIOLATION OF THE SIXTH AND
FOURTEENTH AMENDMENTS TO THE UNTIED STATES
CONSTITUTION BECAUSE HIS TRIAL COUNSEL
PERFORMED DEFICIENTLY, AND BECAUSE THAT
DEFICIENT PERFORMANCE PREJUDICED APPLICANT
WHEN COUNSEL FAILED TO ADEQUATELY
INVESTIGATE AND PRESENT THE APPLICANT'S ONLY
VIABLE LEGAL AND FACTUAL DEFENSE;

t)   THE TRIAL COURT DENIED APPLICANT HIS RIGHT NOT
TO BE DEPRIVED OF LIFE OR LIBERTY WITHOUT DUE
PROCESS OF LAW WHEN IT FAILED TO ORDER A
COMPETENCY HEARING;

u)   APPLICANT WAS DENIED THE EFFECTIVE ASSISTANCE
OF COUNSEL IN VIOLATION OF ARTICLE 1 § 10, OF THE
TEXAS CONSTITUTION BECAUSE HIS TRIAL COUNSEL
PERFORMED DEFICIENTLY, AND BECAUSE THAT
DEFICIENT PERFORMANCE PREJUDICED APPLICANT
WHEN COUNSEL FAILED TO REQUEST AND URGE A
COMPETENCY HEARING;

v)   APPLICANT WAS DENIED THE EFFECTIVE ASSISTANCE
OF COUNSEL IN VIOLATION OF THE SIXTH AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION BECAUSE HIS TRIAL COUNSEL

16

PERFORMED DEFICIENTLY, AND BECAUSE THAT DEFICIENT PERFORMANCE PREJUDICED APPLICANT WHEN COUNSEL FAILED TO REQUEST AND URGE A COMPETENCY HEARING;

w)  APPLICANT WAS DENIED A FAIR AND IMPARTIAL TRIAL AND EQUAL PROTECTION OF THE LAWS AS GUARANTEED UNDER TEXAS AND FEDERAL CONSTITUTIONAL LAW WHEN THE TRIAL COURT COMMENCED THE CAPITAL MURDER TRIAL AGAINST APPLICANT, A MEXICAN NATIONAL, WITH THE PLEDGE OF ALLEGIANCE TO THE U.S. FLAG CONSIDERING THE FOLLOWING COMBINED EFFECTS: (1) APPLICANT'S FOREIGN CITIZENSHIP, (2) HIS INABILITY TO RISE BECAUSE HE WAS SHACKLED TO HIS CHAIR IN CLOSE PROXIMITY TO THE JURY PANEL, AND (3) THE TRIAL COURT'S FALSE EXPLANATION TO THE JURY PANEL REGARDING THE FOREGOING;

x)  APPLICANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF ARTICLE I § 10 OF THE TEXAS CONSTITUTION BECAUSE HIS TRIAL COUNSEL PERFORMED DEFICIENTLY, AND BECAUSE THAT DEFICIENT PERFORMANCE PREJUDICED APPLICANT WHEN TRIAL COUNSEL FAILED TO MOVE FOR A MISTRIAL WHEN APPLICANT WAS UNABLE TO STAND FOR THE PLEDGE OF ALLEGIANCE;

y)  APPLICANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE HIS TRIAL COUNSEL PERFORMED DEFICIENTLY, AND BECAUSE THAT DEFICIENT PERFORMANCE PREJUDICED APPLICANT WHEN COUNSEL FAILED TO MOVE FOR A MISTRIAL WHEN APPLICANT WAS UNABLE TO STAND FOR THE

17

PLEDGE OF ALLEGIANCE;

z)   THE TRIAL COURT VIOLATED DEFENDANT'S DUE PROCESS RIGHT TO A FAIR TRIAL WHEN: (1) SPECTATORS WERE PERMITTED TO APPROACH THE JURY BOX AS A VIDEOTAPE OF THE CRIME SCENE AND VICTIM WAS PLAYED, (2) THE SPECTATORS WERE ALLOWED TO VISIBLY REACT, EXPRESSING THEMSELVES AUDIBLY IN CLOSE PROXIMITY TO THE JURY, AND (3) THE COURT FAILED TO MAKE AN INQUIRY ON THIS ISSUE AND FURTHER FAILED TO GRANT THE MOTION FOR MISTRIAL OR, ALTERNATIVELY, TO ADMINISTER A CURATIVE JURY INSTRUCTION;

aa)   APPLICANT WAS DENIED HIS RIGHT UNDER TEXAS AND FEDERAL CONSTITUTIONAL LAW TO AN IMPARTIAL JURY WHEN THE COURT IMPLICITLY FOUND PERVASIVE PUBLICITY AND RESULTING PREJUDICE IN THE KERR COUNTY JURY POOL BUT WHEN TRANSFERRED VENUE TO BANDERA COUNTY, A LOCATION ONLY AN ADDITIONAL 10 MILES AWAY FROM THE CRIME SCENE AND WHICH ENCOMPASSED A JURY POOL SUBJECT TO THE SAME PUBLICITY AND PREJUDICE AS IN THE ORIGINAL LOCATION;

bb)   APPLICANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF ARTICLE 1 § 10 OF THE TEXAS CONSTITUTION BECAUSE HIS TRIAL COUNSEL PERFORMED DEFICIENTLY, AND BECAUSE THE DEFICIENT PERFORMANCE PREJUDICED APPLICANT WHEN TRIAL COUNSEL FAILED TO OBJECT TO CONDUCTING THE TRIAL IN BANDERA COUNTY;

cc)   APPLICANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AND

FOURTEENTH AMENDMENTS TO THE UNTIED STATES CONSTITUTION BECAUSE HIS TRIAL COUNSEL PERFORMED DEFICIENTLY, AND BECAUSE THAT DEFICIENT PERFORMANCE PREJUDICED APPLICANT WHEN TRIAL COUNSEL FAILED TO OBJECT TO CONDUCTING THE TRIAL IN BANDERA COUNTY;

dd) APPLICANT'S RIGHTS TO DUE PROCESS OF LAW WERE DENIED WHEN HE WAS SHACKLED TO HIS CHAIR THROUGHOUT THE ENTIRE TRIAL;

ee) APPLICANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF ARTICLE 1 § 10 OF THE TEXAS CONSTITUTION BECAUSE HIS TRIAL COUNSEL PERFORMED DEFICIENTLY, AND BECAUSE THAT DEFICIENT PERFORMANCE PREJUDICED APPLICANT WHEN TRIAL COUNSEL FAILED TO OBJECT TO THE RESTRAINT OF APPLICANT AND CONTEST THE FACTUAL BASIS FOR THE SHACKLING;

ff) APPLICANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE HIS TRIAL COUNSEL PERFORMED DEFICIENTLY, AND BECAUSE THAT DEFICIENT PERFORMANCE PREJUDICED APPLICANT WHEN TRIAL COUNSEL FAILED TO OBJECT TO THE RESTRAINT OF APPLICANT AND CONTEST THE FACTUAL BASIS FOR THE SHACKLING;

gg) APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF ARTICLE 1, § 10 OF THE TEXAS CONSTITUTION BECAUSE HIS TRIAL COUNSEL PERFORMED DEFICIENTLY, AND BECAUSE THAT DEFICIENT PERFORMANCE PREJUDICED APPLICANT WHEN TRIAL COUNSEL FAILED TO CONDUCT A

19

MEANINGFUL MITIGATION INVESTIGATION;

hh)   APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE HIS TRIAL COUNSEL PERFORMED DEFICIENTLY, AND BECAUSE THAT DEFICIENT PERFORMANCE PREJUDICED APPLICANT WHEN TRIAL COUNSEL FAILED TO CONDUCT MEANINGFUL MITIGATION INVESTIGATION;

ii)   APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF ARTICLE 1 § 10 OF THE TEXAS CONSTITUTION BECAUSE HIS TRIAL COUNSEL PERFORMED DEFICIENTLY, AND BECAUSE THAT DEFICIENT PERFORMANCE PREJUDICED APPLICANT WHEN COUNSEL FAILED TO INVESTIGATE AND UTILIZE A STATE WITNESS' PRIOR STATEMENT TO IMPEACH HER AND TO ESTABLISH A MENTAL/INSANITY CLAIM;

jj)   APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE HIS TRIAL COUNSEL PERFORMED DEFICIENTLY, AND BECAUSE THAT DEFICIENT PERFORMANCE PREJUDICED APPLICANT WHEN COUNSEL FAILED TO INVESTIGATE AND UTILIZE A STATE WITNESS' PRIOR STATEMENT TO IMPEACH HER AND TO ESTABLISH A MENTAL/INSANITY CLAIM; AND

kk)   APPLICANT'S RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNTIED STATES CONSTITUTION AND THE TEXAS CONSTITUTION WERE VIOLATED WHEN, PURSUANT TO AKE, HE WAS DENIED NECESSARY AND REASONABLE FUNDS FOR A MENTAL

20

HEALTH EXPERT AT THE WRIT LEVEL.

Petitioner moved for hearings on two of the aforementioned allegations: that he was ineligible for execution pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002); and that he was denied the effective assistance of counsel in the penalty phase of his capital trial pursuant to *Strickland v. Washington,* 466 U.S. 668 (1984), and *Wiggins v.Smith*, 539 U.S. 520 (2003). The trial court denied Petitioner's September 30, 2005 motion for a hearing, and signed the state's proposed findings and conclusions of law. On May 3, 2006, the Texas Court of Criminal Appeals rejected the trial court's proposed findings regarding Petitioner's *Atkins* claim, and remanded for an evidentiary hearing to determine whether Mr. Hernandez Llanas suffers from mental retardation, while holding his other claims in abeyance. Following that hearing, Mr. Hernandez Llanas' application for writ of habeas corpus was denied, and on September 10, 2008, the Texas Court of Criminal Appeals affirmed that denial.

On September 8, 2009, Petitioner filed a Subsequent Application for Writ of Habeas Corpus in the 216th Judicial District Court of Kerr County asserting four claims that had not been previously exhausted in state court findings: 1) a Sixth Amendment conflict of interest claim arising out of trial counsel's prior representation of a true perpetrator of an assault for which the State accused Mr. Hernandez Llanas

21

to attempt to demonstrate his future dangerousness; 2) a Fourteenth Amendment due process claim that the State violated its continuing duty to disclose materially exculpatory evidence that Mr. Hernandez Llanas did not commit the assault; 3) A Fourteenth Amendment due process claim that the State violated its continuing duty to turn over materially exculpatory evidence concerning the impact of the crime and prosecution upon the victim's family; and 4) a Sixth Amendment's ineffective assistance of counsel claim that counsel, in addition to deficiencies raised in Mr. Hernandez Llanas' first application, failed to investigate and present the exculpatory victim impact evidence and failed to present the exculpatory evidence that his previous client, rather than Mr. Hernandez Llanas, committed the assault.

On September 8, 2009, Mr. Hernandez Llanas, through undersigned counsel, filed a Petition for Writ of Habeas Corpus and simultaneously filed a Motion to Stay Federal Proceedings in Order to Permit Exhaustion of State Remedies in this Court. On September 23, 2009, this Court issued an Order Denying Without Prejudice Petitioner's Motion for Stay.

On November 25, 2009, the Texas Court of Criminal Appeals dismissed Petitioner's Subsequent Application noting that the case was active in federal court. *Hernandez v. State*, AP-73, 776 (Tex. Crim. App. 2002).

Following the CCA's dismissal of the successor petition, Petitioner filed a Motion for Reconsideration of Petitioner's Motion to Stay Federal Proceedings in Order to Permit Exhaustion of State Remedies in this Court, which this Court granted on January 15, 2010.

On January 22, 2010, Petitioner re-filed the Subsequent Application for Post-Conviction Writ of Habeas Corpus in the 216th Judicial District Court of Kerr County. On March 31, 2010, the CCA dismissed Mr. Hernandez Llanas' Subsequent Application. In its dismissal order, the CCA stated, "We find that the allegations fail to satisfy the requirements of Article 11.071 Sect. (5)(a). Accordingly, the application is dismissed as an abuse of the writ." *Ex Parte Ramiro Hernandez aka Ramiro Hernandez Llanas*, WR-63, 282-03.

