mother sent that food to Ramiro's house because his family was so very poor.  Exh. 4, Declaration of Cecilia Solorzano at 2 (hereinafter "Solorzano Declaration").

### b.    Exposure to neurotoxins

Ramiro's family arrived at the dump when he was two or three years of age. E.H. Vol. 3 at 14.  This was no ordinary dump, but one that exposed Petitioner and his family to a variety of toxic chemicals—Jorge Hernandez Llanas, Petitioner's brother, testified that the waste being dumped at the site included "chemicals" and "spray containers." *Id.*  The dumped chemicals also included a black dust from a company that built brakes for cars. E.H. Vol. 3 at 14.  That dust "burned when you breathed or would even burn your eyes." *Id.*

On several occasions, fires ignited at the dump. E.H. Vol. 3 at 20.  Petitioner's brother recalled one such fire:

> I remember one time there was a chemical fire.  There was this white dust they would come to throw at the house, like on the side of the house.  I remember that I was going with my dad and this big water truck spilled water. Either they rolled over, but they spilled water and on contact with some tanks, they exploded and there was a big explosion . . . . I remember that on that occasion, my father was carrying my younger sister.  We were trying to run away from this explosion, because this explosion was so big that the tanks blew up and they got up to four of five blocks away, and there was even a big hole on the ground.

*Id.* at 20–21.

Petitioner was exposed to additional toxins through the water he drank. Yolanda, Petitioner's sister, testified that the family stored water in containers formerly used by gas stations. E.H. Vol. 4 at 303. According to Yolanda, the family had to clean the containers because they had an oily residue. *Id.* Yolanda described how the family cleaned the containers:

> With a sharp tool we started hitting on the edge of the container until we were able to take off the lid. At that point the container was very, very dirty. Then we would clean it with the same trash, or we would grab plastic, or pieces of paper, or with dirt, and because I was the oldest one, I would grab a stick and I would try to clean it with it.

*Id.* Yolanda further recalled that as a young child, Petitioner *would climb inside the containers* in an attempt to clean them. *Id.* He did so despite the fact that Yolanda advised him not to get inside the containers. *Id.* According to Yolanda, "[H]e would come out all black, coal black, and you could only see his eyes." *Id.*

### c.    *Physical abuse*

In addition to these environmental assaults, Petitioner's childhood was marked by severe physical abuse. Petitoner's brother recalled that their father disciplined Ramiro by hitting him with "belts, wires, hoses, whatever was available." E.H. Vol. 3 at 24. His sister Adelita corroborated this paternal abuse:

> My father at work had some kind of stake, the one that he used there to hit the horses. He always had it inside a container with water because he

> would use it to keep the animals away so they wouldn't come and knock things down. And when we didn't obey him, that's the wood he would hit us with. He would also hit us with electricity cables, with wires, with a belt, with a broom, or with whatever he could find.

*Id.* at 261.

Petitioner's mother was even more violent than his father. Adelita testified that their mother "would kick [Ramiro] and she would hit him with electric wires, the ones that go over the posts. She even once broke a broomstick in his back." E.H. Vol. 4 at 238. Yolanda, another sister, provided the following description of the violence that Ramiro endured as a child:

> My mother was a very - - was very hard on us. Instead of explaining to us how things were supposed to be done, she would demand everything by yelling at us, mistreating us, beating us. Everything was depressive, everything wrong. And then, those who were the older ones, what we did was just hide. We would hide from her because they were beating us. Beatings that she would give us she would use sticks or bars that she would get from trash tables. Everything—anything she could find, she would hit us with it. And since Ramiro was the one who understood the least, he was the one who got beaten the most . . . . That's why, when my mother would come looking for Ramiro, what Ramiro would do is hide among the cardboard boxes that were laying there . . . . [M]y mother would come looking for him and she would start hitting with these bars all the boxes. So whenever she found Ramiro, she would leave him laying on the floor almost passed out because of the beating he would get. It was always like that. Our childhood was treated this way.

*Id.* at 301–302.

Rafaela Segura Guerra confirmed that Ramiro sustained severe abuse at the hands of his mother. Segura Guerra Declaration at 2. She stated, "Sometimes she would hit him with a belt, sometimes with a rope, sometimes with a piece of metal. She would beat Ramiro with whatever she could find. I got to see marks from the beatings he would get from his mother" *Id.* According to Ms. Segura Guerra, Ramiro sought refuge from the beatings at her house:

> Ramiro frequented my house a lot because that's where he would go defend himself. When he knew that his mother was going to beat him, he would go to my house because he knew that I was going to protect him. Sometimes his mother would would be going around looking for him and she would come to my house and ask me if I had seen Ramiro. When I would see that Ramiro's mother was getting close to my house, I would say to Ramiro, 'Get inside son, get inside the house.' I would tell her that I hadn't seen Ramiro because I knew that his mother was going to beat him. Once I saw that his mother was far from my house, I would tell Ramiro to go. I would send him off because I did not want any problems with Mrs. Marta.

*Id.*

Neighbor Cecilia Solorzano also recalled the severe abuse that Ramiro and his siblings endured at the hands of their parents:

> Ramiro's family was strange. Mrs. Martha, Ramiro's mother, was too harsh with her children. When I lived in Mexico, I was scared of Ramiro's mother. That woman yelled a lot. She dealt with her children by yelling and hitting. She would say very harsh curse words to them. Since our house was very close to Ramiro's house, we

> could hear when she would beat her children.  It sounded as
> though she was hitting them with a whip and you could hear
> the screams of the children.

Solorzano Declaration at 2.

>    d.    *Petitioner's cognitive and adaptive functioning limitations*

As described in detail in the Facts Supporting Ground A, *supra*, the evidence

of Petitioner's adaptive functioning limitations is overwhelming.  At the time of

Petitioner's trial, mental retardation was not a bar to the imposition of the death penalty,

but it could nonetheless serve as a powerful mitigating factor; likewise, even if Petitioner

is not deemed to meet the standard for mental retardation, counsel's failure to develop

the wealth of available information on his impaired adaptive functioning deprived the

jury of important mitigating information.

Had counsel investigated and presented the available evidence of Petitioner's

extremely poor functioning, described at length in Ground A, they could and should

have supplemented that evidence with facts showing that neither his family nor his

community responded appropriately to those limitations, thereby exacerbating the

effects of those limitations on the person Petitioner became.

Petitioner's brother Jorge testified that Ramiro was not in special education because his parents did not pay attention to his special needs. E.H. Vol. 3 at 23. When asked whether their father supported Ramiro's education, Jorge responded,

> No. My father was a working man and the way he thought is that 'If you don't study and you don't go to school, you going to end up being an ass and not going to school, so you would just come to work with me at the dump yard.'

*Id.*

Adelita, who has a special needs child herself, explained that none of the children "had the attention of [their] mother." E.H. Vol. 4 at 237.[22] According to Adelita, Petitioner's siblings attempted to assist Ramiro with school work, but they would get frustrated:

> Well, what happened is that my brothers would get frustrated with him and they would tell him, hurry up, and they would give him a bump on his head. And then they would tell him, 'And go away from here, I don't want to deal with you.'

---

[22] Indeed, Adelita testified that at the time that Ramiro was growing up she herself did not recognize his impairments as symptoms of mental retardation because of her misconceptions about mental retardation. E.H. Vol. 4 at 232–235. Due to her son's impairments, however, she has since become familiar with the behavioral manifestations of mental retardation. *Id.* As a result of her increased understanding, she now realizes that Ramiro's behavior was caused by mental retardation. *Id.* 261–263.

*Id.* at 241. Additionally, neighbor Cecilia Solorzano commented that she never saw Ramiro's Llanas's mother do anything to better her childrens' situation. Solorzano Declaration at 3.

Observations of school personnel further illustrate the mother's utter lack of understanding about her son's impairments. Sara Alicia Herrera Saldivas, who taught at the school that Ramiro attended, stated, "What always made an impression on me about Ramiro was that his mother would take him to school with a little branch in her hand like the ones to herd the animals. She would go along hitting Ramiro with the little stick so that he would go to school." Exh. 3, Declaration of Sara Alicia Herrera Saldivas at 1–2 (hereinafter "Herrera Saldivas Declaration").

Not only did Petitioner's family fail to seek professional intervention for Petitioner's special needs, but they severely abused him because of his impairments. E.H. Vol. 3 at 24. Adelita testified that their mother "beat Ramiro a lot" because of his poor performance, E.H. Vol. 4 at 238, and that he received the most punishment because of his stupidity, *id.* at 261. Similarly, Ramiro's sister Yolanda testified that Ramiro was beaten the most because he understood the least. *Id.* at 302.

Despite Petitioner's stark failures in school, *see, e.g.*, *id.* at 240; E.H. Vol. 3 at 25; E.H. Vol. 4 at 301, his family and friends reported that he received no special

education services, E.H. Vol. 3 at 67; E.H. Vol. 4 at 301. Teacher Sara Alicia Herrera

Saldivas confirmed those reports:

> [During the time Ramiro was in school], there were no psychologists in
> the school. There were also no special education services for those
> students with learning problems. We truly had no support. As a teacher,
> one had from 40 to 50 students in each classroom and we had to do
> everything: be a teacher, be a babysitter, be a psychologist.

Herrera Saldivas Declaration at 3.

Thus, trial counsel could have shown the jury that in the shuffle of life's cards,

Petitioner got virtually nothing. Born and raised in abject poverty, he was exposed to

poisonous chemicals and beaten by violent parents, and whether his cognitive deficits

were caused by genetics or environment, he received no help from anyone in learning

how to compensate for them.

> 3.    The victim's wife was morally and religiously opposed to the death
>        penalty.

Counsel left yet one more obvious stone unturned. The most aggravating aspect

of the case against Petitioner was not his prior crimes, but his crimes against Glen Lich

and his wife Lera Tyler. Tyler, however, "objected to the death penalty on moral and

religious grounds in all cases," and remained opposed to the death penalty even after

her husband was murdered. Exh. 28, Affidavit of Lera Patrick Tyler at 1 (hereinafter

"Tyler Affidavit"). In her view, "it is not for humans to decide whether a person

should live or die when there is no other life at stake." *Id*. Consistent with her beliefs,

she "told Mr. Curry [the district attorney] that if someone asked [her] if [she] wanted

the death penalty, [she] would say no." *Id*.

If one of the defense lawyers had approached her, "[Ms. Tyler] would have told

him the same thing [she] told Mr. Curry," *id*., but no one from the defense team ever

contacted Ms. Tyler, *id*.; *see also* Garcia's Billing Records (showing no meetings);

Pickell's Billing Records (same).

## REASONS THE WRIT OF HABEAS CORPUS SHOULD BE GRANTED

### A.    The Clearly Established Supreme Court Law

Under clearly established Supreme Court precedent, a defendant's Sixth

Amendment right to the effective assistance of counsel is violated whenever counsel

provides professionally deficient representation that results in prejudice. *Strickland v.*

*Washington*, 466 U.S. 668 (1994); *see Wiggins v. Smith*, 539 U.S. 510 (2003);

*Williams v. Taylor*, 529 U.S. 362 (2000).

### 1.    Deficient Performance

In the context of a capital sentencing proceeding, counsel's performance is

deficient whenever he breaches his duty "to conduct a thorough investigation of the

defendant's background." *Williams*, 529 U.S. at 396 (*citing*, 1 ABA Standards for

Criminal Justice 4–4.1, commentary, p. 4–55 (2d. ed. 1980)); *accord Neal v. Puckett,*

286 F.3d 230, 236 (5th Cir. 2002) ("In the context of a capital sentencing proceeding,

defense counsel has the obligation to conduct a 'reasonably substantial, independent

investigation' into potential mitigating circumstances." (citation omitted)); *Collier v.*

*Turpin*, 177 F.3d 1184 (11th Cir. 1999). Counsel's performance is also deficient if he

fails to fully investigate the state's evidence in aggravation. *Rompilla v. Beard*, 545

U.S. 374 (2005) (finding counsel's performance deficient for failing to examine the file

on defendant's prior rape and assault).

Although strategic decisions made after thorough investigation are "virtually

unchallengeable . . . [,] strategic choices made after less than complete investigation are

reasonable precisely to the extent that reasonable professional judgments support the

limitations on investigation." *Strickland*, 466 U.S. at 690; *Wiggins*, 539 U.S. at 521

(quoting *Strickland*); *Soffar v. Dretke,* 368 F.3d 441, 487 (5th Cir. 2004) (same); *Lewis*

*v. Dretke*, 355 F.3d 364, 367 (5th Cir. 2003) (per curiam) (same).

2.   Prejudice

The prejudice prong of the *Strickland* test requires the defendant to show that

"there is a reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different." *Strickland*, 466 U.S. at 694;

*accord Lewis,* 355 F.3d at 366; *Turner v. Crosby*, 339 F.3d 1247, 1275 (11th Cir. 2003). In the context of the evidence presented by trial counsel at the sentencing phase, this occurs when the full body of mitigating evidence that could have been presented in a capital case "might well have influenced the jury's appraisal of [the defendant's] moral culpability." *Williams*, 529 U.S. at 398.

## B.   Argument

In the sentencing phase of a capital trial, "the jury is called upon to make a 'highly subjective, unique, individualized judgment regarding the punishment that a particular person deserves.'" *Turner v. Murray*, 476 U.S. 28, 33 (1986) (*quoting, Caldwell v. Mississippi*, 472 U.S. 320, 340 n.7 (1985)). The only issue, by definition, is whether life imprisonment or death is the appropriate punishment. *See Spaziano v. Florida*, 468 U.S. 447, 459 (1984) (the "fundamental issue" in a capital sentencing proceeding is "a determination of the appropriate punishment to be imposed").

Given this issue, it is imperative that the sentencing body possess the fullest information possible concerning the defendant's life and characteristics. *Lockett v. Ohio*, 438 U.S. 586, 602–03 (1978). For the sentencing body to be able to give full effect to this evidence, trial counsel must investigate the defendant's life and present all relevant mitigating evidence. *See Williams*, 529 U.S. at 396. The failure to do so

prevents the sentencing body from considering those "compassionate or mitigating factors stemming from the diverse frailties of humankind," and, therefore, creates an unacceptable risk that the death penalty will be imposed in spite of factors that warrant a less severe penalty.   *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976).

      1.    Trial counsel performed deficiently.

          *a.*    *Trial counsel's failure to rebut the state's evidence of the stabbing*

Trial counsel had a duty to investigate defenses to the state's evidence in aggravation, as well as to construct an affirmative mitigation case.  With respect to the performance prong, this case is squarely controlled by *Rompilla v. Beard*, 545 U.S. 374 (2005).  As in *Rompilla*, trial counsel in this capital case failed to examine the file on a prior offense and, consequently, did not follow the exculpatory information laid out in the file; as in *Rompilla*, that failure constituted deficient performance.  The only distinction between this case and *Rompilla* is that the file in question in *Rompilla* was his own, whereas the file here was that of the man first charged with the offense the state was attempting to attribute to Petitioner.   That, distinction, however, is inconsequential given that trial counsel had notice that Petitioner would be accused of the offense in the penalty phase and knew that there existed a file concerning that

offense. Indeed, if anything, the fact that the case file concerned another suspect made it *more* likely that the file would contain exculpatory information.