## III.  GROUNDS FOR GRANTING HABEAS CORPUS RELIEF

### GROUND A

**BECAUSE PETITIONER IS MENTALLY RETARDED, HIS EXECUTION WOULD VIOLATE THE CRUEL AND UNUSUAL PUNISHMENT CLAUSE OF THE EIGHTH AMENDMENT**

The results of six different IQ tests, administered over a period of almost ten years, place Petitioner in the mentally retarded range, and no expert who has examined Petitioner believed that he was malingering on these measures.  His adaptive functioning deficits include lifelong poor academic performance; impairments in expressive and receptive language; poor math, reading and writing skills; impairments in self direction; inability to express emotion and needs; a history of being easily manipulated and victimized by others; impaired social skills; inability to comprehend and participate in recreation activities; substandard performance at work; inability to use public transportation; inability to manage basic hygiene and appearance; and impairments in domestic living skills.  Although there are no test scores from his developmental period, there is ample evidence of adaptive functioning deficits reaching back into early childhood.  Thus, Petitioner meets all three criteria for mental retardation, and his execution would violate the Cruel and Unusual Punishment Clause

24

of the Eighth Amendment. *Atkins v. Virginia*, 536 U.S. 304 (2002).

## FACTS RELEVANT TO THIS GROUND FOR RELIEF

Because of the fact-intensive nature of *Atkins* claims, and in the interest of avoiding time-consuming repetition for this Court, Petitioner will incorporate a lengthy recitation of the facts, along with citation to their sources, into his Argument. See *infra* Part C.

## REASONS THE WRIT OF HABEAS CORPUS SHOULD BE GRANTED

### A.    The Clearly Established Supreme Court Law

The Eighth Amendment to the United States Constitution prohibits the execution of persons with mental retardation. *Atkins*, 536 U.S. at 321.  Reversing its prior decision in *Penry v. Lynaugh*, 492 U.S. 302 (1989), the United States Supreme Court concluded that "the Constitution places a substantive restriction on the State's power to take the life of a mentally retarded offender." *Id.* (internal punctuation omitted).  In so holding, the Court recognized that "by definition, [mentally retarded persons] have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Id.* at 318.  The Court explained that

> there is abundant evidence that [persons with mental retardation] often act
> on impulse rather than pursuant to a premeditated plan, and that in group
> settings they are followers rather than leaders. Their deficiencies do not
> warrant an exemption from criminal sanctions, but they do diminish their
> personal culpability.

*Id.* (internal citations omitted). In light of the diminished capacity of mentally retarded individuals, neither of the justifications for the death penalty—retribution and deterrence—are satisfied through the execution of a person with mental retardation. *Id.* at 319–20. Moreover, "[m]entally retarded defendants in the aggregate face a special risk of wrongful execution." *Id.* at 320–21.

*Atkins* left it to the states to establish appropriate procedures for determining whether capital defendants are mentally retarded (and thus ineligible for capital punishment), *id.* at 317, but endorsed overlapping definitions of mental retardation adopted by the American Association on Mental Retardation ("AAMR")[3] and the American Psychiatric Association, *id.* at 308 n.3 (setting out both definitions and

---

[3] Effective January 1, 2007, AAMR officially became the American Association on Intellectual and Developmental Disabilities ("AAIDD"). In the interest of avoiding confusion, the organization will be referred to as the AAMR in this document.

noting their similarity).

## B.    The Standard for Determining Mental Retardation

At the time the Supreme Court decided *Atkins*, the AAMR referred to mental retardation as "substantial limitations in present functioning[which are] characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work," and required "manifestation before age 18." AMERICAN ASSOCIATION ON MENTAL RETARDATION, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 5 (9th ed. 1992) [hereinafter "1992 AAMR MANUAL"]; *see also Atkins*, 536 U.S. at 309 n.3. The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") employs a definition that is nearly identical to the one set out in the 1992 AAMR MANUAL.[4]

---

[4] The DSM-IV-TR defines mental retardation as follows:

The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A), that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety (Criterion B). The onset must occur before age 18 years (Criterion C).

In 2002, the AAMR released the latest version of its manual, which redefined mental retardation as "a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18." AMERICAN ASSOCIATION ON MENTAL RETARDATION, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 1 (10th ed. 2002) [hereinafter "2002 AAMR Manual"]. Thus, all three accepted definitions require subaverage intellectual functioning, deficits in adaptive functioning, and onset before the age of 18.

### 1.    Subaverage Intellectual Functioning

The first component of the clinical assessment of mental retardation is measuring the magnitude of the individual's intellectual impairment. To be diagnosed with mental retardation, an individual must be found to be functioning at the intellectual level of the lowest three percent of the entire population, as measured by standardized intelligence tests. *See Atkins*, 536 U.S. at 309 n.5 ("It is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically

---

AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41 (4th ed. 2000) [hereinafter "DSM-IV-TR"]; *see also Atkins*, 536 U.S. at 309 n.3 (setting out American Psychiatric Association's definition with approval).

considered the cutoff IQ score for the intellectual function prong of the mental retardation definition"); *but see* DSM-IV-TR 46 ("The prevalence rate of Mental Retardation has been estimated at approximately 1%."). Thus, the first prerequisite for a diagnosis of mental retardation is severely impaired cognitive functioning.

2.     Limited Adaptive Functioning

The second requirement serves to confirm the reality of the psychometric measurement of the individual's severe impairment, which must be observed to affect the individual's life functioning. As the Supreme Court has noted, all people with mental retardation "have a reduced ability to cope with and function in the everyday world." *Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 442 (1985). The requirement of real, identifiable disabling consequences in the individual's life—of reduced ability to "cope with common life demands," DSM-IV-TR at 42—assures that the diagnosis applies only to persons with an actual, functional disability, *see* 1992 AAMR MANUAL at 38. Previous versions of the definition of mental retardation expressed this requirement in terms of "deficits in adaptive behavior," *see Penry*, 492 U.S. at 308 n.1 (citing an earlier edition of the AAMR's classification manual), while more recent formulations employ the terms "related limitations" in "adaptive skill areas," 1992 AAMR MANUAL at 5; *see also* DSM-IV-TR at 42. According to the

29

definition in the 2002 AAMR MANUAL, the significant limitations in adaptive functioning are expressed in "conceptual, social, and practical adaptive skills." 2002 AAMR MANUAL at 73.   Both sets of terms reflect the same concept: that the impairment in intellectual ability must have an actual impact on everyday functioning. *See id.* at 74 (noting that "most adaptive behavior instruments measure the skill level a person typically displays when responding to challenges in his or her environment") (internal quotation marks omitted).

While the 1992 AAMR MANUAL defined adaptive behavior by focusing on ten specific skills, the 2002 AAMR MANUAL shifts to three broader domains of adaptive behavior: conceptual, social, and practical skills.   *Id.* at 73.   The three broader domains in the new definition "are more consistent with the structure of existing measures [of adaptive behaviors] and with the body of research on adaptive behavior." *Id.* at 73. As the 2002 AAMR MANUAL illustrates, however, the ten skill areas listed in the 1992 definition can be conceptually linked to one or more of the three domains in the 2002 AAMR MANUAL's definition of mental retardation.   *See id.* at 82.

3.   Onset in the Developmental Period

The third prong of the definition of mental retardation is that the disabling condition must have manifested itself during the developmental period of life, before

30

the individual reaches the age of eighteen.  Requiring the disability to have occurred at birth or during childhood means that the individual's mental development during his or her crucial early years was affected by impairment of the brain's ability to function. This element of the definition is derived from the understanding of modern neuroscience encompassing the way the brain develops and the implications of arrested brain development in cognitive impairment.  *See* 1992 AAMR MANUAL at 16–18.

The 2002 AAMR MANUAL identifies four main categories of risk factors for mental retardation—biomedical, social, behavioral, and educational—which can occur at the prenatal, perinatal, or postnatal stage of development.  *See* 2002 AAMR MANUAL at 127, Tbl. 8.1.  In practical terms, this means that any individual with mental retardation not only has a measurable and substantial disability presently, but also had that impairment during childhood, significantly reducing the ability to learn and gain an understanding of the world during life's formative years.

## C. Argument

1.     Petitioner's intellectual functioning is significantly subaverage.. On six occasions Petitioner has scored in the mentally retarded range on a valid standardized I.Q. test, and he has never scored in the normal range on any valid

31

measure of I.Q.

> ### a.  *Tests administered by Dr. Martinez before trial*

In 2000, in anticipation of trial, Dr. Gilbert Martinez, Ph.D., performed a neuropsychological evaluation of Petitioner, E.H. Vol. 3 at 145–47, the purpose of which was to assess his cognitive functioning, *id.* at 146–47. Dr. Martinez administered two instruments designed to assess intelligence: Wechsler Adult Intelligence Scale-III ("WAIS-III") performance subtests, and the Test of Non-Verbal Intelligence-II ("TONI-II"). *Id.* at 158.[5] On the WAIS-III, Petitioner's performance IQ score was 54, Tr. Defendant's Exh. 1, Report of Neuropsychological Evaluation by Gilbert Martinez, Ph.D. at 4 (hereinafter "Martinez Report"), and on the TONI-II, Petitioner scored 57, *id.* at 5. Both of these scores placed him well within the mentally retarded range; both tests, and indeed every test discussed below, is normed such that a score of 70 or below is in the mentally retarded range.

> ### b.  *Tests administered by Dr. Puente for state post-conviction proceedings*

---

[5] These were tests that could be administered to someone who did not speak English.

Dr. Antonio E. Puente, Ph.D. a man with remarkably impressive credentials, *see* E.H. Applicant's Exh. 4, Curriculum Vitae of Dr. Antonio Puente (hereinafter "Dr. Puente CV"), met Petitioner on a number of occasions over a period of three years. On July 10 and 11, 2003, Dr. Puente completed a neuropsychological evaluation of Petitioner. Exh. 29, Affidavit of Antonio E. Puente [Sworn November 30, 2003] at 1 (hereinafter "2003 Puente Affidavit"). Dr. Puente administered a total of twenty different neuropsychological tests to Petitioner, including the Comprehensive Test of Nonverbal Intelligence ("CTONI") and the Beta III Intelligence Test ("Beta III"). *Id.* at 4.

On the CTONI, Petitioner's overall sum of standard score was 18, which produces a Nonverbal Intelligence Quotient ("NIQ") of 52; his pictorial standard score was 10, which produces a Pictorial Nonverbal Intelligence Quotient ("PNIQ") of 57; and his geometric standard score was 8, which produces a Geometric Nonverbal Intelligence Quotient ("GNIQ") of 53. *Id.* at 5. All three scores from the CTONI place Petitioner within the mentally retarded range. On the Beta III, Petitioner earned an IQ score of 64, which, while not quite as low, nonetheless ranks him within the lowest one percent of the population. 2003 Puente Affidavit at 5–6.

In 2006, Dr. Puente administered the Spanish-language Wechsler Adult

Intelligence Scale ("Spanish-language WAIS") to Petitioner. Whether American or Mexican norms are appropriate in the capital sentencing context is disputed, *see* Hoi K. Suen & Stephen Greenspan, *Linguistic Sensitivity Does Not Require One to Use Grossly Deficient Norms: Why U.S. Norms Should Be Used With the Mexican WAIS-III in Capital Cases*, 34 PSYCHOL. INTELL. & DEVELOPMENTAL DISABILITIES (Am. Psychological Ass'n, Div. 33), Summer 2008, at 2–5, *available at* http://www.apa.org/divisions/div33/docs%5C34-1.pdf., so Dr. Puente evaluated Petitioner's performance both ways. Under American norms, Petitioner's IQ was 62, and under Mexican norms, a 70—but both scores are in the range of mental retardation. E.H. Vol. 4 at 150–51; Exhibit 30, Affidavit of Antonio E. Puente [Sworn May 16, 2008] at 2 (hereinafter "2008 Puente Affidavit"). Notably, the Mexican norm score normally overestimates I.Q. *See* Suen & Greenspan, *supra*, at 2.