Had counsel examined the file—and perhaps he had, in connection with his defense of Espino—he was obligated to investigate the facts in that file that pointed to another perpetrator. *Anderson v. Johnson*, 338, F.3d 382, 391 (5th Cir. 2003) ("[C]ounsel's failure to interview eyewitnesses to a charged crime constitutes 'constitutionally deficient representation.'") (quoting *Bryant v. Scott*, 28 F.3d 1411, 1418 (5th Cir. 1994) and noting that *Strickland* guided its holding); *Beltran v. Cockrell*, 294 F.3d 730, 734 (5th Cir. 2002) (finding that counsel's failure to interview eyewitness and present evidence that eyewitness had previously identified co-defendant as the shooter was deficient performance). In *Anderson*, the Fifth Circuit found counsel's performance deficient because, after the victim had identified his client as the perpetrator, counsel failed to interview the only other adult eyewitness to the crime. 338 F.3d at 392. Here, the file indicated that *both* the victim and an eyewitness had identified the true perpetrator as someone other than the defendant *and* provided other facts that would lead a jury to believe Petitioner was not the perpetrator. These additional facts include—but are not limited to—Espino's identity as the driver of the van from which the perpetrator jumped, *cf. Beltran*, 294 F.3d at 734 (finding that co-

103

defendant's presence in the getaway car pointed to his guilt rather than Beltran's); Espino's own injury on the night of the stabbing, in contrast to the absence of any witness who had seen Petitioner's at the scene, *cf. id.* (co-defendant had a tattoo like the one described by an eyewitness, whereas Beltran did not); and a police officer's belief that Espino was lying. Thus, just as counsel's representations of Anderson and Beltran were deficient, counsel's failure to investigate the evidence that Espino, rather than Petitioner, was the assailant constituted constitutionally deficient performance.

None of the plausible explanations for Pickell's failure to examine the Espino file (or follow up on its multiple leads, or present the exculpatory evidence) absolve him of the charge of deficient performance. His conflicting duty to Espino, whom he had just finished representing, may have deterred him. *See* Ground C, *infra* (arguing that counsel labored under a conflict of interest that adversely affected his representation of Petitioner). If that was the case, then he undoubtedly should have sought to withdraw as Petitioner's counsel. Alternatively, as suggested by his total failure to investigate Petitioner's family and social history, the failure to investigate facts pointing to another perpetrator "[was] likely the result of either indolence or incompetence." *Anderson*, 338 F.3d at 393.

That Petitioner had agreed to take the blame for Espino does not excuse counsel's inaction. This is particularly so given that counsel was—through his prior representation of Espino—well aware that Petitioner's friend Serrano (Espino's wife) had coaxed Petitioner into confessing afer Petitioner had been arrested on capital charges. As in *Soffar v. Dretke*, counsel was deficient in failing to contact witnesses or interview police officers that took the statement of those witnesses because, had he done so, "the reliability of [Petitioner's] confessions would have been undermined." 368 F.3d at 477.

### b.   *Trial counsel's failure to conduct an adequate mitigation investigation*

Counsel's performance is deficient whenever he breaches his duty "to conduct a thorough investigation of the defendant's background." *Williams*, 529 U.S. at 396 (citations omitted); *accord Neal v. Puckett,* 286 F.3d 230, 236 (5th Cir. 2002) ("[I]n the context of a capital sentencing proceeding, defense counsel has the obligation to conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances." (quoting *Baldwin v. Maggio*, 704 F.2d 1325, 1332–33 (5th Cir. 1983))). Here, trial counsel conducted virtually no investigation into Petitioner's family and social history.

        *i.     Santiago Gutierrez's failure to conduct a family and
              social history investigation*

Lead trial counsel Pickell signed an affidavit claiming that he hired Santiago
Gutierrez and instructed him to travel to Mexico in "in an effort to contact family,
friends, and acquaintances of [Petitioner] regarding such things as his childhood,
background, health, living conditions, past criminal acts and general character
background" and stating that Gutierrez also interviewed Adelita Hernandez Llanas,
Petitioner's sister, who resided in Texas. Pickell Affidavit. But Gutierrez was not an
appropriate, or even reasonable, person to assign to the task of conducting a family and
social history investigation, and he did not in fact conduct one.

Gutierrez is a former police officer who had no training in, or inclination to,
conduct a family and social history investigation. Gutierrez Declaration at 1 (describing
his job as an investigator as "finding where police have made mistakes" and
acknowledging that he had "never had any training in how to conduct a family and
social history investigation"). Gutierrez's "business did not include doing that kind of
work," and at the time of Petitioner's offense, Gutierrez was in his 70s and had retired
from investigation. *Id.* Pickell called Gutierrez because Gutierrez "was familiar with
Mexico," *id.*, and what Pickell asked him to do was very limited: " find and speak to
Ramiro's mother, and ask her to come to Ramiro's trial to testify." *Id*

His first trip was completely fruitless because he went to the wrong place. *Id.* at 1–2. Though there is some discrepancy between Gutierrez's two sworn statements as to whether he made a second trip in which he spoke to Petitioner's mother in person, Gurierrez Declaration at 2, or simply spoke to her by phone after his failed attempt to visit her, Gutierrez Affidavit, it is undisputed that he did not interview "any other family members, neighbors, or school teachers in Mexico," Gutierrez Declaration at 2. This was because Pickell "had not asked [him] to speak to anyone else, and [had told Gutierrez] to do what he had asked as quickly as possible." *Id.*

Gutierrez did speak to Petitioner's sister, who lives in Texas, to ask her about testifying at the trial, but she did not want to do it. *Id.* He did not speak to any other family members at all, *id.*, and indeed, did not even speak to Petitioner himself about his background, *id.* at 1.

Thus, Gutierrez did not ask the questions of either Petitioner's mother or his sister that would have been appropriate to a family and social history investigation. Moreover, competent family and social history investigations do not rely solely upon *two* informants. Thus, what Gutierrrez did was not a family and social history at all.

Counsel swore that, based upon the results of the Gutierrez interview with Adelita, he "did not feel that it was necessary, or even potentially in the best interest of

107

Mr. Hernandez Llanas to dwell on interviews with her or additional family members."

Pickell Affidavit.  If this statement was an attempt to articulate a reasonable strategic

reason for not conducting a family and social history investigation, it failed entirely.

For two reasons, Adelita's negative reaction—as well as the negative information

she possessed—could not justify the termination of a family and social history that had

essentially not yet begun.  First, Gutierrez, due to both his lack of training and Pickell's

meager instructions, had not asked Adelita the kind of questions that would have

elicited mitigating social history information.[23]  One could hardly expect her to

volunteer such information without knowing that it was even being sought.  Only *after*

a competent, sensitive inquiry into what information Adelita possessed about Petitioner

could counsel balance that information against negative information that might be

elicited on cross-examination were she were called as a witness.  "It is axiomatic. . .

that such a decision by counsel cannot be credited as calculated tactics or strategy

unless it is grounded in sufficient facts, resulting in turn from an investigation that is at

least adequate for that purpose." *Lewis*, 355 F.3d at 368; *see also Adams v.*

*Quarterman*, 324 F. App'x 340, 352 n.55 (5th Cir. 2009) ("Although it may be

---

[23] When post-conviction counsel *did* ask her questions probing Petitioner's childhood, it turned out she had substantial knowledge of mitigating information.  See E.H. Vol. 4 at 230–91.

reasonable for an attorney to make a strategic choice not to present testimony of a psychological expert given that it could open the door to the State's presenting its own aggravating psychological evidence, in this case [defense counsel] made no effort to obtain sufficient information to determine whether evidence from an expert like [a professor of psychology] would have been useful."); *Dobbs v. Turpin*, 142 F.3d 1383, 1388 (11th Cir. 1998) (holding that a strategic decision is unreasonable "when the attorney has failed to investigate his options and make a reasonable choice between them").

Second, and even more importantly, whether Adelita had negative or positive information about Petitioner, or no relevant information at all, that information alone could not justify failure to consult other family members, friends, or other teachers. members. *See Neal v. Puckett*, 286 F.3d 230, 238 (5th Cir.2002) (en banc) (per curiam) (looking to affidavits of school, hospital, and prison staff); *Adams*, 324 F. App'x at 347 ("It is widely accepted that family members do not represent the only potential avenue of mitigating evidence."). Any one witness has limited information,

and may have a bias, which is why the Supreme Court has been so clear that a complete family and social history is necessary.[24]

ii.    *Garcia's failure to conduct a family and social history investigation*

Garcia's affidavit recounts that he called he personally spoke to two family members by phone (Petitioner's mother and his sister, Yolanda Hernandez Llanas), that he described Petitioner's situation to each of them, and that both his mother and his sister indicated that they did not want to testify at trial.  Garcia Affidavit.  Due to the timing and contents of Garcia's contacts with the family, they could not have served an investigative function.

The affidavit neglects to mention the date of this conversation, but according to Yolanda Hernandez Llanas, Garcia phoned her after trial had already begun.  Yolanda Hernandez Llanas Affidavit.  Garcia's billing records corroborate her recollection, as

---

[24] Although the Gutierrez interviews did not create a reason not to investigate, they did create an obligation to pursue and present the specific mitigating evidence Gutierrez himself observed and reported. Gutierrez reported two facts that should have prompted a specific line of investigation.  Gutierrez told Pickell that Petitioner "came from a very very poor place," and that Petitioner "has very low intelligence, and his mother is not very bright either, though she was better than [Petitioner]." Garcia Declaration at 2.  Because both poverty and low-functioning are mitigating, counsel certainly should have sought admissible evidence demonstrating those facts. *See Neal*, 286 F.3d at 236–237 (explaing that, in assessing counsel's performance, the "additional leads" that counsel discovers are relevant); *Housel v. Head*, 238 F.3d 1289, 1294 (11th Cir. 2001) ("When counsel ignores 'red flags' that any reasonable attorney would perceive as demanding further investigation," counsel is deficient).

they do not reflect any efforts to contact Petitioner's family until January 26, 2000—*after* jury selection had begun. Garcia Billing Records at 7. Moreover, the contents of the letter he drafted on that date make it clear that neither Garcia nor Pickell had ever spoken to family members previously. *See* Trial Counsel Letter ("By way of this letter, we want to notify you all that we are the appointed attorneys to defend Ramiro Hernandez Llanas, who is accused of having committed a crime for which he is now being tried in the City of Bandera, Texas."). This contact occurred far too late to serve as the beginning of a family and social history investigation, which ordinarily takes months. *See Blanco v. Singletary*, 943 F.2d 1477, 1501–02 (11th Cir. 1991) (recognizing that waiting until after the defendant is convicted to talk with mitigation witnesses results in counsel being too hurried to do an adequate job, and "almost insures that the witnesses will not be available"); *see also Hamblin v. Mitchell*, 354 F.3d 482, 487 (6th Cir. 2003) ("[A] full and complete investigation of mitigating evidence . . . should be conducted before the guilt phase of the case") (citing *Glenn v. Tate*, 71 F.3d 1204, 1206–08 (6th Cir. 1995); *Douglas v. Wainwright*, 714 F.2d 1532, 1556 (11th Cir. 1983) (explaining that counsel's failure to prepare the accused to testify, and his failure to seek out evidence until the middle of the penalty phase, certainly did not meet constitutional standards of effective counsel); ABA *Guidelines,*

111

11.8.3 ("[C]ounsel should discuss with the client early in the case the sentencing alternatives available, and the relationship between strategy for the sentencing phase and for the guilt/innocence phase.").

Even if Garcia had written the family in a timely manner, the content of his communication rendered it an inappropriate vehicle for eliciting a family and social history. Although the letter asked the family "what information they possess that might help Petitioner," the only explanation of what kind of information might be helpful is "something . . .in [Petitioner's] past to help the jury to mitigate or reduce the impact over the sentence, [which] can include evidence of some event or accident in his past that possibly affects his actions or thoughts of today." Trial Counsel Letter. Even an educated layperson in the United States might be confused about what Garcia sought, and Petitioner's family—poor, uneducated, and living in another country—would have been understandably clueless. Finally, there was no assurance that anyone besides the addressee, Petitioner's sister Yolanda, would read it.

Taken together, the best that can be said about Gutierrez's trip and Garcia's letter is that counsel hoped that some helpful information might be produced. Hope is not the sole method employed by effective counsel.

    c.  *Trial counsel's failure to approach the victim's family*

That trial counsel failed to approach the victim's family is the least of his derelictions; certainly the value of the admissible evidence likely to be obtained by investigation into the stabbing, and into Petitioner's family and social history, was far greater. Moreover, defense-initiated victim outreach, while laudable, *see, e.g.*, Mickell Branham & Richard Burr, *Understanding Defense-Initiated Victim Outreach and Why It Is Essential in Defending a Capital Client*, 36 HOFSTRA L. REV. 1019, 1032–33 (2008) (concluding that outreach has positive transformative effects on those affected by murder), is not yet standard practice. Nonetheless, the fact that trial counsel did not do that *either* is relevant in assessing the competence of their investigation.

In this case, there were reasons to think that the victim's family did or might oppose the death penalty. First, without any more investigation than reading the victim's obituary, trial counsel could have ascertained that the victim's family attended an Episcopalian church. *See Funerals & Death Notices*, THE SAN ANGELO STANDARD-TIMES ONLINE, October 15, 1997, *available at* http://files.usgwarchives.net/tx/tomgreen/obits/1997/101597.txt (last visited September 4, 2009).

113

Beginning in 1958, that denomination "opposed capital punishment on a theological basis that the life of an individual is of infinite worth in the sight of Almighty God; and the taking of such a human life falls within the providence of Almighty God and not within the right of Man," 66TH GENERAL CONVENTION OF THE EPISCOPAL CHURCH, REAFFIRM OPPOSITION TO CAPITAL PUNISHMENT, Res. No. 1979-D004 (1980), http://www.episcopalarchives.org/cgi-bin/acts/ acts_resolution-complete.pl?resolution=1979-D004, and reaffirmed its opposition in 1969 1979, and 1991, 70TH GENERAL CONVENTION OF THE EPISCOPAL CHURCH, REAFFIRM OPPOSITION TO CAPITAL PUNISHMENT, Res. No. 1991-D056 (1992), http://www.episcopalarchives.org/cgi-bin/acts/acts_resolution-complete.pl?resolution=1991-D056. Second, the defense received notice of the state's death penalty witnesses, and Lera Tyler was not on that list. Finally, Ms. Tyler did not attend any portion of the trial other than the day that she was called to testify. Despite these signs pointing toward opposition, no one from the defense team approached Ms. Tyler, rendering that one more thing that trial counsel failed to do.

2.      Trial counsel's deficient performance resulted in prejudice.

Petitioner grew up in poverty unimaginable to most of people who sat in Petitioner's jury. His "house"—made of cardboard and scrap metal, lacking electricity,

114

running water, and walls that were insecurely attached—had rodents running through it . He ate from the trash. He had to work outside sorting trash from the age of four. He was exposed to toxic chemicals and waste, not once, but had to breath and drink them every day. Both of his parents beat him mercilessly. No one helped him to learn. He could not function as normal children do, and he was beaten and exploited because of his limitations; his childhood was an unimaginable nightmare.

Due to counsel's complete failure to investigate, the jury did not gain an accurate sense of little the boy Ramiro was—they heard only about the man that little boy became. And, also due to counsel's dereliction of their duty, the jury believed that the man sitting before them had stabbed someone when he had, in fact, not done so.