Thus, all of the scaled scores of the CTONI, the Beta-III and the Spanish-language WAIS administered by Dr. Puente place Petitioner within the mentally retarded range and are reliable indicators of Petitioner's intellectual functioning. The scores from Dr. Martinez's 2000 assessment further corroborate Dr. Puente's results[6].

---

[6] Dr. Puente and Dr. Martinez administered all IQ tests to Mr. Hernandez Llanas in Spanish.

### c.    TDCJ testing

Some time prior to February 16, 1999, the Texas Department of Criminal Justice ("TDCJ") administered a Revised Beta IQ test ("Revised Beta Test") to Petitioner, not for its relevance to criminal proceedings, but to determine his placement. *See* Exh. 7, TDCJ Letter [Dated March 14, 2003] (hereinafter "2003 TDCJ Letter"); Exh. 8, TDCJ Consolidated Report Form (hereinafter "TDCJ Report Form"); *See* State's Original Answer to Post-Conviction Application for Writ of Habeas Corpus, Psychological Examination by Judy Owens [Dated February 18, 1999] (hereinafter "Judy Owens Examination"). Petitioner obtained an IQ score of 65 on the Revised Beta Test. TDCJ Report Form.

Because Petitioner's IQ score was within the range of mental retardation, TDCJ administered the TONI in order to determine whether Petitioner met the criteria for admission to the Mentally Retarded Offender Program. *See* 2003 TDCJ Letter; Judy Owens Evaluation at 2. According to TDCJ reports, Petitioner obtained an IQ score of 83 on this test, *id.*, which is not in the range of mental retardation.

Of the six IQ tests that Petitioner has completed, this is the only test on which he has obtained an IQ score above 70. The TONI test, however, is not a reliable indicator of Petitioner's intellectual functioning for at least half a dozen reasons. First,

35

there is no dispute that the TONI is a short, fifteen-minute exam intended only for rough screening purposes. Second, at the time the TONI was administered, it was approximately twenty years old and had been replaced by two subsequent editions, making it outdated even if used for its intended purpose. E.H. Vol. 4 at 119–120. Third, TDCJ has destroyed the raw data from this exam, so even its literal result cannot be independently checked for errors or otherwise verified. 2003 TDCJ Letter. Fourth, the TONI was administered by Judy Owens, who had a Master of Arts in *Counseling. See* Exh. 6, Personnel Records of Judy Owens at 9 (hereinafter "Owens Personnel Records"). Her personnel records do not indicate any expertise in mental retardation or intellectual functioning tests. *See* Owens Personnel Records. Although Kenneth Larson, a licensed psychologist, signed her report, Ms. Owens was solely responsible for selecting and administering the tests. Exh. 5, Declaration of Kenneth Larson (hereinafter "Larson Declaration"). Fifth, Larson, who himself had never been trained to administer the TONI, did not review the protocols for tests. *Id.* Finally, and most importantly, utilizing the TONI to determine whether an individual has mental retardation does not comport with established professional practice, 2003 Puente Affidavit at 10, and the AAMR does not consider the TONI an acceptable test

for an actual mental retardation determination, E.H. Vol. 4 at 120.[7] Thus, the TDCJ

score of 83 (or for that matter, the earlier TDCJ score of 65) is completely unreliable.

### d.   No evidence of malingering on I.Q. tests

Three experts concluded that there is no evidence to suggest that Petitioner

malingered on any of the tests that place him in the mentally retarded range.  Two

experts who evaluated Petitioner's cognitive abilities found no evidence of malingering

of any sort, on any issue.  Clinical neuropsychologist Dr. Gilbert Martinez, Ph.D.,

was retained by defense counsel prior to trial to assess Petitioner's cognitive abilities.

Dr. Martinez appropriately noted in his original report that the test data should be

interpreted cautiously due to possible reduced motivation associated with secondary

gain issues, see S.F. Vol. 21 at 110–12, and then concluded that in Petitioner's case,

his substandard performance on IQ tests was *not* consistent with malingering:

> [W]hat I felt was inconsistent with malingering was the consistency of
> test scores across all different types of cognitive tests.  People who are
> malingering usually do poorly on one test and then do well on another,
> especially if they are relatively unsophisticated.  I believe Mr. Hernandez
> is unsophisticated, and people who are unsophisticated typically do not
> produce a very consistent profile.  His profile was consistently low on
> every cognitive test that was administered.

---

[7] Despite the similarity in names, the CTONI given by Dr. Puente, unlike the TONI administered by TDCJ, and discussed below, is a test that is approved by the AAMR as appropriate for diagnosing mental retardation.  E.H. Vol. 4 at 150.

S.F. Vol. 21 at 130, 131.  During the evidentiary hearing, on the issue of Petitioner's

mental retardation, Dr. Martinez reaffirmed his opinion that Petitioner was not

malingering, stating, "I did not feel that he was malingering, or that malingering played

a significant role in his low test scores at the time."  E.H. Vol. 4 at 66.

Dr. Puente, who conducted extensive assessments of Petitioner's intellectual

functioning, likewise found no evidence of malingering:

> The findings do not reflect malingering.  I based this on several
> independent sources.  The tests of malingering do not provide support
> for the conclusion of malingering.  The tests are internally reliable.  In
> addition, the tests reflect academic achievement as measured objectively
> as well as measured by academic achievement in vivo.  These findings
> also corroborate with the clinical impression and finally, these findings
> corroborate independently information provided by a variety of sources
> including family members as well as others.  In addition to all of these,
> these findings corroborate my clinical judgment as administrator of
> objective appropriate tests of mental functioning as well as that of
> intellectual functioning.

2003 Puente Affidavit at 7.  During the evidentiary hearing to determine whether

Petitioner meets the diagnostic criteria for mental retardation, Dr. Puente reiterated his

opinion that there was no evidence that Petitioner malingered on tests he had

administered.  E.H. Vol. 4 at 218–20.

Dr. Michael Arambula, M.D., conducted a pretrial psychiatric evaluation of

Petitioner.  Like Drs. Martinez and Puente, Dr. Arambula found no evidence of malingering.  At trial, Dr. Arambula explained that malingering is a term that refers to individuals who engage in deceit for their own benefit. S.F. Vol. 21 at 166.  Although Dr. Arambula questioned the truthfulness of some of Petitioner's claims due to their implausibility, he found no evidence to suggest that Petitioner was malingering, pointing out that Petitioner's apparent exaggerations were of the type that could harm, rather than help, him, and were therefore not indicative of malingering.  *Id.*

### e.    *Dr. Cantu's irrelevant observations on malingering*

Dr. Robert Edward Cantu, M.D., completed a competency evaluation of Petitioner on February 12, 1998. S.F. Vol. 21 at 133.  In his report dated February 13, 1998, Dr. Cantu noted that Petitioner "became progressively more passive and cognitively blunted when questions moved towards the issues surrounding *competency to stand trial*." E.H. Applicant's Exh. 16, Letter from Robert E. Cantu [Dated February 13, 1998] at 1 (hereinafter "Cantu Letter") (emphasis added).  At trial, Dr. Cantu stated that "there was a *portion* of that interview [with Petitioner] that [he] felt that [Petitioner] was *probably* malingering." S.F. Vol. 21 at 143 (emphasis added).  Specifically, Dr. Cantu testified that on *competency* questions, Petitioner became slower to respond and seemingly failed to understand his questions.  *Id.* at

147–48.

In state habeas proceedings, the State argued that Dr. Cantu's observations constitute evidence that Petitioner malingered on intelligence tests. This argument is wrong for three reasons. First, Dr. Cantu's comments were not related to Petitioner's performance on standardized tests designed to measure intellectual functioning. Dr. Cantu was *not* retained to assess Petitioner's intellectual functioning, nor was he retained to determine whether Petitioner meets the diagnostic criteria of mental retardation; rather, he was retained solely to assess whether Petitioner was competent to stand trial. S.F. Vol. 21 at 147 ("[T]he Court asked me specifically to evaluate competency to stand trial . . . ."). Second, Dr. Cantu's evaluation took place more than one year *before* Dr. Martinez's evaluation of Petitioner, so Dr. Cantu clearly was not referring to whether Petitioner was feigning symptoms of mental retardation on an occasion that had yet to occur—an evaluation to determine mental retardation. Finally, Dr. Cantu's assumption that Petitioner must have know the answers to questions about American legal proceedings—that even a recent immigrant should be that familiar with the U.S. criminal justice system—S.F. Vol. 21 at 148, was made *before Cantu was aware of Petitioner's I.Q. score.* Given the extreme differences between criminal proceedings in Mexico and the United States, such as the absence

40

of the right to a jury, *see* Exh. 24, Declaration of Juan Carlos Padron Sanchez (hereinafter "Sanchez Declaration"), a recent immigrant laboring under Petitioner's cognitive impairments might have been genuinely ignorant of matters such as the role of the prosecutor, judge, and jury in the American system.[8]

In sum, Petitioner's test results consistently reflect mental retardation, and given the opinion of the experts who administered those tests that Petitioner was not malingering, Petitioner has demonstrated significantly substandard intellectual performance.

> 2.    Petitioner has deficits in adaptive functioning.

Petitioner is dramatically lacking in all three adaptive skills areas identified by the 2002 AAMR MANUAL.[9]

---

[8] At the evidentiary hearing on mental retardation, psychiatrist Dr. Richard E. Coons, who neither examined Petitioner *nor had ever personally done an intellectual functioning assessment for mental retardation or scored an IQ test, E.H. Vol. 5.* at 95, opined that malingering was "high on the list of possibilities," E.H. Vol. 5 at 124. Even beyond Dr. Coon's utter lack of qualifications to offer this opinion, there are a variety of reasons to deem his pronouncement of no probative value. Furthermore, because the state court did not rely upon Dr. Coons's opinion in this matter, and because there are so many reasons that opinion is unsupported by the facts, Petitioner will not fully document the absurdity of Dr. Coons's "reasoning" process here. Should the state choose to press that opinion in its response, Petitioner will detail the additional reasons Dr. Coons's opinion should receive no weight at all.

[9] The three adaptive skill areas—conceptual, social, and practical—are simpler tools for analyzing behaviors in a person's life than is the approach contained in the 1992 AAMR MANUAL, which identified ten skill areas and required limitations in two of them. The results in this case do not in any way depend upon which formulation is used, but if this Court prefers briefing organized by the 1992 criteria, Petitioner will provide it.

*a.    Conceptual skills*

The representative skills in this area include the use of language, reading and writing, money concepts, and self-direction. [10]

*i.    poor academic performance*

Undisputed evidence shows that Petitioner did not complete elementary school, but dropped out at about the third grade. E.H. Vol. 3 at 23. Moreover, the years he did spend in school were not academically successful. Sara Alicia Herrera Saldivas, a founding teacher of the school Petitioner attended, recalled that Petitioner failed the second or third grade of elementary school. Exhibit 3, Declaration of Sara Alicia Herrera Saldivias at ¶ 4 (hereinafter "Saldivas Declaration"). Ultimately, he was expelled from school due to his inability to learn. *Id* at ¶ 11 ("There were teachers who[,] if they saw that a student was going to be a lot of work, they would expel him in order to not have to struggle. That happened with Ramiro.").

Adelita Hernandez Llanas, Petitioner's sister, recalled that he struggled a lot in school and that he "didn't nearly learn anything." E.H. Vol. 4 at 240; *see id.* at 250. She noted that even though she was three years younger than her brother, she

---

[10] The comparable skills areas in the 2002 AAMR MANUAL and the DSM-IV-TR are communication, self-direction, and functional academics.

performed better in school. *Id* at 240; *see also id.* at 301 (testimony from another sibling that Petitioner had a great deal of difficulty learning).