In order to establish prejudice, a petitioner need only show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S.at 694. No reasonable application of this test could lead to the conclusion that the truth would move *not even one* of the twelve jurors to show mercy. *See Lewis,* 355 F.3d at 369 (holding that had the evidence of childhood abuse been presented, "it is quite likely that it would have affected the sentencing decision of at least one juror"); *see also Walbey v. Quarterman*, 309 F. App'x. 795, 803 (5th Cir. 2009) (finding prejudice from counsel's

failure to present a complete picture of the "bloodcurdling facts of [the defendant's] upbringing"); *Adams* 324 F. App'x. at 352 (finding prejudice stemming from the failure to present available mitigating evidence of childhood abuse, neglect and abandonment); *Cunningham v. Zant*, 928 F.2d 1006, 1017–20 (11th Cir. 1991) (holding that counsels' deficient performance in failing to present evidence of the defendant's low intellect, and poor socioeconomic background prejudiced the defendant); *Caro v. Woodford*, 280 F.3d 1247 1258 (9th Cir. 2002) (finding prejudice due to counsel's failure to investigate and present evidence of history of head injuries, exposure to neurotoxins, and physical abuse).

### 3. The state court's treatment of this claim

#### a. *The Wiggins-Strickland failure to investigate Petitioner's background*

Petitioner sought, but was denied, a hearing on his claim that counsel's failure to conduct a family and social history investigation violated his Sixth Amendment right to counsel.[25] On the merits of that claim, the state post-conviction court found that trial counsel's performance in the penalty phase was not deficient, which the Texas

---

[25] Petitioner also sought a hearing on his mental retardation claim. The Texas Court of Criminal Appeals remanded for a hearing on that claim, but declined to remand for a hearing on Petitioner's *Strickland-Wiggins* claim.

Court of Criminal Appeals affirmed. *Ex parte Ramiro Hernandez*, 2008 WL 4151813, WR-63, 282-01 (Ct. Crim. App. September 10, 2008). The post-conviction court's order neither addresses nor finds any procedural bar to that claim. *See State v. Ramiro Hernandez a/k/a Ramiro Hernandez Llanas*, Cause No. A97-364-1 (Tex. Dist. Ct.-216th Mar. 7, 2006) (hereinafter "March 7 Order"). The order does not address the prejudice arising from counsel's omissions. *See id.*

The court concluded that Petitioner "was not denied the effective assistance of counsel . . . based on the alleged failure of counsel to conduct meaningful mitigation investigation, as the evidence indicates there was reasonable investigation conducted." *Id.* at 26. In support of that conclusion, the court offered only the following, very brief factual findings:

> e. The court finds that trial counsel employed an investigator to locate and contact the family of the applicant, which action was accomplished. The court finds that trial counsel communicated directly with relatives of the applicant and had arranged transportation for said relatives to Bandera, Texas, to be present at the trial to testify. The court finds that the decision of said relatives not to appear was caused by their own decision, not by any action or lack of action on the part of trial counsel. (State's Habeas Corpus Exhibit No. 2).

> f. The court finds that trial counsel communicated with a sister of the applicant who resided in the Kerr County area, and that counsel was advised by this sister, Adelita Hernandez, of circumstances which would have been harmful to the applicant in terms of mitigation, including lack of any conduct since childhood that would support adaptive behavior in

the nature of mental retardation. She also advised counsel of previous assaults and threats of sexual assault made by the applicant toward herself and another family member. The court finds that counsel determined not to call this family member as a witness. (State's Habeas Corpus Exhibit Nos. 1& 2).

*Id.* at 20–21.

Despite their brevity, these findings of fact contain "an unreasonable determination of the facts." *See* 28 U.S.C. § 2254 (d) (2). An examination of trial counsel's affidavits reveals that, contrary to the state court's finding, counsel did not claim to have himself "communicated with a sister of the applicant." Rather, he claimed that his investigator did so. Moreover, trial counsel did not state that she advised him, or any one else, "of previous assaults and threats of sexual assault toward herself and another family member." Rather, trial counsel said his investigator relayed that Petitioner's sister "was very uncomplimentary of her brother . . . stating among other things that he had previously assaulted her." Thus, there is no mention of a sexual assault—or any mention of an assault on other family members—and consequently, the court's determination of the facts was unreasonable.

The lower court does not describe the standard it applied in concluding that a reasonable investigation was conducted, but its conclusion was "contrary to" *and* "involved an unreasonable application of" the governing standard as laid out in

118

*Strickland* and *Wiggins*.  *See* 28 U.S.C. § 2254(d)(1).  In the context of a capital sentencing proceeding, counsel's performance is deficient whenever he breaches his duty "to conduct a thorough investigation of the defendant's background." *Williams*, 529 U.S. at 396 (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d. ed. 1980)); *accord, Neal*, 286 F.3d at 236 ("[I]n the context of a capital sentencing proceeding, defense counsel has the obligation to conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances." (quoting *Baldwin*, 704 F.2d at 1332–33)); *Collier*, 177 F.3d at 1201–02. Any determination that counsel's actions constituted "a thorough investigation" ignores the plain mean of the noun "investigation" as well as that of the modifier "thorough." *See Williams*, 529 U.S. at 396

The court made the factual determinations that: counsel hired an investigator who "contacted" the family; counsel "communicated directly with" those relatives and arranged for their transportation, and counsel "communicated with" Adelita Hernandez Llanas.  March 7 Order at 20–21.  Neither "contact" nor "communication" is investigation.  Three contacts never could be a "thorough investigation of the defendant's background" as required by *Williams*.

119

Moreover, if the court's factual finding that Adelita provided counsel with harmful information and he "determined not to call her" is an inept attempt to claim a strategic decision justifying the failure to investigate, it is also an unreasonable application of Supreme Court precedent.  Although strategic decisions made after thorough investigation are "virtually unchallengeable . . . [,] strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland,* 466 U.S. at 690; *Wiggins,* 539 U.S. at 521 (quoting *Strickland*); *Soffar,* 368 F.3d at 487 (same); *Lewis,* 355 F.3d at 367 (same).  Because counsel's "investigation" did not qualify as an actual investigation, he could not make a reasonable strategic decision not to call Adelita, let alone make a reasonable decision not to call family and social history witnesses with whom no member of the defense team had ever spoken.

Consequently, the state court's determination that counsel's decision was reasonable despite counsel's failure to investigate potentially mitigating evidence was "contrary to" and "involved an unreasonable application of" clearly established law. *See* 28 U.S.C. § 2254(d)(1).

> b.   *The* Rompilla *failure to examine the prior offense file and the failure to approach the victim's family*

120

The Texas Court of Criminal Appeals  dismissed the successive petition containing this claim without specifically discussing this claim and, therefore, did not address the arguments Petitioner set forth here.

## CONCLUSION

For the foregoing reasons, Petitioner was deprived of his right to the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution, thus requiring the issuance of a writ of habeas corpus.

## GROUND C

**PETITIONER WAS DEPRIVED OF HIS RIGHT TO THE CONFLICT-FREE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY HIS TRIAL COUNSEL'S PRIOR REPRESENTATION OF THE TRUE PERPETRATOR OF AN ASSAULT ATTRIBUTED TO PETITIONER BY THE STATE IN THE PENALTY PHASE OF HIS CAPITAL TRIAL.**

During the penalty phase of Petitioner's trial, the State called Petitioner's "friend," Maria del Carmen Serrano, to testify that she saw Petitioner stab a man on the patio of a Kerrville bar.  Serrrano was the wife of Francisco Espino, who had originally been charged with the stabbing, which certainly gave her a motive to lie; but, the testimony of prison employee Pedro Garcia buttressed her account by

121

recalling that Petitioner admitted to him that he had indeed stabbed the man.  What the jury did not learn, however, was that a disinterested eyewitness had identified Espino as the assailant; that the victim himself had identified Espino as the perpetrator from a line-up; that although police were called to the scene, there was no evidence Petitioner had ever been there; that Espino was undoubtedly present at the scene of the crime and taken to the hospital with injuries himself; and that police deemed Espino to be untruthful.  Why did the jury not hear the evidence that debunked Serrano's story of Petitioner's responsibility for the stabbing?  Because the lawyer who brokered Espino's exoneration at Petitioner's expense was, three days after charges were dismissed against Espino, appointed lead trial counsel for Petitioner.  This successive representation of Espino and Petitioner constituted an actual conflict of interest that adversely affected trial counsel's performance, thus violating the Sixth and Fourteenth Amendments.  *See Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980).

## FACTS RELEVANT TO THIS GROUND FOR RELIEF

On August 3, 1997, Cesareo Ayala was stabbed in the chest outside of a bar in Kerrville.  Officers from the Kerrville Police Department interviewed both Ayala and Enrique Sauceda that night at the Sid Peterson Memorial Hospital.  Sauceda

reported that he and his friend Ayala were walking out of Homero's Bar when a Hispanic male driving a blue van got out and stabbed Ayala.  Sauseda stated that he did not know the driver of the van but would recognize him if he saw him again. Exhibit 22,  Kerrville Police Department Offense Report [Pertaining to Assault of Cesareo Ayala] at 9 (hereinafter "Police Report").

Ayala, the victim of the assault, was also interviewed by Kerrville Police.  He stated that he was walking out of the bar with Sauseda when the driver of the blue van jumped out from the vehicle and stabbed him twice.  *Id.*  Ayala further reported that the passenger of the van also jumped out and both began to kick him.  *Id.* Ayala said that he had previously seen the driver of the van at a baseball game but did not know his name.  *Id.*

That same night, Kerrville Police transported Francisco Espino to the Sid Peterson Memorial Hospital Emergency Room because he had a head injury.  *Id.* at 10.  While Espino was checking in, Sauseda saw him and told a police officer that Espino was the man who had stabbed Ayala.  *Id.*  Police obtained an arrest warrant charging Espino with aggravated assault, arrested him, and transported him to the Kerr County Sheriff's Office.  *Id.*

The police also interviewed Carmen Medina (Espino's wife, also know as Maria del Carmen Serrano).  "[Medina/Serrano] was in the van and witnessed the fight but did not witness who stabbed the victim."  *Id.* at 15.

The following day, Ayala was presented with a photographic line-up, and he positively identified Espino as the assailant, doing so without "any hesitation . . . ."  *Id.* at 16.   Espino gave a statement, but the officer who took the statement "suspect[ded] deception."  *Id.*  The investigative notes conclude:

> "Based on the description given to the officer's by the witness and victim, Francisco Espino AKA Francisco Espinosa fit's [sic] that description.  Espino was the driver of the van. . . . Espino had a 3 cm laceration to his scalp.  It is unknown who caused the injury.  Ayala had a stab wound to his left upper quadrant of the abdomen and a stab wound to his right hand.  Based on this investigation Espino is responsible for these stab wounds.

*Id.*

The officer in charge then recommended that the case be sent to the grand jury, and on August 18, the grand jury indicted Espino for aggravated assault with a deadly weapon.  *Id.*  On August 22, Espino was arraigned before Judge Ables, and on September 2, Judge Ables appointed Steven Pickell, the lawyer who would soon become Petitioner's lead trial counsel, to represent Espino.  Exh. 23, Kerr County District Clerk Files, *State v. Francisco Arteaga Espino* (Case No. A97-285) at 3 (hereinafter "Clerk Files").  Nothing noteworthy happened for six weeks.

But on October 16, *one day* after Petitioner was arrested for capital murder, Pickell had a telephone conference with Espino's wife, Maria del Carmen Serrano. *Id.*  Apparently she implicated Petitioner in this conversation, because without explanation, Pickell recorded: "Ramiro [presumably referring to Petitioner] is in jail (charged with murder)." *Id.*

Then, on October 20, Pickell had a telephone conference with the Kerr County District Attorney's Office, which resulted in the following entry in Pickell's time sheets: "Informed of identity of alleged assailant." *Id.*  The next day, Pickell had a conference with Espino at the jail, who made further accusations against Petitioner, which Pickell again recorded.[26]  At approximately this same time, Serrano visited Petitioner to discuss the stabbing.  S.F. Vol. 20 at 38, 60.  During their meeting, Serrano convinced Petitioner to confess to the stabbing so her husband would get out of prison.  *Id.* at 38.  Petitioner then did so, wholly exculpating Espino.  *Id.* at 62.  Subsequently, on October 22, Petitioner told Pedro Garcia, the shift supervisor at the Kerr County Jail, that he, Petitioner, previously had a conversation with Espino's wife and that everything would be "cleared up." *Id.* at

---

[26] This entry reads, "[W]ould be willing to take polygraph[,] says Ramiro used name of Ruben Salinas, had been friends before in Laredo- Ramiro killed another friend in Laredo, Ruperto Sanchez, another witness."  Clerk Files at 4.

59. Petitioner then told Garcia that Espino was in jail for something that Petitioner and a friend had done. *Id.* at 62. Fait accompli; Espino was cleared. *See* Clerk Files at 2, 4.

On October 23, Pickell had a telephone conference with District Attorney Bruce Curry and Rick Kneese of the Kerrville P.D, after which his time sheet entry states, "Case Dismissed." *Id.* at 4. On October 27, Pickell filed the motion to dismiss charges against Espino, and Judge Ables granted the motion. *Id.* at 2.

Three days after the charges against Espino were dismissed, Judge Ables appointed Pickell to represent Petitioner in his capital murder case. March 7 Order at 2.

During Petitioner's trial, the state called Serrano as a witness. In the guilt phase, she testified that Petitioner called her from prison and admitted that he had killed a man and raped a woman. S.F. Vol. 18 at 253. Neither Pickell nor his co-counsel cross-examined Serrano. *Id.* at 253. Then, during the punishment phase, Serrano testified to the stabbing what she purportedly and belatedly realized she had witnessed. S.F. Vol. 20 at 31. Although she unequivocally testified that she saw Petitioner stab the victim, *id.*, she did admit that on two separate occasions she failed to relay that version of events to authorities, *id.* at 33, 35. Indeed, Serrano

explained that the first time she implicated Petitioner in the stabbing was when she met with Pickell in his capacity as counsel to Espino. *Id.* at 31, 37.

Pickell's co-counsel, A.J. Garcia, conducted the cross-examination of Serrano. *Id.* at 40. After he inquired into her use of false names, *id.* at 41, Garcia briefly questioned Serrano about the stabbing incident, eliciting that she had initially told police she "had not seen anything," *id.* at 43. Garcia then asked Serrano about her deportation after the fight and her illegal reentry into Texas. *Id.* at 45. He ended his cross-examination by inquiring into whether Serrano knew Ayala, which she denied. *Id.* at 49.

The state also presented the testimony of jail supervisor Pedro Garcia concerning Petitioner's statement that he had talked to Serrano, and that things would be cleared up for Espino, who was in jail for what Petitioner had done. *Id.* at 59.

At no point did defense counsel bring up the police report or in any way present evidence in the report that so strongly implicated Espino. The record is bare of any suggestion that Pickell ever informed Petitioner of his prior representation of Espino. It is likewise devoid of any inquiry by Judge Ables into the matter.