Petitioner's own father called him "*burro*" (ass) because of Petitioner's inability to learn. E.H. Vol.. 4 at 250. Adelita stated, "[W]e would tell him if you are not going to learn like a *burro*, then you're always going to be working like a *burro* because that's what they'd use for work." *Id.*

At home, Petitioner had great difficulty studying and would take a long time to—or be unable to—complete homework, even with help from his siblings. E.H. Vol. 4 at 240–41. Adelita testified that her older siblings tried to help Petitioner with school work, but they would get frustrated due to his inability to learn. *Id.* ("Well, what happened is that my brothers would get frustrated with him and they would tell him, hurry up, and they would give him a bump on his head. And then they would tell him, 'And go away from here, I don't want to deal with you.'"). Yolanda, his older sister who tried to tutor Petitioner, remembered that he, in fact, had a hard time even copying words and had limited retention of vocabulary words. E.H. Vol. 4 at 304–05.

Rafaela Segura Guerra, a neighbor, confirmed that Petitioner exhibited lifelong academic problems. She stated that when Petitioner was in school, he would

43

start to do his homework but would not finish it. Exhibit 1, Declaration of Rafaela Segura Guerra at ¶ 13 (hereinafter "Guerra Declaration"). "It was as though he would forget that he had started to do his homework." *Id.* She further recalled that Petitioner had difficulties memorizing songs at the church he attended with Ms. Segura Guerra. *Id.* at ¶ 14.

> ii.   *impairments in language (both expressive and receptive)*

Dr. Martinez noted that during his 2000 evaluation of Petitioner, Petitioner's expressive vocabulary was below average, E.H. Vol. 3 at 153, and that his speech was tangential, *id.* at 154.

Dr. Puente observed that Petitioner exhibited both difficulty understanding and difficulty expressing himself. 2003 Puente Affidavit at 3 ("At times he had difficulty understanding and at times words did not come out fluently."). Dr. Puente also noted that Petitioner ignored feedback, positive or negative, during the evaluation. *Id.* at 5. For example, on the Wisconsin Card Sorting Test, Petitioner declared his choice correct, even when Dr. Puente explicitly told him he had chosen the wrong one. *Id.* Moreover, when Dr. Puente administered the Woodcock-Munoz Language Survey, *id* at 6, Petitioner's scores revealed significant impairments in language: in vocabulary, his age equivalent score was eight years, seven months, and

44

his grade-equivalent score was at the third-grade level; in verbal analogies, his age equivalent score was five years, two months, and his grade-equivalent score was at the kindergarten-level; in identification of letters and words, his age equivalent score was eleven years, two months, and his grade-equivalent score was at the fifth-grade level; and in dictation, Petitioner's age equivalent score was seven years, two months, and his grade-equivalent score was at the first-grade level.  *Id.*

### iii.   *poor math, reading and writing skills*

Petitioner has exhibited life-long problems with math, reading, and writing skills. Jorge Hernandez Llanas, Petitioner's brother, testified that Petitioner did not learn how to read or write during the time he was enrolled in school.  E.H. Vol. 3 at 25.  Nor was he able to count change.  *Id.*  Yolanda Hernandez Llanas, his sister, testified that when she attempted to help her brother with his homework, Petitioner was unable to even copy words.  E.H. Vol. 4 at 304–05.  He also had a great deal of difficulty reading simple words.  *Id.*

Juan Manuel Arteaga Espino, a neighbor, also reported that Petitioner was unable to count.  E.H. Vol. 3. at 117–18.  Mr. Arteaga Espino recalled that when Petitioner tried to bet on baseball games with other children, Petitioner would "just stick his hand out and show us all his change, but he didn't know how much it was."

*Id* at 117.

Petitioner's substandard reading, writing, and math skills have persisted into adulthood. Jorge noted that letters he has received from Petitioner since his incarceration evince writing difficulties. *Id.* at 29 (describing the letters as "not correct" and "crooked"). Adelita Hernandez Llanas, Petitioner's sister, testified that as an adult, Petitioner had difficulties writing and reading. E.H. Vol. 4 at 257–58. She also testified that, at times, she and her husband took Petitioner to the store when he resided in Kerrville, and because he was unable to count money, he paid by giving the cashier a large bill, relying on the cashier to tell him whether he had provided enough money. *Id.* at 255.

At the evidentiary hearing to determine whether Petitioner has mental retardation, the State introduced into evidence approximately fifty separate pages containing writings by Petitioner. *See* E.H. State's Exh. 1, Packet of Inmate Request Forms and Letters (hereinafter "State Packet"). The writings included Inmate Request Forms, as well as letters that Petitioner wrote while incarcerated at the Kerr County Jail. All of the writings were in Spanish, his native language, and even in Spanish, those writings provide compelling evidence of deficits in the conceptual area, corroborating the findings of Drs. Puente and Martinez that Petitioner suffers

from language-related deficits.

The letters and Inmate Request Forms are replete with punctuation, grammar, and spelling errors.  They evince Petitioner's total lack of understanding of the concept of punctuation—the *fifty pages* of his writings contain virtually no punctuation marks at the conclusion of sentences.  The request submitted on June 23, 1998 is only one of countless examples of Petitioner's failure to terminate sentences with punctuation marks. State Packet at 5.   The following is a translation of Petitioner's request:

> Excuse me I send this notice that it has been three weeks that I don't eat meals of 12 and 5 not because I don't want to eat it's that I can't smell the food and I feel a little ill I please ask if you can give me in the afternoon a light meal like an egg "or" two and it's true other type of food doesn't agree with me in the stomach thank you[11]

When Petitioner did utilize periods, he placed them in odd and inappropriate places.  The following translations exemplify his inappropriate use of periods: "Only one friend gives me '10'. or. '15' dollars and then . . . ." *Id.* at 33.   In one writing, he wrote, "Whoever sees and reads. this message don't do it in excess. to the drugs maybe the same thing will happen to you. or something worse take care and God

---

[11] The correct internal apostrophes for the word don't were added during translation. The original letter does, however, contain the incorrect  punctuation surrounding the word "or."

protect you always don't take it . . . ." *Id.* at 47.

There were only two instances in which Petitioner used periods to terminate his thoughts. Even in those instances, he failed to follow the most basic of grammatical rules, like capitalizing the first letters of the sentences that followed the periods. For example, on November 10, 1998, Petitioner wrote, "No one gives me nothing. only one friend . . . ." *Id.* at 33. On July 11, 1998, he wrote, "I already have 12 days without bathing without soap and without shampoo. this I ask you . . . ." *Id.* at 38 (translation).

His writings also lack commas. On February 20, 2008, Petitioner submitted a request to jail administrators. *Id.* at 45. The format he utilized clearly called for the use of commas, but instead of using them, he inexplicably used colons instead, writing, "I need from my property the following 1 notebook: 5 envelopes: 5 stamp: 1 pair of socks: 1 deodorant: 1 personal letter name Veronica Campos Herrera: 1 pen: This I ask you as a favor thank you[.]" *Id.* at 45 (translation).  On July 11, 1998, Petitioner wrote, "I bother again to tell you if you can give me permission to be able to receive commissary in other words to buy envelopes notebook brush paste in other words have say a little bit to clean a bit my body . . . ." *Id.* at 38.

A few other aspects of Petitioner's writings are particularly noteworthy. He

48

utilizes both upper case and lower case letters within single words, with no discernible

pattern. The very first writing in the State Packet illustrates Petitioner's consistent

failure to utilize the correct letter case:

> Atente Abiso Me dirigo aL oFisiaL encargado oriTa Que
> si por FABor Me podriAn saCar un RaTo pos ya Tengo
> casi una semana y unos diAs Que no salgo pos para Aser
> un poco de ejercicio yo selos pido de Todo FABor esta
> Bien y Grasias espero Que me SaQuen un Rato nomas eso
> Les pido yo de FaVor

*Id.* at 1.

His spelling can only be described as abysmal. Of all the writings that the State

introduced at trial, there is not a single writing that does not contain multiple

misspelled words. Petitioner repeatedly fails to spell the most basic and simple words

correctly. Putting aside the inappropriate use of capital letters, the very first writing

of the State's own exhibit illustrates Petitioner's deficient spelling skills:

> Atente **abiso** me **dirigo** al **ofisial** encargado **aorita** que si por **fabor** me
> **podrian** sacar un rato pos ya tengo casi una semana y unos **dias** que no
> salgo pos para **aser** un poco de **ejersicio** yo **selos** pido de todo **fabor**
> esta bien y **grasias** espero que me saquen un rato **nomas** eso les pido
> yo de favor

*Id.* at 1. In just this single request, Petitioner's spelling error rate was close to twenty-

five percent.

Also noteworthy is the fact that, at times, he runs two words together as if they

were a single word. For example, on the request dated July 11, 1998, he wrote "selos"
instead of "se los." *Id.* at 38. Likewise, on the request dated October 15, 1998, he
wrote "Quesi" instead of "que si." *Id.* at 37.

Other times, Petitioner inserts spaces within a word and, therefore, creates word
fragments. For example on his requests dated July 5, 1998 and December 1, 1998,
Petitioner wrote "super visor" instead of "supervisor." *Id.* at 22, 42.

Thus, although Petitioner is able to communicate simple thoughts, his letters
evince significant impairments in all aspects of written language. The findings of Drs.
Puente and Martinez corroborate these conclusions drawn from the letters as well as
the observations of lay witnesses. Dr. Martinez found that Petitioner's performance
on the Task of Mental Tracking test was below average. E.H. Vol. 3 at 165.
According to Dr. Martinez, this substandard performance is consistent with someone
who exhibits difficulty counting. *Id.* at 165–66. Dr. Martinez also found that
Petitioner's auditory attention was severely impaired. *Id.* at 166.

Dr. Puente noted that, during his evaluation of Petitioner, he counted with his
fingers, 2003 Puente Affidavit at 3, and that he had difficulty writing his own name *id.*
at 5 (noting that Petitioner took 15 seconds to write his name with his dominant right
hand and "did a poor job at that").

### iv.    impairments in self-direction

Life history witnesses consistently report that Petitioner was unable to complete tasks independently. He was unable to follow directions and was easily distracted. E.H. Vol. 3 at 18–19. Indeed, the family would, regardless of the time of day, find him asleep when he was asked to run errands. When told to do things, Petitioner "would just sit there or fall asleep. Without anything else, he would just - suddenly you would find him asleep." *Id.* at 19. When Petitioner's father would ask him to get one of several tools that the family used for scavenging through the trash, Petitioner would sometimes "grab the wrong one, or he wouldn't even get there to bring it. He would forget about it and just play off to the side." *Id.* at 69.

He was also unable to run simple errands for the family. If asked to go to the store, which was only half a block away, Petitioner would sometimes come back to the house in order to be reminded of what it was he was supposed to obtain. *Id.* at 25, 108. Other times, he would come back with the wrong change, or bring back the wrong items, or would forget to bring some of the things he was asked to buy. *Id.* When he was seventeen—nearly an adult—he traveled to Mexico City with his sister Yolanda, E.H. Vol. 4 at 305, and she recalled that Petitioner had a hard time following instructions and that he often brought the wrong items from the store, *id.* at 307.

51

*v.*     *inability to express emotions and needs*

As a child, Petitioner was unable to express emotions and needs effectively. Juan Manuel Arteaga Espino, a neighbor, testified that Petitioner became easily frustrated when he could not accomplish a task. E.H. Vol. 3 at 116. When Petitioner wanted to play sports with neighborhood children but could not perform, "he [would] getting like desperate, like he was losing his temper." *Id.* at 115–16.

As an adult, Petitioner continued to exhibit great difficulty expressing his emotions and needs. Indeed, while awaiting trial at the Kerr County Jail and the Bandera County Jail, he exhibited child-like and immature behaviors. For example, Pamela K. Hicks, Kerr County Jail Administrator, testified that Petitioner threw a tantrum because he was not served eggs with his meal. S.F. Vol. 21. at 92.