127

## <u>REASONS THE WRIT OF HABEAS CORPUS SHOULD BE GRANTED</u>

### A.    The Clearly Established Supreme Court Law

The most basic duty of counsel, whether appointed or retained, is the duty of loyalty.  *See, e.g., Strickland v. Washington*, 466 U.S. 668, 692 (1984).   Our system of criminal justice presumes that counsel will act as an accused's advocate, *Anders v. California*, 386 U.S. 738 (1967), and the Supreme Court has emphasized that "'[t]he very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free[,]'" *United States v. Cronic*, 466 U.S. 648, 655 (1984) (quoting *Herring v. New York*, 422 U.S. 853, 862 (1975)); *see also Argersinger v. Hamlin*, 407 U.S. 25, 31 (1972); *Gideon v. Wainwright*, 372 U.S. 335, 343–44 (1963).   Consequently, the Sixth Amendment right to the effective assistance of counsel guarantees that the accused in a criminal case be afforded counsel whose ability to act on his client's behalf is unimpaired by a conflict of interest.  *See Wood v. Georgia*, 450 U.S. 261, 271 (1981); *Cuyler v. Sullivan*, 446 U.S. 335, 349 (1980); *Holloway v Arkansas*, 435 U.S. 475, 489–90 (1978).

Because of the centrality of loyal advocacy and the difficulty in measuring the exact effect that the conflict had on counsel's performance, *see Strickland*, 466

U.S. at 692; *Holloway*, 435 U.S. at 490–91, when asserting an ineffective assistance of counsel claim based on a conflict of interest, a petitioner need not show a reasonable likelihood that the outcome of his trial would have been different but for the conflict, *see Strickland*, 466 U.S. at 692; *Cuyler*, 446 U.S. at 348. Instead, to obtain relief based upon trial counsel's representation of conflicting interests, a defendant must demonstrate that "an actual conflict adversely affected" defense counsel's performance. *Cuyler*, 446 U.S. at 348; *see Strickland*, 466 U.S. at 692; *see also Mickens v. Taylor*, 535 U.S. 162, 174 (2002).

An "actual conflict," as opposed to "a mere theoretical division of loyalties," is a conflict that adversely affects the attorney's performance. *Id*. at 170, n.5.[27]

---

[27] In *Mickens*, the Supreme Court stated that the conflict standard is not properly conceived of as a two-part test under which a defendant must establish 1) a conflict of interest, and 2) a resulting effect on the outcome of trial, as several lower courts had previously held, *Mickens*, 446 U.S. at 169, but simply requires that the defendant show an "actual conflict of interest." *Id*. at 169-The Fifth Circuit has pointed out that this is largely a semantic distinction:

> Courts of appeals applying *Cuyler* traditionally have couched its test in terms of two questions: (1) whether there was an actual conflict of interest, as opposed to a merely potential or hypothetical conflict; and (2) whether the actual conflict adversely affected counsel's representation. However, in *Mickens*, the Supreme Court announced that "the [*Cuyler*] standard is not properly read as requiring inquiry into actual conflict as something separate and apart from adverse effect. An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." *Mickens*, 535 U.S. at 172 n.5. Regardless of this clarification of the terminology, the relevant questions remain the same, and we must ask whether [counsel] labored under a conflict of interest, which was not merely hypothetical, and whether that conflict adversely affected the representation (i.e., whether it was an actual conflict).

Once a petitioner establishes that a conflict in fact existed, he may demonstrate that it adversely affected counsel's performance "with evidence that counsel's judgment was actually fettered by concern over the effect of certain trial decisions on other clients." *Perillo*, 205 F.3d at 807 (quotation and internal punctuation omitted). However, "when a petitioner's claim is premised solely upon what a conflicted lawyer failed to do on his or her behalf, the petitioner must generally establish adverse effect by demonstrating that there was some plausible alternative defense strategy that could have been pursued, but was not, because of the actual conflict." *Id.; see also Freund v. Butterworth*, 165 F.3d 839, 860 (11th Cir. 1999) ("[P]etitioner need not show that the defense would necessarily have been successful if [the alternative strategy or tactic] had been used, rather he only need prove that the alternative possessed sufficient substance to be a viable alternative . . . [and] some link between the actual conflict and the decision to forgo the alternative strategy of defense." (quotation and internal punctuation omitted)).

The *Cuyler* standard applies to both concurrent and successive representation of clients. *See Perillo v. Johnson*, 205 F.3d 775, 797–99 (5th Cir.

---

*United States v. Infante*, 404 F.3d 376, 391-92 (5th Cir. 2005) (citations omitted).

130

2000); *Brown v. Dretke*, No. SA-01-CA-0241-XR, 2004 U.S. Dist. LEXIS 24634,

*179–80 n.162 (W.D. Tex. Dec. 3, 2004); *see also Hall v. United States*, 371 F.3d

969, 974 (7th Cir. 2004) (applying *Cuyler* standard to counsel's successive

representations which were substantively similar and separated by ten days); *Moss v.*

*United States*, 323 F.3d 445, 459-60 (6th Cir. 2003) (applying *Cuyler* standard to

counsel's successive representations which involved nearly identical subject matter),

*cert. denied*, 540 U.S. 879 (2003); *Tueros v. Greiner*, 343 F.3d 587, 593-94 (2d Cir.

2003) (identifying *Cuyler* as the clearly established standard for instances of multiple

representations), *cert. denied*, 541 U.S. 1047 (2004).

**B.    Argument**

  1.    Trial counsel's representation of Espino and Petitioner created a
        conflict of interest.

The guiding inquiry into any conflict of interest is "whether counsel's

allegiance to the accused was compromised by competing obligations owed to other

clients. *Perillo*, 205 F.3d at 798.  The Fifth Circuit Court of Appeals has held that

the determination of existence of an actual conflict of interest a fact-intensive review

of the circumstances, *id.* at 782, and has identified four factors that help determine

whether counsel's multiple representations constitute a conflict of interest.  Those

factors are: (1) whether and how closely the subject matter of the representations is

related; (2) the temporal closeness of the multiple representations; (3) whether the prior representation has been terminated; and (4) whether the attorney has confidential information that aids one client and harms another. *Infante*, 404 F.3d at 392 (citing *Perillo*, 205 F.3d at 798). Evaluation of these factors compels to the conclusion that Pickell labored under a conflict of interest while representing Petitioner.

Here the first factor, the similarity of the subject matter of the representation, strongly points to a conflict of interest. The Fifth Circuit has "clearly and unambiguously" relied on the substantive relationship between counsel's multiple representations when analyzing a violation of the right to conflict-free counsel. *Perillo*, 205 F.3d at 780 (citations omitted). Pickell represented Espino for charges arising from the precise incident to which Petitioner confessed, and which was used to establish Petitioner's future dangerousness. Indeed, in this case, Pickell was intimately involved in trading Espino's exoneration for the state's "discovery" of evidence of Petitioner's purported responsibility. This overlap in subject matter assured that Pickell would have to choose between competing obligations to his clients, *see Moss*, 323 F.3d at 462 (explaining that successive representation based on identical underlying facts creates a "high probability of prejudice" and "difficulty

132

of proving that prejudice") (quoting *Mickens*, 535 U.S. at 175), and Pickell's role as broker established that even prior to the commencement of his representation of Petitioner, he had taken actions that affirmatively harmed Petitioner.

The second factor, the temporal closeness of the successive representation, likewise points to an actual conflict. Pickell's representation of Espino technically did not overlap his representation of Petitioner—but only three days separate them. Multiple representations which are "relatively close" in time support the existence of an actual conflict of interest. *See Infante*, 404 F.3d at 392 (explaining that counsel's multiple representations arising from "nearly identical" criminal cases, together with their close temporal relationship, supported the conclusion that counsel labored under a conflict of interest); *see also Perillo*, 205 F.3d at 798 ("Where the prior representation . . . is followed closely by the subsequent representation, there is more likely to be a conflict arising from defense counsel's representation of the first client."). The tension between duties to each client was far greater here than in *Perillo*, 205 F.3d at 783, 786, 802 n.11, where the Fifth Circuit affirmed the district court's conclusion that successive representations for the same crime, separated by *three years*, constituted an actual conflict of interest.

With respect to the final *Infante* factor, whether confidential information was acquired, the facts of Pickell's dual representation of Espino and Petitioner make it inevitable that Pickell would have acquired confidential information from Espino as to his own culpability; Pickell most probably also acquired information covered by the attorney-client privilege from Serrano.[28] The Fifth Circuit in *Perillo* recognized that an approach that precludes finding a conflict of interest in the absence of direct evidence that counsel obtained confidential information is inconsistent with Fifth Circuit precedent, ethical rules, and the approach of every other circuit that has addressed the issue. 205 F.3d at 800. The *Perillo* court found the analogy to civil motions to disqualify instructive, *id.* (citing *In re American Airlines*, 972 F.2d 605, 614-16 (5th Cir. 1992)), and the analogy is particularly apt here.

---

[28.] Pickell's co-counsel, Garcia, cross-examined Serrano during the punishment phase of Petitioner's trial. This assignment of duties may have ameliorated the appearance of impropriety in the eyes of the jury, but it did nothing to remedy the underlying conflict. In *United States v. Culverhouse*, 507 F.3d 888, 893, 898 (5th Cir. 2007), the Fifth Circuit explained that even though counsel was ultimately *recused*, his representation of the defendant prior to recusal could create an actual conflict of interest depending on whether counsel knew of the overlapping issues. Obviously, Pickell was aware of the shared factual issues, given that he represented Espino until just three days before he was appointed to represent Petitioner, and that the termination of his representation of Espino was generated by Petitioner's agreement to take responsibility for the crime. Thus, if assigning the cross-examination of Serrano to Garcia was Pickell's gesture toward the existence of a conflict, that gesture did not in any way ameliorate it.

In a civil motion to disqualify, the movant must establish a "substantial relationship" between the current and prior representation. *In re American Airlines*, 972 F.2d at 614–16.  Upon that showing, the court irrebuttably presumes that relevant confidential information was exchanged during the prior representation. *Id* at 614.  Because Pickell's prior representation and the evidence offered in aggravation against Petitioner were based on the same underlying events, counsel must have—and should be presumed to have—acquired, during his prior representation, confidential information that would conflict with his duty of loyalty to Petitioner.  Consequently, Pickell's presumed acquisition of confidential information supports the finding of a conflict of interest.

Faced with a similar factual situation, the Fifth Circuit has found the existence of a conflict of interest.  In *Infante*, the court held that a conflict of interest existed where counsel, who represented Infante on drug conspiracy charges, had previously represented witnesses for charges arising from the discrete transactions that comprised the conspiracy.  404 F.3d at 392–93.[29]  The *Infante* court stressed that

---

[29] Although the *Infante* court characterized counsel's representation as partially concurrent due to his promise to file a substantial assistance motion based on the witnesses' testimony, it found that a conflict existed even if that element of concurrent representation was ignored. *Id.* at 392 (clarifying that "[e]ven if [counsel]'s representation of the witnesses was actually completed prior to Infante's trial, the representations were relatively close in time"such that a conflict of interest still existed).

the close substantive relationship between representations compelled the finding of a conflict. *Id.* Here, too, the entwined subject matter of Pickell's multiple representations compels the conclusion that a conflict existed. *See Houston v. Schomig*, 533 F.3d 1076, 1080–81 (9th Cir. 2008), *cert. denied*, 129 S. Ct. 1346 (2009) (remanding for an evidentiary hearing where a public defender had previously represented a witness for the state in a factually-related case); *U.S. ex. rel Gray v. Dir., Dep't of Corr.*, 721 F.2d 586, 596 (7th Cir. 1983), *cert. denied*, 466 U.S. 909 (1984) (finding a conflict of interest in the multiple representations of one defendant charged with rape and murder and another low-functioning defendant charged with aiding abetting the rape and murder).

> 2.   Trial counsel's conflict of interest adversely affected his performance.

Pickell may not have done anything wrong during the course of his representation of Espino; he had a duty to act as a zealous advocate on Espino's behalf, and clearly he did so. *See Perillo*, 205 F.3d at 781. It appears that Pickell prompted Serrano to urge Petitioner to take the blame for Espino, and clearly Pickell approached the district attorney's office with the admission Serrano successfully convinced Petitioner to make. Unless Pickell *knew* at that time that Petitioner was

innocent, there was nothing wrong with this conduct. What was improper—grossly improper—was to subsequently accept appointment as Petitioner's counsel.

Pickell's continuing duty to Espino obviously diverged from his new responsibility to Petitioner. *See Perillo*, 205 F.3d at 790, 796, 806 (discussing the continuing obligation that counsel owed to a former client); *see also* ABA Model Rules of Professional Conduct 1.9 (prohibiting subsequent representation "in the same or substantially related matter" as a previous client). Pickell had to choose between his current and previous clients, and the transcript of the penalty phase of Petitioner's trial makes it blatantly obvious that Pickell chose Espino.

An *un*conflicted lawyer, knowing that his client was facing capital charges and that the state planned to introduce evidence of an unadjudicated stabbing during the penalty phase, would have investigated the stabbing. In this case, little investigation would have been required because a treasure-trove of such evidence was summarized in the police report. An unconflicted lawyer would then have presented the available evidence pointing away from his client.

Had Petitioner been represented by an *un*conflicted lawyer, his jury would have known that at the time of the crime, no one at the scene reported that Petitioner was present and, indeed, that absolutely nothing in the extensive police report points

to Petitioner. His jury would also have know that virtually all of the facts gathered by police pointed to Espino. Most importantly, it would have known that an eyewitness with no apparent stake in the matter identified Espino as the assailant and that the victim himself, after viewing a photo array, identified Espino without hesitation. That hypothetical jury also would have heard strong circumstantial evidence that corroborated Espino's identity as the assailant: that Espino was also injured on the night of the stabbing and taken to the hospital by police; that Serrano, Espino's wife, was found in the van out of which the perpetrator jumped immediately before the assault and claimed, that night, that she saw the fight but not who stabbed the victim; and that the officer who interviewed Espino believed him to be untruthful.

An *un*conflicted lawyer might have called police officers to establish these facts, or he might have tried to locate and call the victim Ayala, or perhaps he may have attempted to contact eyewitness Sausedo. He might, moreover, have probed into the details surrounding Serrano's visit with Petitioner, including inquiry into Pickell's role in coaching Serrano.[30] *See Perillo* at 796–97, 808 (referencing and

---

[30] It also seems likely that an *un*conflicted lawyer would have attempted to impeach Serrano's guilt phase testimony that Petitioner caller her and confessed to the murder. Pickell's choice not to ask her even a *single* question certainly was an unusual one given the damaging nature of the testimony and Serrano's demonstrated propensity to tell different stories on different occasions.

approving of plausible alternative strategies found by the district court, which included impeaching witness's credibility).

A variety of legitimate judgments might have been made concerning the best way to present all of this exculpatory information, but it is impossible to imagine any legitimate strategic reasons that would lead an *un*conflicted lawyer to ignore that information entirely, which is precisely what Pickell did. Pickell stood by while the jury was led to believe that Petitioner had committed a crime that made him more dangerous, when exposure to the available facts would have almost certainly dissuaded jurors of Petitioner's responsibility for that crime. His passivity was inexcusable, and it constituted an adverse effect.

Because Petitioner has established "an actual conflict that adversely affected counsel's performance, prejudice is presumed without any further inquiry into the effect of the actual conflict on the outcome of the defendant's trial." *Perillo*, 205 F.3d at 781–82; *see Cuyler*, 446 U.S. at 349–50 ("[A petitioner] who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief.").

     3.     The state court proceedings respecting this claim

139

The Texas Court of Criminal Appeals  dismissed the successive petition containing this claim without specifically discussing this claim and, therefore, did not address the arguments Petitioner set forth here.

## CONCLUSION

For the foregoing reasons, trial counsel labored under an actual conflict of interest in violation of the Sixth and Fourteenth Amendments of the United States Constitution, requiring the issuance of a writ of habeas corpus.