*b.*     *Social skills*

The representative skills in this area relate to interpersonal skills, responsibility, self-esteem, gullibility, naivete, and the abilities to follow rules and avoid victimization.[12]

*i.*     *vulnerability to manipulation*

---

[12] The comparable skill area in the DSM-IV-TR is social/interpersonal skills.

Petitioner is easily manipulated by others. According to Juan Manuel Arteaga Espino, when the neighborhood boys gambled in baseball and Petitioner wanted to participate, he would just stick out his hand and show all of his change, and others would tell him how much he needed. E.H. Vol. 3 at 117–18. Juan Manuel testified, "If you would tell him that he could bet for the sodas or the cokes, he would be all excited and pull out his hand full of change, but he wouldn't know how much, but - and then he would play, but then suddenly he would just start running around or run away." *Id.* at 120. Children in the neighborhood would trick him out of money because he could not make change. *Id.* at 120–21.

Enedelia Lopez Vasquez, a neighbor, also described Petitioner's gullibility and naivete, recalling that her own daughters would tell him if he washed containers for them, they would give him something in exchange for his help and despite their promises, never did. Exh. 2, Declaration of Enedelia Lopez Vasquez at ¶ 17 (hereinafter "Vasquez Declaration"). "They would do the same thing to him time after time, and Ramiro always believed them. I would tell my daughters, 'Why do you do that to Ramiro?' They would answer me, 'So he'll help us.'" *Id.*

This vulnerability to manipulation continued into adulthood. When Petitioner was living in the Kerrville area, his sister chided him for sending other people to the

53

store for him, who would then take advantage of him because he did not know the prices. E.H. Vol. 4 at 255–56. When asked why he let the others take advantage of him, Petitioner would say it was "okay" because people would not cheat him. *Id.* at 256.

Petitioner has also taken the blame for the wrongful actions of others on at least two occasion, despite the fact that the consequences were grave. In 1989, Petitioner was arrested along with others for a homicide in the state of Tamulipas, Mexico. Mr. Juan Luis Arriaga Torres gave at least two separate confessions acknowledging his role in the offense for which he and Petitioner had been arrested, and Petitioner also gave two statements describing their complicity in the offense. *See* Exh. 25, Tamaulipas State Ministry of Public Safety Records (hereinafter "Tamaulipas Public Ministry Records"); Exh. 27, Translation of Legal Pleadings in Spanish at 2, 3 (hereinafter "Pleadings Translation").[13] Nonetheless, when Arriaga Torres personally confronted Petitioner in a *careo*,[14] Tamaulipas Public Ministry Records; Pleadings

---

[13] Undersigned habeas counsel obtained records from the Ministry of Public Safety of the state of Tamaulipas (Exh. 25) and translations of relevant portions of the file (Exh. 26 concerning Medical Records and Exh. 27 concerning the Legal Pleadings).

[14] A *careo is* a procedure whereby a defendant engages in face to face confrontations with adverse witnesses without the intervention of counsel. *See* Exhibit 24, Declaration of Juan Carlos Padron Sanchez at 1 (hereinafter "Sanchez Declaration).

Translation, Petitioner caved under the pressure of the face-to-face confrontation with Mr. Arriaga Torres and took sole responsibility for the offense.  *See* Tamaulipas Public Ministry Records; Legal Pleadings Translation.  That this action did not reflect the truth, but rather Petitioner's vulnerability to manipulation, is further revealed by that fact that on appeal, the appellate court found that Mr. Arriaga Torres was, indeed, equally criminally responsible for the offense for which Petitioner took sole responsibility.  Tamaulipas Public Ministry Records; Pleadings Translation.

Similarly, when approached by Maria del Carmen Serrano (a "friend") Petitioner took responsibility for an assault for which Serrano's husband had been indicted. S.F. Vol. 20 at 38.  As discussed in Ground C, *infra*, there is no credible evidence suggesting that Petitioner was even present at the crime scene, and there is ample evidence (including identifications by the victim and another eyewitness) that Serrano's husband was indeed the perpetrator.

So once more, Petitioner was exploited by a friend, but this time not he was not just manipulated into taking full responsibility where responsibility was shared, but manipulated into taking full responsibility where he in fact had none.

### ii. *frequent victimization*

As a child, Petitioner was frequently victimized by other children in the

neighborhood, as well as his own family. Jorge Hernandez Llanas, Petitioner's brother, recalls that older schoolmates repeatedly harassed Petitioner. *See* Motion to Supplement Record with Affidavits Pertaining to the Issue of Mental Retardation and Requests for Evidentiary Hearing, Affidavit of Jorge Hernandez Llanas. Jorge stated that on one occasion, he found several of Petitioner's older schoolmates beating him up in a field. *Id.* Jorge also recalls that at times, Petitioner came home with pencil stab wounds on his arms and backs. *Id.* Jorge believes that Petitioner, whom Jorge described as shy, did not know how to defend himself and, as a result, was harassed by his schoolmates. *Id.* Juan Manuel Arteaga Espino, a neighbor, testified that other children made fun of Petitioner because he "was all dirty and his hair was all messy and that's the way he looked." E.H. Vol. 3 at 118–19.

Petitioner was also severely victimized at home. Jorge testified that his parents oftentimes hit with "belts, wires, hoses, whatever was available." *Id.* at 24. Adelita Hernandez Llanas, Petitioner's sister, testified that his siblings and parents would hit and pick on Petitioner because of his inability to learn. E.H. Vol. 4 at 241. Adelita recalled that although her mother beat the children "almost every day because of anything," Petitioner received most of the punishment. *Id.* at 261. Yolanda, another sister, recalled that because "Ramiro was the one who understood the least, he was

the one who got beaten the most." E.H. Vol. 4 at 301–02 Ramiro often hid from his mother when beatings were imminent, and whenever his mother found Ramiro, "she would leave him laying on the floor almost passed out because of the beating he would get." *Id*

Petitioner continued to be severely victimized as an adult. Records from the State of Tamaulipas Ministry of Public Safety reveal that, far from being the tough inmate he claimed to be, Petitioner sustained severe beatings while incarcerated in Mexico.[15]

### iii.    *impaired social skills*

Life-history witnesses describe Petitioner as someone who did not have friends. Juan Manuel Arteaga Espino, a neighbor, testified that he never saw Petitioner with

---

[15] An entry dated September 23, 1994 states, "Mr. Hernandez Llanas-25 year old male who presents with severe pain on palpitation over the spine, caused by 10-15 blows with a wooden object. Pain radiates to the left lower extremity on palpitation. He also presents paresthesia of the left lower extremity." Tamaulipas Public Ministry Records; Exh. 26, Translation of Medical Files in Spanish at 6 (hereinafter "Medical Translation"). On September 27, 1995, Mr. Hernandez Llanas was observed to have a contusion to his right thigh. Tamaulipas Public Ministry Records; Medical Translation at 5. One day later, on September 28, 1995, Mr. Hernandez Llanas was seen by medical personnel for numerous injuries to numerous parts of his body. Tamaulipas Public Ministry Records; Medical Translation at 4. According to the medical records, the diagnostic impression was "Contusions from blows to several parts of his body." Tamaulipas Public Ministry Records; Medical Translation at 4. The injuries included a hematoma to the left eye as well as echymoses (medical term for bruising) to his left eye and area over the right kidney. Tamaulipas Public Ministry Records; Medical Translation at 4. In addition, Mr. Hernandez Llanas presented with lesions to several parts of his body. Tamaulipas Public Ministry Records; Medical Translation at 4.

friends. E.H. Vol. 3 at 122; *see also* Exh. 4, Declaration of Cecilia Solorzano at ¶ 8 (hereinafter "Solorzano Declaration") (stating Petitioner "really did not have friends").

As he became older, Petitioner could not form romantic relationships, though he wanted to do so. Enedelia Lopez Vasquez, a neighbor, reported that, although Petitioner claimed to have girlfriends, no one ever knew him to have one. Vasquez Declaration at ¶ 16; *see also* Solorzano Declaration at ¶ 9 (recalling that Petitioner did not have girlfriends).

Petitioner's interactions with others were marked by immaturity. Ms. Lopez Vasquez recalled, "Ramiro was always very childlike, he always behaved like a child." Vasquez Declaration at ¶16. She recalled that when he was about fifteen-years-old and saw her approaching his house, Petitioner would start yelling with excitement that she would be making flour tortillas. *Id* at ¶ 18. Jorge Hernandez Llanas, Petitioner's brother, described Petitioner as a "very loud" boy, E.H. Vol. 3 at 25, and noted that people knew Petitioner was around because they could hear him yelling from half-a-block away. *Id.* at 25–26.

Even as an adult, Petitioner could not grasp social norms. Adelita Hernandez Llanas, Ramiro's sister, commented that when Petitioner came to visit her in Kerrville, "He would say, hi, I came by to say hello, and then a little bit after that he would say

hi I came by to say hello." E.H. Vol. 4 at 257.

*iv. impairments in leisure activities*

Petitioner did not participate in sporting activities with neighborhood children because of his inability to follow the rules of the game. Juan Manuel Arteaga Espino testified that when neighbors played baseball, Petitioner would come close to the game because he wanted to play, E.H. Vol. 3 at 115–16, but he was unable to follow the rules, *id.*

Jorge Hernandez Llanas, Petitioner's brother, testified that Petitioner tried to play baseball and football with other children. *Id.* at 21–22. The other children, however, would kick Petitioner out of the game because he was unable to do what he was told. *Id.* When this happened, Petitioner would initially become sad and start crying, but after "sitting there" for a considerable amount of time, Petitioner would "just stand up and cheer for the other guys playing." *Id.* at 22; *see also* Solorzano Declaration at ¶ 11 (recalling that when neighbors got together to play sports, Petitioner did not participate, but would sit and watch).

c.     *Practical skills*

The representative skills in this area include activities of daily living,

59

occupational skills, and maintaining safe environments.[16]

i.    *substandard work performance*

The jobs that Petitioner obtained were all unskilled and involved menial tasks. Like the rest of his family, Petitioner worked scavenging through mounds of trash in Mexico. E.H. Vol. 3 at 17. He also worked at a taco stand in Mexico when he was eighteen- or nineteen-years old, where his job duties included warming tortillas and giving sodas to customers. *Id.* at 75. At trial, there was testimony that Petitioner worked as the assistant to a carpenter for approximately three weeks, S.F. Vol. 18 at 33, and then helped take care of a litter of puppies. *Id.* at 36–37. Adelita, his sister, testified that Petitioner cleaned horse stables and fed horses. E.H. Vol. 4 at 256–57.

Petitioner's performance was substandard in even the most of mundane tasks, like separating recyclable materials. He experienced great difficulty sorting trash, and according to his brother Jorge, was unable to sort glass by color. E.H. Vol. 3 at 18. Yolanda Hernandez Llanas testified that Petitioner was unable to pile cardboard properly and was unable to sort by category or by color. E.H. Vol. 4 at 298–99. His work was very poor despite being given instructions. *Id.* ("Even when I explained it

---

[16] The comparable skills areas in the DSM-IV-TR are self-care, home living, use of community resources, health, leisure, work, and safety.

60

to him several times, step by step, he wouldn't understand what I was saying."). Petitioner would look at Yolanda a "while [she] was doing it, but the truth is that he couldn't make it right." *Id.* Jorge also recalled having to call Petitioner to the side because "he was never doing things the way he was told to do them." E.H. Vol. 3 at 19.

### ii. inability to use public transportation

Petitioner easily became lost and disoriented and therefore was unable to venture very far from familiar surroundings. Yolanda, Petitioner's sister, testified that when he was about seventeen years of age, they traveled together to Mexico City by bus. E.H. Vol. 4 at 306. During a stop, he got off the bus in order to use the bathroom, but was unable to find his way back to the bus. *Id.* Yolanda had to ask the bus driver to wait until she could locate her brother, and later found him in a different waiting area. *Id.*

In Mexico City, she did not allow Petitioner to get on the subway by himself because he got lost so easily. *Id.* at 307. Jorge likewise never knew Petitioner to travel by himself. E.H. Vol. 3 at 75. Jorge also recalled that if Petitioner was asked to run errands further than next door to their house or half-a-block from the family's home, Petitioner would get lost. *Id.* at 110.