## GROUND D

**THE ADMISSION OF A FOREIGN CONVICTION FROM A JURISDICTION LACKING FUNDAMENTAL FAIR TRIAL SAFEGUARDS, INCLUDING THE RIGHT TO JURY TRIAL, THE REQUIREMENT OF PROOF BEYOND A REASONABLE DOUBT, THE RIGHT TO CROSS-EXAMINATION BY DEFENSE COUNSEL, THE RIGHT AGAINST COMPELLED SELF-INCRIMINATION, AND THE PROHIBITION AGAINST DOUBLE JEOPARDY, VIOLATED PETITIONER'S SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS.**

At the penalty phase of Petitioner's trial, and over his objection, the state introduced documents establishing that he was convicted of murder in Mexico. Petitioner's Mexican conviction was obtained in a criminal justice system that did not permit him a trial by jury, that did not require proof beyond a reasonable doubt

of his guilt, that did not allow his lawyers to question witnesses, and that permitted an appellate court to substitute a conviction of murder for the trial judge's determination that he was guilty of voluntary manslaughter. Moreover, the system in which he was tried was riven with widespread, well-documented instances of corruption and physical coercion. The penalty-phase use of a conviction that does not comport with American right to counsel standards violates the Sixth Amendment. *See Burgett v. Texas*, 389 U.S. 109, 115 (1967) (convictions obtained in violation of *Gideon v. Wainwright*, 372 U.S. 375 (1963), cannot be used "either to support guilt or enhance punishment for another offense"). Moreover, the penalty-phase use of such an unreliable conviction violates due process and fails to meet the "need for reliability in the determination that death is the appropriate punishment . . . ." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

## FACTS RELEVANT TO THIS GROUND FOR RELIEF

### A.    The Admission of Petitioner's Mexican Conviction

In its opening penalty-phase statement, the prosecution  promised that the state would show that Petitioner had "escaped from a Mexican prison for the same offense, a murder." S.F. Vol. 20 at 7. The state began its penalty phase case with evidence relating to the Mexican conviction. *See id.* at 13. Over defense counsel's

141

objection, *id.* at 14–15, the Court admitted certified Mexican documents and a translation, *id.* at 26–27.

## B.    The Structure of Mexican Criminal Trials

In 2008, Mexico's President Felipe Calderon signed into law sweeping reforms to the country's criminal justice system, though many of the reforms are not scheduled to be fully implemented until 2016. Exhibit 24, Declaration of Juan Carlos Padron Sanchez at 1 (hereinafter "Sanchez Declaration"). Under the new legislation, American-style oral trials will replace the previous system of closed criminal proceedings, which relied heavily on written evidence.   FED. RESEARCH DIV., LIBRARY OF CONG., MEXICO: A COUNTRY STUDY 332 (Tim L. Merrill & Ramón Miró eds., 4th ed. 1997), *available at* http://memory.loc.gov/frd/cs/mxtoc.html. Prior to the 2008 reform, criminal proceedings were not open to the public, and the parties were required to submit questions to the judge, who then determined whether the question was relevant and actually questioned the witness.  Sanchez Declaration at 1.  Moreover, the judge had the power to call witnesses he believed to be relevant to the case.  *Id.*  Although the defendant had no right to have an attorney question witnesses against him, under the Mexican constitution, he did—and still does—have the right of "*careo*," *i.e.*, the right to personally "engage any adverse witness . . . in

a face to face confrontation" without any intervention by lawyers.  *Id.* at 2; *see also* FED. RESEARCH DIV., LIBRARY OF CONG., *supra* at 332 (noting that the "right to confront one's accusers" is guaranteed).   This right may be exercised by one defendant against his co-defendant, as happened in Petitioner's case: when Petitioner was confronted by his co-defendant, Petitioner retracted his accusations of the co-defendant's involvement, which led to the dismissal of charges against the co-defendant.   Exh. 25, Tamaulipas State Ministry of Public Safety Records (hereinafter "Tamaulipas Public Ministry Records"); Exh. 27, Translation of Legal Pleadings in Spanish at 2, 3 (hereinafter "Pleadings Translation").

In Mexico, the judge alone determines the guilt of a defendant because there is no right to jury trial; the judge decides all questions of law and fact.   Sanchez Declaration at 2.  Appellate judges have the authority to affirm, modify, or revoke the findings of the trial judge in either direction.  *Id.*  During appellate review, a criminal defendant may "in effect be found guilty of a higher offense than the offense for which they were originally convicted at the trial level."  *Id.*  This occurred in Petitioner's case: the trial judge originally convicted him only of "Homicidio Simple" or voluntary manslaughter, but upon appellate review, the conviction was converted to one of "Homicidio Calificado" or   murder.

Tamaulipas Public Ministry Records; Pleadings Translation at 5, 6.  In addition, Petitioner's sentence was *increased* on appeal from a fourteen-year sentence at the trial level to a twenty-five-year sentence.  Tamaulipas Public Ministry Records; Pleadings Translation at 5, 6.

### C.    The Prevalence of Torture, Corruption, and Other Human Rights Violations in the Mexican Criminal Justice System

In addition to these formal differences between the Mexican and American criminal justice systems, Mexico is plagued by human rights abuses, which are formally prohibited but nonetheless rampant.  Even in 2008, the United States Department of State's 2008 Human Rights Report on Mexico states that reported human rights problems in Mexico included "poor and overcrowded prison conditions; arbitrary arrests and detention; corruption, inefficiency, and lack of transparency in the judicial system; [and] confessions coerced through torture . . . ."  BUREAU OF DEMOCRACY, HUMAN RIGHTS, AND LABOR, U.S. DEPT. OF STATE, 2008 HUMAN RIGHTS REPORT: MEXICO [hereinafter *2008 Human Rights Report*] (2009), http://www.state.gov/g/drl/rls/hrrpt/2008/wha/119166.htm. These violations stem from both

> official toleration of abuses and impunity . . . [and] the justice system's ineffective protection of individual guarantees and its lax approach to human rights abuses.  Through willful ignorance of

> abuses or purposeful fabrication of evidence, prosecutors routinely prosecute victims using evidence obtained through human rights violations, including torture and illegal detention, and judges avail themselves of permissive law and legal precedent to condemn victims while ignoring abuses.

HUMAN RIGHTS WATCH, SYSTEMIC INJUSTICE: TORTURE, "DISAPPEARANCE," AND EXTRAJUDICIAL EXECUTION IN MEXICO 1 (1999), *available at* http://www.hrw.org/legacy/reports/1999/mexico/Mexi991-01.htm.   "Although the judiciary is independent, weaknesses in the system make court decisions susceptible to improper influence by both private and public entities, particularly at the state and local level. Corruption, inefficiency, and lack of transparency continued to be major problems in the justice system." *2008 Human Rights Report, supra.* Past reports by the United States Department of State, *see, e.g.*, BUREAU OF DEMOCRACY, HUMAN RIGHTS, AND LABOR, U.S. DEPT. OF STATE, 1996 HUMAN RIGHTS REPORT: MEXICO [hereinafter *1996 Human Rights Report*] (1997) http://www.state.gov/www/global/human_rights/ 1996_hrp_report/mexico.html; a country study by the Federal Research Division of the Library of Congress, *see* FED. RESEARCH DIV., LIBRARY OF CONG., *supra*; and two fact-finding reports from the 1990s from Americas Watch and its successor organization Human Rights Watch, *see* HUMAN RIGHTS WATCH, *supra*; AMERICAS WATCH, PRISON

145

CONDITIONS IN MEXICO (1991), http://www.hrw.org/sites/default/files/reports/MEXICO913.pdf, document that human rights abuses were even worse at the time Petitioner was arrested, tried, and convicted in Mexico.

### 1.    Torture

Although the Mexican law, then and now, formally prohibits "torture and other cruel, inhuman, or degrading treatment," *see 1996 Human Rights Report* at 1c, and provides that confessions obtained through illicit means such as torture are not admissible as evidence in court, the reality in the judicial system is different. *See* HUMAN RIGHTS WATCH, *supra* at 1.   Members of the police and security forces continued to torture and abuse detainees.   FED. RESEARCH DIV., LIBRARY OF CONG., *supra* at 329–30.   The most commonly used methods of torture were threats, beatings, asphyxiation, and electric shocks. *1996 Human Rights Report* at 1c.   Because police officers were both poorly trained and poorly equipped to investigate crimes, they continued to attempt to solve crimes by rounding up likely suspects and then extracting confessions from them. *Id.* Many state human rights commissions received reports of torture allegedly committed by police. *Id.* The authorities punished few officials for torture, which continued to occur mainly because confessions were the primary evidence in many criminal convictions. *Id.*

The State Department Reports from 1998 and 1997 contain similar findings. *See* BUREAU OF DEMOCRACY, HUMAN RIGHTS, AND LABOR, U.S. DEPT. OF STATE, MEXICO COUNTRY REPORT ON HUMAN RIGHTS PRACTICES FOR 1998 [hereinafter *1 9 9 8   H u m a n   R i g h t s   R e p o r t*]   (1 9 9 9) http://www.state.gov/www/global/human_rights/1998_hrp_report/mexico.html; BUREAU OF DEMOCRACY, HUMAN RIGHTS, AND LABOR, U.S. DEPT. OF STATE, MEXICO COUNTRY REPORT ON HUMAN RIGHTS PRACTICES FOR 1997 [hereinafter *1997 Human Rights Report*] (1998), http://www.state.gov/www/global/human_rights/1997_hrp_report/mexico.html.[31]

The frequency with which torture was employed in the era in which Petitioner was arrested and tried is stunning by any standard.  In its June 1990 report, *Human Rights in Mexico: A Policy of Impunity*, Americas Watch found that torture and other forms of mistreatment by the police were routine during arrests and detention

---

[31] Torture still persists to this day: "[C]ruel treatment and physical abuse in particular continued to be a serious problem, particularly among state and local law enforcement elements." *2008 Human Rights Report, supra.* "While law enforcement officials were punished for lesser offenses, human rights groups, who linked physical abuse to the pervasiveness of arbitrary detention, maintained that no official had ever been convicted of torture, giving rise to concern about impunity.  Despite the law's provisions to the contrary, police and prosecutors often attempted to justify an arrest by forcibly securing a confession to a crime." *Id.*  As was true at the time of Petitioner's conviction, "judges [in 2008 continued] to allow statements coerced through torture to be used as evidence against the accused, a practice particularly subject to abuse because confessions were often the primary evidence in criminal convictions." *Id.*

in police lock-ups.  AMERICAS WATCH, *supra* at 3.  Opposition political leaders in the Federal District's Assembly of Representatives said in August 1990 that *eighty percent* of the prisoners in Federal District detention centers were tortured by police before being brought there.  *Id.*  "In most cases the torture was a routine means to force prisoners to sign declarations of guilt."  *Id.*

2.      Arbitrary Arrest and Detention

Arbitrary arrests and detention were and are a significant problem in Mexico. The *2008 Human Rights Report* states that "[t]he law prohibits arbitrary arrest and detention as well as sponsoring or covering up an illegal detention; however, security forces often ignored these provisions."  Again, the reality of law enforcement differs significantly from the formal law.  There have been "complaints that, in some cases, police held persons incommunicado for several days[, and] made arrests arbitrarily and without a warrant."  *Id.*  That report also illustrates corruption within the Mexican police system, as "many police, particularly at the state and local level, were involved in kidnapping, extortion, or providing protection for, or acting directly on behalf of, organized crime and drug traffickers."  *Id.*  Earlier State Department reports reflect the same problems.  *See, e.g.*, *1998 Human Rights Report, supra*; *1997 Human Rights Report, supra*.

### 3.    Corruption in the Judiciary

Again, according to a contemporaneous State Department Report, many Mexican detainees reported that officials asked them to pay bribes for release before formal arraignment, and many arrestees report that they successfully bribed officials into having their charges dropped before going before a judge.   *1996 Human Rights Report* at 1d.    Corruption is, thus, rampant throughout the system. Furthermore, in a number of cases in northern border states, judges, police, and persons posing as attorneys extorted large sums of money—$3,000 to $10,000—from tourists to "fix" real or fabricated infractions.  *See 1997 Human Rights Report.*

### 4.    Inadequacies in the Provision of Counsel

The right to counsel, although formally acknowledged, is in fact severely limited in Mexican prosecutions. "While the law provides defendants with the right to an attorney at all stages of criminal proceedings, in practice this only meant that authorities had to appoint a 'person of confidence,' who was not required to meet any particular legal qualifications, to represent a defendant. The public defender system was not adequate to meet demand, especially at the state level." *2008 Human Rights Report, supra; see also Special Report: Presumed Guilty?:*

149

*Criminal Justice and Human Rights in Mexico*, 24 FORDHAM INT'L L.J. 801, 852 (2001) ("In practice, however, the person of confidence can make matters worse. In some cases, for example, the person of confidence assigned to the defendant was in fact unknown to the defendant.   In a number of other cases that our delegation encountered, the person of confidence actually worked for the Public Ministry.") Furthermore, the Fordham Law School Report, based upon a fact-finding mission to Mexico, found that "[b]oth defense lawyers and government officials made clear to our delegation that the standard practice in Mexico is to deny access to counsel until a detainee first makes his or her declaration before the Public Ministry, and even then, to deny communication between the two at least until after the declaration is made." *Id.* at 844.

Furthermore,

Mexico's system of public defenders is so notoriously weak—to the point that the United Nations (U.N.) special rapporteur on torture reported in 1998 that "the public defender cannot be relied on to defend"—that the existence of formal procedural guarantees provides few real protections for victims. In an attempt to diminish coercion in the taking of statements by prosecutors, in 1990 Mexico instituted a system of the "person of confidence"—an individual named by the accused to be present when any statement is made.  In a legal system in which individual guarantees are routinely ignored by judges, however, this system, like that of the public defenders, fails to provide real safeguards."

HUMAN RIGHTS WATCH, *supra* at 9.

## REASONS THE WRIT OF HABEAS CORPUS SHOULD BE GRANTED

### A.      The Clearly Established Supreme Court Law

1.      Due Process and Eighth Amendment Guarantees of Reliability

One of the concerns undergirding, and protected by the Due Process Clause is reliability.  *See, e.g., White v. Illinois*, 502 U.S. 346, 363–64 (1992) (explaining that reliability is "more properly" a due process clause concern than a confrontation clause concern); *Stovall v. Denno*, 388 U.S. 293, 301–02 (1967) (stating that pretrial identification proceedings violate due process if they are "unnecessarily suggestive and conducive to irreparable mistaken identification").  Because general reliability concerns are heightened in death penalty proceedings, "the Constitution places special constraints on the procedures used to convict an accused of a capital offense and sentence him to death."  *Murray v. Giarratano,* 492 U.S. 1, 8–9, (1989) (internal citations omitted).  "The finality of the death penalty requires a 'greater degree of reliability' when it is imposed."  *Id.*; *see also Monge v. California,* 524 U.S. 721, 732, (1998) (recognizing an "acute need for reliability in capital sentencing proceedings"); *Simmons v. South Carolina,* 512 U.S. 154,

161–62, (1994) (same); *Beck v. Alabama*, 447 U.S. 625, 638, (1980) (same); *Gardner v. Florida,* 430 U.S. 349, 357, 362 (1977) (same).

"[C]onsidered as a group, foreign convictions differ from domestic convictions in important ways." *Small v. United States*, 544 U.S. 385, 389 (2005). Whether  convictions from a particular country should be viewed as unreliable depends upon whether the legal system in question "is inconsistent with an American understanding of fairness."    *Id.*    Thus, whether due process and heightened reliability constraints are violated by the introduction of foreign convictions in a capital sentencing proceeding depends upon the characteristics of the legal system that generated the conviction.