### iii.  inability to maintain hygiene and appearance

Jorge, Petitioner's brother, recalled that his mother still had to dress Petitioner when he was about eight or nine because Petitioner was unable to do it independently. E.H. Vol. 3 at 72.  Petitioner would put his shoes on the wrong foot and was unable to button his shirts correctly.  *Id.*  He had to be reminded to take a bath at the age of thirteen, and at times his mother forced him to bathe by beating him. E.H. Vol. 4 at 244–45.  Yolanda explained:

> We have to give him his bath because he would come out with some pieces where you could see the white skin or some pieces, wherever the water hit him, he didn't know how to bathe himself.  We had to dress him, scrub him, dress him correctly, because it was the same thing to wear his short on the right side, or on the wrong side, or if it was dirty.  We always had to supervise him to do things because he wouldn't do it by himself.

E. H. Vol. 4 at 304.

Juan Manuel Arteaga Espino,[17] a neighbor, remembered that "[Petitioner] would look all dirty and his hair was all messy." E.H. Vol.. 3 at 121.  Petitioner always wore the same clothing, and Juan Manuel never saw Petitioner cleaning himself. *Id* at 12-22.

---

[17] Juan Manuel Arteaga Espino, a neighbor, testified at the evidentiary hearing on mental retardation.  Throughout the transcript of the hearing, his name is misspelled as "Juan Manuel Artiaga Espiro."

Enedelia Lopez Vasquez, another neighbor, recalled that on one occasion, she and Petitioner's father found Petitoner bathing with pigs in a dam near Petitioner's house. Vasquez Declaration at ¶ 11. Not surprisingly, he developed an infection that night from the dirty water. *Id.*

*iv.     impairments in home living skills*

Family members described the difficulties that Petitioner had in the area of food preparation. Adelita, his sister, testified that as an adult, Petitioner did not know the order in which food items should be cooked. For example, if he cooked eggs and bacon, Petitioner would put the eggs before the bacon, and the bacon would not get cooked well enough. E.H. Vol.. 4 at 259. He mixed unlikely ingredients together, such as eggs, uncooked bacon and beans. *Id.* Adelita did not eat food that Petitioner prepared because it "disgusted" her. *Id.* at 260. Yolanda, Petitioner's older sister, tried to teach her brother how to cook, but he never learned and was always a "bad cook" who mixed everything together. E.H. Vol. 4 at 307–08.

Thus, taken together, the evidence the Petitioner suffered significant deficits in all three categories —conceptual, social, and practical—is overwhelming.

3.   Petitioner's substandard intellectual functioning and limitations in adaptive functioning were present during the developmental period.

Due to the abject poverty and educational deprivation Petitioner suffered as a

child, there is no I.Q. test administered during his developmental period that documents his substandard intellectual functioning. Requiring the existence of such a test would be a bad joke, since the absence of such testing is often itself an indicator of extreme poverty, which in turn is a predictor of mental retardation. *See Branham v. Heckler*, 775 F.2d 1271, 1274 (4th Cir. 1985) ( "[T]here may be many reasons why an individual would not have had the opportunity or need to have a formal intelligence quotient test until later in life. The fact that one was not taken does not preclude a finding of earlier mental retardation."). Obviously, valid childhood testing that produced scores over 70 would weigh against a finding of juvenile onset, but the absence of such scores does not. *See Morris v. Dretke,* 413 F.3d 484, 487 (5th Cir. 2005) (considering I.Q. scores obtained after the defendant was 18 years old when analyzing whether the defendant had manifested significantly subaverage intellectual functioning prior to age 18); *Hodges v. Barnett*, 276 F.3d 1265, 1269 (11th Cir. 2001) (finding that there is a presumption "that IQs remain fairly constant throughout life"); *see also Durden v. Astrue*, 586 F. Supp. 2d 828, 832 (S.D. Tex. 2008) (finding that, in a civil context, claimant need not present evidence of I.Q. testing conducted prior to adulthood to claim mental retardation).

Furthermore, when compelling evidence of limitations in adaptive functioning

64

during the development period is present, an inference of juvenile onset is warranted. *See Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001) ("[A] person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning."). Here, as described above, the evidence of heartbreakingly pervasive limitations in adaptive functioning requires a conclusion of juvenile onset because nothing else could explain the breadth and depth of Petitioner's limitations.

Moreover, the presence of several significant risk factors for mental retardation bolsters the conclusion of juvenile onset. The 2002 AAMR MANUAL describes four categories of risk factors that may interact to cause mental retardation: (1) biomedical factors—causal agents that relate to biologic processes—such as genetic disorders or nutrition; (2) social factors—causal conditions that relate to social and family interaction—such as stimulation and adult responsiveness; (3) behavioral factors—potentially causal conditions—such as dangerous (injurious) activities or maternal substance abuse; and (4) educational factors, particularly the absence of educational support that promotes mental and adaptive skills development. Petitioner was exposed to several biomedical risk factors in an intense form, and for long periods of time, suffered from social factors including ongoing physical abuse and pervasive lack of stimulation; he also experienced a total lack of educational support.

> a.  *Biomedical risk factors*
>
> > i.  *abject poverty, including poor nutrition*

Ground B, *infra*, which addresses trial counsel's failure to conduct an adequate family and social history investigation, details the stark, unmitigated poverty into which Petitioner was born. He lived in a "house" made of cardboard that was located at a dump, that rodents ran through, and that almost blew away during every storm. His family ate from the trash and were so desperate that other residents of the dump—presumably in a similar situation—were *moved to give them food*. From the age of four, Petitioner himself had to work sorting trash at the dump, and he never had enough of anything, be it food, attention, or hope.

Photographs obtained from the family depict the unrelenting poverty Petitioner and his family endured. Exh. 19, Photograph [Childhood Home]; Exh. 20, Photograph [Trash Dump]; Exh. 21, Photograph [Family Member Picking Trash]; *see also* E.H. Applicant's Exhs. 1, 2, 9. One photograph depicts the shack made of recyclable materials, which the family obtained from the trash dump in which they resided. Exh. 19. Another depicts the trash dump at which Petitioner and his family worked as scavengers. Exh. 20. The third photograph shows a family member scavenging through the trash, just as Petitioner did throughout his childhood and adolescence.

Exh. 21. The photographs, along with the testimony of family members and neighbors summarized and cited in Ground B, *infra*, offer irrefutable evidence of Petitioner's absolutely destitute existence in Mexico.

*ii.    exposure to neurotoxins*

Ground B also details Petitioner's exposure to neurotoxins. From the age of two, he lived at what was not only an ordinary dump, but a place where unidentified toxic chemicals were secretly dumped at night. Whatever those chemicals were, they burned the dump residents' eyes and lungs, often caught fire, and sometimes exploded. Petitioner would climb inside those containers in an attempt to clean them, and come out all black, covered in soot of unknown origin.

*b. Social risk factors*

*i.    physical abuse*

Ground B also details the extraordinary physical abuse to which Petitioner was subjected, by both his mother and father. His siblings and neighbors testified to the frequent and violent beatings that Petitioner and his siblings received and to the fact that he was victimized even more than the other children due to his lack of intelligence. One neighbor, Ms. Segura Guerra, tried to talk to Petitioner's mother about her mistreatment of her son, Guerra Declaration at ¶ 7, but his mother responded by saying

that she hit Petitioner Llanas because of his stupidity, *id.* Cecilia Solorzano, another

neighbor, recalled the severe abuse that Petitioner and his siblings endured at the hands

of their parents:

> Ramiro's family was strange. Mrs. Martha, Ramiro's mother, was too
> harsh with her children. When I lived in Mexico, I was scared of
> Ramiro's mother. That woman yelled a lot. She dealt with her children
> by yelling and hitting. She would say very harsh curse words to them.
> Since our house was very close to Ramiro's house, we could hear when
> she would beat her children. It sounded as though she was hitting them
> with a whip and you could hear the screams of the children.

Solorzano Declaration at ¶ 6.

### ii.    *inadequate family support and lack of stimulation*

The family failed to provide adequate support and stimulation to Petitioner.

Jorge Hernandez Llanas testified that Petitioner was not in special education because

his parents did not pay attention to Petitioner's special needs. E.H. Vol. 3 at 23. His

parents had neither the resources nor the inclination to support Petitioner's educational

needs. *Id.*

Adelita Hernandez Llanas, who has a special needs child herself, also explained

that Petitioner and his siblings "never had the attention of [their] mother." E.H. Vol.

4 at 237. According to Adelita, Petitioner's siblings attempted to assist him with

school work but would get frustrated:

68

> Well, what happened is that my brothers would get
> frustrated with him and they would tell him, hurry up, and
> they would give him a bump on his head.  And then they
> would tell him, 'And go away from here, I don't want to deal
> with you.'

*Id.* at 241.

Cecilia Solorzano, a neighbor, commented that she never saw Petitioner's mother

do anything to better her childrens' situation.  Solorzano Declaration at ¶ 12.  She

described the sadness that permeated Petitioner's household:

> Ramiro and his siblings had a very sad childhood.  They never had a
> normal childhood.  They suffered a lot.  One could say that Ramiro never
> had the life of a normal child.
>
> I never heard that Ramiro's parents would buy him toys.  To the contrary,
> the life of Ramiro and his family was the garbage dump.

*Id.* at ¶¶ 1–2.

Observations of school personnel further illustrate the mother's utter lack of

understanding of Petitioner's impairments.  Sara Alicia Herrera Saldivas, who taught

at the school that Petitioner attended, stated, "What always impressed me about Ramiro

was that his mother would take him to school with a little branch in her hand like the

ones to herd the animals.  She would go along hitting Ramiro with the little stick so that

he would go to school."  Saldivas Declaration at ¶ 3.

69

### c.   *Educational risk factors*

Given the limitations Petitioner manifested as a young child, he was in desperate need of special education services. He got nothing. Jorge testified that the school that Ramiro attended did not provide special education services,  E.H. Vol. 3 at  67, and his sister Yolanda, who is now a teacher, testified that the type of care that is now available to those who cannot learn was not available when Ramiro was growing up, E.H. Vol. 4 at 301.  Saldivas explained that at the time Petitioner was in school, there were no psychologists, not special education services and no support:

> As a teacher, one had from 40 to 50 students in each classroom and we
> had to do everything: be a teacher, be a babysitter, be a psychologist.

Saldivas Declaration at ¶ 10.  Petitioner was forced to leave school because of his academic failures, so after the third grade, he received no educational services at all.

Considering all of risk factors for mental retardation present in Petitioner's childhood, it would almost be shocking if he were *not* mentally retarded.  Considering the probability of mental retardation, along with the strong and consistent evidence of significantly subaverage intelligence as an adult and the overwhelming evidence of significantly deficient adaptive functioning throughout Petitioner's entire life, the conclusion that Petitioner is mentally retarded is inescapable.