> 2.    The Sixth Amendment Prohibition Against the Use of Convictions Obtained Without the Representation of Counsel

In felony cases, the Constitution requires that an indigent defendant be offered appointed counsel unless that right is intelligently and competently waived. *Gideon v. Wainwright,* 372 U.S. 335 (1963).  Convictions gained in violation of *Gideon* cannot be used "either to support guilt or enhance punishment for another offense . . . ." *Burgett v. Texas,* 389 U.S. 109, 115 (1967).  Consequently, a sentence based in part on a prior invalid conviction must be set aside.  *See United*

*States v. Tucker*, 404 U.S. 443, 447–449 (1972); *see also Nichols v. U.S.*, 511 U.S. 738, 743 n.9 (1994) (reaffirming the holdings of *Burgett* and *Tucker* but distinguishing the use of uncounseled misdemeanor convictions for enhancement of a subsequent offense).

Moreover, the Sixth Amendment right to counsel is not satisfied by a formal appointment, as *Powell v. Alabama* demonstrates. 287 U.S. 45 (1932). In *Powell*, the Supreme Court treated the literal last-minute appointment of counsel as equivalent to the failure to appoint counsel. *See id.* at 71. Subsequently, in *Cronic v. United States*, the Court recognized that

> constitutional error of the first magnitude . . . may be present on some occasions when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without any inquiry into the actual conduct of the trial.

466 U.S. 648, 658–60 (1984). In so concluding, the court further explained that "the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial." *Id.* at 658.

The accused need not be deprived of the assistance of counsel—actually or constructively— for the entire trial in order for the presumption of prejudice to apply: "The presumption that counsel's assistance at trial is essential require[d the Supreme Court] to conclude that a trial is unfair if the accused is denied counsel *at a critical stage of his trial.*" *Id.* at 659 (emphasis added). Thus, for example, the transcript of a preliminary hearing had to be excluded from a state criminal trial because the defendant had no lawyer at that hearing and did not, therefore, have the opportunity to cross-examine the principal witness against him (who since that preliminary hearing had left the state). *See Pointer v. State of Texas*, 380 U.S. 400 (1965); *see also Burdine v. Johnson*, 262 F.3d 336 (5th Cir. 2001) (presuming prejudice when counsel slept during portions of petitioner's capital murder trial), *cert. denied sub. nom. Cockrell v. Burdine,* 536 U.S. 1120 (2002).

A second situation also warrants a presumption of prejudice: where counsel has "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing[.]" *Cronic*, 466 U.S. at 659. In that situation, "there has been a denial of Sixth Amendment rights that makes the adversary process presumptively unreliable." *Id.* Therefore, if a defendant is denied the assistance of counsel within the meaning of the Sixth Amendment at any critical stage of a prior proceeding, the conviction

resulting from that proceeding may not be used "either to support guilt or enhance punishment for another offense . . . ." *Burgett,* 389 U.S.at 115.

## B.    Argument

Despite the relatively large number of Mexican nationals against whom the death penalty has been sought in the United States, Petitioner was unable to find a single case that has approved of the admission of a Mexican conviction in the penalty phase of an American capital trial before a jury.  The characteristics of the Mexican criminal justice system reviewed in the Facts Supporting Ground D, *supra,* make plain the reason that, aside from this case, there is no split of opinion; the Mexican criminal justice system denies procedural rights fundamental to the American scheme of justice.   Both the reliability concerns of the Eighth and Fourteenth Amendments, as well as the Sixth Amendment right to counsel, render the capital sentencing proceeding admission of convictions obtained in such a system plainly unconstitutional.

> 1.   The penalty phase admission of Petitioner's Mexican conviction violated his Fourteenth Amendment right to due process and his Eighth Amendment right to a reliable sentencing determination.

In a noncapital context, the Supreme Court has recognized the varying characteristics of foreign legal systems and ruled that whether a particular country's convictions should be viewed as unreliable depends upon whether the legal system in question "is inconsistent with an American understanding of fairness." *Small v. United States*, 544 U.S. 385, 389 (2005). At least one lower court has held that the variability and uncertainty attendant to foreign convictions compels the conclusion that they are inadmissible in an American criminal case to enhance a sentence. *See People v. Braithwaite,* 240 N.W.2d 293, 294 (Mich. Ct. App. 1976) ("Since many foreign jurisdictions do not provide due process rights equivalent to those existing in the United States, it would be manifestly unfair to allow foreign convictions to be considered in sentencing a defendant convicted of a crime in this country."). Even courts that take a more liberal approach, however, have read the Supreme Court's precedents as prohibiting the use of a foreign conviction *for sentence enhancement in a noncapital cases* where "the foreign legal system lacks procedural protections necessary for fundamental fairness." *People v. Wallach*, 312 N.W.2d 387, 403 (Mich. Ct. App. 1981); *see also State v. Roberts*, 14 P.3d 713, 745 (Wash. 2000) (noting that "the use of foreign convictions in capital sentencing proceedings must be closely scrutinized . . . ."); *People v. Galvan*, 572 N.W.2d 49, 50 n.1 (Mich. Ct.

App. 1997) ("Convictions in other jurisdictions are a relevant consideration at sentencing and should be considered *as long as the courts are convinced that the defendant was afforded due process in that system*." (emphasis added)); *State v. Smith*, 705 P.2d 1087, 1092 (Mont. 1985) (collecting cases and explaining that "foreign convictions may be considered . . . *unless the defendant demonstrates that they were obtained under a system which provided inadequate procedural safeguards*") (emphasis added).

Because "[t]he finality of the death penalty requires a 'greater degree of reliability' when it is imposed," *Murray v. Giarratano,* 492 U.S. 1, 8–9, (1989) (internal citation omitted); *see also Monge,* 524 U.S.at 732 (recognizing an "acute need for reliability in capital sentencing proceedings"), a stricter standard should apply to the use of foreign convictions in a capital sentencing proceeding.  There can be no doubt that Mexican convictions do not meet a strict standard given the aforementioned absence of American-style judicial safeguards.

Setting aside for the moment the prevalence of *illegal* human rights violations, defendants who received all the protections Mexican law purports to provide are denied many of the protections compelled in American jurisdictions by the United States Constitution.  In addition to being denied the right to counsel, discussed

157

separately below in subsection 2, defendants who were tried in Mexico at the time of Petitioner's Mexican conviction were deprived of at least five fundamental trial rights made applicable to the states through the Fourteenth Amendment's Due Process Clause: (1) They were not afforded the presumption of innocence; (2) they did not (and still do not) have a right to have their guilt determined by a jury of their peers; (3) they did not have the right to public trial; (4) they could be (and still may be) compelled to incriminate themselves through the *careo*, when they may be—as Petitioner was—forced to respond to the accusations of a co-defendant; and (5) in contravention of American double jeopardy protections, their acquittal of a higher offense by the trial judge could be vacated by an appellate judge and a conviction for a higher offense instated. Finally, as summarized in Part C of the Facts Relevant to This Ground For Relief, these legal deprivations are frequently only the tip of the iceberg, given the well-established prevalence of torture and corruption. Thus, due process, heightened by the stakes of a capital sentencing proceeding, forbids the introduction of Mexican convictions.

The rarity of cases involving the use of Mexican convictions in capital sentencing proceedings provides further, albeit indirect, support for this conclusion. Petitioner has only located three litigated cases approving the admission of any

foreign conviction in the penalty phase of a capital trial. *See United States v. Fleischman,* 684 F.2d 1329 (9th Cir. 1981), *cert. denied,* 459 U.S. 1044 (1982); *State v. Roberts,* 14 P.3d 713(Wash. 2000); *State v. Lowenfield,* 495 So.2d 1245 (La. 1985), *cert denied,* 476 U.S. 1153 (1986), *reh'g denied,* 478 U.S. 1032 (1986). None of these cases support the admission of a Mexican conviction before a capital sentencing jury.

Two of those cases, *Roberts* and *Lowenfeld,* involve Canadian convictions, which differ radically from convictions obtained in the Mexican system. In the more recent case, *Roberts,* the court's rationale for approving the use of the conviction would clearly lead to the condemnation of the admission of Mexican convictions.

*Roberts* held that a Canadian conviction could be admitted as evidence in the penalty phase of a capital proceeding because the defendant did not offer "specific reasons why the Canadian convictions were constitutionally defective or unreliable[.]" 14 P.3d at 745. The *Roberts* court acknowledged that "the use of foreign convictions in capital sentencing proceedings must be closely scrutinized," *id.,* and in so scrutinizing the convictions, found that the defendant, as a Canadian citizen, had the right "to be represented by counsel, to be informed of the specific charge against him, to be tried by a 12-person jury, to confront witnesses, to remain

159

silent, and to refuse to offer testimony[,]" *id.* at 744.  Not even the defendant claimed that "any specific constitutional infirmities plagued those [foreign] convictions." *Id.* at 745.

The third case, *Fleishman*, does involve a Mexican conviction.  Nonetheless, for two reasons, it does not impeach the conclusion that the introduction of Petitioner's confession violated the Eighth and Fourteenth Amendments.  First, though *Fleischman* does consider a prior Mexican conviction introduced at a capital sentencing proceeding, that proceeding—unlike Petitioner's sentencing proceeding—did not take place in front of a jury.  The *Fleischman* court specifically relied upon the fact that "the district judge was . . . under no mistaken impression that the convictions were constitutionally valid under this country's laws[.]" *Flesichman*, 684 F.2d at 1346.

Petitioner's jury, in contrast, did not have that information.  And, even if the jury had been given information concerning the unreliability of the Mexican criminal justice system, it could not have been expected to understand its significance in the way that a judge would.

The second reason for disregarding *Fleischman* is, however, even more important: *Fleischman* was decided more than a quarter of a century ago.  Because

160

it was decided before the development of the Supreme Court's jurisprudence on the increased reliability required by the Eighth Amendment, it does not evaluate the constitutionality of the admission of such convictions under the correct standard. Thus, there is no published authority for the proposition that admission of Petitioner's Mexican conviction at his capital sentencing can be squared with the prevailing interpretation of the commands of the Due Process Clause of the Fourteenth Amendment and the heightened reliability required by the Eighth Amendment.[32]   The lack of this authority is no accident—the two cannot be squared.

> 2.  The penalty-phase admission of Petitioner's Mexican conviction violated his Sixth Amendment right to the assistance of counsel.

Petitioner's Mexican conviction was obtained without the protection offered by the Sixth Amendment.  Although the Mexican criminal justice system provides what it denominates a right to counsel, that right falls far short of Sixth Amendment standards.  The "person of confidence" guaranteed to the defendant need not have a lawyer's training.  But more importantly, counsel are not permitted to perform one

---

[32] *United States v. Garza*, 165 F.3d 312 (5th Cir. 1999), approved the admission of evidence of crimes in Mexico, but is not to the contrary. In *Garza*, unlike this case, the government did not rely upon evidence from an unreliable criminal justice system, but produced testimony directly establishing the defendant's commission of unadjudicated offenses. *See id.* at 314.

of the most important functions that the American criminal justice system assigns to counsel: the cross-examination of witnesses against the defendant. *See* Sanchez Declaration at 2. For that matter, counsel are not permitted to examine witnesses on the defendant's behalf either. *Id.* at 1. Moreover, even the limited tasks counsel *are* permitted to perform may be severely compromised by the identity or training of the person appointed. *See Special Report: Presumed Guilty?: Criminal Justice and Human Rights in Mexico, supra* at 852 ("In practice . . . the person of confidence can make matters worse. In some cases, for example, the person of confidence assigned to the defendant was in fact unknown to the defendant. In a number of other cases that our delegation encountered, the person of confidence actually worked for the Public Ministry."). Finally, at another critical stage of the prosecution, interrogation after arraignment, "[b]oth defense lawyers and government officials made clear . . . that the standard practice in Mexico is to deny access to counsel until a detainee first makes his or her declaration before the Public Ministry, and even then, to deny communication between the two at least until after the declaration is made." *Id.* at 844.

Because convictions obtained in the Mexican criminal justice system do not comport with Sixth Amendment right to counsel protections, they may not be used

162

"either to support guilt or enhance punishment for another offense[.]" *Burgett* 389 U.S. at 115. Thus, the introduction of Petitioner's Mexican conviction at his capital sentencing proceeding violated the Sixth Amendment.

> 3.    The state court treatment of this claim.

On direct appeal, the Texas Court of Criminal Appeals rejected Petitioner's claim that his Mexican conviction should not have been admitted because it was obtained in a system lacking the procedural protections embodied in the American constitution, and one in which widespread corruption and coercion further compromised the reliability of convictions. *See Hernandez v. State*, AP-73,776 (Tex. Crim. App. 2002), *cert. denied,* 539 U.S. 962 (2003), at 24. Its explanation for this rejection was short:

> Hernandez . . . fails to show how these general concerns are specifically relevant to his case. He has not presented any evidence that he was actually subjected to procedural violations or police corruption.

*Id.*

This disposition of the claim is "contrary to" and "involved an unreasonable application of" Supreme Court precedent, and thus, AEDPA, 28 U.S.C. §2254, does not bar granting relief on this claim. The assertion that Petitioner has not

presented evidence that "he was actually subjected to procedural violations or police corruption," depending on its interpretation, is either legally irrelevant or an unreasonable determination of the facts.

If the state court meant that Petitioner had not shown that he was deprived of procedures to which he was due *under Mexican law*, that is not the relevant question; the relevant question is whether the conviction was obtained in a manner inconsistent with American law.  Just as uncounseled felony convictions may not be used for sentence enhancement even if they were obtained before *Gideon* declared them to be unconstitutional, *See United States v. Tucker*, 404 U.S. 443, 447 (1972), foreign convictions obtained without the fundamental protections of American criminal procedure must not be used for sentence enhancement even if they were obtained in a foreign system that does not (yet) recognize the necessity of such protections.

Likewise, if the Texas Court of Criminal Appeals meant that Petitioner had not shown that the lack of procedural protections led to an erroneous conviction in Mexico, that rationale also would have been contrary to or an unreasonable application of Supreme Court precedent.  Speculation about whether the result of Petitioner's trial in Mexico would have been different had he been afforded the

fundamental protections required by the Sixth, Eighth, and Fourteenth Amendments is "not only fruitless, but beside the point." *Tucker*, 404 U.S. at 447–48. As *Tucker* explains, the relevant question "is not whether the results of the [unconstitutional] proceedings might have been different if [Petitioner] had had counsel, but whether the sentence in the [instant] case might have been different[,]" *id.*, absent the introduction of an unconstitutionally-obtained conviction.[33]

A final possible interpretation of this one-line rationale is that Petitioner has not shown that, though Mexican law does not entitle him to any of these protections, he did, for some unexplained reason, nonetheless receive them. If this is what the court meant, then its decision is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," and

---

[33]
> It is worth pointing out . . . that to make the contrary assumption, i.e., that the prosecutions would have turned out exactly the same even if the respondent had had the assistance of counsel, would be to reject the reasoning upon which the Gideon decision was based: '(R)eason and reflection require us to recognize that in our adversary system of criminal justice, any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him. . . . That government hires lawyers to prosecute and defendants who have the money hire lawyers to defend are the strongest indications of the widespread belief that lawyers in criminal courts are necessities, not luxuries.'