70

4.    The state court's treatment of this claim.

This is not a case of dueling experts, where the state court resolved the duel by finding the state's expert more credible. Indeed, the state's proposed findings of fact included such credibility determinations, and before signing its proposed order, Judge Ables crossed out the paragraphs making such credibility comparisons. This is also not a case of dueling standards where the Applicant asserts one standard, the state proposes another, and the court applies the standard advocated by the state. *Cf. Rodriguez v. Quarterman*, 2006 WL 1900630 (W.D. Tex. July 11, 2006) (holding state court's application of the criteria set forth in *Ex Parte Briseno*, 135 S.W. 3d 1 (Tex. Ct. Crim. App. 2004) was neither contrary to, nor an unreasonable application of, Supreme Court precedent). Instead, the state court's treatment of this claim is entirely idiosyncratic and does not apply any of the prevailing definitions of mental retardation.[18]

_____

[18] Because the state court decision does not apply *Briseno*, Petitioner does not here either contest the permissibility of that standard, or address in any detail its applicability to the facts of this case. He does, however, note that a likely reason for the state courts decision not to apply Briseno is that Petitioner would prevail under that standard because: (1) the people who knew Petitioner best during the developmental stage did believe and act in accordance with the belief that he was mentally retarded (though they might not have phrased it that way due to their lack of education); (2) Petitioner's planning behavior was extremely limited, and on numerous occasions he acted impulsively; (3) Petitioner never *showed* any leadership (though he *claimed* to have been a leader in Mexico), and was frequently exploited and manipulated by others; (4) Petitioner's response to external stimuli were frequently irrational, and he seemed either unaware of social norms, or unable to act upon them on many occasions; (5) a careful reading of his statements to

The state court decision makes a variety of findings of fact and then draws legal conclusions, almost entirely skipping the analysis of those facts. It does not preclude relief under AEDPA both because it contained numerous "unreasonable determination[s] of the facts, *see* 28 U.S.C. 2254(d)( 2), and because its application of the law to the facts was "contrary to, or involved an unreasonable application of, clearly established law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

Because the findings of fact are so long and rambling, Petitioner will here address the major thrust of the state court's findings on each prong.[19] With respect to the first prong, Judge Ables concluded that Petitioner was probably malingering on the standard I.Q. tests, and relied on the higher I.Q. score from the Texas Corrections screening, reasoning that the lack of training of the administrator did not undercut it and that Petitioner's behavior was inconsistent with that of a person with an I.Q. in the 50s.

---

the interrogating officer reveals that he frequently responded in an incoherent, wandering fashion to questions; (6) although he tried to hide facts and lie, he was unable to do so effectively; and (7) The commission of the offense required—and reflected—very little forethought, planning, or complex execution of purpose. Most notably, Petitioner *feel asleep at the scene of the crime*. *Should* this court desires full briefing on the application of the *Briseno* factors, Petitioner would be happy to provide it, but has not here done so because the state court's decision did not rely upon the application of those factors.

[19] Should Respondent choose to specifically rely on a particular factual finding or findings Petitioner in his reply will address the evidence that rendered those findings unreasonable.

This conclusion was an unreasonable determination of the facts because it ignored the consistency of scores obtained by qualified experts and ignored their determination that Petitioner was not malingering. It was also unreasonable because it relied upon a test that: was not approved as an instrument for the diagnosis of mental retardation; was 20 years old and has since been re-normed twice; was administered by an untrained person whose interpretation of the results was not reviewed by anyone qualified to do so; and was conducted under circumstances where the accuracy of the scoring of the exam could not be determined, given that the state had lost the underlying protocols.

With respect to the second prong, the state ignored all of the lay testimony concerning Petitioner's adaptive functioning deficits. This was both an unreasonable way to determine facts and also an unreasonable application of *Atkins*, given *Atkins*' reliance on professional definitions of mental retardation that require consideration of such evidence. In support of its conclusion that Petitioner lacked adaptive functioning deficits, the state court cited facts, none of which contradicted—or could contradict—the existence of adaptive functioning deficits. Citation of these facts, such as Petitioner's apparently normal behavior in court, his ability to communicate with counsel, his ability to form menial work, his drinking of beer, his escape from a prison

in Mexico (which occurred when the sole guard at the hospital in which Petitioner was being held fell asleep, and Petitioner walked out), and his awareness of right and wrong, revealed that the court itself labored under false stereotypes about what persons with mental retardation are able to do and applied its own personal criteria for mental retardation. This approach was "contrary to, or involved an unreasonable application" of *Atkins*.

With respect to the third prong, the court simply found that there was no credible evidence that mental retardation was manifested during the developmental period. Whether that statement reflected a bizarre and unreasonable estimation of the facts from Petitioner's family, neighbors, and community, or instead reflected the incorporation of a legal standard that was "contrary to, or involved an unreasonable application of" Atkins is unclear, but what is clear that it was wholly inaccurate, given the evidence presented, and the governing legal standard.

## CONCLUSION

For all of the foregoing reasons, the Eighth Amendment's Cruel and Unusual Punishment Clause would be violated by Petitioner's execution. A writ of habeas corpus must issue.

## **GROUND B**

**PETITIONER WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS DURING THE PENALTY PHASE DUE TO COUNSEL'S FAILURE TO DEVELOP AND PRESENT EVIDENCE IN MITIGATION, INCLUDING EVIDENCE OF EXTRAORDINARY CHILDHOOD DEPRIVATION, EXPOSURE TO TOXINS, AND PHYSICAL ABUSE,  AND BY COUNSEL'S FAILURE TO DISPROVE THE STATE'S PENALTY PHASE CLAIM THAT PETITIONER HAD STABBED A MAN IN AN UNRELATED INCIDENT.**

Petitioner's jury saw violence, a history of more violence, and virtually no mitigation during his sentencing proceeding.  Counsel completely failed to investigate Petitioner's background and upbringing when, had they done so, they would have uncovered a childhood marked by extreme poverty, sustained exposure to toxic chemicals, violent physical abuse, and a total failure to respond to his special needs. Counsel also failed to present to the jury evidence that would have eviscerated the state's claim that Petitioner had stabbed a man in a previous incident outside a local bar.  Their failures constituted grossly deficient performance, and absent those failures, there is a strong likelihood that one or more jurors would have concluded that Petitioner did not deserve the death penalty.  Because the facts establish both incompetence and prejudice, Petitioner's death sentence violates the Sixth Amendment right to counsel.

*Wiggins v. Smith*, 539 U.S. 510 (2003); *Strickland v. Washington*, 466 U.S. 668 (1994); *Williams v. Taylor*, 529 U.S. 362 (2000).

## FACTS RELEVANT TO THIS GROUND FOR RELIEF

### A.   The Jury's Picture of Petitioner

#### 1.   The State's Penalty-phase Evidence

The state began the penalty phase by introducing, over Petitioner's objection, evidence of Petitioner's Mexican conviction for murder.  S.F. Vol. 20 at 26; *see Ground D, infra* (arguing that the conviction was introduced in violation of Petitioner's right to counsel and so unreliable as to violate the Fourteenth and Eighth Amendments).

Next was the testimony of Maria del Carmen Serrano, who testified that Petitioner told her he had escaped from a Mexican prison, either by going through a window or by going through a door and being "helped by some relatives," *id.* at 29, and, more significantly, that she had seen Petitioner stab a man outside a bar in Kerrville, *id.* at 31. Serrano admitted that her husband had first been charged with the stabbing and that she had twice failed to tell police that Petitioner was the perpetrator, *id.* at 33, 35, explaining that she kept quiet because she was afraid  Petitioner would hurt her children, *id.* at 34. A guard, Pedro Garcia, testified that Petitioner had told him that he (Petitioner) had talked to Serrano and that things would be cleared up for her

husband, who was in jail for what Petitioner had done. *Id.* at 59; *see Ground C, infra* (arguing that Petitioner's trial counsel, who represented Serrano's husband at the time Serrano convinced Petitioner to take the blame, labored under a conflict of interest that adversely affected Petitioner's representation).

Rachel Carnichart then testified that Petitioner had raped her at knifepoint, but that she had not previously reported the offense because Petitioner threatened her. S.F. Vol. 21 at 28. Carnichart testified that Petitioner told her not to tell anyone about the rape because he would run away to Mexico. *Id.* She also testified that Petitioner threatened to kill her when she resisted taking her clothes off and then again after the rape. *Id.* at 29. Carnichart stated that Petitioner told her that he was not afraid to kill her because he had killed people in Mexico. *Id.*

The state then introduced testimony concerning Petitioner's misconduct in jail while awaiting trial, including his attempt to assault a guard with a food tray, *id.* at 11, his graphic threat to harm a guard who had not given him eggs for breakfast, *id.* at 63, and that he had twice possessed a "shank." *Id.* at 43, 66.

Last, the state introduced the testimony of Dr. Grigson, who had not examined Petitioner, but who nonetheless expressed virtual certitude that Petitioner would be

dangerous in the future.  *Id.* at 207–09.[20]

2.    The Penalty-phase Defense

The penalty phase of Petitioner's trial was devoid of testimony by anyone with even slight personal knowledge of his life history.  The defense called only three witnesses at punishment: psychiatrists Dr. Robert Cantu and Dr. Michael Arambula. and clinical psychologist Dr. Gilbert Martinez.  *See* S.F. Vol. 21 at 100–199.  Drs. Cantu and Arambula each concluded that Petitioner was mentally ill, but their diagnoses did not at all agree.  *See id.* at 167–68.  Dr. Martinez reported the results of the standardized tests he administered to Petitioner that established low intellectual functioning, but he did not have enough information to determine whether this was caused by mental retardation or something else.  *Id.* at 109–10.  Because no other witnesses were called, the information the jury learned about Petitioner's life history was incidental and depended entirely upon information that Petitioner himself had provided to the experts.

Unsurprisingly, that information was exceedingly limited and superficial.  The

---

[20] Dr. Grigson admitted that he had been previously disciplined by a professional organization but claimed it was not due to this violation of professional standards, but due to the organization's opposition to the death penalty.  *Id.* at 212.

only aspect of Petitioner's life history Dr. Arambula mentioned was the possibility that Petitioner had failed the third grade three times, and he made clear that he was relying on Petitioner's assertion of that fact. *Id.* at 176 ("It's possible that he has mental retardation, because in my interview of him, he said he tried to pass the third grade three times and didn't make it, so that would be consistent with that."). Dr. Cantu alluded briefly to a possible history of substance abuse and closed head injuries, *id.* at 139, but provided no details, and he expressed some skepticism about the accuracy of that history, probably because the supporting information he had came only from Petitioner, *id.* ("I think if one believes a history of substance abuse . . . which Mr. Hernandez gave to me . . . [and] I believed that a closed head injury or repeated closed head injuries, *if those were real*, would also be a factor." (emphasis added)). Dr. Martinez mentioned those same two facts, *id.* at 109 ("[T]here was evidence from his history to suggest that he has a history of poly-substance abuse"); *id.* at 120 ("[Petitioner] reported at [the age of twelve] he was hit by an automobile while riding his bicycle.").

The jury learned nothing more of Petitioner's family and social history. Nor did it learn anything that would call into question the accuracy of Serrano's testimony that she saw Petitioner stab someone.

79

## B.    Trial Counsel's Inadequate Investigation

Counsel could not have shown the jury more of Petitioner's background because they had not investigated it.

### 1.    What Counsel Claimed They Did

Steven Pickell was appointed to represent Petitioner, and J.A. Garcia was appointed to assist him. In an affidavit dated November 25, 2002, Pickell stated that he hired Santiago Gutierrez, an investigator, and instructed him to travel to Mexico "in an effort to contact family, friends, and acquaintances of Mr. Hernandez regarding such things as his childhood, background, health, living conditions, past criminal acts and general character background." State's Original Answer to Post-Conviction Application for Writ of Habeas Corpus Exh. 1, Affidavit of Steven Pickell (hereinafter "Pickell Affidavit"). Pickell stated that Gutierrez also interviewed Adelita Hernandez Llanas, Petitioner's sister, who resided in Texas, and that based upon that interview, he "did not feel that it was necessary, or even potentially in the best interest of Mr. Hernandez Llanas to dwell on interviews with her or additional family members." *Id.*

In an affidavit dated November 22, 2002, Pickell's co-counsel, Garcia, stated his "understanding" that Gutierrez made trips to Nuevo Laredo in Mexico in order to contact family members and claimed that he personally spoke to two family members

by phone—Petitioner's mother, and his sister Yolanda Hernandez Llanas.  State's Original Answer to Post-Conviction Application to Writ of Habeas Corpus Exh. 2, Affidavit of J.A. Garcia (hereinafter "Garcia Affidavit").  Garcia further stated that he described Petitioner's situation to each of the family members and that both his mother and his sister indicated that they did not want to testify at trial.  *Id.*

Neither Pickell nor Garcia have ever claimed that they made any additional efforts to investigate Petitioner's social or family history.

### 2.    What Counsel Really Did—and did not—Do

As it turned out, even the paltry mitigation investigation trial counsel claimed to have conducted exceeded what they actually did.