*Tucker*, 404 U.S. at 447 n.5 (quoting *Gideon*, 372 U.S. at 344).

consequently, its decision is no barrier to habeas corpus relief. *See* 28 U.S.C. §

2254(d)(2).  Given that Mexican criminal proceedings do not produce complete

transcripts, it would be virtually impossible to prove the negative; certainly it would

have been impossible for counsel to do so based upon the brief "pen pack" that the

state provided.  The court could have—and should have—taken judicial notice of

governing Mexican law and concluded that Petitioner was not, in fact, afforded

protections to which he was not entitled under Mexican law.

      With respect to the prevalence of coercion and corruption in the Mexican

system, the question is a closer one.  Because those characteristics are not part of

the system, it is impossible to be certain that they did affect Petitioner's trial.  It is

also highly unlikely that, if Petitioner did experience human rights violations, he

could demonstrate them.  Given that the United States government has repeatedly

recognized the high frequency of torture and corruption in Mexican prosecutions in

the Department of State's yearly human rights reports, that Human Rights

organizations believe that the use of torture is routine, and that some estimates of the

frequency with which prisoners are tortured run as high as eighty percent, the use of

a Mexican conviction poses a grossly unacceptable risk of unreliability.  Whether

that risk, absent the procedural deprivations that are legitimized by Mexican law,

would be sufficient to preclude the use of a foreign conviction in a capital sentencing proceeding is a question that need not be answered because, here, legal factors leading to procedural deprivations were undoubtedly present, and extralegal rights violations were more likely than not present.

Thus, if the state court meant that Petitioner failed to establish that he was deprived of procedural protections that are fundamental to the American scheme of justice, then its factual determination was unreasonable; if it meant that Petitioner failed to establish that the deprivations led to a false conviction,[34] then its legal determination constituted a decision that was "contrary to, or involved an

---

[34] Following its assertion that Petitioner had not proven that his own rights had been violated, the state court noted: "Further, [Petitioner] himself made statements to various people which supported the reliability of the information demonstrated the exhibits at issue." *Ramiro Hernandez AKA Ramiro Hernandez Llanas v. State*, No. 73,776 at 24 (Tex. Ct. Crim. App. Dec. 18, 2002) (order affirming denial of post-conviction relief). The court also referred to statements Petitioner made to (1) Serrano that he had escaped from prison in Mexico (which, of course, was not in dispute); (2) Carnichart that he had "killed people" in Mexico; and (3) Dr, Arambula that he was "in prison before for killing someone," and that he had become the leader of a gang while in prison." *Id.* If the court meant by this "further" comment these statements eliminated reliability concerns, it was wrong on that count too. That Petitioner told Serrano he had escaped from a prison in Mexico did not demonstrate that he was guilty of the offense for which he was there imprisoned, and that he told Dr. Arambula he was "in prison for killing someone" may or may not have meant he was *justifiably* imprisoned for that offense. Perhaps, as Petitioner told Carnichart, he had in fact "killed people" in prison, but it is equally likely that he was using that statement, true or not, to intimidate her. In any event, the statements of a man with an IQ in the 50s can hardly be deemed a sufficient assurance of reliability.

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

## CONCLUSION

For the foregoing reasons, the use of a Mexican conviction during the punishment phase of Petitioner's trial violates the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and requires the issuance of a writ of habeas corpus.

## GROUND E

**PETITIONER WAS DEPRIVED OF HIS RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION WHEN THE PROSECUTOR WITHHELD INFORMATION THAT THE VICTIM OF AN ASSAULT, ATTRIBUTED TO PETITIONER AND USED AS EVIDENCE OF HIS FUTURE DANGEROUSNESS, HAD IN FACT IDENTIFIED ANOTHER MAN AS THE ASSAILANT AND AT NO TIME IMPLICATED PETITIONER IN THE ASSAULT, AND WITHHELD INFORMATION THAT THE MURDER VICTIM'S WIFE DID NOT WANT PETITIONER TO RECEIVE THE DEATH PENALTY.**

## **FACTS RELEVANT TO THIS GROUND FOR RELIE**

As described in more detail in Ground C, *supra*, the state's penalty phase case against Petitioner included evidence that he had stabbed a man outside a bar in Kerrville, thereby causing significant injury. S.F. Vol. 20 at 31. The evidence of Petitioner's involvement in the stabbing was comprised of the testimony of Maria del Carmen Serrano that she saw Petitioner stab the victim, *id.*, and the testimony of jail employee Pedro Garcia that Petitioner told him that after speaking to Serrano, he (Petitioner) would admit his guilt in order to clear Serrano's husband, Francisco Espino, *id.* at 60.

At the time it presented this testimony to the jury, the state had in its possession evidence that both impeached Serrano's account of the stabbing and directly implicated Serrano's husband as the perpetrator. Police Report at 9–16. The police report reflects that on the day of the assault in question, Serrano was present at the bar and interviewed by police, yet stated that she did not see the stabbing at all. *Id.* at 15. The police report also reflects that an eyewitness identified Francisco Espino as the assailant, *id.* at 10, and that the victim later identified Espino from a photographic line-up, *id.* at 16. The police report also reflects that Espino himself was injured, which tends to corroborate his involvement

in the assault. *Id.* at 10. In contrast, despite the fact that it was compiled after interviewing several persons present at the stabbing, the police report contains no information that anyone blamed Petitioner for—or even saw him at the scene of—the stabbing.

There is no evidence that the state turned this information over to Petitioner's trial counsel. It is unclear whether lead defense counsel Pickell had seen this report; if he had seen it, the report would have arisen during Pickell's representation of Francisco Espino, and his subsequent representation of Petitioner undoubtedly resulted in conflicting loyalties with respect to the contents of the report. *See* Ground C, *supra*. Second chair Garcia cross-examined Serrano, and his own file is devoid of any suggestion either that he had seen the police report implicating Espino or that the state had in some other way informed him of its contents.

The state also possessed relevant exculpatory information concerning the victim's wife, Lera Tyler. Ms Tyler "objected to the death penalty on moral and religious grounds in all cases," and remained opposed to the death penalty after her husband was murdered. Exh. 28, Affidavit of Lera Patrick Tyler at 1 (hereinafter "Tyler Affidavit"). In her view, "it is not for humans to decide whether a person should live or die when there is no other life at stake." *Id.* Because of her beliefs,

she "told Mr. Curry [the prosecutor] that if someone asked [her] if [she] wanted the death penalty, [she] would say no." *Id.*

No one from the defense team ever contacted Ms. Tyler. *Id.* If one of the defense lawyers had approached her, "[she] would have told him same thing [she] told Mr. Curry." *Id.* On information and belief, neither Mr. Curry nor anyone else from the state ever informed defense counsel of Ms. Tyler's beliefs.

## REASONS THE WRIT OF HABEAS CORPUS SHOULD BE GRANTED

### A.   The Clearly Established Supreme Court Law

"The prosecution's affirmative duty to disclose evidence favorable to a defendant can trace its origins to early 20th-century strictures against misrepresentation." *Kyles v. Whitley*, 514 U.S. 419, 432 (1995). Since the early 20th century, the Supreme Court has been adamant that governmental deception of the court and jury, and knowing suppression of evidence favorable to the accused, is inconsistent with the most "rudimentary demands of justice." *See, e.g., Napue v. Illinois*, 360 U.S. 264 (1959); *Alcota v. Kansas*, 355 U.S. 28 (1957); *Mooney v. Holohan*, 294 U.S. 103, 112 (1935). Forty years ago, the Court expanded that

obligation, creating an affirmative duty on the state to disclose evidence that is both "favorable to [the] accused" and "material." *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *see also Moore v. Kemp*, 809 F.2d 702, 719 (11th Cir. 2002) ("A prosecutor has a duty to provide an accused with all evidence in the state's possession materially favorable to the accused's defense."). Under *Brady* and its progeny, a new trial is required if: (1) the state fails to disclose information it possesses; (2) that information is exculpatory; and (3) that information is material to either guilt or punishment. *See Kyles*, 514 U.S. at 432–38 (1995); *United States v. Bagley*, 473 U.S. 667, 677 (1985); *Johnson v. Alabama*, 256 F.3d 1156, 1189 (11th Cir. 2001); *Kennedy v. Herring*, 54 F.3d 678, 682 (11th Cir. 1995).

As to the first element, suppression of evidence favorable to an accused violates constitutional principles "irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87; *accord Moore*, 809 F.2d at 719. Because each "individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police," *Kyles*, 514 U.S. at 437, actual notice of exculpatory information is not necessary to trigger a *Brady* obligation, *see United States v. Agurs*, 427 U.S. 97, 106, 110 (1976). As the Court emphasized in *Kyles*, "whether the prosecutor succeeds or

172

fails in meeting this obligation . . . , the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable." 514 U.S. at 437–38.

"Favorable" or "exculpatory" evidence obviously includes information that directly tends to make the defendant's innocence more likely, but it also encompasses facts that impeach a government witness. *See Giglio v. United States*, 405 U.S. 150, 154 (1972); *Crawford v. Head*, 311 F.3d 1288, 1325 (11th Cir. 2002). Moreover, in a capital case, the second element of "exculpatory" evidence is satisfied by information that is directly relevant either innocence or to the appropriateness of the death penalty. *Brady v. Maryland*, 373 U.S. at 95. Because the Eighth Amendment mandates that the "sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any circumstances of the offense that the defendant proffers as a basis for a sentence less than death," *Lockett*, 438 U.S. at 604, exculpatory evidence is not limited to evidence that would "relate specifically to petitioner's culpability for the crime he committed," *Skipper v. South Carolina,* 476 U.S. 1, 4 (1986), but includes any evidence that would be "mitigating" in the sense that it "might serve 'as a basis for a sentence less than death,'" *id.* at 5 (quoting *Lockett*, 438 U.S. at 604).

Finally, undisclosed exculpatory information is "material" for *Brady* purposes "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles*, 514 U.S. at 433-34 (quoting *Bagley*, 473 U.S. at 682); *accord Johnson*, 256 F.3d at 1189; *United States v. Alzate*, 47 F.3d 1103, 1109–10 (11th Cir. 1995). The Court in *Kyles* emphasized that the adjective "reasonable" is important. 514 U.S. at 434. The Court noted: "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.*; *accord Crawford*, 311 F.3d at 1325; *Johnson*, 256 F.3d at 1189.[35] Thus, a "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Crawford*, 311 F.3d at 1325 (quoting *Bagley*, 473 U.S. at 682); *accord United States v. Scheer*, 168 F.3d 445, 451 (11th Cir. 1999).[36]

---

[35] *Kyles* makes clear that "materiality . . . is not a sufficiency of evidence test," and therefore "[a] defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would have been enough left to convict." *Kyles,* 414 U.S. at 434–35; *accord, Crawford,* 311 F.3d at 1325. The *Kyles* Court noted that "once a reviewing court applying *Bagley* has found constitutional error there is no need for further harmless-error review." *Kyles,* 414 U.S. at 435; *accord, Crawford*, 311 F.3d at 1326.

[36] The Supreme Court has also made clear that the reasonable probability standard is less than a preponderance of the evidence standard. *See Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). In other words, a defendant does not have to show that it is more probable than not that, had the evidence been disclosed, the result of the proceeding would have been different. *Id.*; *accord, Crawford,* 311 F.3d at 1325; *Scheer*, 168 F.3d at 452; *Hays v. Alabama*, 85 F.3d 1492, 1498 (11th Cir. 1996).

The materiality of "suppressed evidence [must be] considered collectively, not item by item." *Kyles*, 514 U.S. at 436; *Crawford*, 311 F.3d at 1326; *Scheer*, 168 F.3d at 452. The question thus is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Strickler v. Greene*, 527 U.S. 263, 290 (1999) (quoting *Kyles*, 514 U.S. at 435).

### B.    Argument

The police report was in the hands of the state, which was therefore under a duty to disclose the report if it contained exculpatory material evidence. Clearly, evidence that impeached Serrano's penalty phase testimony that she saw Petitioner stab a victim at a bar was exculpatory. Even more clearly, evidence that an eyewitness and the victim himself had identified another person as the assailant was exculpatory. The fact that the person identified by the victim as the perpetrator was observed by the police to have been wounded himself was also exculpatory, as was the fact that no one interviewed at the crime scene mentioned Petitioner as a possible perpetrator or even alluded to his presence at the time of the crime.

Likewise, the fact that Lera Tyler was morally and religiously opposed to the death penalty, and remained so after the murder of her husband, was information

possessed by the state; indeed it was in the hands of the prosecutor's office. Consequently, her beliefs and sentiments were subject to the duty of disclosure if they are properly deemed exculpatory and, if taken together with the other undisclosed information, they were material.

Is opposition to the imposition of the death penalty exculpatory?  Given the breadth of evidence that may be mitigating in a particular case, that depends upon who opposes it, and why.[37]  Because of Ms. Tyler's suffering as the victim's wife, as well as her direct sexual victimization by the Petitioner, a jury likely would infer that she would wish to see Petitioner executed, or at least that it might in some measure reduce her pain and anguish.  But in fact, Ms. Lich Tyler's suffering was likely to be increased by a verdict of death.  In essence, the fundamental Eighth Amendment premise is that if the sentencer fails to consider those "compassionate or mitigating factors stemming from the diverse frailties of humankind," an unacceptable risk exists that the death penalty will be imposed despite factors that warrant a less severe penalty.  *Woodson v. North Carolina,* 428 U.S. 280, 304 (1976).  A consideration of the suffering of Lera Lich Tyler is within those

---

[37] Two of Glen Lich's relatives spoke at sentencing, and their comments suggested that they were more interested in reconciliation than in revenge or execution. Nonetheless, their views, if known to the state, would not necessarily have been exculpatory, and certainly were not material.

"compassionate or mitigating factors stemming from the diverse frailties of humankind" that a jury might find extraordinarily compelling. Thus, information about Ms. Lich Tyler's beliefs and feelings was exculpatory.

Because the materiality of "suppressed evidence [must be] considered collectively, not item by item," *Kyles*, 514 U.S. at 436; *Crawford*, 311 F.3d at 1326; *Scheer*, 168 F.3d at 452, the state's withholding of evidence implicating Francisco Espino in the bar stabbing, considered with the suppressed evidence of Lera Tyler's desire for the exercise of mercy "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict," *Strickler*, 527 U.S. at 290 (quoting *Kyles*, 514 U.S. at 435). Taken together, the fact that Petitioner probably did not commit a violent assault alleged by the state and the fact that the raped wife of the murder victim would suffer additional pain and anguish if the death penalty were imposed may have mattered to one juror, and as such, undermine confidence in the verdict.

### C.    State court treatment of this claim

The Texas Court of Criminal Appeals  dismissed the successive petition containing this claim without specifically discussing this claim and, therefore, did not address the arguments Petitioner set forth here.

177

## CONCLUSION

For the foregoing reasons, the prosecution's withholding of favorable and material evidence violates the Fourteenth Amendment of the United States Constitution and requires the issuance of a writ of habeas corpus.