#### a.    *Gutierrez's failure to conduct a family and social history investigation*

Habeas counsel for Petitioner located Santiago Gutierrez, and on March 18, 2009, Gutierrez signed an affidavit relating to his qualifications and work on Petitioner's case. Exh. 15, Declaration of Santiago Gutierrez [Dated March 18, 2009] (hereinafter "Gutierrez Declaration").  Santiago's background was in police work, and he thought of his job as an investigator as " finding where police have made mistakes." *Id.* at 1. He had "never had any training in how to conduct a family and social history investigation," and "[his] business did not include doing that kind of work." *Id.*

Gutierrez is now 83 years old, and even at the time Petitioner was tried, Gutierrez was no longer conducting investigation work. *Id.* However, Pickell knew that Gutierrez was familiar with Mexico, so he hired Gutierrez "to find and speak to Ramiro's mother, and ask her to come to Ramiro's trial to testify." *Id.*

Gutierrez never spoke to Petitioner about his life history. *Id.* He did make two trips to Mexico, but on the first trip, went to the wrong location. *Id.* at 1–2. On the second trip, he found Petitioner's mother and spoke to her for about an hour-and-a-half. *Id.* at 2. He asked her if she would come to Texas to testify at her son's trial, and she responded in the negative. *Id.* Petitioner's mother did not tell Gutierrez "anything about physically abusing [Petitioner]." *Id.*

Gutierrez did not interview "any other family members, neighbors, or school teachers in Mexico" because Pickell "had not asked [him] to speak to anyone else, and [had told Gutierrez] to do what he had asked as quickly as possible." *Id.*

Gutierrez did speak to Petitioner's sister, who lives in Texas, to ask her about testifying at the trial, but she did not want to do it. *Id.* Gutierrez did not speak to any other family member. *Id.*

Gutierrez reported to Pickell what Petitioner's mother had said and also told him that Petitioner "came from a very very poor place," and that Petitioner "has very low

intelligence, and his mother is not very bright either, though she was better than [Petitioner]." *Id.*

In reviewing the district attorney's files, undersigned habeas counsel discovered that the state had obtained an affidavit from Gutierrez during the pendency of state post-conviction proceedings.   Exh. 14, Affidavit of Santiago Gutierrez [Dated November 25, 2005] (hereinafter "Gutierrez Affidavit").   The state did not file this affidavit, and the content of the affidavit makes it clear why it did not.   That affidavit contains similar—though not identical—information to that which habeas counsel obtained.   In his first affidavit, Gutierrez stated that he had been asked by Pickell to locate Petitioner's mother, and that he did so by getting the name from Petitioner's sister, Herminia, who lived in Comfort, Texas.   *Id.*   That affidavit too reflects that Gutierrez drove to Laredo, Mexico, but was unable to find the indicated address.   *Id.*

However, Gutierrez's first affidavit differs from the declaration obtained by post-conviction counsel in that he recalled then speaking to Petitioner's mother on the phone, rather than making a second trip to Mexico to find Petitioner's mother.[21] Gutierrez also reported, much like he did seven years later, that Petitioner's mother

---

[21] This discrepancy may not be surprising given the six-and-a-half year gap; Gutierrez acknowledged that he could not remember dates and times, and that his notes were probably destroyed. *See* Gutierrez Declaration.

"gave [him] the impression that she did not care to see or talk to her son." *Id.*

In sum, Gutierrez, who was neither trained to do family and social history investigations nor asked to do one by trial counsel, only spoke to Petitioner's mother and to one sister, and he spoke to them only to try to persuade them to appear and testify at trial.

Jorge Hernandez Llanas, Petitioner's brother, and Yolanda Hernandez Llanas, Petitioner's sister, signed affidavits stating that no one from the defense team came to Mexico to interview them. *See* Original Post-Conviction Application for Writ of Habeas Corpus, Exh. I, Affidavit of Yolanda Hernandez Llanas (hereinafter "Yolanda Hernandez Llanas Affidavit").

> b.     *Trial counsel's own failure investigate Petitioner's family and social history*

Garcia's affidavit states that he spoke to Petitioner's mother and sister Yolanda over the phone. Garcia Affidavit. His billing records, however, do not reflect any efforts to contact Petitioner's family until January 26, 2000—*after* jury selection had already begun. Exh. 17, Billing Records of A.J. Garcia at 7 (hereinafter "Garcia Billing Records"). According to his records, on that date, he drafted a letter to Petitioner's family. *Id.* Moreover, Yolanda Hernandez Llanas stated that she received a telephone call from trial counsel *after Petitioner's trial had begun*—during a recess—wherein she

was informed that her mother had to travel to the United States immediately (but did not clearly explain why).  Yolanda Hernandez Llanas Affidavit.

The family's account of the timing of Garcia's first contact with Petitioner's family is corroborated by both the date and the contents of a letter that Garcia sent to the family.  Exh. 16, Letter from Trial Counsel [Dated January 27, 2000] (hereinafter "Trial Counsel Letter").  Although the letter was sent to Yolanda Hernandez Llanas, its salutation addresses the "Hernandez Family" and, despite its date, *introduces* counsel to the family.  *Id.*  ("By way of this letter, we want to notify you all that we are the appointed attorneys to defend Ramiro Hernandez Llanas, who is accused of having committed a crime for which he is now being tried in the City of Bandera, Texas.").  It then goes on to explain that counsel are seeking the family's help to see what information they possess that might help Petitioner, giving the "example" of "something . . . in [Petitioner's] past to help the jury to mitigate or reduce the impact over the sentence," and "can include evidence of some event or accident in his past that possibly affects his actions or thoughts of today."  *Id.*  After stating that "it would not be necessary that you all present yourselves to give testimony, although on some occasions this type of testimony on the part of members of the family is very good for the jury," it requests that "you all" immediately call collect to discuss the matter.  *Id.*

Thus, Garcia's contact with Petitioner's family, due to its nature, brevity, and timing, was not investigative.

Pickell's billing records do not reflect any direct contact with Petitioner's family, his friends, or the community in which he grew up. *See* Exh. 18, Billing Records of Steven Pickell (hereinafter "Pickell Billing Records").

### c.   *Other investigative omissions*

Neither Pickell nor Garcia's time sheets reflect any investigation into the assault Serrano claimed she saw Petitioner commit. *See* Pickell's Billing Records; Garcia's Billing Records. Nor do those records reflect any investigation into, or outreach to, the victim's family.

### C.   A Truer Picture

An adequate investigation would have given the jury a less aggravated, more accurate sense of Petitioner's prior criminal history, as well as a compelling picture of the nightmare of Petitioner's childhood.

### 1.   Petitioner was not the assailant of the man stabbed outside a Kerrville Bar.

The state's penalty phase evidence that Petitioner stabbed a man outside a bar in Kerrville seemed persuasive; an eyewitness, Maria del Carmen Serrano, had testified to seeing the stabbing, S.F. Vol. 20 at 31, and a guard, Pedro Garcia, had testified that

86

Petitioner admitted his responsibility for that stabbing, *id.* at 59. As detailed in the Facts in Support of Ground C, *infra*, counsel could easily have acquired compelling evidence that Petitioner did not commit that crime.

What was that evidence? A disinterested eyewitness had identified Serrano's husband, Francisco Espino, as the assailant. Exh. 22, Kerrville Police Department Offense Report [Pertaining to Assault of Cesareo Ayala] at 10 (hereinafter "Police Report"). The victim himself had identified Espino as the perpetrator from a photographic line-up. *Id.* at 16. Although police were called to the scene and interviewed witnesses, no one even reported that Petitioner had even been there. *See Id.* at 1–16.

In contrast, Espino was undoubtedly present at the scene of the crime. Indeed, he was the driver of the van out of which the assailant had jumped. *Id.* at 16. Serrano herself had been in the van and had denied seeing who had committed the stabbing. *Id.* at 15. Further confirmation of Espino's involvement in an altercation was that he was taken to the hospital that same night with injuries to his head. *Id.* at 16. Finally, the police deemed Espino to be untruthful. *Id.*

This evidence was all readily available, wrapped up in a neat package in the police report on the assault—a very simple request would have produced it. Indeed,

87

because Pickell represented Espino prior to Espino's exoneration by Petitioner, he almost certainly already possessed the report.

### 2.      Petitioner's childhood was horrifying.

An adequate family and social history would have revealed that Petitioner grew up in unimaginable circumstances.  His childhood was not a childhood at all, but a developmental period during which he experienced extraordinary poverty, constant exposure to neurotoxins, and violent abuse at the hands of his parents.

#### a.      *Third world deprivation*

Petitioner, Ramiro Hernandez Llanas, grew up in Nuevo Laredo, Mexico. *See* E.H. Vol. 3 at 152.  He was one of ten children born to Martha Hernandez de Llanas and literally grew up in a dump.  E.H. Vol. 3 at 13; E.H. Vol. 4 at 297.

Jorge Hernandez Llanas, Petitioner's brother, testified that the family moved to the waste dump because they were very poor.  E.H. Vol. 3 at 14.  When the family arrived at the dump, they did not have a dwelling and slept on the ground outdoors. E.H. Vol. 4 at 298. Eventually the family built a ramshackle hut from cardboard, metal, and wood they gathered from the dump.  E.H. Vol. 3 at 14.  Unsurprisingly, it was neither secure nor stable:

> The wind could have taken the house away.  I remember the
> one occasion, there was some kind of tornado and I

remember that my father - (witness crying) - I remember that
my father had to wire it down.  We used some wires to keep
it down.  I remember the house shaking with the wind.  It
was almost taken, like up in the air.

*Id.* at 15.

Rafaela Segura Guerra, a neighbor who witnessed the suffocating poverty the

family endured, also recalls that the family's dwelling was made from items Mr.

Hernandez Llanas's family found in the trash, such as cardboard and pieces of wood.

Exh. 1, Declaration of Rafaela Segura Guerra at 3 (hereinafter "Segura Guerra

Declaration").

The dwelling itself was unfit for habitation.  Rodents would come into the

dwelling, which had a dirt floor.  *Id.*; E.H. Vol. 3 at 17.  None of the dwellings in the

area had water or electricity.  E.H. Vol. 3 at 125; *See* Segura Guerra Declaration at 3.

Because the Hernandez Llanas family had no running water and the nearest clean water

was approximately one-and-a-half blocks from their house, the family fashioned hoses

out of waste material to transport the water to their house.  E.H. Vol. 4 at 303; Segura

Guerra Declaration at 3.

Petitioner's family made a living scavenging through the trash that was dumped

where they lived.  E.H. Vol. 4 at 294; Segura Guerra Declaration at 3.  Petitioner began

working at the dump when he was approximately four years of age, E.H. Vol. 4 at 18,

89

and was forced to work regardless of weather conditions, *see* Exh. 2, Declaration of Enedelia Lopez Vasquez at 2 (hereinafter "Lopez Vasquez Declaration").

Enedelia Lopez Vasquez, a neighbor who also worked scavenging through the trash, described the grueling nature of the work:

> Working in the dumps was very hard. People think that it is easy work but it's not, it is very hard work. You would end up black, black from the dust. Our hands would get black, black from the dirtiness. It would even look like we had our hands covered in coal. We worked without gloves. We did not have any type of protection. We worked among nothing but germs. Our noses would get full of dirt.
>
> It is also hard because we worked out in the open air. No matter what the weather would be like, that's how we had to work. We worked in the four winds. We worked in the very hot sun. If it was drizzling, we still had to take out garbage because if we did not clear out what the trucks had already dumped for us, the trucks would no longer dump more trash for us. Sometimes we even had to work at night in order to clear out what we already had.
>
> When we were working in the trash, we never knew what we were going to find. We would suddenly get hit by a stench. Sometimes there would even be dead animals among the trash.

Lopez Vasquez Declaration at 2.

The family even *ate* from the trash. Segura Guerra Declaration at 3. Cecilia Solorzano, a neighbor, recalled that when there was food left over at her house, her