## GROUND F

**TEXAS LAW ENFORCEMENT VIOLATED PETITIONER'S PERSONAL RIGHTS UNDER THE VIENNA CONVENTION ON CONSULAR RELATIONS AND HIS DUE PROCESS AND EQUAL PROTECTION RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS BY FAILING TO NOTIFY PETITIONER THAT HE WAS ENTITLED TO CONTACT THE MEXICAN CONSULATE PRIOR TO SPEAKING WITH LAW ENFORCEMENT.**

Petitioner raised this claim both on direct appeal in and state post-conviction habeas proceedings; the Texas Court of Criminal Appeals denied relief on this issue, as did the post-conviction court judge; the Texas Court of Criminal Appeals affirmed that denial.  Nonetheless, Petitioner maintains that failure to inform him of his rights under the Vienna Convention is, alone, a violation worthy of relief under the Vienna Convention on Consular Rights and the Fifth and Fourteenth Amendments. *See Maldonado v. State*, 998 S.W.2d 239, 246–48 (Tex. Ct. Crim.

App. 1999); *but see U.S. v. Jimenez-Nava*, 243 F.3d 192, 198–99 (5th Cir. 2001); *Rocha v. State*, 16 S.W.3d 1, 19 (Tex. Crim. App. 2000).[38]

Texas law enforcement arrested Petitioner on October 15, 1997.  That same day, Ranger De Los Santos, a Texas Ranger, interviewed Petitioner twice.  During these interviews, Ranger De Los Santos never informed Petitioner his right to contact the Mexican Consulate prior to speaking with law enforcement personnel. Ranger De Los Santos instead extracted from Petitioner two confessions as well as details about a crime in Mexico that was later highlighted during the penalty phase of Petitioner's trial.  The Mexican Consulate remained unaware of Petitioner's case for several days after his arrest and subsequent confessions.

Article 36 (1) (b) of the Vienna Convention on Consular Relations requires law enforcement officials to inform foreign nationals of their right to contact their country's consulate prior to speaking with law enforcement "without delay." Vienna Convention on Consular Relations art. 36 (a) (b), April 24, 1963, 21 U.S.T. 77, 100–101, 595 U.N.T.S. 261, 292.

---

[38] Petitioner is aware of, and here cites direct authority that controls this case and is contrary to his assertion. He has raised this claim to preserve his rights in anticipation of a change in the law. Should a change in law occur, Petitioner will seek leave to brief the Court on that claim.

Both the United States and the Republic of Mexico are party to the Vienna Convention on Consular Relations, and the Texas Court of Criminal Appeals has acknowledged that Untied States law enforcement officials are in fact subject to this obligation. *See Maldonado v. State*, 998 S.W.2d 239, 246–48 (Tex. Ct. Crim. App. 1999). Thus, when a defendant is arbitrarily deprived of the rights guaranteed to him by the Vienna Convention, he is also deprived of his due process and equal protection rights as guaranteed by the Fifth and Fourteenth Amendments. Moreover, the requirement that an individual be informed of his Article 36 (1) (b) rights is a personal right that an individual may enforce in court. *See, e.g., United States v. Lombera-Camorlinga,* 170 F.3d 1241, 1243 (9th Cir. 1999) (recognizing Article 36 establishes individual rights that give defendants standing); *United States v. Hongla-Yamche,* 55 F.Supp.2d 74, 77–78 (D.Mass. 1999) (same); *United States v. $69,530.00 in United States Currency,* 22 F. Supp. 2d 593, 594 (W.D. Tex.1998) (same). By failing to inform Petitioner of his right to contact the Mexican Consulate, Texas law enforcement violated Petitioner's personal rights under the Vienna Convention on Consular Relations and the Fifth and Fourteenth Amendments of the United States Constitution.

For the foregoing reasons, Texas law enforcement's failure to provide consular notification violates the Vienna Convention and Petitioner's due process rights pursuant to the Fifth and Fourteenth Amendments of the United States Constitution and requires the issuance of a writ of habeas corpus.

## GROUND G

**THE TEXAS STATUTORY DEFINITION OF MITIGATION AS FACTORS THAT RENDER A CAPITAL DEFENDANT LESS "BLAMEWORTHY" PLACES AN UNCONSTITUTIONAL LIMIT ON THE EIGHT AMENDMENT CONCEPT OF MITIGATION.**

Petitioner raised this claim both on direct appeal and in post-conviction proceedings.  The Texas Court of Criminal Appeals rejected this claim on direct appeal, and affirmed the post-conviction court's holding that the Texas sentencing statute, which supplied the jury instructions in Petitioner's case, did not impermissibly limit the jury's ability to consider mitigating evidence.  Petitioner asserts that these findings were in error because the Texas statute instructs the jury to consider evidence that makes a defendant less blameworthy, and in so doing excludes many categories of mitigating evidence that the Eight Amendment requires juries to consider.  *See Skipper v. South Carolina*, 476 U.S. 1 (1986); *but see Smith*

*v. Dretke*, No. 03-20366, 2004 WL 48898, *3 (5th Cir. 2004); *Martinez v. Dretke*, 426 F. Supp. 2d 403, 540–41 (W.D. Tex. 2006); *Johnson v. State*, 773 S.W.2d 322 (Tex. Ct. Crim. App. 1989), *aff'd, Johsnon v. Texas*, 509 U.S. 350 (1993).[39]

At the punishment phase of Petitioner's trial the court instructed the jury, pursuant to the Texas capital sentencing statute that "mitigating evidence is evidence that a juror might regard as reducing the defendant's blameworthiness." TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2 (f) (4) (Vernon 1996). The Supreme Court has held, however, that constitutionally relevant mitigating evidence is not simply evidence related to a capital defendant's moral culpability or blameworthiness for the crime, but also includes any mitigating evidence relevant to the defendant's character, to his history, or to circumstances of the crime that weigh in favor of a life sentence. *Skipper v. South Carolina*, 476 U.S. 1 (1986); *see also Lockett v. Ohio*, 438 U.S. 586, 606 (1976) (holding that the Eighth and Fourteenth Amendments require that a sentencer not be precluded from considering as mitigating evidence any "aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence

---

[39] Petitioner is aware of, and cites here, direct and controlling authority contrary to his assertion. He nonetheless raises this claim to preserve his rights in anticipation of a change in law. Should a change in law occur, Petitioner will seek leave to brief the Court on that claim.

less than death"); *Roberts (Harry) v. Louisiana*, 431 U.S. 633, 637 (1977) (same); *Roberts (Stanislaus) v. Louisiana*, 428 U.S. 325, 333–34 (1976) (same).

The principle driving the Court's jurisprudence on mitigating evidence is that punishment should be directly related to the personal culpability of the criminal defendant.  Thus, jury instructions regarding mitigating evidence must be sufficient to "provide the jury with a vehicle for expressing its reasoned moral response to that evidence in rendering its decision."  *Penry v. Lynaugh*, 492 U.S. 302, 303–04 (1989).  Because the Texas sentencing statute adopts an exceedingly narrow view of mitigating evidence as only that evidence that affects a defendant's blameworthiness, that statute—which provided the basis for the jury instructions at Petitioner's trial—promotes arbitrary decisions like those struck down by *Furman v. Georgia*, 408 U.S. 238 (1972), and violates the Eight and the Fourteenth Amendments.  Thus, the state court's denial of relief on this issue was "contrary to" and "involved an unreasonable determination of clearly established Federal law."  The Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254(d) (1996).

For the foregoing reasons, the Texas statutory definition of mitigation violates the Eighth Amendment of the United States Constitution and requires the issuance of a writ of habeas corpus.

## GROUND H

**THE "PENRY" SPECIAL ISSUE USED IN THE TEXAS SENTENCING STATUTE VIOLATES THE EIGHT AND FOURTEENTH AMENDMENTS BY FOSTERING THE TYPE OF OPEN-ENDED ARBITRARINESS CONDEMNED BY THE SUPREME COURT IN *FURMAN V. GEORGIA*.**

On direct appeal and in state habeas proceedings, the Texas Court of Criminal Appeals upheld the Texas capital sentencing statute including the "Penry" special issue.   These holdings were in error because the "Penry" issue invites arbitrary death sentences that violate the Eight Amendment. *See Gregg v. Georgia*, 428 U.S. 153 (1976); *but see Tuilaepa v. California*, 512 U.S. 967, 979–80 (1994); *Martinez v. Dretke*, 426 F. Supp. 2d 403, 530–32 (2006).[40]

In *Penry v. Lynaugh*, the Supreme Court found that the challenged Texas capital sentencing statute did not satisfy the constitutional mandate that a capital sentencing jury be afforded the opportunity to consider various forms of evidence as mitigating. 492 U.S. 302, 303–04 (1989). In an attempt to cure this constitutional defect, the Texas legislature added to its capital sentencing scheme the "Penry"

---

[40] Petitioner is aware of, and cites here, direct and controlling authority contrary to this assertion. He nonetheless raises this claim to preserve his rights in anticipation of a change in law. Should a change in law occur, Petitioner will seek leave to brief the Court on that claim.

special issue. TEX. CODE CRIM. PROC. ANN. art. 37.071, art. 37.0711 (Vernon 1996). The "Penry" special issue instructs the jury to determine:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, including the defendant's character and background, and the personal moral culpability of the defendant, there is sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

In *Furman*, the Supreme Court found that the death penalty, as applied, violated the Eight Amendment in part because capital sentencing juries had been given unstructured and unfettered discretion in sentencing which had resulted in arbitrary sentences for capital defendants. *Furman v. Georgia*, 408 U.S. 238 (1972). While the Constitution requires that all forms of mitigating evidence be considered and given full affect, it simultaneously requires that the jury be given adequate structure within which to consider both mitigating and aggravating factors. *Gregg v. Georgia*, 428 U.S. 153 (1976). The "Penry" special issue provides no structure for a capital jury to deliberate within and therefore permits arbitrary sentences that offend the Eight and Fourteenth Amendments.

185

For the foregoing reasons, the "Penry" special issue used in the Texas sentencing statute violates the Eighth and Fourteenth Amendments of the United States Constitution and requires the issuance of a writ of habeas corpus.

## GROUND I

**THE TEXAS CAPITAL SENTENCING STATUTE VIOLATES THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS BECAUSE IT IMPERMISSIBLY ALLOCATES THE BURDEN OF PROOF, REQUIRING THE DEFENDANT TO PROVE MITIGATION RATHER THAN REQUIRING THE STATE TO PROVE THE EXISTENCE OF AGGRAVATING FACTORS, AND BECAUSE IT DOES NOT REQUIRE A UNANIMOUS JURY TO FIND BEYOND A REASONABLE DOUBT THAT THE DEFENDANT SHOULD BE SENTENCED TO DEATH.**

On direct appeal and on appeal from state habeas proceedings, the Texas court of last resort found that the Texas sentencing statute did not violate the Sixth, Eighth and Fourteenth Amendments. Despite these holdings, Petitioner maintains that the jury instructions given pursuant to the Texas sentencing statute violated Petitioner's rights by shifting the burden to Petitioner rather than calling on the state to prove aggravation beyond a reasonable doubt. *Walton v. Arizona*, 497 U.S. 639 (1990); *Apprendi v. New Jersey*, 530 U.S. 466, 482–83 (2000); *Ring v. Arizona*, 536 U.S. 584, 609 (2002); *but see Rowell v. Dretke*, 398 F.3d 370 (5th Cir. 2005);

186

*Moore v. Dretke*, No. Civ.A.SA-02-CA-0579, 2005 WL 705340 at *11–*12 (W.D.Tex. 2005).[41]

In all capital cases, the Eighth Amendment requires the State to prove the existence of aggravating factors during the penalty phase before the defendant can be sentenced to death.   *Walton v. Arizona*, 497 U.S. 639 (1990).   The Texas "Penry" special issue impermissibly implies to the jury that the burden is on the defendant to prove enough mitigating circumstances to spare him from the death penalty rather than on the state to prove enough aggravating factors to make him death eligible.   Thus the "Penry" special issue violates the Eighth Amendment by lifting the state's burden to prove aggravation.

The Texas sentencing statute further violates the Sixth and Fourteenth Amendments because jury instructions made pursuant to this statute allow for the defendant to receive a death sentence even if not every juror has found beyond a reasonable doubt that the defendant is eligible to receive the death penalty. Generally, if a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, the jury must find that fact beyond a reasonable

---

[41] Petitioner is aware of, and cites here, direct controlling authority contrary to his assertions. He nonetheless raises this claim to preserve his rights in anticipation of a change in law. Should a change in law occur, Petitioner will seek leave to brief the Court on that claim.

doubt. *Apprendi v. New Jersey*, 530 U.S. 466, 482–83 (2000); *see Ring v. Arizona*, 536 U.S. 584, 609 (2002); *but see Rowell v. Dretke*, 398 F.3d 370 (5th Cir. 2005). The death penalty in particular cannot be administered unless the jury has found aggravation beyond a reasonable doubt. *Walton v. Arizona*, 497 U.S. 639 (1990). The Texas sentencing statute does not meet this requirement.

Under the Texas capital sentencing statute, the jury must answer two special issues. First, the jury is asked to determine whether the defendant is a future danger to society; this is the aggravating circumstance that the state must prove to the jury beyond a reasonable doubt before a defendant can be sentenced to death. TEX. CODE CRIM. PROC. ANN. art. 37.071 §2(b) 1 (Vernon 1996). Next, if the jury answers the first special issue in the affirmative, then it must determine if, despite the fact that the defendant is a future danger, his life should be spared because of mitigating circumstances. *Id.* at § 2(d) 1. The jury instructions regarding the first special issue, however, do not make it clear that if even one juror does not answer the first question in the affirmative, deliberations should go no further and the defendant should receive a life sentence because the state has failed to meet its burden of proving the aggregating circumstance beyond a reasonable doubt. *Ring v. Arizona*, 536 U.S. 584, 609 (2002).

Instead, the jury instructions state that the defendant will receive a life sentence if ten or more jurors vote in favor of the defendant on special issue two, implying that despite a single juror's contrary vote on special issue one, jury deliberations should continue and life sentence given only in the event of ten votes for the defendant on special issue two.   TEX. CODE CRIM. PROC. ANN. art. 37.071 § 2(d) 2 (Vernon 1996).   Thus, the Texas statute violates the Sixth and Fourteenth Amendments because deliberations can result in a sentence of death even though a unanimous jury was not convinced beyond a reasonable doubt that the defendant should receive a death sentence.

For the foregoing reasons, the Texas capital sentencing statute violates the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and requires the issuance of a writ of habeas corpus.

## IV.  PRAYER FOR RELIEF

WHEREFORE, Petitioner prays that the Court:

A)  issue an order to have him brought before it, to the end that he may
be discharged from the unconstitutional confinement and restraint;

B)  conduct an evidentiary hearing at an appropriately scheduled time
where proof may be offered and argument advanced concerning the allegations set
forth in this petition;

C)  permit him because of his indigence to proceed without payment of
costs; and

D)  grant such other relief as may be necessary and appropriate.

Respectfully submitted,


/s/ Sheri L. Johnson
S H E R I     L Y N N     J O H N S O N
108 Myron Taylor Hall
Cornell Law School
Ithaca, NY 14853
(607) 255 6478


/s/ Naomi E. Terr
NAOMI E. TERR
Texas Defender Service
1927 Blodgett Street
Houston, Texas 77004
(713) 222-7788

191

## Verification

I, Naomi E. Terr, attorney for Petitioner in the above-entitled action, state that to the best of my knowledge and belief, the facts set forth in this Petition are true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 16, 2010

/s/ Naomi E. Terr

## Certificate of Service

On July 16, 2010, I electronically filed the foregoing with the clerk of the court for the U.S. District Court, Western District of Texas, using the electronic case filing system of the court. A "Notice of Electronic Filing" was sent to Jeremy Greenwell, counsel for Respondent, at his e-mail address.

/s/ Naomi E. Terr