UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **RAMIRO HERNANDEZ a/k/a** | § | |
| **RAMIRO HERNANDEZ LLANAS,** | § | |
| **TDCJ No. 999342,** | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| **V.** | § | **CIVIL NO. SA-08-CA-805-XR** |
| | § | |
| **RICK THALER, Director,** | § | |
| **Texas Department of Criminal** | § | |
| **Justice, Correctional** | § | |
| **Institutions Division,** | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM OPINION AND ORDER

Petitioner Ramiro Hernandez Llanas filed this habeas corpus action pursuant to 28 U.S.C Section 2254 challenging his Bandera County conviction for capital murder and sentence of death. For the reasons set forth hereinafter, petitioner is not entitled to habeas corpus relief from this Court but is entitled to a Certificate of Appealability regarding his claim that he is mentally retarded.

## I. Statement of the Case

### A. The Crime and Aftermath

Beginning late on the evening of October 14, 1997 and continuing into the early morning hours of October 15, 1997,

petitioner bludgeoned to death his employer Glen Lich with a metal bar, then ransacked the Lich residence and repeatedly sexually assaulted Lich's wife at knife-point.[1]

Mrs. Lich testified at length during petitioner's trial concerning petitioner's activities on the night of her husband's murder. She recounted, without contradiction by petitioner or any other witness, that (1) she met the petitioner when he arrived at the Lich residence in July, 1997 to assist a carpenter who was helping to renovate the ranch house and other buildings, (2) petitioner worked at the Lich residence for about three weeks, (3) months later, around the beginning of October, 1997, petitioner telephoned her husband and negotiated an arrangement in which petitioner received room and board at the Lich residence in exchange for assisting Mr. Lich and others who were continuing the renovations, (4) on October 14, 1997, after petitioner had been staying at the Lich residence for about ten days, petitioner knocked on the door of the Lich bedroom around ten p.m. and Glen Lich went outside to talk with petitioner, (5) not long thereafter, Mrs. Lich looked up from reading the paper and saw petitioner on the porch outside the bedroom, (6) petitioner opened the door and entered the bedroom, covered in blood and holding a knife in his hand, (7) petitioner approached Mrs. Lich,

---

[1] Statement of Facts from petitioner's trial court proceedings (henceforth "S.F. Trial"), Volume 18, testimony of Lera Lich, at pp. 32-79.

held the knife to her neck, tore off her glasses, pulled off her clothes, and forced her on to the bed, (8) petitioner undressed himself and proceeded to have non-consensual vaginal intercourse with Mrs. Lich while holding the knife to her neck, i.e., he raped Mrs. Lich, (9) Mrs. Lich, who speaks very little Spanish tried to communicate with petitioner while she was being sexually assaulted but was only able to understand a few words petitioner spoke in English, (10) when she asked about her husband, petitioner responded in English with phrases such as "five hours," "Laredo," "five thousand dollars," "ten thousand dollars," and "my brother," and in Spanish with "fifteen thousand dollars, then your husband will be back," (11) after twice sexually assaulting Mrs. Lich, petitioner escorted her to the bathroom where he held her at knife point while she relieved herself, (12) petitioner then took her back to the bedroom, where he wrote down the numbers "10,000" and "15,000" on a piece of paper, (13) petitioner placed or attempted to place several telephone calls, finally reaching someone with whom petitioner had an angry conversation in Spanish, (14) petitioner then tore a towel into strips and tied Mrs. Lich's hands and ankles to the bed and covered her face with a blanket, (15) Mrs. Lich was nonetheless able to see out of a corner of the blanket and witnessed petitioner ransacking the bedroom, placing jewelry and other items in a plastic bag, (16) in Spanish, petitioner

3

threatened Mrs. Lich's elderly mother, who was asleep nearby in a separate bedroom, (17) petitioner removed the blanket from Mrs. Lich and asked for the keys to the Lich's Jeep, (18) Mrs. Lich nodded in the direction of the keys, (19) petitioner went outside and started the Jeep but, after a few minutes, turned off the engine, came back inside, and tied Mrs. Lich's wrists and ankles even more securely to the bed with wires, (20) petitioner made a second series of telephone calls, after which he yanked all the phones in the room off the hook, (21) then, petitioner went outside for a period of time, (22) petitioner came back inside, rummaged throughout the bedroom again, then untied Mrs. Lich and raped her at least two more times at knife point, (23) during the second series of sexual assaults, petitioner wore Glen Lich's watch, Mrs. Lich's grandmother's wedding ring, and several of Mrs. Lich's necklaces, (24) when Mrs. Lich asked petitioner about her husband, petitioner replied "two hours Laredo," asked her if she wanted to live longer, instructed her not to call the police, and indicated she would see her husband again if she gave petitioner the money he had demanded, (25) petitioner threatened Mrs. Lich's elderly mother and Mrs. Lich's daughter, the latter by name, and (26) at one point, petitioner gestured with a syringe motion and said it was "okay with me."[2]

---

[2] *Id.*, at pp. 32-79, 90-98, 104-07.

Lera Lich survived petitioner's repeated sexual assaults and, when petitioner fell asleep following the second wave of such assaults, slipped out of his grasp and made her way to a neighboring residence in rural Kerr County.[3]  When sheriff's deputies arrived at the Lich residence, they found petitioner sound asleep on the bed.[4]  When the sheriff's deputies woke petitioner, he violently resisted arrest but was eventually subdued and arrested.[5]

Shortly after petitioner's arrest, Kerr County Sheriff's personnel took Lera Lich to the hospital, where a sexual assault kit was collected.[6]

---

[3] S.F. Trial, Volume 18, testimony of Lera Lich, at pp. 89-86.

[4] S.F. Trial, Volume 18, testimony of Randall T. Sanders, at pp. 116-18, 128-30.

[5] S.F. Trial, Volume 18, testimony of Randall T. Sanders, at pp. 118-21, 130-31.
During petitioner's examining trial, Deputy Sanders gave a much more graphic account of petitioner's violent resistance to the attempts of himself and another deputy to secure petitioner on the morning in question. S.F. Trial, Volume 2, testimony of Randall T. Sanders, at pp. 67-74.

[6] S.F. Trial, Volume 18, testimony of Francis Kaiser, at pp. 186-89; testimony of Barbara Jolene Fudge, at pp. 192-99.

Law enforcement officials searched the Lich residence and found Glen Lich's body near a generator building.[7]  His skull had been battered beyond recognition.[8]

On the morning of October 15, 1997, after having been given his *Miranda* warnings in Spanish, petitioner gave an audiotape recorded statement in Spanish to law enforcement officials in which he identified himself as "Reuben Salinas."[9]  On the afternoon of the same day, when confronted again by law enforcement officers and given a second set of *Miranda* warnings in Spanish, petitioner admitted his name was Ramiro Hernandez and gave a second audiotape recorded statement in Spanish.[10]  As he had in his first statement, in his second statement, petitioner admitted he had struck Glen Lich "once" with a metal bar but, in his second statement, petitioner admitted for the first time that

---

[7] S.F. Trial, Volume 18, testimony of Randall T. Sanders, at pp. 122-27.

[8] *Id.*, at p. 124.
Numerous photographs of both crime scenes (i.e., the bloody location near the generator building where Glen Lich's mutilated body was found in close proximity to a bloody piece of metal rebar and the ransacked, blood-stained, Lich bedroom) were admitted into evidence as State's Exhibits 29-54, 56-66, and 69, and are found in S.F. Trial, Volume 24.

[9] S.F. Trial, Volume 5, testimony of Gerardo De Los Santos, at p. 38.

[10] S.F. Trial, Volume 2, testimony of Gerard De Los Santos, at pp. 80-89; Volume 5, testimony of Gerardo De Los Santos, at pp. 35-41.

he had sexually assaulted Mrs. Lich "once."[11]  Both of

petitioner's recorded statements and English translations of same

were admitted into evidence during his examining trial but

neither statement nor any transcription of same was offered or

admitted into evidence during petitioner's subsequent capital

murder trial.

## B.   Indictment

On November 17, 1997, a Kerr County grand jury indicted

petitioner on a single count of capital murder, to wit,

intentionally causing the death of Glen Lich by striking and

beating Glen Lich with a metal bar, while in the course of

committing and attempting to commit the offenses of sexual

assault of Lera Lich, robbery of Lera Lich, and burglary of a

habitation with intent to commit theft of Lera Lich.[12]

---

[11] English version transcriptions of both of petitioner's audiotape recorded statements appear in the record herein as exhibits to the verbatim transcription of petitioner's examining trial, i.e., S.F. Trial, Volume 2.
    In his first statement (which is 16 pages in length), petitioner identified himself as Reuben Salinas, claimed he struck Glen Lich only once, denied he sexually assaulted Mrs. Lich, claimed he had consumed a large amount of beer and liquor the night of the murder, and expressed remorse for having killed Glen Lich.
    In his second statement, petitioner stated he "made love" to Mrs. Lich only one time, he only remembered striking Glen Lich "once," he never had any problems with Glen Lich, and he drank heavily the night of the murder.

[12] Transcript of pleadings, motions, and other documents filed in petitioner's trial court proceedings (henceforth "Trial Transcript"), Volume I, at p. 5; Transcript of pleadings. motions, and other documents filed in petitioner's state habeas

## C.  **Guilt-Innocence Phase of Trial**

Following a change of venue to Bandera County, the guilt-
innocence phase of petitioner's capital murder trial commenced on
February 7, 2000.  In addition to the testimony of Lera Lich and
other evidence summarized above, the prosecution presented
testimony establishing that (1) Lera Lich's physical examination
on the morning of October 15, 1997 revealed evidence of extreme
violence, to wit, severe trauma to her cervix, abrasions and
bruises in the vaginal area, bi-lateral lacerations in the labia
minora, and a pooling of blood in the vaginal vault[13]; (2)
photographs taken of Lera lich during her physical examination
revealed cuts on her neck, throat, left palm, right shoulder, and
left upper arm, as well as bruises on her chest[14]; (3) blood
found on petitioner's shirt, pants, and the metal bar found near
Glen Lich's body all matched the DNA of Glen Lich[15]; (4) mixed
DNA samples found on the sheets taken from the Lich bed consisted

---

corpus proceeding (henceforth "State Habeas Transcript"), Volume
I, at p. 2.

[13] S.F. Trial, Volume 18, testimony of Barbara Jolene Fudge,
at pp. 196-99.

[14] S.F. Trial, Volume 18, testimony of Francis Kaiser, at
pp. 187-88.
Photographs taken of Mrs. Lich during her examination were
admitted into evidence as State Exhibits nos. 79-84 and appear in
S.F. Trial, Volume 24.

[15] S.F. Trial, Volume 18, testimony of Brady Mills, at pp.
208-11.

of DNA from the blood of Lera Lich and semen of the petitioner[16]; (5) a couple weeks before the murder, petitioner told his cousin Martin Salinas that he (petitioner) planned to "hodor" (i.e., "hurt") his boss, steal his boss's jeep, and sell it in Mexico[17]; (6) after Lich's murder, petitioner saw his cousin in jail and told his cousin the murder was "a stupid thing"[18]; (7) following his arrest, petitioner telephoned a friend from jail and told her he had killed a man and raped a lady[19]; and (8) Sheriff's deputies found (a) strips of cloth and wires tied to the head board and foot board of the Lichs' bed, (b) sacks filled with jewelry on the floor of the Lichs' bedroom, (c) a bloody "crowbar" near Glen Lich's body, (d) a bloody flashlight on the bedroom floor beside the bed, (e) bloody bed sheets, pillows, and a quilt on the bed, (f) petitioner's bloody shirt, shoes, and baseball cap, and (g) a black handled knife.[20]

---

[16] *Id.*, at pp. 212-13.

[17] S.F. Trial, Volume 18, testimony of Martin Salinas, at pp. 222-26, 231, 246-27.

[18] *Id.*, at p. 234.

[19] S.F. Trial, Volume 18, testimony of Maria Del Carmen Serrano, at p. 253.

[20] S.F. Trial, Volume 18, testimony of James A. Hicks, at pp. 139-64; testimony of Todd Burdick, at pp. 167-70.
Photographs of the crimes scenes, both the Lichs' bedroom and the location where Glen Lich's body was found, were admitted into evidence at State Exhibit nos. 29-54, 56-66, and 69 and appear in S.F., Trial, Volume 24.

A blood spatter expert testified the "crowbar" found near Glen Lich's body with a large amount of blood on it could have been used to bludgeon the victim and could have caused the pattern of blood spatter found on the generator, the generator building, and many other objects located in all directions six feet or more from Lich's body.[21]

The medical examiner testified the autopsy of Glen Lich revealed (1) a tremendous deformation injury to the head and cranial vault, (2) multiple lacerations and tears throughout the full thickness of the scalp, (3) lacerations to the middle of the face, across the bridge of the nose, (4) subtotal amputation of the right ear from the head, (5) lacerations to the jaw and mouth, (6) contusions and abrasions to the right clavicle, (7) contusions on the right side of the neck and sternocleidomastoid muscle, (8) a massive skull fracture to the top of the cranium, (9) separation of the top of the skull from the brain, (10) extensive fractures to the base of the brain consistent with brain injuries one would expect to see in a car accident, (11) a minimum of six blows were necessary to inflict the damage done to Glen Lich's head, (12) possibly as many as seventeen blows were administered to Glen Lich's head, far more than the number necessary to cause death, (13) some of the blows may have been

_____

[21] S.F. Trial, Volume 19, testimony of Kevin Crosthwait, at pp. 16-17, 28-37.

delivered post-mortem, and (14) the cause of death was traumatic head injury, consistent with multiple blows to the head, possibly from the "crowbar" found near Lich's body.[22]

Petitioner presented no evidence during the guilt-innocence phase of trial.

On February 8, 2000, after deliberating approximately five minutes, the jury returned its verdict, finding petitioner guilty beyond a reasonable doubt of capital murder.[23]

## D.    **Punishment Phase of Trial**

The punishment phase of petitioner's trial commenced later that same afternoon.

### 1.    The Prosecution's Evidence

The prosecution presented evidence showing (1) petitioner had previously been convicted in Mexico of murder[24]; (2) prior to

---

[22] S.F. Trial, Volume 19, testimony of Elizabeth Peacock, at pp. 42-49.
      Photographs from Glen Lich's autopsy were admitted into evidence as State Exhibit nos. 71-77 and are found in S.F. Trial, Volume 24.

[23] S.F. Trial, Volume 19, at pp. 107-11.
      The record from petitioner's trial indicates his jury returned from its lunch break and began its deliberations at the guilt-innocence phase of trial at approximately 1:25 p.m. on February 8, 200 and sent out a note at approximately 1:30 p.m. indicating it had reached a verdict. *Id.*, at p. 108.

[24] S.F. Trial, Volume 20, testimony of William R. "Rusty" Hierholzer, at pp. 26-27.  This witness testified petitioner's fingerprints matched those on a pen packet from Mexico which was admitted into evidence as State Exhibit no. 95 and can be found in S.F. Trial, Volume 24.

his murder of Glen Lich, petitioner had stabbed a man during a bar fight[25]; (3) petitioner told a guard at the Kerr County Jail that he had stabbed someone at a bar and he planned to come forward so that Francisco Espino (Ms. Serrano's husband) would be cleared of the stabbing[26]; (4) on one occasion while at the Bandera County Jail, petitioner refused to obey an order to return to his sleeping area and threatened to harm himself and possibly others with a metal food tray[27]; (5) in May, 1997, petitioner drove to the home of a fifteen year old female acquaintance, convinced her to accompany him on a drive, drove the teenager to an isolated location, where he forced her to disrobe at knife point, had non-consensual intercourse with her while holding a knife to her neck, told her he had killed people

---

[25] S.F. Trial, Volume 20, testimony of Maria Del Carmen Serrano, at pp. 28-56.

Ms. Serrano also testified that (1) when initially questioned by police concerning the stabbing, she had claimed not to have seen the incident, (2) she did not come forward and tell the police what she had seen until after she spoke with her husband's attorney, i.e., attorney Steven Pickell, who would later become one of petitioner's trial counsel, (3) she discussed the stabbing with petitioner after petitioner's arrest for capital murder, (4) petitioner mentioned to her his desire to steal his boss's truck and sell it in Laredo, (5) petitioner told her he had escaped from prison in Mexico by pretending to be sick and had given orders to others while in prison, and (6) she did not like the petitioner because he had advised her children not to listen to her. *Id.*

[26] S.F. Trial, Volume 20, testimony of Pedro B. Garcia, Jr., at pp. 57-61.

[27] S.F. Trial, Volume 21, testimony of Irene Broyles, at pp. 11-19.

in Mexico, and threatened to kill her if she ever reported the
rape[28]; (6) on several occasions while incarcerated, petitioner
was found in possession of homemade weapons, i.e., shanks,
fashioned from animal bones and other materials[29]; and (7) on one
occasion in June, 1998, petitioner used a sheet to cover the
entrance to his cell to conceal himself from officers, brandished
a shank, made threats against Kerr County jail personnel, and did
not relinquish his weapon until guards stormed his cell in
force.[30]

>    2.   <u>Defense Evidence</u>

Dr. Gilbert Martinez, a clinical psychologist, testified (1)
he conducted a neuropsychological evaluation of petitioner, (2)
petitioner's English language skills are very limited, (3)
evaluation of Spanish speaking individuals are very difficult
because not many tests have been standardized for Spanish
speaking populations, (4) he administered only the non-verbal

---

[28] S.F. Trial, Volume 21, testimony of Rachel A.
Charnichart, at pp. 22-29.
     This witness also testified she believed petitioner's
threats and did not report her rape after petitioner drove her
home and told her he would flee to Mexico if she did report same,
then return and kill her. *Id.*, at pp. 28-29.

[29] S.F. Trial, Volume 21, testimony of Shelley S. Morgan, at
pp. 44-47; testimony of Ronald Braziel, at pp. 49-50; testimony
of Kyle L. Dean, at pp. 58-60; testimony of Jeffrey D. Gomez, at
pp. 66-68.

[30] S.F. Trial, Volume 21, testimony of Jeffrey D. Gomez, at
pp. 61-69, 74-76; testimony of Pamela K. Hicks, at pp. 84-90.

portion of the Wechsler Adult Intelligence Scale to petitioner because, due to petitioner's low language proficiency, the verbal portions of that test would not be valid, (5) petitioner's nonverbal intelligence scores are extremely low, in the mid-fifties, (6) petitioner showed significant impairment in both verbal and nonverbal memory and gave simplistic answers which lacked content, (7) petitioner displayed low functioning levels in mental abilities, intelligence, and cognitive abilities, (8) petitioner possesses an anti-social personality and functions at close to the level of mental retardation, possibly because of poly substance abuse and childhood head trauma, (9) persons with low cognitive ability lack impulse control, are aggressive, and lack psychological coping skills, (10) while malingering could contribute to petitioner's low scores, it was unlikely it explained all of petitioner's impairments, and (11) while motivational factors could explain some of the discrepancy in petitioner's historical IQ scores, petitioner's cognitive test scores are consistently low and petitioner is "unsophisticated", this rendering "malingering" unlikely.[31]

Dr. Robert E. Cantu, a psychiatrist, testified (1) he evaluated petitioner for competency to stand trial and concluded that, while petitioner did suffer from Schizo-phreniform

---

[31] S.F. Trial, Volume 21, testimony of Gilbert Martinez, at pp. 100-31, 193-97.

disorder, petitioner was nonetheless competent to stand trial,
(2) in his view, malingering was a "significant concern" because
of the prominence of petitioner's tendency to claim he did not
know things, (3) he believed petitioner suffers from a chronic
mental illness which might benefit from medication, (4) if
properly medicated, petitioner is less likely to become violent,
(5) petitioner's mental illness did not impair petitioner's
ability to distinguish right from wrong, (6) during his
interview, petitioner appeared to shift gears and to slow down
when they reached issues addressing petitioner's competence to
stand trial, and (7) discrepancies in petitioner's stories could
indicate malingering.[32]

Dr. Michael Arambula, a forensic psychiatrist, testified (1)
petitioner has a mood disorder, which makes petitioner more
irritable, aggressive, and violent, and a thought disorder, which
disturbs petitioner's ability to think clearly, (2) petitioner
likely suffers from organic brain damage, (3) petitioner's
thought disorder could be attributed to petitioner's history of
long term drug (inhalant) abuse, (4) petitioner has a
"distinctive" anti-social personality, (5) while petitioner might
be mentally retarded, he was unable to render an opinion on that
subject, (6) long-term drug abuse can make a person appear

---

[32] S.F. Trial, Volume 21, testimony of Robert E. Cantu, at pp. 131-55.

mentally retarded, and (7) petitioner does not suffer from a
severe mental disease.[33]

### 3. Prosecution's Rebuttal Evidence

The prosecution called Dr. James P. Grigson, who testified
that, although he had never examined petitioner, he believed
petitioner was likely to commit criminal acts of violence that
would constitute a continuing threat to society because
petitioner is a sociopath who lacks a conscience.[34]

### 4. The Verdict

On February 10, 2000, petitioner's jury returned its
verdict, finding (1) beyond a reasonable doubt there was a
probability the petitioner would commit criminal acts of violence
that would constitute a continuing threat to society and (2)
taking into consideration all of the evidence, including the
circumstances of the offense, the petitioner's character and
background, and the personal moral culpability of the petitioner,
there were insufficient mitigating circumstances warranting a

---

[33] S.F. Trial, Volume 21, testimony of Michael Arambula, at
pp. 157-92, 219-30.

[34] S.F. Trial, Volume 21, testimony of James P. Grigson, at
pp. 199-217.

sentence of life imprisonment.[35]  The trial court imposed the

sentence of death mandated by the jury's verdict.[36]

## E. **Direct Appeal**

Petitioner appealed his conviction and sentence.[37]  In an

---

[35] Trial Transcript, Volume II, at pp. 316-17; S.F. Trial, Volume 23, at pp. 61-64.

[36] S.F. Trial, Volume 23, at pp. 66-69.

[37] Respondent did not furnish this Court with a copy of petitioner's appellant's brief when respondent forwarded copies of petitioner's other state court records to this Court. However, the Texas Court of Criminal Appeals' unpublished opinion rejecting all fourteen of petitioner's points of error on direct appeals on the merits was included among the voluminous records furnished to this Court.  From that opinion, it is possible to discern that petitioner's points of error on direct appeal consisted of arguments that (1) petitioner's trial counsel rendered ineffective assistance by (a) failing to request a competency hearing, (b) failing to inform Dr. Arambula that petitioner was NOT intoxicated at the time of his offense (despite petitioner's assertions to the contrary in his two tape recorded statements to law enforcement officers), (c) failure to adequately prepare for trial, (d) making improper statements during jury argument (specifically admitting the evidence would paint a grim picture for petitioner), and (e) soliciting harmful information from a defense witness (specifically that petitioner had confessed to the murder), (2) the trial court erred in admitting evidence of petitioner's Mexican murder conviction, (3) the trial court erred in admitting Dr. Grigson's opinion testimony, (4) the trial court erred in commencing the trial by leading the jury in the Pledge of Allegiance to the U.S. flag, (5) the trial court erred in failing to order a competency hearing *sua sponte*, (6) the trial court erred in failing to suppress petitioner's confessions as violations of the Vienna Convention, (7) petitioner is exempt from execution because he is mentally retarded, (8) the trial court ordered excessive security during trial (petitioner was shackled throughout trial), (9) there was insufficient evidence of petitioner's guilt, (10) the prosecutor improperly argued petitioner refused to discuss the facts of his case with Dr. Cantu, (11) the trial court erred in admitting gruesome photographs of the crime scene and autopsy, and the Texas Capital sentencing (12) fails to inform the jury of

unpublished Opinion issued December 18, 2002, the Texas Court of
Criminal Appeals affirmed petitioner's conviction and sentence.
*Hernandez v. State*, No. 73,776 (Tex. Crim. App. December 18,
2002). The United States Supreme Court denied petitioner's
petition for writ of certiorari on June 27, 2003. *Hernandez v.*
*Texas*, 539 U.S. 962, 123 S.Ct. 2646, 156 L.Ed.2d 662 (2003).

**F.**   **First State Habeas Corpus Proceeding**

Petitioner filed his first application for state habeas
corpus relief on May 2, 2002, asserting 37 grounds for relief,
including a plethora of attacks upon the constitutionality of the
Texas capital sentencing scheme and myriad claims of ineffective
assistance by petitioner's trial counsel.[38] In his twelfth claim
for state habeas relief, petitioner again argued he was exempt
from execution by virtue of his mental retardation.[39]

In an Order signed March 6, 2006 (but not filed until March
13, 2006), the state trial court issued its findings of fact and
conclusions of law and recommended petitioner's first state
habeas corpus application be denied.[40] In a separate document

_____

the effect of a single holdout juror, (13) shifts the burden of
proof on mitigation to the defense, and (14) does not require
consideration of mitigating evidence.

   [38] Petitioner's first state habeas corpus application, filed
by attorney Albert L. Rodriguez, appears at pages 30-178 of
Volumes I and II of petitioner's State Habeas Transcript.

   [39] State Habeas Transcript, Volume I, at pp. 65-83.

   [40] State Habeas Corpus Transcript, Volume VI, at pp. 4-29.

styled "Exhibit A" signed and filed those same dates, respectively, the state trial court specifically made factual findings and legal conclusions rejecting petitioner's mental retardation claim.[41]

In an unpublished Order, the Texas Court of Criminal Appeals remanded the cause to the trial court for a live evidentiary hearing on petitioner's mental retardation claim. *Ex parte Ramiro Hernandez*, 2006 WL 1174311 (Tex. Crim. App. May 3, 2006).

On October 16-18, 2006, the state trial court held an evidentiary hearing on petitioner's mental retardation claim, heard testimony from several members of petitioner's family, a childhood neighbor of petitioner, a pair of mental health experts retained by petitioner (Dr. Gilbert Martinez and Dr. Antonio E. Puente), the Kerr County Sheriff, and the State's mental health expert (Dr. Richard E. Coons).  In an Order issued May 20, 2008, the state trial court issued its "Supplemental" findings of fact and conclusions of law and recommended once more that petitioner's mental retardation claim be denied.[42]

The Texas Court of Criminal Appeals adopted the findings of fact and conclusions of law contained in the state trial court's

---

[41] State Habeas Transcript, Volume V, at pp. 154-60.

[42] State Habeas Transcript, Volume V, at p. 137-53.
The state trial court's Order issued May 20, 2008 incorporated by reference the findings and conclusions included in its "Exhibit A filed May 13, 2006. State Habeas Transcript, Volume V, at pp. 154-60.

original findings of fact and conclusions of law (issued March 13, 2006), as well as the trial court's supplemental findings and conclusions (issued May 20, 2008), and denied state habeas corpus relief. *Ex parte Ramiro Hernandez*, WR-63,282-01, 2008 WL 4151813 (Tex. Crim. App. September 10, 2008).

**G.  Initial Federal Habeas Corpus Proceedings in this Court**

On September 29, 2008, petitioner filed a motion for leave to proceed *in forma pauperis* and a motion for appointment of counsel to represent him in a federal habeas corpus proceeding challenging his conviction for capital murder and sentence of death. *Docket entry nos. 1 & 3.* In an Order issued September 30, 2008, this Court granted petitioner's motion for appointment of counsel. *Docket entry no. 5.*

On September 9, 2009, petitioner filed his original petition for federal habeas corpus relief herein, asserting therein some 16 claims for relief. *Docket entry no. 32.*

**H.  Second State Habeas Corpus Proceeding**

On or about October 2, 2009, petitioner filed his second application for state habeas corpus relief. In an unpublished Order issued November 25, 2009, the Texas Court of Criminal Appeals dismissed petitioner's second state habeas corpus application because of the pendency of petitioner's federal habeas corpus petition before this Court. *Ex parte Ramiro Hernandez*, WR 63,282-02 (Tex. Crim. App. November 25, 2009).

## I.   Additional Proceedings in this Court

In an Order issued January 15, 2010, this Court stayed this cause to permit petitioner to return to state court and exhaust state habeas remedies on what petitioner's federal habeas counsel represented were several then-unexhausted claims. *Docket entry no. 39.*

## J.   Third State Habeas Corpus Proceeding

On January 22, 2010, petitioner filed his third state habeas corpus application, urging therein arguments that (1) one of his trial counsel (attorney Steven Pickell) operated under a conflict of interest throughout petitioner's trial court proceedings arising from attorney Pickell's previous representation of Francisco Espino, i.e., the husband of prosecution witness Maria Del Carmen Serrano and the original suspect arrested in connection with the stabbing outside a bar in May, 1997, an offense to which petitioner subsequently pleaded guilty, (2) the prosecution knowingly withheld from petitioner's trial counsel potentially exculpatory or mitigating evidence in the form of information indicating (a) the stabbing victim in the May, 1997 bar fracas had identified Espino as his assailant and (b) Lera Lich did not wish petitioner to receive the death penalty, and (3) petitioner's trial counsel rendered ineffective assistance by failing to adequately investigate petitioner's background and

present mitigating evidence showing petitioner suffered extreme neglect, abuse, poverty, and exposure to toxins throughout his childhood in Nuevo Laredo, Mexico.[43]

In an unpublished Order, the Texas Court of Criminal Appeals dismissed petitioner's third state habeas corpus application as an abuse of the writ. *Ex parte Ramiro Hernandez*, WR-63,282-03, 2010 WL 1240353 (Tex. Crim. App. March 31, 2010).

**K.   Return to this Court**

On July 16, 2010, petitioner filed an amended petition, in which petitioner asserted only nine claims for relief. *Docket entry no. 48.* On October 25, 2010, respondent filed an answer and motion for summary judgment. *Docket entry no. 53.* On April 12, 2011, petitioner filed his reply to respondent's answer and motion for summary judgment. *Docket entry no. 61.*

## II.   AEDPA Standard of Review

Because petitioner filed his federal habeas corpus action after the effective date of the AEDPA, this Court's review of petitioner's claims for federal habeas corpus relief is governed by the AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001). Under the AEDPA standard of review, this Court cannot grant petitioner federal habeas corpus relief in this cause in connection with any claim that was

---

[43] Third State Habeas Transcript, at pp. 12-44.

adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141, 125 S.Ct. 1432, 1438, 161 l.Ed.2d 334 (2005); *Williams v. Taylor*, 529 U.S. 362, 404-05, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of 28 U.S.C. Section 2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown v. Payton*, 544 U.S. at 141, 125 S.Ct. at 1438; *Mitchell v. Esparza*, 540 U.S. 12, 15-16, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003)("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially

indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"). A state court's failure to cite governing Supreme Court authority does not, *per se*, establish the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Mitchell v. Esparza*, 540 U.S. at 16, 124 S.Ct. at 10.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Brown v. Payton*, 544 U.S. at 141, 125 S.Ct. at 1439; *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S.Ct. 2527, 2534-35, 156 L.Ed.2d 471 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *McDaniel v. Brown*, ___ U.S. ___, ___, 130 S.Ct. 665, 673, 175 L.Ed.2d 582 (2010)("A federal habeas court can only set aside a state-court decision as 'an unreasonable application of...clearly established Federal law,' § 2254(d)(1), if the state court's application of that law is 'objectively unreasonable.'"); *Wiggins v. Smith*, 539 U.S. at 520-21, 123 S.Ct. at 2535. The focus of this inquiry is on whether

24

the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S.Ct. 1933, 1939, 167 L.Ed.2d 836 (2007)("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."); *Wiggins v. Smith*, 539 U.S. at 520, 123 S.Ct. at 2535; *Price v. Vincent*, 538 U.S. 634, 641, 123 S.Ct. 1848, 1853, 155 L.Ed.2d 877 (2003)("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner").

Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado*, 541 U.S. 652, 660-61, 124 S.Ct. 2140, 2147, 158 L.Ed.2d 938 (2004)("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003).

The AEDPA also significantly restricts the scope of federal habeas review of state court fact findings. Section 2254(d)(2) provides federal habeas relief may not be granted on any claim

that was adjudicated on the merits in the state courts unless the state court's adjudication of the claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Wood v. Allen*, ___ U.S. ___, ___, 130 S.Ct. 841, 849, 175 L.Ed.2d 738 (2010)("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."); *Williams v. Taylor*, 529 U.S. at 410, 120 S.Ct. at 1522 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."). Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), on habeas review, this does not suffice to supersede the trial court's factual determination. *Wood v. Allen*, ___ U.S. at ___, 130 S.Ct. at 849; *Rice v. Collins*, 546 U.S. 333, 341-42, 126 S.Ct. 969, 976, 163 L.Ed.2d 824 (2006).

In addition, Section 2254(e)(1) provides a petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro v. Landrigan*, 550 U.S. at 473-74, 127 S.Ct. at 1939-40 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless

applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice v. Collins*, 546 U.S. 333, 338-39, 126 S.Ct. 969, 974, 163 L.Ed.2d 824 (2006)("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *Miller-El v. Dretke,* 545 U.S. 231, 240, 125 S.Ct. 2317, 2325, 162 L.Ed.2d 196 (2005)("[W]e presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'"); 28 U.S.C. §2254(e)(1).

However, the deference to which state-court factual findings are entitled under the AEDPA does not imply an abandonment or abdication of federal judicial review. *See Miller-El v. Dretke*, 545 U.S. at 240, 125 S.Ct. at 2325 (the standard is "demanding but not insatiable"); *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003)("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief.").

Finally, in this Circuit, a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to the AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's written

opinion supporting its decision. *See Maldonado v. Thaler*, 625
F.3d 229, 239 (5th Cir. 2010)(federal habeas review of a state
court's adjudication involves review only of a state court's
decision, not the written opinion explaining the decision), *cert.
filed March 14, 2011 (No. 10-9511)*; *St. Aubin v. Quarterman*, 470
F.3d 1096, 1100 (5th Cir. 2006)(holding Section 2254(d) permits a
federal habeas court to review only a state court's decision and
not the written opinion explaining that decision), *cert. denied*,
550 U.S. 921 (2007).

### III. <u>Mental Retardation Claim</u>

A.   <u>The Claim</u>

In his first claim for federal habeas relief in his amended
petition, petitioner argues he is exempt from execution under the
Supreme Court's holding in *Atkins v. Virginia*, 536 U.S. 304, 122
S.Ct. 2242, 153 L.Ed.2d 335 (2002), which held the Eighth
Amendment precludes the execution of mentally retarded capital
murderers.[44]

B.   <u>State Court Disposition</u>

Petitioner fairly presented the state appellate court with
his *Atkins* claim both in his direct appeal (as point of error
seven) and as his twelfth claim for state habeas corpus relief in
his first state habeas corpus application.

---

[44] Petitioner's Amended Petition, filed July 16, 2010,
docket entry no. 48, *(*henceforth *"Amended Petition"), at pp. 24-
74.

1.   Direct Appeal

On direct appeal, the Texas Court of Criminal Appeals rejected petitioner's *Atkins* claim on the merits, concluding petitioner had failed to present sufficient evidence at trial establishing petitioner's mental retardation.[45]

2.   First State Habeas Corpus Proceeding

Petitioner once again litigated his *Atkins* claim during his first state habeas corpus proceeding, this time with the benefit of a live evidentiary hearing during which petitioner presented fact witnesses, expert witnesses, and many documents.

a.   Petitioner's Siblings and Neighbor

Petitioner's older brother Jorge Hernandez, two years petitioner's senior, testified extensively during the evidentiary hearing in petitioner's first state habeas corpus proceeding, as did several of petitioner's other siblings and a family friend. According to Jorge, (1) their family moved to live across the street from a junkyard when petitioner was one or two years old, (2) their family of twelve lived in a shack made of lumber,

---

[45] *Hernandez v. State*, No, 73,776 (Tex. Crim. App. December 18, 2022), at pp. 28-33.  The state appellate court pointed to (1) the fact none of the three mental health experts who testified on petitioner's behalf at trial had concluded petitioner was mentally retarded, (2) the conclusion of Dr. Cantu that petitioner was likely malingering as an explanation for petitioner's low test scores, (3) a Texas Department of Criminal Justice IQ score of 83, and (4) the lack of any evidence in the record showing petitioner suffered from deficits in adaptive behavior to support its conclusion petitioner had failed to carry his burden of proof on the mental retardation issue. *Id.*

metal, and cardboard they scavenged from the junkyard, which was located near a heavily polluted river,[46] (3) their home shook when it was windy and was unsecured against rodents and vermin, (4) the children in their family worked with their father in the junkyard scavenging cardboard, metal, glass, and other materials to sell, (5) petitioner began working with their father in the junkyard at age four but had problems separating the trash, putting items in the correct container, and separating the glass bottles by color, (6) in sum, petitioner had trouble following directions and often fell asleep when he should have been working, (7) petitioner did not play sports with the other children in the neighborhood because he could not learn the rules, would lose focus during the games, and would not do what he was told during the games, (8) for instance, when he attempted to play baseball, petitioner would wander off second base when told to stand there, would put his baseball glove on his head, would not throw the ball to others when it was thrown to him, and generally wandered around on his own, (9) as a result, petitioner was often excluded from games by others in the neighborhood, (10)

---

[46] Photographs of the location where petitioner's childhood home once stood were admitted into evidence during petitioner's state habeas corpus hearing as Applicant's Exhibit nos. 1, 2, and 9. Statement of Facts from the evidentiary hearing in petitioner's first state habeas corpus proceeding (henceforth "S.F. State Habeas Hearing"), Volume 3 of 6, at pp. 16, 71; and Volume 5 of 6, at p. 298. All three of these photographs appear in S.F. State Habeas Hearing, Volume 6 of 6.

at age eight or nine, petitioner still could not dress himself properly, would put the wrong shoes on his feet, not button his shirt properly, and could not wash his own clothes, (11) petitioner lived at home until age 18, never held a job until then, and could not read or write, (12) petitioner left home at 18 to work selling tacos at a taco stand, (13) as a child, petitioner was unreliable when sent to run errands because petitioner would not follow instructions, often forgot items or brought back the wrong items, and could not make change, (14) some of the times when petitioner was sent on errands, he would fall asleep, get distracted, or not come home until someone went out to find him, (15) since petitioner's arrest in the United States, petitioner has written Jorge at least ten letters, (16) in reviewing a series of prisoner request forms written in Spanish and signed by petitioner, Jorge found many misspelled words and several grammatical errors, as well as many instances of poor penmanship, (17) petitioner did not finish elementary school, stopped attending school in the third or fourth grade, at age eight or nine, and went to work in the junkyard with their father because petitioner would not learn, (18) their father called petitioner a "burro" because petitioner would not learn or follow directions, (19) both their parents beat the children in

their family with belts, wires, hoses, or whatever was available, and (20) their father beat the children especially hard.[47]

According to a friend of the Hernandez Llanas family named Juan Manuel Artiaga Espiro, (1) the dump where petitioner's family lived was heavily contaminated with chemicals and a contaminated creek with green and black colored water ran beside the dump, (2) Juan once swam in the creek and got sick, (3) petitioner, who did not know how to swim, would sit beside the creek and watch others swim, (4) petitioner would not play sports with the rest of the neighborhood, (5) when petitioner attempted to play games with them, petitioner would get "desperate," lose his temper, and go off and sleep, (6) petitioner would go to the dump at night, when other children were afraid to do so, to be with people who did drugs there, (7) petitioner was unable to gamble with the other children because petitioner could not make change or count money, (8) Juan's younger brother spent four years in the first grade but petitioner, who was "different" from other children, was slower than Juan's younger brother, (9) as a result, petitioner was teased, called names, and ridiculed by other children, (10) as a child, others took advantage of petitioner, tricking him out of his money, (11) petitioner always looked dirtier than his other siblings, had messy hair, and was

---

[47] S.F. State Habeas Hearing, Volume 3 of 6, testimony of Jorge Hernandez, at pp. 13-25, 29-30, 35, 40, 43, 46, 61, 67-75, 77-102, 108-10.

made fun of because of his appearance, (12) petitioner always wore the same clothes, did not talk a lot, and had no friends as a child, (13) Juan witnessed petitioner's father strike petitioner with wires or cables a couple times and once saw petitioner's father throw a bottle at petitioner, striking petitioner in the back, (14) Juan's mother invited petitioner over to the Artiaga Espiro home to watch television because she felt sorry for petitioner, (15) petitioner's family teased petitioner for his lack of learning, and (16) families living at the dump with petitioner's family had to go two blocks to get clean water.[48]

Petitioner's younger sister Adelita Hernandez, three years petitioner's junior, testified (1) she gave a statement to prosecutors prior to petitioner's trial in which she stated she had not seen anything during her childhood which suggested petitioner was mentally retarded but she had since changed her mind after one of her sons began displaying behavior similar to petitioner's behavior as a child,[49] (2) her son was being tested

---

[48] S.F. State Habeas Hearing, Volume 3 of 6, testimony of Juan Manuel Artiaga Espiro, at pp. 114-26, 128, 130, 138-41.

[49] English and Spanish versions of Adelita Hernandez's written statement dated Applicant's Exhibit nos. 7 and 8 were admitted into evidence during petitioner's state habeas hearing. S.F. State Habeas Hearing, Volume 4 of 6, at pp. 269-70. Both exhibits appear in S.F. State Habeas Hearing, Volume 6 of 6. Another copy of the English version of her affidavit appears at State Habeas Transcript, Volume III, at p. 469.
In pertinent part, Adelita Hernandez's written statement

for vision and hearing problems and does not obey her, is

forgetful, and performs poorly in school, (3) when their family

lived at the dump, petitioner had problems as a child similar to

those of her own son, (4) she does not know if petitioner's

problems as a child were due to petitioner's inability to perform

or petitioner simply "forgot" how to do things, (5) petitioner

---

dated November 20, 2003 states as follows:

> I lived with Ramiro, my mother and father, and my
> other brothers and sisters until I was 15 years old. I
> never noticed anything about Ramiro that caused me to
> believe that he was mentally retarded. He functioned
> like a person of average intelligence. He would take
> care of himself. He bathed and dressed in clean
> clothes. He had no problem maintaining employment. He
> earned his money and he had no problem managing his
> money. He did not have any problems with his
> recollection. I never saw him faint. He attended
> public school until fifth grade. He quit school in the
> fifth grade and went to work. It is very common in
> Mexico for children to drop out of school at an early
> age. I went to school in Mexico until the sixth grade.
> I am in good health and so are my brothers and sisters.
> My father died at the age of 56 years. He had diabetes
> and high blood pressure. I understand he died from
> diabetes and high blood pressure complications. My
> mother suffers from attacks similar to convulsions but
> I do not know her diagnosis. Finally, if they say that
> Ramiro is mentally retarded, it is a lie in my opinion.
> When Ramiro was in Kerrville, Texas, my sister Martha
> told me that she spoke with him and he told her that if
> Martha and Nancy had visited him while he was in jail
> in Matamoros, he would have raped one of them. A few
> months before Ramiro killed the man in Kerrville,
> Texas, Ramiro assaulted me because I confronted him
> about a bicycle he stole from my house. I am afraid of
> Ramiro. Ramiro and my other brother assaulted me when
> I was pregnant and living in Mexico in 1988. Both of
> them assaulted me so badly that I was hospitalized for
> three days. They assaulted me because they found out I
> was pregnant and I was not married. Ever since then, I
> have been afraid of Ramiro.

and the other younger children in their family did not have their mother's attention, (6) their mother kicked the children and beat them with wires, (7) their mother once broke a broom stick over petitioner's back, (8) petitioner was "suspended" from school in Mexico and their mother took petitioner to another school because the teachers did not want to deal with petitioner any more, (9) petitioner was "suspended" because petitioner would fall asleep in class, never brought his homework, and always wanted to leave the classroom, (10) petitioner never learned anything in school, (11) their older brothers tried to teach petitioner, who did learn from their brothers, but their brothers grew frustrated with petitioner, (12) petitioner had some friends at school, (13) at age thirteen, petitioner would bathe and dress himself but their mother still had to remind petitioner to change his clothes daily, (14) at age thirteen, petitioner could dress and bathe himself but chose not to do so unless he was forced to do so, (15) petitioner had difficulty sorting metal, plastic, cardboard, and glass by color when the family worked at the dump, (16) Adelita became pregnant at age fifteen and left home after petitioner and their brother Jorge beat her for dishonoring their family, (17) she later married and moved to the United States with her husband and children, (18) petitioner stole a bicycle from her home here in the U.S., (19) petitioner physically abused (beat) her when she was a pregnant teenager, (20) as an adult

living in the United States, petitioner still could not make change, (21) petitioner found work in the U.S. cleaning stables and feeding horses, (22) petitioner is not smart, had trouble remembering things, and a hard time reading, (23) petitioner does not know how to cook for himself, even simple dishes like bacon and eggs, tends to put all ingredients into a pan and cook them the same length of time, which leaves some ingredients (like the bacon) undercooked and other portions overcooked, resulting in an indigestible mess, (24) when they were children, their parents beat them daily, (25) their mother did most of the daily beatings, (26) their father hit them with wooden stakes, electric wires, a belt, a broom, whatever was available, (27) petitioner got the worst beatings because he was hard headed, (28) petitioner went to school through the fourth grade but repeated first grade twice, (29) petitioner worked at a ranch here in the U.S. for four or five months before petitioner began using drugs, (30) she did not know if petitioner used drugs in Mexico, and (31) prior to petitioner reaching ages 13-15, their mother had to tell petitioner to bathe and clean himself.[50]

Petitioner's older sister Yolanda Hernandez Llanas, ten years petitioner's senior, testified (1) their family moved to the dump when she was fourteen and petitioner was about age four,

---

[50] S.F. State Habeas Hearing, Volume 3 of 6, testimony of Adelita Hernandez, at pp. 231-45, 248-50, 252-62, 274-76, 283-84, 287.

(2) everyone worked at the dump picking up and sorting trash, (3) they fed themselves and clothed themselves from the discarded material they found in the dump, (4) as a child, petitioner was unable to properly take care of the cardboard they gathered, understand directions, or separate glass by color, (5) petitioner acted like a child younger than his age, (6) petitioner had difficulty learning, (7) their mother was very hard on the children, yelling at them, mistreating them, and beating them, (8) the older children ran and hid from their abusive mother, (9) their mother beat petitioner unmercifully, (10) they had to get water from a spigot one and a half blocks from the shack in which they lived, (11) petitioner often crawled inside oil and gas containers to clean them and would emerge coal black, (12) she had to bathe petitioner because petitioner could not bathe himself, (13) petitioner could not write words, would often write the letter "d" as a "b", and could not repeat what they had been studying, (14) petitioner was nine years old when she moved out of the family home in Nuevo Laredo, (15) when petitioner was seventeen, she invited him to come visit her in Mexico City, (16) during the bus trip to Mexico City, petitioner got off the bus at a stop to use the restroom, and, when he did not return to the bus, she had to go searching for him and found him sitting in a waiting area, (17) when he stayed with her in Mexico City, petitioner did not know how to sweep properly, (18) petitioner

had a hard time learning, often failed to bring back the correct items when he was sent to the store, got lost on the subway in Mexico City, and mixed all the ingredients together when he cooked for himself, (19) their mother had to tell petitioner to bathe himself when he was a child, and (20) petitioner never learned to cook.[51]

          b.   <u>Kerr County Sheriff & Petitioner's Jail Records</u>

The Kerr County Sheriff and County jail records custodian testified (1) petitioner was held in a portion of the Kerr County Jail from October 20, 1997 until December 4, 1997 in which petitioner could have passed written materials back and forth to other inmates, (2) subsequent to December 4, 1997, petitioner was in a more isolated environment in which it was impossible for petitioner to have contact with another jail inmate, (3) subsequent to December 4, 1997, petitioner checked out a number of books from the jail library, including a Spanish Bible, a Spanish dictionary, and several books written in English, (4) the jail library does not contain any children's books, (5) subsequent to December 4, 1997, any request forms filled out for petitioner were written either by petitioner himself or by a jail staffer, (6) prisoner request forms submitted written in Spanish by petitioner were routinely translated into English by jail

---

[51] S.F. State Habeas Hearing, Volume 4 of 6, testimony of Yolanda Hernandez Llanas, at pp. 293-95, 298-311.

staffers, often on the request form itself, (7) petitioner
requested and made changes to his jail visitation list, (8) in
November, 1997, another inmate named Raul Mejia informed jail
personnel in writing that petitioner was planning an escape -
Mejia stated in his note that the petitioner planned to pretend
to be sick so he would be sent to the hospital, from which
petitioner planned to escape, (9) Mejia also reported to jail
staffers that petitioner (a) had said he planned to "play crazy"
because otherwise he (petitioner) did not have a chance in court,
(b) bragged about killing more than three people, and (c) said he
had gotten twenty-five years for murder in Mexico and then
escaped, (10) shortly thereafter, jail staffers arrived at
petitioner's cell and found petitioner laying on his bunk
complaining he had fallen off his toilet and could not move his
legs, (11) petitioner was taken to the hospital for evaluation
under very heavy security, (12) x-rays were taken of petitioner
and he was returned to the jail with directions to take Tylenol
for pain, (13) petitioner was in custody at the Kerr County Jail
from October 15, 1997 until December, 1998, when petitioner was
transferred to the Texas Department of Criminal Justice, (14)
petitioner was again an inmate at the Kerr County Jail from
December 30, 1998 until February 2, 2000, when he was transferred
to the Bandera county Jail to stand trial, (15) petitioner was
once more an inmate at the Kerr County Jail from February 18,

2003 until February 24, 2003 and from October 13, 2006 until the date of petitioner's state habeas corpus hearing, and (16) at no point in his detention at the Kerr County Jail was petitioner permitted to attend classes.[52]

The state habeas trial court's interpreter read selected portions of the petitioner's inmate request forms in English into the record, which records (written primarily in Spanish) had previously been admitted into evidence as State Exhibit nos. 1 and 2.[53]

### c. Petitioner's Mental Health Experts

Dr. Gilbert Martinez, the same clinical neuropsychologist who testified during petitioner's trial, testified during petitioner's state habeas hearing (1) when he evaluated petitioner in 2000 in connection with petitioner's assertions of a head injury at age twelve, he did not evaluate petitioner's ability to communicate in English but did find petitioner's Spanish expressive vocabulary below average,[54] (2) petitioner's

---

[52] S.F. State Habeas Hearing, Volume 5 of 6, testimony of William R. "Rusty" Hierholzer, at pp. 2-32.

[53] Petitioner's jail inmate request forms and other Kerr County Jail records were admitted into evidence during petitioner's state habeas corpus hearing at S.F. State Habeas Hearing, Volume 3 of 6, at p. 41. Those exhibits, marked as State Exhibit nos. 1 and 2, written primarily in Spanish, appear in S.F. State Habeas Hearing, Volume 6 of 6, at the end of that volume.

[54] S.F. State Habeas Hearing, Volume 3 of 6, testimony of Dr. Gilbert Martinez, at pp. 145-53.

speech was tangential in that petitioner had difficulty staying on topic and would often digress and speak about unrelated topics but petitioner was capable of following basic instructions in Spanish,[55] (3) petitioner was generally slow in his responses and displayed poor judgment,[56] (4) he did a clinical interview of petitioner and administered the nonverbal portion of the WAIS-III test that was not available in Spanish at that time,[57] (5) he also administered verbal memory and recall tests,[58] (6) while he had not been retained to evaluate petitioner for mental retardation, at that time, he felt petitioner's IQ was in the mid-sixties, i.e., in the mild to moderate mental retardation range,[59] (7) he concluded petitioner was severely impaired on auditory attention, moderately impaired on social judgment,

---

Dr. Martinez explained that he had been requested to evaluate petitioner after petitioner reported a history of a head injury at age twelve, after which petitioner claimed he had experienced difficulty controlling his aggressive behavior, an injury for which Dr. Martinez admitted he had never obtained any independent confirmation or corroboration. *Id.*, at pp. 149-51. Dr. Martinez also explained he was never able to independently verify that petitioner had, in fact, sustained a head injury at age twelve. S.F. State Habeas Hearing, Volume 4 of 6, testimony of Dr. Gilbert Martinez, at p. 16.

[55] S.F. State Habeas Hearing, Volume 3 of 6, testimony of Dr. Gilbert Martinez, at p. 154.

[56] *Id.*, at p. 155.

[57] *Id.*, at pp. 156-58.

[58] *Id.*, at p. 160.

[59] *Id.*, at pp. 148, 161-62, 176-77.

mildly impaired on abstract visual motor construction skills, moderately impaired in abstract visual reasoning, and severely impaired in psychomotor speed, visual sequential reasoning, and attention to detail,[60] (8) petitioner's TONI-II score was 57, which was consistent with petitioner's low performance on other tests he administered,[61] (9) he had to "improvise" when evaluating petitioner's ability to read and write in Spanish,[62] (10) petitioner's low psychomotor speed could have been due to either brain damage or chronic mental retardation and was

---

[60] *Id.*, at p. 162.

[61] *Id.*, at p. 164.
    Dr. Martinez described the Test Of Nonverbal Intelligence ("TONI") as a "screening tool" designed to ascertain only a gross estimate of a subject's intellectual capabilities based upon a relatively brief evaluation process (about fifteen minutes) and contrasted the TONI against the much more sophisticated and comprehensive Wechsler Adult Intelligence Scale which he testified requires approximately ninety minutes to administer. S.F. State Habeas Hearing, Volume 4 of 6, testimony of Dr. Gilbert Martinez, at pp. 84-85. Dr. Martinez also explained he employed a version of the TONI that was more up to date (i.e., the TONI-II) than the version employed by the TDCJ's evaluator. *Id.*, at p. 87.
    Petitioner's other mental health expert, Dr. Antonio E. Puente, described the TONI as a fifteen minute screening test, not a detailed test of IQ and testified (1) the TONI is not considered accurate by the AAMR, (2) petitioner's 1999 TONI-I test (which resulted in a score of 83) was twenty years old at that time and had been replaced by two more recent versions of the same test, and (3) the person who administered petitioner's 1999 TONI-I test was a master's level psychological associate. S.F. State Habeas Hearing, Volume 4 of 6, testimony of Dr. Antonio E. Puente, at pp. 114-21.

[62] S.F. State Habeas Hearing, Volume 3 of 6, testimony of Dr. Gilbert Martinez, at pp. 164-65.

consistent with petitioner's reported inability to make change or
sort bottles by color,[63] (11) petitioner's ability to recall a
series of numbers read to him and repeat them back was severely
impaired,[64] (12) petitioner's long-term memory was severely
impaired,[65] (13) petitioner was unable to draw a figure from
memory,[66] (14) petitioner had many errors in the test of line bi-
section,[67] (15) petitioner had difficulty engaging stimuli,[68] (16)
he was unable to get many measures of petitioner's executive
functioning, i.e., higher level mental functions like planning,
organization, and mental shifting, because of language issues and
standardization issues,[69] (17) petitioner was impaired in terms
of his cognitive flexibility,[70] (18) petitioner had difficulty
with Spanish fluency, i.e., petitioner was unable to think of
many words that began with a particular letter,[71] (19) all the
tests he relied upon in evaluating petitioner were fraught with

---

[63] *Id.*, at p. 163.

[64] *Id.*, at p. 166.

[65] *Id.*, at pp. 166-67.

[66] *Id.*. at p. 169.

[67] *Id.*, at p. 170.

[68] *Id.*, at p. 170.

[69] *Id.*, at pp. 170-71.

[70] *Id.*, at p. 171.

[71] *Id.*, at p. 171.

the potential for malingering or intentionally low performance,[72] (20) Dr. Martinez "did not feel Mr. Hernandez had the sufficient intellectual or educational levels to complete many of these tests,"[73] (21) petitioner has an anti-social personality disorder, which is related to attention deficit disorder,[74] (22) Dr. Martinez interviewed petitioner through a plexiglass window while petitioner was in handcuffs (which Dr. Martinez described as not a typical neuropsychological assessment),[75] (23) "There were also motivational issues that always have to be considered in a situation like this,"[76] (24) he felt confident petitioner had "pretty significant" cognitive impairment,[77] (25) while petitioner was depressed at the time of the evaluation, the TONI test Dr. Martinez administered large amounts of cognitive processing and was, thus, less susceptible to the effects of depression,[78] (26) depression alone does not explain the

---

[72] *Id.*, at pp. 171-72.

[73] *Id.*, at p. 172.

[74] *Id.*, at pp. 173-74.

[75] *Id.*, at p. 175. Dr. Martinez also testified petitioner was in handcuffs throughout his evaluation. S.F. State Habeas Hearing, Volume 4 of 6, testimony of Dr. Gilbert Martinez, at pp. 51-52.

[76] S.F. State Habeas Hearing, Volume 3 of 6, testimony of dr. Gilbert Martinez, at p. 175.

[77] *Id.*, at p. 176.

[78] *Id.*, at p. 184.

difference in the TONI-II test score petitioner received from Dr. Martinez (i.e., 57) and the TONI-I score petitioner received from a master's level clinician employed by the TDCJ (i.e., 83),[79] (27) speed of response time is critical to evaluating the results of some timed tests and depression does affect speed of performance "pretty significantly,"[80] (28) petitioner was severely impaired on the Digital Span Test, i.e., the ability to repeat back a series of numbers of increasing length both forward and backwards,[81] (29) IQ scores are related to level of education,[82] (30) cultural group is related to adaptive behavior,[83] (31) some records Dr. Martinez obtained from jails and prisons contradicted things petitioner told Dr. Martinez,[84] (32) petitioner was a "marginal historian," who told different clinicians different things about his own history, including both admitting and denying a history of drug abuse,[85] (33) several sources of error are intrinsic to the assessment process,

---

[79] *Id.*, at p. 184.

[80] *Id.*, at pp. 185-86.

[81] *Id.*, at p. 190.

[82] S.F. State Habeas Hearing, Volume 4 of 6, testimony of Dr. Gilbert Martinez, at pp. 5-7.

[83] *Id.*, at pp. 6, 9.

[84] *Id.*, at p. 12.

[85] *Id.*, at pp. 12-15.

including some due to the subject's performance level (e.g., depression, stress, anxiety - such as that caused by concern over the possibility of execution or a lifetime of incarceration), the testing environment, the qualifications and training of the test administrator, and the time of administration,[86] (34) petitioner scored consistently low on all tests he gave petitioner,[87] (35) it is possible but very difficult for a truly mentally retarded person to learn to read and write,[88] (36) long-term drug abuse causes brain damage and translates into decreased test scores,[89] (37) he had a concern about malingering during his evaluation of petitioner and acknowledged that motivational factors likely played a role in petitioner's test scores but did not believe petitioner was intentionally misrepresenting answers for the purpose of obtaining secondary gain,[90] (38) there is a difference between "malingering" and "poor performance" based upon motivational factors,[91] (39) no measures of effort on test taking have been standardized for Hispanic populations,[92] (40) poverty

---

[86] *Id.*, at pp. 21-22, 46-48, 51-53.

[87] *Id.*, at p. 25.

[88] *Id.*, at p. 29.

[89] *Id.*, at pp. 30-33.

[90] *Id.*, at pp. 40-43, 45-46, 52-53, 65-66, 73-74, 77-78.

[91] *Id.*, at pp. 40-48.

[92] *Id.*, at p. 50.

and low education do not cause mental retardation,[93] (41)
petitioner suffers from severely impaired cognitive intellectual
functioning and there is no evidence petitioner's cognitive
disorder resulted from an event occurring after petitioner
reached age eighteen,[94] (42) he was unable to diagnose petitioner
with mental retardation in 2000 because of a lack of information
concerning petitioner's adaptive behavior deficits prior to age
eighteen and the unavailability of petitioner's school records,[95]
and (43) the process of evaluating a subject for mental
retardation involves examining whether the subject currently has
adaptive behavioral deficits, i.e., whether the person meets the
standards of personal independence and social responsibility
expected of a person of the same age and cultural group, and
determining whether those deficits appeared before the person
reached age eighteen, a process which involves determining when
the person achieved developmental milestones (such as learning to
walk and talk).[96]

Dr. Antonio E. Puente, a neuropsychologist with extensive
experience in the area of mental retardation, particularly with
evaluating the neuropsychological functioning of Spanish

---

[93] *Id.*, at pp. 60, 63.

[94] *Id.*, at pp. 61, 64.

[95] *Id.*, at p. 62.

[96] *Id.*, at pp. 94-97.

speakers, testified (1) he evaluated petitioner for two days in an evaluation room in July, 2003 during which evaluation petitioner was shackled but did not have on handcuffs or other restraints,[97] (2) he spoke with four of petitioner's siblings and one of petitioner's childhood neighbors,[98] (3) these persons corroborated petitioner's statements indicating petitioner was raised in an impoverished rural setting next to the dump in Nuevo Laredo, where petitioner began working at an early age, and that petitioner's mother beat petitioner when petitioner was asked to leave school because he could not read or write,[99] (4) intelligence is a composite product of multiple factors but consideration of "culture" in the context of evaluating intellectual ability leads to racism,[100] (5) education level is the best predictor of mental retardation,[101] (6) there is no "normal medical history" for petitioner and it is unknown if petitioner had a history of drug abuse,[102] (7) petitioner was

---

[97] S.F. State Habeas Hearing, Volume 4 of 6, testimony of Dr. Antonio E. Puente, at pp. 101-08.

[98] *Id.*, at pp. 112, 126.

[99] *Id.*, at pp. 123-27.

[100] *Id.*, at pp. 131-32.

[101] *Id.*, at p. 130.

[102] *Id.*, at p. 136. Dr. Puente also testified (1) petitioner was in tact emotionally, (2) depression was not a "huge issue" for petitioner, (3) he did not find any thought disorders present, (4) nor did he see schizophrenia or depression in his

48

functioning at a very low level prior to age eighteen,[103] (8) in 2003, he found petitioner suffered from deficits in attention, eye-hand coordination, and fluency (in Spanish),[104] (9) petitioner became so frustrated during a test of complex cognitive functioning, i.e., reasoning, that he (Dr. Puente) stopped the test halfway through,[105] (10) petitioner's ability to reason is very, very, poor,[106] (11) petitioner's overall academic achievement in English was at the pre-school level and in Spanish at grade level 2.65,[107] (12) he lacked confidence in the validity of the IQ scores reported by the TDCJ,[108] (13) in 2006, he administered a Spanish language version of the WAIS to petitioner which had been normed for the Mexican population that produced a

---

most recent evaluations of petitioner, and (5) while a childhood head injury could explain petitioner's low scores, there was no evidence to corroborate petitioner's claim he injured his head as a child. *Id.*, at pp. 134-37.

[103] *Id.*, at p. 137.

[104] *Id.*, at p. 142.

[105] *Id.*, at pp. 144-45.

[106] *Id.*, at p. 145.

[107] *Id.*, at pp. 146-47, 157, 160-61.  Dr. Puente also testified petitioner was reading and writing in Spanish at the 1-3 year level and had a Spanish vocabulary at the 1.6 year level. *Id.*, at pp. 160-61.

[108] *Id.*, at p. 149.

full scale score of 70,[109] (14) if all of petitioner's IQ scores are averaged, petitioner's mean IQ is approximately 60, well within the mentally retarded range,[110] (15) he believes petitioner has an IQ in the mentally retarded range and displayed deficits in multiple categories of adaptive behavior prior to age eighteen,[111] (16) petitioner indicated he used drugs daily until the time of his first incarceration,[112] (17) someone who is retarded can have "flashes of normalcy" and even "flashes of brilliance" and mentally retarded persons do commit crimes,[113] (18) the re-testing factor may explain why petitioner did better on the performance portion of the WAIS in 2006 than petitioner did when Dr. Martinez administered the performance portion of the WAIS in 2000,[114] (19) petitioner's digit span score was four (i.e., petitioner could only repeat up to four numbers forward or

---

[109] *Id.*, at pp. 151, 171-72. Dr. Puente testified petitioner scored 87 on the performance portion of this Spanish language WAIS-III and 66 on the verbal portion for a full scale score of 70. *Id.*, at pp. 171-72. He also testified he had a 95 percent confidence level in the accuracy of this score within five points of that score. *Id.*, at p. 212.

[110] *Id.*, at p. 152.

[111] *Id.*, at pp. 163-64. Dr. Puente also testified petitioner had been asked to leave school because petitioner could not read or write and that petitioner was academically and intellectually at the bottom of the heap. *Id.*, at p. 163.

[112] *Id.*, at pp. 166-67.

[113] *Id.*, at pp. 169, 207, 215.

[114] *Id.*, at p. 174-76.

backward) and petitioner did poorly on connecting dots but he (Dr. Puente) did not believe "malingering" was a factor in petitioner's scores,[115] (20) the mentally retarded tend to improve over time in a highly restrictive environment but petitioner has not,[116] (21) petitioner has had problems adapting to life in prison, specifically petitioner has been disciplined and has not joined in Bible Studies or earned a GED,[117] (22) petitioner's post-age-eighteen inhalant abuse could have caused petitioner brain damage,[118] (23) petitioner's falling asleep at the crime scene was "retarded,"[119] (24) petitioner did plan his rape of a teenager but that crime was neither "successful" nor "wise,"[120] (25) petitioner's ability to learn is "pretty flat,"[121] and (26)

---

[115] *Id.*, at pp. 178-81, 219. Dr. Puente rejected Dr. Martinez's distinction between "malingering" and merely "poor performance" on tests, arguing that poor performance was simply a species of malingering and rejecting malingering as a major cause of petitioner's poor test performance. *Id.*, at p. 220-21.

[116] *Id.*, at p. 193.

[117] *Id.*, at p. 192.

[118] *Id.*, at pp. 209-10.

[119] *Id.*, at p. 197.

[120] *Id.*, at p. 200.

[121] *Id.*, at p. 204.

petitioner's adaptive skills have not increased since age eighteen.[122]

>    d.    The State's Mental Health Expert

Dr. Richard E. Coons, a psychiatrist who had not personally evaluated petitioner but who had listened to the testimony of Dr. Martinez and Dr. Puente and reviewed their testing date in consultation with a psychologist, testified (1) he lacked confidence in Dr. Martinez's conclusions because Dr. Martinez relied upon petitioner's statements and it was clear petitioner had repeatedly misled interviewers about his background,[123] (2) petitioner's test scores on the tests Dr. Martinez administered were unreliable because (a) they revealed wide disparities on scores of tests designed to measure the same skill sets (e.g., petitioner did extremely poorly on the digit span test administered by Dr. Martinez but extremely well on a cancellation test and a test requiring petitioner to name animals), (b) petitioner performed in the normal range on the FAS test (i.e., the fiftieth percentile), (c) there was an inexplicably wide difference (i.e., more than two standard deviations - 54 to 87)

---

[122] *Id.*, at p. 222. Dr. Puente offered conflicting testimony on the issue of whether petitioner could drive a motor vehicle, testifying initially that petitioner could not drive or make change but, later, acknowledging that petitioner had, in fact, driven a motor vehicle on the occasion petitioner kidnaped and raped a fifteen-year-old girl. *Id.*, at pp. 215, 223.

[123] S.F. State Habeas Hearing, Volume 5 of 6, testimony of Richard E. Coons, at p. 58

between the Performance Scales on the WAIS tests administered by Dr. Martinez and Dr. Puente, and (d) Dr. Martinez did not perform a full verbal IQ test,[124] (3) petitioner's lower scores could reflect petitioner was being passive during the testing conducted by Dr. Martinez, i.e., petitioner failed to give his best effort, which was consistent with Dr. Cantu's conclusion that petitioner had not given his best effort during Dr. Cantu's clinical interview,[125] (4) in stark contrast to Dr. Martinez's results, petitioner did not show moderate to severe impairment in attention and memory on the tests administered by Dr. Puente,[126] (5) based upon the wide variations in petitioner's scores, motivational variables likely played a role in the findings of Dr. Martinez and Dr. Puente,[127] (6) Dr. Puente's administration and interpretation of test scores was flawed in several regards, more specifically Dr. Puente and his team of psychologists (a) improperly administered the Ruff Two and Seven Selective

---

[124] *Id.*, at pp. 59-61, 109, 112-14, 119, 123-24, 133, 137-41, 150, 152, 154, 160, 164-66.
  Dr. Coons also disagreed with Dr. Martinez's findings that petitioner had severe impairment in updated verbal material and memory, pointing out petitioner's lowest score on any test of verbal fluency was the fiftieth percentile. *Id.*, at pp. 118-19.

[125] *Id.*, at pp. 62, 116, 121, 123-24, 133, 137-41, 150, 160, 166, 177-78, 182.

[126] *Id.*, at pp. 62, 118-19.

[127] *Id.*, at pp. 63, 116, 123-24, 137, 140-41, 150, 160, 164-66, 177-78, 182, 185, 187, 189.

Attention Test, (b) ignored petitioner's perfect score on a cancellation test because that test had not been normed for a 34-year-old, (c) ignored petitioner's "very good" drawing of two intersecting pentagons, (d) incorrectly scored the digit span test, (e) dismissed petitioner's performance on several tests when petitioner made few errors but worked slowly, (f) gave petitioner a score of "zero" on a test requiring petitioner to draw in the missing pieces of several objects when petitioner had, in fact, drawn in the missing pieces of many of the missing objects in question, just not all of them, (g) dismissed the fact petitioner was able to do basic addition and multiplication but not division (something Dr. Coons attributed to petitioner's low educational level), and (h) ignored the discrepancy between petitioner's very low score on the Wide Range Achievement Test and the fact petitioner can write (in Spanish) and petitioner currently reads at the grade level of 5.8 (almost a sixth grade level),[128] (7) Dr. Puente gave petitioner several tests on which petitioner scored very highly but Dr. Puente then ignored those test results because the tests had not been normed,[129] (8) Dr. Puente heavily weights the accounts of petitioner's life prior to age eighteen regardless of whether those accounts are independently corroborated and disregards petitioner's post-age-

---

[128] *Id.*, at p. 65-70, 99-100, 103, 110, 112-14, 117, 119.

[129] *Id.*, at p. 71.

eighteen behavior,[130] (9) consideration of a subject's cultural group is critical in evaluating adaptive behavior,[131] (10) contrary to Dr. Puente's view, petitioner is a highly unreliable historian and it is highly probable petitioner's tests scores do not accurately reflect petitioner's true capabilities,[132] (11) petitioner informed Dr. Puente that he (petitioner) used inhalants from age twelve until his incarceration at age twenty, as often as four times a day,[133] (12) petitioner's adaptive behavior as to communication is appropriate for petitioner's age and cultural group,[134] (13) petitioner identified errors in testimony during the course of his capital murder trial and communicated same effectively to his trial counsel,[135] (14) petitioner had to develop considerable adaptive skills just to

---

[130] *Id.*, at p. 71.

[131] *Id.*, at pp. 72, 130, 133. Dr. Coons pointed out that petitioner had spent a significant portion of his adult life living in jails and prisons and had, in Dr. Coons' view, adapted better to prison life once petitioner no longer had access to drugs and petitioner was no longer suffering the effects of a family life in which petitioner was compelled to eat out of a dump and endure physical and emotional abuse from parents, siblings, and others. *Id.*, at pp. 72-73.

[132] *Id.*, at pp. 75-76.

[133] *Id.*, at p. 77.

[134] *Id.*, at pp. 81-83, 85. Dr. Coons concluded petitioner is verbal, oriented, recalls things from his past, has good long term memory, writes written requests from jail, and understands and communicates his interests. *Id.*, at p. 82.

[135] *Id.*, at p. 82.

survive under the conditions in which he grew up and developed
social skills despite his humble beginnings, including the
ability to communicate cooperatively and respectfully with his
trial counsel,[136] (15) petitioner apparently is capable of taking
care of his own health and safety, refrains from use of
cigarettes and dieted down to 170 pounds from 300,[137] (16) despite
little formal education, petitioner reads and writes (in
Spanish), likes to read and talk with others, watch television,
and held a job working on a ranch while in the free world,[138] (17)
in his opinion, petitioner does not fall within the statutory
definition of "mentally retarded" contained in the Texas Health
and Safety Code,[139] (18) it is invalid to "average" test scores in
an effort to ascertain IQ, as Dr. Puente did in his power point
presentation to the state habeas trial court,[140] (19) petitioner
has adapted well to life in prison,[141] (20) a full scale IQ score
of 70 is at the breaking point of mental retardation,[142] (21)
several of petitioner's test scores are lower than could

---

[136] *Id.*, at pp. 84, 191-92, 195, 201-02, 204-05, 214-15, 221.

[137] *Id.*, at pp. 86-87.

[138] *Id.*, at pp. 87-89.

[139] *Id.*, at p. 90.

[140] *Id.*, at p. 102.

[141] *Id.*, at pp. 85, 200-02, 207, 221, 224.

[142] *Id.*, at p. 126.

reasonably be expected because petitioner scored significantly higher on other tests that measure the same skill set,[143] (22) petitioner's score on the Ruff Cancellation Test was unusually high - 289 out 300,[144] (23) if a subject establishes an ability to have good attention and good short term working memory on one test, it is reasonable to expect the subject to demonstrate the same abilities on another test,[145] (24) IQ can jump dramatically once one starts getting educated or attending school,[146] and (25) petitioner now reads at the fifth grade level and has adapted to prison life in many ways.[147]

e. <u>State Habeas Trial Court's Findings & Conclusions</u>

In an Order issued May 20, 2008, the state habeas trial court found, in pertinent part, that (1) Dr. Arambula had opined petitioner's drug use might account for petitioner's perceived low abilities, (2) Dr. Cantu expressed concern over the possibility petitioner was not giving his best efforts, (3)

---

[143] *Id.*, at pp. 60-62, 70-71, 110, 112-14, 119, 123, 137-39, 152, 154, 160, 164-66, 182.

[144] *Id.*, at p. 152.

[145] *Id.*, at pp. 165-66. Dr. Coons pointed out petitioner's score on the Woodcock-Munoz Language Survey was lower than petitioner's other scores of verbal fluency. *Id.*, at p. 164. Dr. Coons also expressed the opinion petitioner's digit score of "two" on Dr. Martinez's Digit Span Test was "unbelievable" in view of petitioner's other test scores. *Id.*, at pp. 60-62, 114.

[146] *Id.*, at p. 215.

[147] *Id.*, at pp. 221-22, 224.

during trial petitioner was alert and immediately notified court authorities when his headset failed to function properly, (4) upon his arrest, petitioner furnished the name of a relative to law enforcement officers as his own, (5) when later confronted with his misrepresentation, petitioner admitted he had deliberately misled the officers, (6) petitioner's murder of Glen Lich was premeditated, (7) petitioner was gainfully employed at the time of the offense, (8) petitioner committed several other crimes involving planning, including (a) escaping from custody in Mexico, (b) illegally entering the United States, and (c) abducting a fifteen year old female, driving her to an isolated location in a vehicle petitioner had arranged to employ for his illicit purpose, forcible raping his victim at knife-point, and successfully threatening her in a manner designed to ensure her silence following his commission of those crimes, (9) petitioner gave a coherent, articulate, and knowledgeable pair of confessions to law enforcement authorities following his arrest, (10) there is a high probability of malingering by petitioner in connection with his IQ tests, (11) petitioner failed to present any credible evidence showing a significant deficit in adaptive behavior in the areas of leisure, work, communication, or social/interpersonal skills, (12) the affidavit of petitioner's sister Adelita supported a finding that petitioner did not display deficits in personal hygiene or managing his own

financial and personal affairs during his youth and had obtained gainful employment, (13) petitioner's premeditated abduction and sexual assault of Rachel Charnichart, during which petitioner operated a motor vehicle, brandished a weapon, took his victim to a secure location, and threatened his victim in a manner calculated to (and which actually did) convince her not to report his crimes, demonstrate high levels of adaptive skills and abstract reasoning and belie any assertion petitioner suffers from deficits in adaptive skills, (14) petitioner was capable of following rules and making meaningful written (albeit in Spanish) requests for resources, thus also belying any claim petitioner suffers from adaptive skills deficits, and (15) Dr. Puente's conclusion that petitioner is mentally retarded is not credible because petitioner's conversational and communication skills are inconsistent with a diagnosis of mental retardation and with petitioner's demonstrated abilities to engage in complex, premeditated, criminal activity involving the use of motor vehicles, weapons, sophisticated threats, and necessarily involving substantial advance planning.[148]

The state habeas trial court concluded, in pertinent part, that (1) petitioner is not mentally retarded, (2) petitioner's

---

[148] State Habeas Transcript, Volume V, at pp. 137-52. The state habeas trial court also made "findings" which essentially tracked the testimony of Dr. Coons regarding the discrepancies between petitioner's answers to different skills tests designed to measure the same skills sets. *Id.*, at pp. 151-52.

level of intellectual functioning does not support a finding of mental retardation, and (3) there was no credible evidence petitioner demonstrated mental retardation prior to age eighteen.[149]

The Texas Court of Criminal Appeals specifically adopted the foregoing findings and conclusions when it rejected petitioner's mental retardation/*Atkins* claim on the merits. *Ex parte Ramiro Hernandez*, WR-63,282-01, 2008 WL 4151813 (Tex. Crim. App. September 10, 2008).

C.    Clearly Established Federal Law

The Supreme Court's Eighth Amendment analysis in *Atkins* focused initially on current trends among state legislatures regarding the imposition of  the death sentence on mentally retarded murderers. *See Atkins v. Virginia*, 536 U.S. at 311-17, 122 S.Ct. at 2246-50 (holding the Eighth Amendment draws its meaning from the evolving standards of decency marking the progress of a maturing society and the clearest and most reliable objective evidence of contemporary values is the legislation enacted by state legislatures).  The Supreme Court then shifted its focus to the dual penological purposes served by the death penalty: retribution and deterrence of capital crimes by prospective offenders. *Atkins v. Virginia*, 536 U.S. at 318-21, 122 S.Ct. at 2250-52.

---

[149] State Habeas Transcript, Volume V, at pp. 152-53.

With regard to retribution, the Court held an exclusion from the death penalty for mentally retarded murderers was warranted by virtue of "the lesser culpability of the mentally retarded offender" which it contrasted with "the culpability of the average murderer." *Atkins v. Virginia*, 536, U.S. at 319, 122 S.Ct. at 2251.

The Supreme Court then held, in pertinent part, as follows:

> With respect to deterrence -- the interest in preventing capital crimes by prospective offenders -- "it seems likely that 'capital punishment can serve as a deterrent only when murder is the result of premeditation and deliberation.'" Exempting the mentally retarded from that punishment will not affect the "cold calculus that precedes the decision" of other potential murderers. Indeed, that sort of calculus is at the opposite end of the spectrum from behavior of mentally retarded offenders. The theory of deterrence in capital sentencing is predicated upon the notion that the increased severity of the punishment will inhibit criminal actors from carrying out murderous conduct. Yet it is the same cognitive and behavioral impairments that make these defendants less morally culpable--for example, the diminished ability to understand and process information, to learn from experience, to engage in logical reasoning, or to control impulses--that also make it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information.

*Atkins v. Virginia*, 536 U.S. at 319-20, 122 S.Ct. at 2251 (citations omitted).

The Supreme Court ultimately concluded the execution of mentally retarded criminals would not measurably advance the deterrent or retributive purposes underlying the death penalty and, therefore, the Eighth Amendment prohibits such punishment. *Atkins v. Virginia*, 536 U.S. at 321, 122 S.Ct. at 2252.

Significantly, the Supreme Court declined in *Atkins* to furnish state and lower federal courts with a definitive *legal* definition of "mental retardation" or "mentally retarded," instead offering two *clinical* definitions as possible options:

> The American Association on Mental Retardation (AAMR) defines mental retardation as follows: "*Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18."
> The American Psychiatric Association's definition is similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system."

*Atkins v. Virginia*, 536 U.S. at 308 n.3, 122 S.Ct. at 2245 n.3 (*citations omitted*).

As the Supreme Court noted in *Atkins*, "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Atkins v. Virginia*, 536 U.S. at 317, 122 S.Ct. at 2250. Moreover, the Supreme Court went to point out

the clinical definitions of mental retardation which it had expressly approved "require not only subaverage [sic] intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction *that become manifest before age 18*." *Atkins v. Virginia*, 536 U.S. at 318, 122 S.Ct. at 2250 (emphasis added).

Thus, it is clearly established under the Supreme Court's holding in *Atkins* that a convicted capital murderer asserting he is constitutionally exempt from execution based on his mental retardation must support his claim of mental deficiency with a showing he suffered "significant limitations in adaptive skills" before age 18. *Id.*

D.   AEDPA Analysis

1.   The Factors Considered by the State Habeas Court

Texas courts faced with determining whether a convicted capital murderer is mentally retarded within the meaning of *Atkins* have relied on a combination of a clinical definition of "mental retardation," the statutory definition of that term contained in the Texas Health and Safety Code, as well as some very pragmatic guidelines. *See In re Brown*, 457 F.3d 392, 396 (5th Cir. 2006)("Texas courts have followed the definition of mental retardation adopted by the American Association on Mental Retardation and the nearly identical definition set forth in

63

section 591.003(13) of the Texas Health and Safety Code."); *In re Salazar*, 443 F.3d 430, 432 (5th Cir. 2006)(holding the same).

> The Texas Court of Criminal Appeals adopted two definitions of mental retardation in the aftermath of *Atkins*, both of which contain the same substantive elements. The first, the AAMR definition, defined mental retardation as a disability characterized by "(1) 'significantly subaverage' general intellectual functioning; (2) accompanied by 'related' limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18." The second, from the Texas Health and Safety Code, requires "significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period."

*Clark v. Quarterman*, 457 F.3d 441, 444 (5th Cir. 2006), *cert. denied*, 549 U.S. 1254 (2007).

More specifically, in *Ex parte Briseno*, 135 S.W.3d 1, 7-8 (Tex. Crim. App. 2004), the Texas Court of Criminal Appeals adopted a combination of both a clinical definition[150] and a statutory definition[151] of "mental retardation" for use in capital sentencing but also specifically directed fact-finders in

---

[150] The Texas Court of Criminal Appeals' opinion in *Briseno* referenced the American Association on Mental retardation's definition of "mental retardation," which that court described as "a disability characterized by: (1) 'significantly subaverage' general intellectual functioning; (2) accompanied by 'related' limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18." *Ex parte Briseno*, 135 S.W.3d at 7 (footnotes omitted).

[151] The Texas Court of Criminal Appeals also referenced the definition of "mental retardation" contained in section 591.003(13) of the Texas Health and Safety Code, i.e., "'significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period.'" *Ex parte Briseno*, 135 S.W.3d at 7.

criminal trials to focus on the following additional, non-clinical, non-statutory, practical considerations:

> Did those who knew the person best during the developmental stage - his family, friends, teachers, employers, authorities - think he was mentally retarded at that time, and if so, act in accordance with that determination?
> Has the person formulated plans and carried them through or is his conduct impulsive?
> Does his conduct show leadership or does it show that he is led around by others?
> Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?
> Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?
> Can the person hide facts or lie effectively in his own or others' interests?
> Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

*Ex parte Briseno*, 135 S.W.3d at 8-9.

The Texas Court of Criminal Appeals has likewise emphasized the issue before the fact-finder is whether the defendant is, in fact, mentally retarded and, while expert opinions on whether the defendant meets psychological diagnostic criteria for mental retardation may assist in this determination, the fact-finder ultimately must base the determination on all of the evidence and the credibility of the witnesses. *Ex parte Briseno*, 135 S.W.3d at 9. The Texas Court of Criminal Appeals has consistently applied the foregoing criteria in evaluating whether a criminal defendant convicted of capital murder was "mentally retarded." *See Hall v.*

*State*, 160 S.W.3d 24, 38-40 (Tex. Crim. App. 2004)(recognizing the similarity between a defense of mental retardation and the insanity defense, holding a defendant must bear the burden of proof to prove mental retardation by a preponderance of the evidence, and concluding such a claim may be rebutted by evidence showing the defendant was never diagnosed as mentally retarded while in school and committed a conceptually complex crime), *cert. denied*, 545 U.S. 1141 (2005); *Ex parte Modden*, 147 S.W.3d 293, 295-98 (Tex. Crim. App. 2004)(holding school and prison records fully supported the unanimous expert opinions concluding the defendant was mentally retarded and had been since birth). Thus, the Texas courts apparently do not limit the focus of their *Atkins* analysis on the defendant's conduct prior to age 18 but, rather, examine a wide range of practical considerations in determining whether the defendant truly is "mentally retarded" within the meaning of *Atkins*.

The petitioner's state habeas trial court specifically cited to the *Briseno* opinion in its Order of May 20, 2008 containing its "Supplemental" findings of fact and conclusions of law denying petitioner's *Atkins* claim.[152] The state habeas trial court expressly considered precisely the factors the Texas Court of Criminal Appeals identified in *Briseno*, e.g., the degree of planning involved in the offense, the lack of any evidence

---

[152] State Habeas Transcript, Volume V, at p. 139.

showing any third party directed petitioner in connection with his murder of Glen Lich or rapes of Lera Lich, petitioner's ability to concoct and communicate a false identity upon arrest, petitioner's ability to communicate the factual details of his offenses (in a manner designed to diminish his own personal moral culpability), and the absence of any *credible* evidence petitioner demonstrated significant deficits in adaptive skills prior to age eighteen.[153]

_____

[153] The state habeas trial court reasonably relied upon the information contained in the November, 2002 statement of Adelita Hernandez regarding petitioner's developmental years when it rejected petitioner's *Atkins* claim. In contrast, the characterizations of petitioner's diminished mental capabilities contained in the testimony at petitioner's state habeas hearing of Adelita Hernandez, her brother Jorge and sister Yolanda, as well as their neighbor Juan Manuel Artiaga Espiro, are so extreme as to defy credibility. According to these witnesses, as a child the petitioner was incapable of even the most rudimentary tasks of self-care. Yet, as Dr. Coons pointed out, the fact petitioner survived to adulthood under the conditions described by these witnesses suggests petitioner was capable of acquiring and employing a wide array of survival skills far beyond the capability of most individuals of petitioner's tender years and lack of education. That petitioner later escaped from custody while serving a twenty-five-year prison sentence and illegally made his way not merely into this nation but substantially into the interior of this nation belies the type of intellectual deficits described by these witnesses. Petitioner's abduction and rape of a fifteen-year-old victim required substantial planning and preparation, as well as a more than marginal level of criminal sophistication to invent a credible threat of retaliation which actually dissuaded his victim from reporting his crimes against her. In light of petitioner's demonstrated abilities to undertake and successfully complete crimes involving substantial amounts of planning and preparation, and in the absence of any independent school records, medical, or developmental records, the state habeas trial court acted reasonably in rejecting these witnesses' characterizations of petitioner's intellectual and adaptive skills capabilities as a

The Fifth Circuit has applied the same factors cited in
*Briseno* in evaluating claims of mental retardation raised by
other Texas capital murderers. *See Moore v. Quarterman*, 517 F.3d
781, 783-84 (5th Cir. 2008)(holding a Texas court decision
rejecting an *Atkins* claim on the merits under the *Briseno*

---

child and young man.
    These witnesses also criticized petitioner for failing, as a
small child and then a young teenager, to adequately bathe
himself on a regular basis despite the undisputed evidence that
his family lacked even the most rudimentary access to clean
water.  It was undisputed the Hernandez Llanas residence (a shack
across the street from a garbage dump) lacked running water,
electricity, or even a modicum of structural stability.  There
was no testimony offered suggesting petitioner or his family had
any access to a shower, bath tub, soap, or other means of bathing
themselves other than a hose which ran an unspecified distance
from the nearest faucet, at least a block and a half from their
residence.  As for petitioner's alleged proclivity for a lack of
personal hygiene, there was no testimony in the record from any
impartial witness suggesting petitioner fell significantly
outside the realm of reasonable personal hygiene one would expect
from a child subjected to daily beatings by abusive parents,
banished from school at an early age, and forced to raise himself
in virtual third world conditions on the edge of a trash dump.
    As Dr. Coons pointed out, and the DSM-IV strongly suggests,
the cultural context in which an individual grew up is critical
to intelligently evaluating his or her adaptive skills level. *See
Diagnostic and Statistical Manual of Mental Disorders, Fourth
Edition, Text Revision, published 2000 by the American
Psychiatric Association* (henceforth "DSM-IV-TR"), at p. 42 ("As
in the assessment of intellectual functioning, consideration
should be given [in evaluating adaptive functioning] to the
suitability of the instrument to the person's socio-cultural
background, education, associated handicaps, motivation, and
cooperation.").  Petitioner presented the state habeas trial
court with no teacher evaluations, educational, developmental, or
medical records relating to petitioner's childhood nor any
impartial witness who offered any coherent testimony regarding
petitioner's childhood. *See DSM-IV-TR*, at 42 ("It is useful to
gather evidence for deficits in adaptive functioning from one or
more reliable independent sources (e.g., teacher evaluation and
educational, developmental, and medical history.")).

criteria was entitled to AEDPA deference), *cert. filed*, May 13, 2008, no. 07-10940; *Moreno v. Dretke*, 450 F.3d 158, 163-65 (5th Cir. 2006)(rejecting *Atkins* claim where state court applied the *Briseno* criteria and concluded low post-*Atkins* IQ test scores had to be judged in the context of the administering psychologist's observations about the petitioner's low level of effort and conclusion "this score may somewhat underestimate his true level of intellectual functioning"), *cert. denied*, 549 U.S. 1120 (2007).

This Court has concluded use of the *Briseno* factors is a reasonable application of the legal principles announced in *Atkins*. *See Rodriguez v. Quarterman*, 2006 WL 1900630, *10-*14 (W.D. Tex. July 11, 2006)(concluding the Texas Court of Criminal Appeals' *Briseno* criteria represent an objectively reasonable application of a "far-from-crystal-clear federal constitutional standard").

The state habeas court's reliance on the legal standard set forth in *Briseno* in rejecting petitioner's *Atkins* claim was an objectively reasonable application of legal principles fully consistent with clearly established federal law. The remaining question is whether the state habeas court's application of those legal standards, and ultimate rejection of petitioner's *Atkins* claim on the merits, was objectively reasonable in light of the evidence properly before petitioner's state habeas court.

2. <u>Intellectual Functioning</u>

The testimony before the state habeas court was replete with references to test scores that could not be verified or which, lacked proper norms for any Hispanic population.  As Dr. Puente and Dr. Martinez both argued during the state habeas hearing, reliance upon the results of TONI tests as a true indicator of IQ is problematic, at best.[154]  Likewise, Dr. Martinez's use of only the performance portion of a version of the WAIS that he and his associates apparently translated into Spanish raises almost as many questions as it answers.[155]  The state trial court acted in wholly reasonable manner when it placed far greater emphasis on petitioner's full scale score of 70 on the Spanish language version of the WAIS-III administered to petitioner by Dr. Puente in 2006.  Furthermore, given the compelling observations of Dr. Coons regarding (1) the lack of any rational, reasonable, motivation on petitioner's part to perform at maximum effort and (2) the great inconsistencies between petitioner's scores on a

---

[154] S.F. State Habeas Hearing, Volume 4 of 6, testimony of Dr. Gilbert Martinez, at pp. 84-85, 87; testimony of Dr. Antonio E. Puente, at pp. 117, 119-21, 149.

[155] Dr. Martinez testified the Spanish language version of the WAIS-III was not available at the time he evaluated petitioner. S.F. State Habeas Hearing, Volume 3 of 6, testimony of Dr. Gilbert Martinez, at pp. 157; Volume 4 of 6, testimony of Dr. Gilbert Martinez, at p. 69.

wide array of tests designed to measure the same skill sets,[156] it was perfectly reasonable for the state habeas court to conclude petitioner's actual level of intellectual functioning was significantly greater than the score of 70 petitioner earned on the 2006 Spanish language WAIS-III.

Dr. Coons persuasively argued that attempting to "average" or derive the arithmetic mean of all of petitioner's WAIS and TONI scores without consideration of the wide range of circumstances that impacted the reliability of each of those test scores was an exercise in statistical and scientific futility.[157] In Dr. Coons' view, averaging those scores demonstrates a failure to comprehend the true nature of IQ testing, i.e., it fails to recognize that a test score establishes only a subject's minimum capability and ignores that motivational and environmental factors might very well pull a subject's scores down below the subject's true capabilities.[158]

---

[156] S.F. State Habeas Hearing, Volume 5 of 6, testimony of Richard E. Coons, at pp. 59-62, 70-71, 100, 103, 110, 112-14, 119, 123, 138-39, 160, 164.

[157] S.F. State Habeas Hearing, Volume 5 of 6, testimony of Richard E. Coons, at p. 102.

[158] S.F. State Habeas Hearing, Volume 5 of 6, testimony of Dr. Richard E. Coons, at pp. 116-18, 121, 123.
This Court has independently reviewed the entirety of the expert testimony and reports in the record and understands Dr. Coons' argument to be analogous to an assertion that the true "speed" of a sprinter cannot be determined by "averaging" that sprinter's times in a series of fifty yard dashes; rather, the question is what is that sprinter's personal best time in that

Dr. Coons argued it was absolutely essential in evaluating petitioner's intellectual capabilities to account for the fact the petitioner understood that good scores on the tests in question would likely result in petitioner's execution being expedited.[159]  In that regard, Dr. Coons' testimony was substantially consistent with the opinions expressed by Dr. Cantu and Dr. Martinez during their testimony at petitioner's trial and state habeas corpus hearing, respectively.[160]  While Dr. Martinez

_____

event.  Simple put, Dr. Coons argued that a person capable of performing at a relatively high level on a test of a particular skill set should reasonably be expected to perform in a similar manner on other tests of the same or similar skill sets. *Id.*, at pp. 165-66.  More specifically, Dr. Coons argued that petitioner's score of 87 on the performance component of the Spanish language WAIS-III test administered by Dr. Puente in 2006 established that petitioner was capable of performing at that level on that test and petitioner's significantly lower score on the same portion of the WAIS-III administered by Dr. Martinez several years previously should be viewed as an inaccurate measure of petitioner's true capabilities. *Id.*, at pp. 112-13. This Court finds Dr. Coons' argument compelling.  The state habeas trial court reasonably discounted petitioner's low scores on the tests administered by Dr. Martinez and Dr. Puente when those low test scores were inconsistent with much higher test scores achieved by petitioner on other tests measuring the same or similar skill sets.

[159] S.F. State Habeas Hearing, Volume 5 of 6, testimony of Dr. Richard E. Coons, at pp. 63, 76, 116, 123, 158, 189.

[160] S.F. Trial, Volume 21, testimony of Dr. Robert E. Cantu, at pp. 138, 143, 147-49; testimony of Dr. Gilbert Martinez, at pp. 111-12, 121, 125, 129-30; S.F. State Habeas Hearing, Volume 4 of 6, testimony of Dr. Gilbert Martinez, at pp. 21-22, 40-45, 47 (recognizing that a test subject's effort is a factor to be considered), 65-66 (a lack of sincere effort may have played a role but concluding they played only a minor role in petitioner's scores).

disagreed about the *likelihood* that a lack of effort on petitioner's part played a "significant" role in explaining petitioner's incredibly low scores on some of the tests Dr. Martinez administered, all three of these diagnosticians agreed (unlike Dr. Puente) that a lack of effort by petitioner may have played a role in petitioner's low test scores.[161]  In contrast, Dr. Puente equated "poor performance" by petitioner with "malingering" and dismissed completely any possibility of

_____

[161] *See* S.F. State Habeas Hearing, Volume 3 of 6, testimony of Dr. Gilbert Martinez, at p. 175 ("There were also motivational issues that always have to be considered in a situation like this."); S.F. State Habeas Hearing, Volume 4 of 6, testimony of Dr. Gilbert Martinez, at pp. 46-47, 52-53, 65, 77 (recognizing that "effort" may have played a role in petitioner's low test scores but expressing the opinion that it was a fairly minor role based upon his clinical impressions); *Id.*, at pp. 66, 73-74 (rejecting malingering as a factor in petitioner's low test scores because petitioner was "unsophisticated"); S.F. Trial, Volume 21, testimony of Dr. Gilbert Martinez, at pp. 111-12, 121, 125, 129-30 (recognizing that motivational factors can affect test scores but opining that malingering did not explain all of petitioner's low test scores); S.F. Trial, Volume 21, testimony of Robert E. Cantu, at pp. 138, 143, 147-49 (opining that petitioner was quite possibly "malingering" passively by not putting forth his best effort during portions of Dr. Cantu's interview of petitioner); S.F. State Habeas Hearing, Volume 5 of 6, testimony of Dr. Richard E. Coons, at pp. 60-63, 76, 80, 112-14, 116-19, 121, 123-24, 137-40, 150, 160, 164-66, 178-79, 182, 187, 189 (arguing petitioner's low test scores do not accurately establish petitioner's full intellectual capabilities because (1) there were inexplicably large discrepancies between petitioner's scores on multiple tests designed to measure the same skill sets, thus suggesting petitioner was not consistently putting forth his best efforts, and (2) there was "an incredibly huge reason for manipulation" by petitioner, i.e., petitioner's perfectly rational desire to avoid being executed, a result which petitioner knew would occur unless petitioner scored poorly on IQ tests).

"malingering" by petitioner based upon his view that petitioner was unlikely to have deliberately performed poorly.[162]  Both of petitioner's trial counsel furnished affidavits to the state habeas trial court in which they (1) reported experiencing no problems communicating with petitioner, (2) commented favorably upon petitioner's ability to comprehend pretrial and trial proceedings and to actively participate in his own defense, and (c) suggested petitioner's low scores on various tests administered by Dr. Martinez were likely the result of malingering, a conclusion they claimed to have shared with Dr. Martinez, Dr. Cantu, and Dr. Arambula.[163]

The categorical rejection by Dr. Puente and Dr. Martinez of Dr. Coons' suggestion that petitioner deliberately performed poorly on petitioner's IQ tests in order to avoid execution is particularly perplexing in view of the unanimous diagnoses by Dr. Martinez and Dr. Arambula that petitioner possesses an anti-social personality[164] and Dr. Cantu's expressed concerns that petitioner deliberately slowed down his responses during Dr. Cantu's clinical interview when Dr. Cantu reached the section

---

[162] S.F. State Habeas Hearing, Volume 4 of 6, testimony of Dr. Antonio E. Puente, at pp. 181, 219-20.

[163] Affidavits of Steven J. Pickell and J.A. Garcia, State Habeas Transcript, Volume III, at pp. 417-27.

[164] S.F. Trial, Volume 21, testimony of Gilbert Martinez, at p. 109; testimony of Michael Arambula, at p. 177.

addressing petitioner's competence to stand trial.[165]  The DSM-IV-
TR recognizes that persons with anti-social personalities "are
frequently deceitful and manipulative in order to gain personal
profit or pleasure."[166]  Avoiding execution certainly falls within
the category of personal gain for which anti-social personalities
can reasonably be expected to "repeatedly lie, use an alias, con
others, or malinger."[167]  Dr. Martinez stated in his written
report dated January 4, 2000 that petitioner "became somewhat
evasive" when questioned about his criminal history and denied
any history of incarceration in Mexico.[168]

   Given the inconsistencies between petitioner's scores on
various tests designed to measure the same skill sets identified
by Dr. Coons (without contradiction by petitioner's experts), the
diagnosis of petitioner as possessing an anti-social personality,
petitioner's demonstrated history of prevarication, and the
obvious negative consequences for petitioner of a high score on
any of the tests designed to measure petitioner's intellectual
functioning, the state habeas trial court reasonably credited Dr.
Coons' concern over the likelihood that negative motivation may

---

[165] S.F. Trial, Volume 21, testimony of Robert E. Cantu, at
pp. 138, 147-49. 152.

[166] DSM-IV-TR, at p. 702.

[167] DSM-IV-TR, at p. 702.

[168] State Habeas Transcript, Volume II, at p. 222.

have caused petitioner's test scores to inaccurately under-measure petitioner's true level of intellectual functioning. In other words, given petitioner's high scores on a number of the tests administered by Dr. Puente, the state habeas trial court reasonably rejected the contentions of Dr. Martinez and Dr. Puente that petitioner was too "unsophisticated" to have "malingered" by deliberately performing poorly on some IQ tests.

Furthermore, the state habeas trial court reasonably examined the facts and circumstances of petitioner's criminal record, including (1) petitioner's escape from custody in Mexico while serving a 25-year sentence for homicide, (2) petitioner's successful illegal entry into this nation while a fugitive from Mexican justice, and (3) petitioner's abduction, rape, and terrorization of a fifteen-year-old girl, when it concluded petitioner's level of intellectual functioning did not fall within the scope of the definition of "mental retardation" as envisioned by the United States Supreme Court in *Atkins*.

Given the evidence presented during petitioner's trial and state habeas corpus proceeding, the Texas Court of Criminal Appeals' conclusion that petitioner failed to demonstrate he suffers from "significantly subaverage general intellectual functioning" was objectively reasonable and fully supported by the evidence before that court.

    3.   <u>Adaptive Functioning</u>

Dr. Coons testified that petitioner had demonstrated considerable adaptive functioning in surviving to adulthood amid the horrific circumstances of petitioner's childhood and had adapted well to life in prison.[169]  Dr. Puente, in contrast, identified many deficiencies in petitioner's adaptive functioning during childhood (such as the inability to count money, properly separate bottles by color, obtain an education, or maintain proper personal hygiene) and argued petitioner had failed to properly adapt to life in prison because petitioner continued to

_____

[169] S.F. State Habeas Hearing, Volume 5 of 6, testimony of Dr. Richard E. Coons, at pp. 69-70, 72-74, 77, 81-89, 133, 191-92, 195, 200-05, 207-08, 210-11, 215, 221-24.  He attributed petitioner's purportedly poor childhood performance in a variety of adaptive behavior categories on the severe physical, emotional, and mental abuse petitioner sustained as a child, petitioner's lack of proper nutrition and physical necessities like shelter and clothing, petitioner's lack of education, and the other handicaps arising from petitioner's socio-cultural environment. *Id.*  Dr. Coons described the circumstances of petitioner's childhood as akin to petitioner growing up in a foxhole in the middle of a battlefield. *Id.*, at p. 215.  Dr. Coons argued that petitioner displayed adaptive behavior during childhood by selling drugs to survive. *Id.*, at pp.
      Based upon the testimony and documentary evidence available, Dr. Coons concluded petitioner had adapted well to life in prison, concluding petitioner may not have shown adaptive skills earlier in life simply because petitioner never had the opportunity to demonstrate such skills in Nuevo Laredo but insisting petitioner had adapted well to life in prison. *Id.*, at pp. 81, 85-90, 200-05, 207, 221-24 (pointing out petitioner can now read and write at the fifth grade level, petitioner is able to communicate in writing sufficiently well to communicate his personal desires and needs, petitioner apparently likes to read, petitioner writes letters to his family from prison, petitioner took the initiative to diet and reduce his weight from 300 to 170 pounds, petitioner avoids cigarettes, and petitioner was able to identify discrepancies in trial testimony and to communicate same to his trial counsel).

demonstrate low levels of academic achievement and intellectual functioning, could only perform menial forms of work as an adult, had not participated in Bible study or GED courses while incarcerated, had engaged in disciplinary violations, fell asleep at the crime scene, displayed a "pretty flat" ability to learn, and had not improved while living in an restrictive environment.[170]  The state habeas trial court had before it numerous documents relating to petitioner's background, including a mental health evaluation prepared by TDCJ personnel dated February 18, 1999 in which petitioner reportedly gave a history in which he claimed he was married at age seventeen and had seven children, petitioner reported a stable work history as a carpenter (including working for four years in Laredo doing construction work as a carpenter), and petitioner also reported having worked for four months building corrals.[171]

There are several reasons why the state habeas trial court reasonably gave more credence to Dr. Coons' opinions regarding petitioner's lack of adaptive functioning deficits over the opinions of Dr. Puente.  First, even petitioner's experts agreed there was a dearth of the type of documentation usually relied

---

[170] S.F. State Habeas Hearing, Volume 4 of 6, testimony of Dr. Antonio E. Puente, at pp. 137, 142, 145-46, 154, 159-64, 192-93, 197, 204, 216, 222, 226.

[171] State Habeas Transcript, Volume III, at pp. 466-68.

upon to help evaluate adaptive functioning.[172]  Second, petitioner

failed to present the state habeas trial court with any credible

testimony from independent third parties with personal knowledge

of petitioner's developmental milestones or any documentation

from reliable independent sources addressing petitioner's

achievement or failure to achieve developmental childhood

milestones.[173]  Third, the state habeas trial court reasonably

---

[172] *See* S.F. State Habeas Hearing, Volume 4 of 6, testimony
of Dr. Antonio E. Puente, at pp. 129, 136 (recognizing there were
"no school records" or "normal medical history" for petitioner);
*Id.*, at pp. 155-57 (explaining that neither of the leading tests
for adaptive functioning, i.e., the ABAS and VARMANS had been
translated into Spanish or normed for Hispanic populations); S.F.
State Habeas Hearing, Volume 3 of 6, testimony of Dr. Gilbert
Martinez, at pp. 175-77 (explaining that he was unable to
evaluate petitioner's adaptive functioning due to a lack of
reliable, independent, information regarding petitioner's life
history); S.F. State Habeas Hearing, Volume 4 of 6, testimony of
Dr. Gilbert Martinez, at pp. 12-16 (noting petitioner's
proclivity for telling different clinicians different versions of
his life history, some of which contradicted the few available
medical records on petitioner); *Id*, at p. 62 (noting the absence
of any school records for petitioner made it impossible to
properly evaluate petitioner's adaptive functioning); *Id.*, at p.
94 (noting the need for information on a subject's developmental
milestones to properly evaluate adaptive functioning).

[173] At one point in his testimony, Dr. Puente testified that
he interviewed four of petitioner's siblings and a childhood
neighbor allegedly knowledgeable of petitioner's childhood. S.F.
State Habeas Hearing, Volume 4 of 6, testimony of Dr. Antonio E.
Puente, at p. 112.  These five individuals were not identified
specifically but, presumably, they included the three siblings of
petitioner and neighbor who testified before the state habeas
trial court.  At another point in his testimony, Dr. Puente
claimed he had reviewed the affidavits of twenty persons and
interviewed five members of petitioner's family. *Id.*, at p. 156.
Dr. Puente did not identify any of the twenty persons who
allegedly furnished the affidavits in question; nor did Dr.
Puente furnish the state habeas court with copies of same.

found the testimony of petitioner's siblings and neighbor

regarding petitioner's childhood to be incredible.[174]  Having

independently reviewed the entirety of the testimony of

petitioner's siblings and neighbor regarding petitioner's

childhood, this Court finds said testimony internally

inconsistent and lacking in detailed accounts of specific

adaptive deficits at specific ages.  While petitioner's siblings

and neighbor described petitioner generally as slow, they

included very few relevant time frames along with their accounts

of petitioner's allegedly "slow" behavior.

For instance, petitioner's brother Jorge testified (1) their

family moved to the dump when petitioner was one or two years

old, (2) petitioner began working at the dump around age four,

and (3) petitioner dropped out of elementary school at age right

or nine after reaching the third or fourth grade.[175]  In contrast,

petitioner's older sister Yolanda testified (1) their family

moved to the dump when petitioner was four years old, (2)

petitioner was nine years old when she left home, and (3) at the

time she left home, petitioner could not bathe himself, and (4)

---

[174] State Habeas Transcript, Volume V, at p. 144 ("Applicant failed to present any credible evidence of a significant deficit in the adaptive behavior areas of health & safety, self-care, use of community resources or self-direction.").

[175] S.F. State Habeas Hearing, Volume 3 of 6, testimony of Jorge Hernandez Llanas, at pp. 14, 18, 23.

petitioner never learned to cook for himself.[176]  Petitioner's younger sister Adelita, who had earlier executed a written statement denying petitioner was incapable of taking care of himself, testified (1) when petitioner was thirteen, their mother had to remind petitioner to bathe and change into clean clothes, (2) petitioner was unable to dress and bathe himself until after age thirteen, (3) petitioner repeated first grade twice but went to school through fourth grade, (4) petitioner did learn from their brothers, and (5) petitioner was "suspended" from school because he fell asleep in class, did not do his homework, and always wanted to leave the classroom.[177]  The state habeas trial court reasonably reject the inconsistent, often vague, testimony about petitioner's childhood offered by petitioner's siblings and neighbor.

It was far from clear from the foregoing testimony precisely when petitioner and his family moved to the dump, when petitioner began school, how far petitioner progressed in school, and the reasons why petitioner left school.  Contrary to the suggestions of petitioner's mental health experts, the testimony of Adelita Hernandez suggests petitioner was forced to leave school because of behavioral issues, not necessarily academic ones.  Given the

---

[176] S.F. State Habeas Hearing, Volume 4 of 6, testimony of Yolanda Hernandez Llanas, at pp. 293-94, 308-10.

[177] S.F. State Habeas Hearing, Volume 4 of 6, testimony of Adelita Hernandez, at pp. 239-45, 275, 287.

lack of proper diet, severe physical and emotional abuse, and intense poverty experienced by petitioner as a young child described by petitioner's siblings in their testimony before the state habeas trial court, petitioner could hardly be labeled intellectually deficient for falling asleep in class or behaving inappropriately in class. Likewise, given Yolanda's testimony regarding petitioner's propensity for switching the letters "d" and "b" backwards as a child, it is curious petitioner has never been tested for dyslexia. Given the fact Yolanda testified she left home about the time Adelita indicated petitioner *started* school (i.e., around age eight or nine), which Jorge testified was about the age petitioner *stopped* attending school, it is difficult to draw any firm conclusions regarding petitioner's level of educational progress. Likewise, given the testimony that there was no electricity and no running water in or near the Hernandez Llanas residence and the abject poverty under which petitioner grew up, observations that petitioner failed to bathe himself as a teenager unless "reminded" to do so by his mother hardly qualify as evidence of a "significant" deficit in adaptive behavior.

Additionally, Dr. Martinez and Dr. Coons agreed that consideration of a subject's cultural group was essential to

accurately evaluating the subject's adaptive functioning.[178]  In contrast, Dr. Puente appeared to argue that consideration of a subject's cultural background in evaluating the subject's intelligence was tantamount to "racism."[179]  The DSM-IV-TR recommends consideration of the suitability of any test instrument intended to measure the subject's adaptive functioning "to the person's socio-cultural background, education, associated handicaps, motivation, and cooperation."[180]

Dr. Martinez and Dr. Coons agreed that petitioner's current adaptive functioning was relevant to the issue of whether petitioner is mentally retarded.[181]  Dr. Puente, in contrast, relied almost exclusively upon the accounts of petitioner's childhood furnished by petitioner and petitioner's siblings to evaluate petitioner's adaptive functioning, which accounts the state habeas trial court reasonably found to be less than credible.[182]

---

[178] S.F. State Habeas Hearing, Volume 4 of 6, testimony of Dr. Gilbert Martinez, at pp. 6, 8-9, 97; Volume 5 of 6, testimony of Dr. Richard E. Coons, at pp. 72-74, 81, 84, 192, 200, 215.

[179] S.F. State Habeas Hearing, Volume 4 of 6, testimony of Dr. Antonio E. Puente, at pp. 131-32.

[180] DSM-IV-TR, at p. 42.

[181] S.F. State Habeas Hearing, Volume 4 of 6, testimony of Dr. Gilbert Martinez, at pp. 98-99; Volume 5 of 6, testimony of Dr. Richard E. Coons, at pp. 200-01, 210-11.

[182] S.F. State Habeas Hearing, Volume 4 of 6, testimony of Dr. Antonio E. Puente, at pp. 123-30, 137, 156-63, 166-67.

The state habeas trial court focused on the complexity and planning required to carry out petitioner's adult criminal conduct, both in connection with the murder of Glen Lich and sexual assault of Mrs. Lich, as well as petitioner's prior abduction and sexual assault of a fifteen-year-old victim, and petitioner's escape from custody in Mexico and illegal entry into this nation.[183] The state habeas trial court also pointed out petitioner had been able to obtain gainful employment and to obtain and use a motor vehicle despite the fact petitioner was a fugitive from justice and an undocumented alien.[184] The state habeas trial court reasonably concluded the level of planning and preparation necessarily involved in petitioner's pattern of criminal conduct demonstrated a lack of significant limitations in adaptive functioning.[185]

In view of the evidence presented during petitioner's trial and state habeas corpus proceeding, the Texas Court of Criminal Appeals' conclusion that petitioner failed to establish through credible evidence that petitioner demonstrated "significant limitations in adaptive functioning" in at least two skill areas was objectively reasonable and fully consistent with the evidence before that state court.

---

[183] State Habeas Transcript, Volume V, at pp. 142-44.

[184] *Id.*, at pp. 144-45.

[185] *Id.*, at p. 152.

4.  <u>Conclusion</u>

Having examined the evidence before the state habeas court in detail, this Court concludes the Texas Court of Criminal Appeals' rejection on the merits of petitioner's *Atkins* claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence actually presented in the petitioner's trial and state habeas corpus proceedings.[186]  Petitioner's first claim in his amended federal

---

[186] Petitioner has presented this Court with a wealth of new affidavits and other documents attached as exhibits to petitioner's Amended Petition for a Writ of Habeas Corpus, filed July 16, 2010, *docket entry no. 48*, which petitioner did not present to the state habeas court.  Because those documents were never "fairly presented" to the state habeas corpus during petitioner's first state habeas corpus proceeding, they may not be considered by this Court in the course of determining whether the state habeas court's factual findings and conclusions of law concerning petitioner's *Atkins* claim were "objectively reasonable" in light of the evidence actually presented to that court.

Petitioner had a full evidentiary hearing before the state habeas court during his first state habeas corpus proceeding and every opportunity therein to develop the factual basis for his *Atkins* claim.  The Texas Court of Criminal Appeals rejected petitioner's *Atkins* claim on the merits following that hearing. Under such circumstances, petitioner may not present this Court with new evidence supporting his *Atkins* claim.  Under the AEDPA, a federal habeas corpus proceeding is not a proper forum in which to re-litigate (with the aid of new evidence) the merits of a claim the state courts have already rejected on the merits. *See Cullen v. Pinholster*, ___ U.S. ___, ___, 131 S.Ct. 1388, 1398-99, 179 L.Ed.2d 557 (2011) (holding review under Section 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits and it would be contrary to the AEDPA's underlying purpose to permit a petitioner to overcome

habeas corpus petition does not warrant federal habeas relief
under the AEDPA.

### IV. **Ineffective Assistance Claims**

A.   The Claims

In his second and third claims in his amended federal habeas
corpus petition, petitioner argues he was deprived of his Sixth
Amendment right to the effective assistance of counsel at trial
by virtue of (1) his trial counsel's failures to (a) adequately
investigate petitioner's background *and* present mitigating
evidence showing petitioner's childhood was characterized by
abject poverty, exposure to toxins, extreme physical and
emotional abuse, and deprivation of the basic necessities of life
and (b) present evidence showing petitioner was not guilty of the
stabbing about which prosecution witness Maria Del Carmen Serrano
testified at the punishment phase of trial,[187] and (2) his trial
counsel operated under a conflict of interest arising from said
counsel's previous representation of Francisco Espino, i.e., the
husband of Maria Del Carmen Serrano and, at one time, a suspect
in the stabbing to which petitioner later pleaded guilty (and

---

an adverse state-court decision with new evidence introduced in
federal habeas court and reviewed by that court in the first
stance effectively *de novo*).

[187] Amended Petition, at pp. 75-121.

about which Ms. Serrano testified at the punishment phase of petitioner's capital murder trial).[188]

B.    State Court Disposition

    1.    Failure to Investigate & Present Mitigating Evidence

In his thirty-fourth claim for relief in his first state habeas corpus application, petitioner argued his trial counsel rendered ineffective assistance by failing to adequately investigate petitioner's background and present additional mitigating evidence showing petitioner's deprived, abused, childhood.[189]

Petitioner also submitted exhibits marked G through K supporting his ineffective assistance claim consisting of (G) a hearsay affidavit executed by petitioner's current federal habeas counsel, (G-1) a series of photographs purporting to depict the location of petitioner's childhood home, (H) Spanish and English versions of an affidavit executed by petitioner's mother (Martha Hernandez Llanas), (I) Spanish and English versions of an affidavit executed by petitioner's older sister Yolanda,[190] (J)

<hr>

[188] Amended petition, at pp. 121-40.

[189] State Habeas Transcript, Volume II, at pp. 161-67.

[190] The affidavit of Yolanda Hernandez Llanas attached as exhibit I to petitioner's first state habeas corpus application states, in contrast to Yolanda's testimony before the state habeas trial court (when she testified she left home at age 19), that she left home at age seventeen, when petitioner was only seven years old. State Habeas Transcript, Volume II, at p. 253. The difference is significant because, if her affidavit is

Spanish and English versions of an affidavit executed by
petitioner's brother Jorge, and (K) the draft and final versions
of the written statement of Lera Patrick Tyler Lich.[191]

The state habeas trial court also had before it the
affidavits of petitioner's trial counsel, who asserted (1) they
or their investigator, contacted members of petitioner's family
and, after they made arrangements to pay for petitioner's mother
and older sister Yolanda to come to Bandera County to testify at
petitioner's trial, both of those persons chose not to attend
petitioner's trial and (2) when they interviewed petitioner's
sister Adelita, she informed them petitioner had previously
assaulted her, had subsequently threatened to sexually assault
their sister Martha, and she feared the petitioner.[192]  Finally,
the state habeas trial court also had before it the statement of
petitioner's younger sister Adelita Hernandez quoted at length
above.[193]

The state habeas trial court found (1) petitioner's trial
counsel communicated with petitioner's family members and made

---

correct, then (1) Yolanda left home prior to the time petitioner
entered school and (2) Yolanda resided with petitioner at the
dump for only approximately three years.

[191] State Habeas Transcript, Volume II, at pp. 235-74.

[192] State Habeas Transcript, Volume III, at pp. 422-23, 426-
27.

[193] *See note 49, supra.*

88

arrangements for transportation of petitioner's family to petitioner's trial, (2) the decision by petitioner's relatives not to appear at petitioner's trial was not the result of any action or inaction by petitioner's trial counsel, and (3) petitioner's trial counsel determined not to call petitioner's sister Adelita to testify at trial based upon said counsels' decision that her testimony would prove harmful to petitioner (because of her accounts of petitioner's violent acts against her and petitioner's threats of violence against another member of their family) and would not support a claim of mental retardation.[194]  The state habeas trial court concluded petitioner's trial counsel did not render ineffective assistance "based on the alleged failure of counsel to conduct meaningful mitigation investigation, as the evidence indicates there was reasonable investigation conducted."[195]  The Texas Court of Criminal Appeals adopted the foregoing findings and conclusions when it denied petitioner's first state habeas corpus application. *Ex parte Ramiro Hernandez*, WR-63,282-01, 2008 WL 4151813 (Tex. Crim. App. September 10, 2008).

  2.  <u>Failure to Challenge Evidence of Stabbing</u>

Despite filing three state habeas corpus applications, petitioner has, to date, never fairly presented any state court

---

[194] State Habeas Transcript, Volume VI, at pp. 22-23.

[195] State Habeas Transcript, Volume VI, at p. 28.

with his complaint about his trial counsels' failure to challenge the prosecution's punishment-phase evidence showing petitioner stabbed another man outside a bar in the months prior to Glen Lich's murder.

   3.   Conflict of Interest Complaint

Petitioner presented his complaint about his trial counsel's alleged conflict of interest for the first time in petitioner's third state habeas corpus application.  The Texas Court of Criminal Appeals dismissed petitioner's third state habeas corpus application based upon state writ-abuse principles in an unpublished Order. *Ex parte Ramiro Hernandez*, WR 63,393-03, 2010 WL 1240353 (Tex. Crim. App. March 31, 2010).

C.   Clearly Established Federal Law

The Sixth Amendment entitles criminal defendants to "the effective assistance of counsel," *i.e.*, legal representation that does not (1) fall below an objective standard of reasonableness in light of prevailing professional norms and the circumstances of the defendant's case (*Wong v. Belmontes*, ___ U.S. ___, ___, 130 S.Ct 383, 384, 175 L.Ed.2d 328 (2009); *Bobby v. Van Hook*, ___ U.S. ___, ___, 130 S.Ct. 13, 16, 175 L.Ed.2d 255 (2009)); and (2) give rise to a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different (*Porter v. McCollum*, ___ U.S. ___, ___, 130 S.Ct.

447, 452-53, 175 L.Ed.2d 398 (2009); *Wong v. Belmontes*, ___ U.S. at ___, 130 S.Ct. at 386).

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of *trial* counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

To satisfy the first prong of *Strickland*, i.e., establish that his counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); *Williams v. Taylor*, 529 U.S. 362, 390-91, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000). In so doing, a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U.S. at 687-91, 104 S.Ct. at 2064-66. Courts are extremely

deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith*, 539 U.S. at 523, 123 S.Ct. at 2536 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby v. Van Hook*, ___ U.S. at ___, 130 S.Ct. at 16; *Strickland v. Washington*, 466 U.S. at 688-89, 104 S.Ct. at 2065. It is strongly presumed counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542; *Strickland v. Washington*, 466 U.S. at 694, 104 S.Ct. at 2068. A reasonable probability is a

probability sufficient to undermine confidence in the outcome of the proceeding. *Id.*

In evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must re-weigh all the evidence in aggravation against the totality of available mitigating evidence (had the petitioner's trial counsel chosen a different course). *Wong v. Belmontes*, ___ U.S. at ___, 130 S.Ct. at 386; *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542. *Strickland* does not require the State to "rule out" or negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that the result of the punishment phase of a capital murder trial would have been different. *Wong v. Belmontes*, ___ U.S. at ___, 130 S.Ct. at 390-91.

In evaluating petitioner's complaints about the performance of his counsel under the AEDPA, the issue before this Court is whether the Texas Court of Criminal Appeals could reasonably have concluded petitioner's complaints about his trial counsel's performance failed to satisfy either prong of the *Strickland* analysis. *Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003), *cert. denied*, 540 U.S. 1154 (2004). In making this determination, this Court must consider the underlying *Strickland* standard. *Id.* In those instances in which the state courts failed to adjudicate either prong of the *Strickland* test, this

Court's review of the un-adjudicated prong is *de novo*. *See Porter v. McCollum*, ___ U.S. at ___, 130 S.Ct. at 452 (holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U.S. 374, 390, 125 S.Ct. 2456, 2467, 162 L.Ed.2d 360 (2005)(holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542 (holding the same).

A habeas petitioner has the burden to prove both prongs of the *Strickland* ineffective assistance standard by a preponderance of the evidence. *Rogers v. Quarterman*, 555 F.3d 483, 489 (5th Cir. 2009), *cert. denied*, ___ U.S. ___, 130 S.Ct. 365, 175 L.Ed.2d 62 (2009).

Under the well-settled *Strickland* standard, the Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Bell v. Cone*, 535 U.S. at 698, 122 S.Ct. at 1852; *Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066; *Scheanette v. Quarterman*, 482 F.3d at 820.

Under the AEDPA, in order to obtain federal habeas relief on
an ineffective assistance claim rejected on the merits by a state
court, the petitioner must do more than convince the federal
court the state court applied *Strickland* incorrectly - the
petitioner must show the state court applied *Strickland* to the
facts of his case in an objectively unreasonable manner. *Bell v.
Cone*, 535 U.S. at 699, 122 S.Ct. at 1852.  The Supreme Court has
recently discussed this distinction:

> Establishing that a state court's application of
> *Strickland* was unreasonable under § 2254(d) is all the
> more difficult.  The standards created by *Strickland*
> and § 2254(d) are both "highly deferential," *id.*, at
> 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320,
> 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and
> when the two apply in tandem, review is "doubly" so,
> *Knowles*, 556 U.S., at ___, 129 S.Ct. at 1420.  The
> *Strickland* standard is a general one, so the range of
> reasonable applications is substantial. 556 U.S. at
> ___, 129 S.Ct. at 1420.  Federal habeas courts must
> guard against the danger of equating unreasonableness
> under *Strickland* with unreasonableness under § 2254(d).
> When § 2254(d) applies, the question is not whether
> counsel's actions were reasonable.  The question is
> whether there is any reasonable argument that counsel
> satisfied *Strickland*'s deferential standard.

*Harrington v. Richter*, ___ U.S. ___, ___, 131 S.Ct. 770, 788, 178
L.Ed.2d 624 (2011).

A federal habeas court reviewing a state court's rejection
on the merits of a claim for relief pursuant to the AEDPA must
focus exclusively on the propriety of the ultimate decision
reached by the state court and not evaluate the quality, or lack
thereof, of the state court's written opinion supporting its

decision. *See Maldonado v. Thaler*, 625 F.3d 229, 239 (5th Cir. 2010)(federal habeas review of a state court's adjudication involves review only of a state court's decision, not the written opinion explaining the decision), *cert. filed March 14, 2011 (No. 10-9511)*; *St. Aubin v. Quarterman*, 470 F.3d 1096, 1100 (5th Cir. 2006)(holding Section 2254(d) permits a federal habeas court to review only a state court's decision and not the written opinion explaining that decision), *cert. denied*, 550 U.S. 921 (2007).

D.   AEDPA Analysis

   1.   Failure to Investigate & Present Mitigating Evidence

      a.   No Deficient Performance

While petitioner presented the state habeas trial court with several affidavits from petitioner's family members and other documents purporting to describe the conditions under which petitioner was raised from age four to eighteen, none of those affidavits include any assertions that any members of petitioner's family ever communicated the gist of that information to petitioner's investigator or trial counsel.  On the contrary, in her affidavit Yolanda states she did not pass on to petitioner's trial counsel any of the information about petitioner's background included in her affidavit.[196] Petitioner's mother's affidavit is sufficiently ambiguous with regard to whether she was ever contacted by petitioner's defense

---

[196] State Habeas Transcript, Volume II, at p. 255.

96

team as to render eminently reasonable the state habeas court's factual finding that petitioner's counsel did, in fact, make contact with her prior to the punishment phase of trial.[197]

While complaining about the alleged failure of petitioner's defense team to contact members of petitioner's family, this aspect of petitioner's multi-faceted ineffective claims herein ignores the fact petitioner was interviewed by no less than three different mental health clinicians, i.e., Dr. Martinez, Dr. Cantu, and Dr. Arambula, all of whom petitioner's trial counsel called to testify on petitioner's behalf at the punishment phase of petitioner's trial.[198]  Petitioner furnished each of these

---

[197] More specifically, petitioner's mother stated in her affidavit that she could not remember if petitioner's attorneys contacted her by telephone in Nuevo Laredo but that she did not go to petitioner's trial because no one ever explained to her why her presence was necessary. State Habeas Transcript, Volume II, at p. 247.  While Martha Hernandez Llanas' affidavit does detail the squalid, almost subsistence conditions under which petitioner was raised, at no point therein does petitioner's mother indicate that she or any other member of her family ever communicated that information to petitioner's defense team or were prepared to testify about same had they been called to do so at petitioner's capital murder trial.  In contrast, petitioner's trial counsel both swore in their affidavits that they or their investigator did contact petitioner's family, they did make arrangements for petitioner's mother to attend petitioner's trial, but she chose not to attend, citing health concerns. State Habeas Transcript, Volume III, at pp. 422, 427.

[198] S.F. Trial, Volume 21, testimony of Dr. Gilbert Martinez, at pp. 100-31, 193-97; testimony of Dr. Robert E. Cantu, at pp. 131-55; and testimony of Dr. Michael Arambula, at pp. 157-92, 219-30.

mental health experts with a personal history.[199]  Dr. Martinez
testified in great detail during petitioner's state habeas
hearing concerning the information petitioner conveyed to Dr.
Martinez, including the petitioner's account of his own long-term
drug inhalant abuse.[200]  Dr. Martinez's report of January 4, 2000
states petitioner reported he was physically abused by both his
parents and denied the bare necessities.[201]  Thus, there was
evidence in the record from which the state habeas court
reasonably could have determined petitioner's trial counsel were
aware of the dire circumstances of petitioner's childhood, even
without personally interviewing each member of petitioner's
family.  Petitioner does not allege any facts showing he
concealed from Dr. Martinez, Dr. Arambula, or Dr. Cantu the
painfully difficult circumstances of petitioner's childhood.

     Given the highly deferential standard of review mandated by
the AEDPA, the determination by the state habeas court that
petitioner's trial counsel's investigation into petitioner's
background did not fall below an objective level of
reasonableness was itself objectively reasonable.  The Texas

_____

     [199] S.F. Trial, Volume 21, testimony of Dr. Gilbert Martinez,
at p. 102; testimony of Dr. Robert E. Cantu, at p. 134; and
testimony of Dr. Michael Arambula, at p. 158.

     [200] S.F. State Habeas Hearing, Volume 4 of 6, testimony of
Dr. Gilbert Martinez, at pp. 12-16, 30-32.

     [201] State Habeas Transcript, Volume II, at pp. 222-23.

Court of Criminal Appeals decision on the merits that this aspect of petitioner's ineffective assistance claim failed to satisfy the deficient performance prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence actually presented in the petitioner's trial and state habeas corpus proceedings.[202]

The remaining question is whether the ensuing decision by petitioner's trial counsel not to present evidence during the punishment phase of petitioner's capital trial of petitioner's abject childhood poverty and history of extreme physical and emotional abuse by petitioner's parents was objectively reasonable. The state habeas trial court issued no findings of fact nor any conclusions of law specifically addressing this aspect of petitioner's *Wiggins* claim. Therefore, this Court must determine *de novo* whether the decision by petitioner's trial counsel not to introduce evidence of petitioner's history of

---

[202] In the course of making this determination, this Court has focused exclusively upon the record evidence before the state habeas court. *See Cullen v. Pinholster*, ___ U.S. at ___ , 131 S.Ct. at 1400 ("evidence later introduced in federal court is irrelevant to §2254(d)(1) review"). Thus, this Court's conclusion that the state habeas court reasonably concluded petitioner's trial counsel did not render ineffective assistance in connection with said counsels' investigation of petitioner's background is premised upon the evidence that was actually before the state habeas court.

childhood abuse and abject poverty caused the performance of said counsel to fall below an objective level of reasonableness. *See Porter v. McCollum*, ___ U.S. at ___, 130 S.Ct. at 452 (holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis). In the course of this determination, this Court will consider all of the specific factual allegations and evidence now before this Court.[203]

Fortunately, this is not a complex determination. There were readily apparent practical roadblocks, as well as potential tactical pitfalls, in attempting to pursue a trial strategy of appealing to the emotions of petitioner's capital sentencing

---

[203] Because this Court has undertaken a *de novo* examination of the remaining aspects of petitioner's second claim for relief herein, this Court has considered all of the specific factual allegations and evidence now before this Court relevant to petitioner's second claim herein. The statements of Rafaela Segura Guerra, Enedelia Lopez Vasquez, Sara Alicia Herrera Saldivas, and Ceclia Solorzano attached as Exhibit nos. 1-4 to petitioner's Amended Petition for a Writ of Habeas Corpus, docket entry no. 48, furnish a few additional details concerning the abject poverty in which petitioner grew up. Primarily, however, these statements merely reiterate the petitioner's siblings' testimony during petitioner's state habeas corpus hearing concerning (1) the abject poverty in which the Hernandez Llanas family resided during petitioner's childhood and (2) the severe physical and emotional abuse directed toward petitioner by his mother during petitioner's childhood. Interestingly, in contrast to the testimony of petitioner's siblings, these statements from neighbors and relatives of the Hernandez Llanas family seem to attempt to absolve petitioner's father of any alleged abuse directed toward petitioner.

jury.  One of the first is the question of how petitioner's trial counsel could have presented evidence of petitioner's abused and deprived childhood without also opening the door to evidence that would have all but convinced petitioner's jury that petitioner was raised in such a horrible environment that petitioner was practically destined to become a violent predator.  Had petitioner's trial counsel called petitioner to testify about petitioner's abused and deprived childhood, petitioner would have been subject to cross-examination about a wide range of criminal conduct, including petitioner's abduction and sexual assault of a fifteen year old.  Had petitioner's trial counsel attempted to call petitioner's mother to testify about the abject poverty in which petitioner grew up, she would have been subject to impeachment based her violent abuse of her children, especially her extreme physical abuse of petitioner.  Had petitioner's trial counsel called petitioner's brother Jorge to testify at petitioner's trial, that witness would have been subject to impeachment based upon the incident in which Jorge and petitioner beat their pregnant sister Adelita so badly she was hospitalized for three days and feared for her life to the extent she moved out of the family home at age fifteen.  Had petitioner's trial counsel called petitioner's sister Yolanda to testify about the circumstances of petitioner's childhood, she would have been subject to impeachment based upon her assertions that she moved

out of the family residence at either age seventeen or nineteen,
i.e., either just before or just after petitioner started school.
In fact, calling any member of petitioner's family to testify at
the punishment phase of petitioner's trial would have likely
opened the door to cross-examination about petitioner's violent
assault upon his sister Adelita and petitioner's violent threat
against his other sister Martha.  Thus, there were potentially
disastrous down-sides to trying to appeal to the jury's
sympathies by presenting the testimony of petitioner's family
showing petitioner was deprived of any physical or emotional
support and was abused by his parents throughout his childhood.[204]

There is also the obviously double-edged nature of such
evidence.  Petitioner's jury might very well have interpreted
testimony showing petitioner's abusive, deprived, childhood as
establishing that petitioner was destined from an early age to
grow into a violent adult.  The extreme physical and emotional
abuse to which petitioner's mother subjected petitioner on an
almost daily basis could logically be expected to cause violent

---

[204] Had petitioner's trial counsel attempted to call any of
the four neighbors or relatives who furnished the affidavits
attached as Exhibit nos. 1-4 to petitioner's *Amended Petition*,
those witnesses would likely have placed the lion's share of the
blame for petitioner's difficult, abused, childhood on
petitioner's mother, as they did in their affidavits.  They would
have offered very little new information regarding petitioner's
childhood beyond that furnished by the petitioner's siblings and
neighbor who testified at petitioner's state habeas corpus
hearing.

resentment within petitioner.  In fact, the picture of
petitioner's childhood painted during petitioner's first state
habeas corpus proceeding (and confirmed by the petitioner's new
evidence) is so utterly bleak and bereft of hope it would likely
have furnished a shrewd prosecutor with compelling evidence from
which to argue petitioner was molded by his own family into a
person without a conscience who posed a substantial risk of
future violence.

Whatever sympathy for petitioner evidence showing that he
was an abused, neglected, child, might have engendered within
petitioner's capital sentencing jury, the reality was, at the
time of petitioner's capital murder trial, petitioner was no
longer a child.  Instead, by the time the punishment phase of
petitioner's capital murder trial began, petitioner's jury had
already convicted petitioner of a violent, unprovoked, murder,
the heinous nature of which petitioner exacerbated by repeatedly
sexually assaulting his murder victim's spouse in the hours
immediately after the murder.  By the conclusion of the
prosecution's case at the punishment phase of petitioner's
capital murder trial, the jury could not help but be fully
cognizant that the person seated before them was not an innocent
child; instead, he was a violent predator with a history of
multiple murders and violent sexual assaults.

Faced with such overwhelming evidence showing petitioner's propensity for violence, instead of attempting to appeal to the sympathies of petitioner's capital sentencing jury, petitioner's trial counsel chose to present three mental health experts who testified, collectively, that (1) petitioner suffered from *treatable* mental illnesses, (2) petitioner displayed very low intellectual abilities, and (3) petitioner would benefit from proper medication and life in a highly structured environment, such as a prison. Given the heinous nature of petitioner's offense and petitioner's history of violent crimes, this Court independently concludes the decision by petitioner's trial counsel to pursue a strategy of appealing to the intellect, rather than the emotions, of petitioner's capital sentencing jury was objectively reasonable under the circumstances of petitioner's capital murder trial.

Criminal defense counsel must deal with their clients as they find them. Petitioner's propensity for violence was well-established by the evidence presented throughout petitioner's capital murder trial. Additionally, there is no evidence currently before this Court showing petitioner had ever made a sincere expression of contrition or remorse for any of his criminal conduct. Under these circumstances, there were readily cognizable reasons why petitioner's trial counsel could have reasonably concluded an appeal to the jury's sympathies based

upon petitioner's horribly abused and deprived childhood could do petitioner as much harm as good.

This Court concludes the decision by petitioner's trial counsel not to present evidence of petitioner's abused and deprived childhood during the punishment phase of petitioner's capital murder trial did not cause the performance of petitioner's trial counsel to fall below an objective level of reasonableness.

b. No Prejudice

Likewise, because the state habeas trial court made no effort to address the prejudice prong of *Strickland* in connection with this aspect of petitioner's ineffective assistance claims, this Court's analysis of this prong is necessarily *de novo*. *See Rompilla v. Beard*, 545 U.S. at 390, 125 S.Ct. at 2467 (holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice).

It is important to remember that, by the punishment phase of petitioner's trial, petitioner's jury had already convicted petitioner of having murdered Glen Lich in a particularly brutal manner in an unprovoked, premeditated, attack. The level of violence inflicted upon Glen Lich was far beyond that necessary to disable or even kill him. There was also uncontradicted

evidence presented during the guilt-innocence phase of petitioner's capital murder trial showing (1) petitioner planned weeks prior to the murder to steal Lich's vehicle so petitioner could sell it, (2) immediately after the murder, petitioner sexually assaulted Mrs. Lich at least four times, (3) during those sexual assaults, petitioner demanded money from Mrs. Lich and terrorized Mrs. Lich by threatening to harm her daughter (by name) and elderly mother (who was sleeping nearby), and (4) when confronted by Sheriff's deputies in the hours after the murder, petitioner violently resisted arrest.

Furthermore, by the time the state rested at the punishment phase of petitioner's capital murder trial, there was also uncontradicted evidence before the jury showing (1) petitioner had previously stabbed another man outside a bar, (2) at the time of petitioner's murder of Glen Lich, petitioner was a fugitive from justice, having escaped from custody while serving a 25-year sentence in Mexico for homicide, (3) while in custody, petitioner was found on several occasions in the possession of homemade weapons, and (4) a few months before the murder of Glen Lich, petitioner employed deception to abduct a fifteen-year-old girl, drive her to an isolated location, and sexually assault her at knife point, in a manner similar to the way petitioner sexually assaulted Mrs. Lich.

Finally, the only Special Issues before the jury at the punishment phase of petitioner's capital murder trial inquired whether (1) there was a probability petitioner would commit criminal acts of violence that would constitute a continuing threat to society and (2) whether, considering all the evidence, including the circumstances of the offense and petitioner's character, background, and personal moral culpability, there were sufficient mitigating circumstances to warrant a sentence of life in prison, rather than a death sentence.[205]

Having reviewed the entirety of the records from petitioner's trial, direct appeal, and multiple state habeas corpus proceedings, as well as all the new documentation submitted by petitioner as attachments and exhibits to his pleadings herein, this Court concludes there is no reasonable probability that, but for the failure of petitioner's trial counsel to present double-edged, potentially mitigating, evidence detailing petitioner's abused and deprived childhood, petitioner's capital sentencing jury would have answered either of the capital sentencing Special Issues differently.

Furthermore, any appeal to the jury's sympathy founded upon evidence showing petitioner's abused, deprived, childhood would have necessarily been blunted by the absence of any evidence in the record showing petitioner had ever expressed remorse or

---

[205] Trial Transcript, Volume II, at p. 316.

sincere contrition for his murder of Glen Lich or any of petitioner's other criminal offenses. While petitioner did express some remorse for the murder during his two audio-recorded statements given the day after the murder, (1) during the first of those statements, petitioner gave a false name, (2) petitioner claimed in both his statements that he only struck Glen Lich once (in sharp contrast to the uncontradicted trial testimony of the medical examiner that Glen Lich was struck multiple times - possibly as many as 17 - and the numerous graphic photographs admitted into evidence during trial bearing mute testimony to the extensive damage to Glen Lich's head done by his murderer), (3) in both his recorded statements, petitioner denied he sexually assaulted Mrs. Lich more than once, and (4) in both his statements petitioner claimed to have been intoxicated at the time of the murder and sexual assaults upon Mrs. Lich (despite her trial testimony that she smelled no liquor on petitioner's breath). Thus, petitioner's tape-recorded statements consisted of petitioner's attempts to diminish his own criminal responsibility, not accept responsibility therefor. Neither of petitioner's largely self-serving tape-recorded statements presented a sincere expression of contrition or remorse for petitioner's crimes on the night of October 14-15, 1997.

Given the lack of any evidence of genuine remorse or sincere contrition in the record now before this Court, this Court

concludes *de novo* there is no reasonable probability that, but for the failure of petitioner's trial counsel to present evidence of petitioner's abused and deprived childhood, the outcome of the punishment phase of petitioner's trial would have been different. According, despite *de novo* review, petitioner's *Wiggins* claim fails to satisfy the prejudice prong of *Strickland*.

   2.   Failure to Challenge Stabbing Conviction

       a.   Procedural Default on Unexhausted Claim

Insofar as petitioner argues his trial counsel rendered ineffective assistance by failing to challenge the prosecution's evidence showing petitioner stabbed a man outside a bar a few months prior to petitioner's murder of Glen Lich, two procedural hurdles bar federal habeas review of the merits of this claim.

First, it is well-settled a federal habeas petitioner's failure to exhaust available state habeas remedies (i.e., failure to "fairly present" his claim to the state courts) bars federal habeas review of said claim absent a showing of cause and actual prejudice or a fundamental miscarriage of justice. *See Rocha v. Thaler*, 626 F.3d 815, 820-23 (5th Cir. 2010)(holding a petitioner presenting an unexhausted claim must show cause and actual prejudice or a fundamental miscarriage of justice as prerequisites to obtaining federal habeas review of the merits of his unexhausted claim), *cert. filed March 17, 2011 (no. 10-9659)*; *Woodfox v. Cain*, 609 F.3d 774, 793 (5th Cir. 2010)(holding an

unexhausted claim could not form the basis for federal habeas relief). Petitioner has filed three state habeas corpus actions but has never "fairly presented" any state court with his complaint about his trial counsels' failure to challenge the prosecution's evidence of petitioner's guilt in connection with the stabbing of Cesareo Ayala on August 3, 1997.

This Court concludes that if petitioner were to file a fourth state habeas corpus application raising the same challenge to his trial counsels' performance arising from said counsels' failure to challenge the prosecution's evidence of petitioner's guilt in connection with the bar stabbing, a Texas habeas court would not likely permit consideration of the merits of that claim. *See Williams v. Thaler*, 602 F.3d 291, 305-06 (5th Cir. 2010)(discussing Article 11.071, §§(a)(1)-(3) of the Texas Code of Criminal Procedure and its limitations upon successive state habeas corpus applications), *cert. denied*, ___ U.S. ___, 131 S.Ct. 506, 178 L.Ed.2d 376 (2010); *Hughes v. Dretke*, 412 F.3d 582, 595 (5th Cir. 2005)(procedural bar doctrine applies to unexhausted claims if state court likely would dismiss a successive habeas application under Article 11.071), *cert. denied*, 546 U.S. 1177 (2006). This Court concludes a Texas habeas court would likely dismiss a fourth state habeas application presented by petitioner urging this same complaint about the failure of petitioner's trial counsel to challenge the

prosecution's evidence of petitioner's responsibility for the stabbing in question.

Petitioner has made no effort to establish cause or actual prejudice for his failure to raise this same ineffective assistance claim in any of his previous state habeas corpus proceedings or to satisfy the fundamental miscarriage of justice exception to the procedural default doctrine. Thus, petitioner has procedurally defaulted on said claim.

Second, absent circumstances not presented by petitioner herein, 28 U.S.C. Section 2254(b)(1) precludes granting federal habeas relief on the merits of any claim for which state court remedies have not been exhausted.

         b. <u>No Merits</u>

Alternatively, Section 2254(b)(2) authorizes this Court to deny relief on an unexhausted claim which lacks merit.

         (1) <u>No Deficient Performance</u>

This Court independently determines there was nothing objectively unreasonable with the decision by petitioner's trial counsel not to challenge the prosecution's evidence showing petitioner stabbed bar patron Cesareo Ayala on August 3, 1997. Petitioner entered a guilty plea to the aggravated assault charge which arose out of that stabbing incident and was serving a term of incarceration for that offense at the time of petitioner's capital murder trial.

Petitioner's federal habeas counsel argues the prosecution's evidence of petitioner's guilt of this offense should have been challenged at trial because (1) one of the prosecution's witnesses who testified she saw petitioner do the stabbing, i.e., Maria Del Carmen Serrano, was biased because her own husband had been arrested for the offense, and (2) the stabbing victim identified Serrano's husband, i.e., Francisco Espino, as his assailant. Both of these arguments ignore the fact the petitioner pled guilty to the stabbing in question and the prosecution had a plethora of documentary evidence establishing the fact of petitioner's guilty plea to that offense at its disposal at the time of petitioner's trial. Furthermore, there is no evidence currently before this Court showing petitioner himself has ever recanted or withdrawn his judicial confession to having committed the stabbing in question.

A prosecutor, confronted with an attempt by petitioner to deny responsibility for the stabbing of Ayala by attacking the credibility of Serrano or relying upon Ayala's identification of Espino as his assailant would likely have argued to the jury (1) the fact the petitioner pled guilty to the offense in question eliminated any genuine doubt as to the responsible party's identity, (2) Ayala's mistaken selection of Espino as his assailant merely emphasized the traumatic impact petitioner's violent assault had upon the victim, and (3) petitioner

volunteered to a Kerr County jail guard that petitioner was going to take responsibility for the stabbing. Petitioner's trial counsel vigorously cross-examined Serrano, obtaining concessions that Serrano's husband had been arrested for the stabbing, Serrano misled police when questioned regarding what she saw the night of the stabbing, and Serrano had herself been deported for her role in the bar-fight.[206] There is no evidence now before this Court suggesting Kerr County jail guard Pedro B. Garcia, Jr. inaccurately recounted his conversation with petitioner regarding the petitioner's role in the Ayala stabbing.

Under such circumstances, this Court independently concludes the decision by petitioner's trial counsel not to challenge the prosecution's evidence of petitioner's responsibility for the stabbing at the bar fell well within the broad range of professionally competent, objectively reasonable, professional legal representation.

(2) No Prejudice

Furthermore, this Court concludes there is not a reasonable probability that, but for the failure of petitioner's trial counsel to challenge the prosecution's evidence showing petitioner's responsibility for the bar stabbing, the outcome of

---

[206] S.F. Trial, Volume 20, testimony of Maria Del Carmen Serrano. at pp. 43-45.

the punishment phase of petitioner's trial would have been any
different.

Petitioner pled guilty to that offense.  Petitioner has
never recanted his judicial confession to that offense or
withdrawn his guilty plea.  Challenging the prosecution's
evidence in the manner now urged by petitioner's federal habeas
counsel would not have altered those two facts.  Nor would
challenging the prosecution's evidence concerning the stabbing
have impacted the prosecution's evidence showing the horrific
details of petitioner's murder of Glen Lich, petitioner's
multiple sexual assaults on Lera Lich, and petitioner's abduction
and sexual assault of a fifteen-year-old girl.  Nor would
challenging the evidence concerning the stabbing have altered the
fact that, at all times relevant to petitioner's capital offense,
petitioner was in this country illegally after having escaped
from custody while serving a 25-year term of imprisonment for
homicide.  Challenging the prosecution's evidence regarding the
stabbing would not, in all reasonable probability, have had any
impact on the jury's verdict at the punishment phase of trial.
Even without any mention of the Ayala stabbing, petitioner's jury
was made well aware of petitioner's long record of violent acts.

    3.    Conflict of Interest Complaint

        a.    Procedural Default

114

Petitioner first presented his complaint about his trial co-counsel's alleged conflict of interest to the state habeas court in his third state habeas corpus application,[207] which the Texas Court of Criminal Appeals dismissed on state writ-abuse principles. *Ex parte Ramiro Hernandez Llanas*, 2008 WL 1240353 (Tex. Crim. App. March 31, 2010). Petitioner's state procedural default bars federal habeas review of this claim. *See Moore v. Quarterman*, 534 F.3d 454, 464 (5th Cir. 2008)(Texas' abuse of the writ doctrine is a valid state procedural bar, foreclosing federal habeas review); *Coleman v. Quarterman*, 456 F.3d 537, 542 (5th Cir. 2006)(holding the same), *cert. denied*, 549 U.S. 1343 (2007).

    b.  No Merit

Alternatively, this Court concludes petitioner's conflict of interest complaint does not warrant federal habeas corpus relief.

        (1) *Cuyler* Inapplicable

The Sixth Amendment right to counsel includes the right to representation that is free from any conflict of interest. *United States v. Garcia-Jasso*, 472 F.3d 239, 243 (5th Cir. 2006); *United States v. Vasquez*, 298 F.3d 354, 360 (5th Cir. 2002), *cert. denied*, 537 U.S. 1024 (2002); *United States v. Vaquero*, 997 F.2d 78, 89 (5th Cir. 1993), *cert. denied*, 510 U.S. 1016 (1993).

---

[207] Transcript Third State Habeas Corpus Proceeding, at pp. 16-29.

A conflict of interest exists when defense counsel places himself in a position conducive to divided loyalties. *United States v. Vasquez*, 298 F.3d at 360; *United States v. Vaquero*, 997 F.2d at 89. "In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980); *United States v. Infante*, 404 F.3d 376, 390-91 (5th Cir. 2005); *Ramirez v. Dretke*, 396 F.3d 646, 649 (5th Cir. 2005).

Under the *Cuyler* test, an "actual conflict" exists when defense counsel is compelled to compromise his duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client. *Perillo v. Johnson*, 205 F.3d at 781. A defendant must show more than a speculative or potential conflict. *United States v. Garcia-Jasso*, 472 F.3d at 243; *United States v. Infante*, 404 U.S. at 391. The defendant must demonstrate that his counsel made a choice between possible alternative courses of action; if he did not make such a choice, the conflict remained hypothetical. *United States v. Garcia-Jasso*, 472 F.3d at 243. The mere possibility of a conflict, absent a showing that the attorney actively represented conflicting interests, is not sufficient. *Cuyler v. Sullivan*, 446 U.S. at 350, 100 S.Ct. at

116

1719 ("But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance."); *United States v. Villarreal*, 324 F.3d 319, 327 (5th Cir. 2003).

"An adverse effect on counsel's performance may be shown with evidence that counsel's judgment was actually fettered by concern over the effect of certain trial decisions on other clients." *United States v. Infante*, 404 F.3d at 393; *Perillo v. Johnson*, 205 F.3d at 807. The defendant must establish adverse effect by demonstrating there was some plausible alternative defense strategy that could have been pursued, but was not, because of the actual conflict. *United States v. Infante*, 404 F.3d at 393; *Perillo v. Johnson*, 205 F.3d at 781; *Beathard v. Johnson*, 177 F.3d 340, 345 (5th Cir. 1999), *cert. denied*, 528 U.S. 954 (1999). "To prevail, a defendant must identify 'some plausible defense strategy or tactic that might have been pursued but was not, because of the conflict of interest.'" *United States v. Villarreal*, 324 F.3d at 327; *Hernandez v. Johnson*, 108 F.3d 554, 560 (5th Cir. 1997), *cert. denied*, 522 U.S. 984 (1997); *Perillo v. Johnson*, 79 F.3d 441, 449 (5th Cir. 1996).

In *Beets v. Scott*, 65 F.3d 1258 (5th Cir. 1995)(*en banc*), *cert. denied*, 517 U.S. 1157 (1996), the Fifth Circuit rejected a broad-ranging application of the *Cuyler* standard to complaints of

ineffective assistance arising from alleged conflicts of interest by defense counsel. *See Beets v. Scott*, 65 F.3d at 1268, (holding that not every potential conflict, even in multiple client representation cases, is an "actual conflict' for Sixth Amendment purposes). Subsequently, the Fifth Circuit has consistently refused to apply the *Cuyler* test outside the context of multiple representation situations. *See*, *e.g.*, *United States v. Garza*, 429 F.3d 165, 172 (5th Cir. 2005)("*Cuyler* only applies where an attorney was effectively, if not technically, representing multiple clients in the same proceeding."), *cert. denied*, 546 U.S. 1220 (2006).

Here, petitioner argues his co-counsel at trial, attorney Steven J. Pickell, had previously represented Francisco Espino in connection with the same bar stabbing to which petitioner entered a guilty plea prior to attorney Pickell assuming the role of petitioner's lead counsel in petitioner's capital murder proceeding. Petitioner argues further that, but for this fact, his trial counsel would have more aggressively challenged the prosecution's evidence showing petitioner's guilt in the bar stabbing case. Petitioner presented the state courts, and presents this Court, with no fact-specific allegations, much less any evidence, showing petitioner was prepared to recant his judicial confession to the stabbing or to otherwise withdraw his guilty plea to that offense. In fact, petitioner was serving a

118

term of imprisonment for aggravated assault in connection with the bar stabbing at the time of petitioner's capital murder trial. There is no factual allegation, much less any evidence, currently before this Court suggesting petitioner has ever challenged the factual or legal validity of his conviction in the bar stabbing case, either on direct appeal or in a state habeas corpus proceeding. Nor has petitioner alleged any facts, much less presented any evidence, showing he was prepared to take the stand during the punishment phase of his capital murder trial and to recant his judicial confession or to seek to withdraw his guilty plea in the bar stabbing case. Thus, petitioner does not allege that he was prepared at the time of his capital murder trial to take the stand and contradict the testimony of either Maria Del Carmen Serrano (that she saw petitioner stab the victim in the bar fracas) or the Kerr County jail employee (who testified petitioner informed him that petitioner was the person actually responsible for the stabbing for which Francisco Espino had been arrested).

Finally, petitioner has failed to present this Court with any fact-specific allegations, or any affidavits, establishing there was any other witness available at the time of petitioner's trial who could have countered the eyewitness testimony of Maria Del Carmen Serrano, who testified she saw petitioner commit the stabbing in question. Petitioner complains that his trial

counsel failed to seek to admit police reports showing the stabbing victim initially identified Francisco Espino as his assailant. But petitioner does not suggest how those rank hearsay police reports could have been admitted into evidence. Since neither Serrano nor Pedro B. Garcia, Jr. (the Kerr County Jail employee to whom petitioner confessed his involvement in the Ayala stabbing) wrote the reports in question, the reports' value to "impeach" those two witnesses is dubious, at best. Petitioner has not alleged any facts showing that Cesareo Ayala was available to testify at the time of petitioner's capital murder trial or that Ayala would have identified Espino as his assailant if called to testify at petitioner's trial about the bar stabbing incident. Moreover, as explained above, petitioner does not explain how the traumatized Ayala's mis-identification of his assailant invalidates petitioner's subsequent judicial confession and guilty plea to the aggravated assault charge arising out of stabbing incident.

Under such circumstances, petitioner has failed to allege any specific facts, much less furnish any evidence, showing the potential or hypothetical conflict of interest about which petitioner complains ever blossomed into an actual conflict of interest. Petitioner has not alleged any specific facts, much less presented this Court with any evidence, showing his trial counsel ever had available to them the means to attack the

prosecution's evidence of petitioner's guilt in the bar stabbing incident other than cross-examining prosecution witnesses Serrano and the Kerr County Jail employee to whom petitioner confessed his responsibility for the stabbing. Petitioner's trial counsel did cross-examine Serrano and elicited admissions from her showing her relationship with Francisco Espino, the person initially arrested for the bar stabbing, as well as her admission she misled police about the stabbing incident when they first questioned her.[208]

While petitioner argues generically about his trial counsel's failure to "investigate" the bar stabbing, at no point does petitioner offer any clue as to what *admissible* evidence existed at the time of petitioner's capital murder trial which petitioner's trial counsel could have used to further challenge the credibility of the punishment-phase testimony of Serrano or Pedro B. Garcia, Jr. (the Kerr County jail employee to whom petitioner confessed his responsibility for the bar stabbing).

Petitioner alleges no specific facts, much less presents any evidence, showing he was ready, willing, or able to take the stand at the punishment phase of his capital murder trial and assert that he had been coerced, duped, or convinced to plead guilty to the bar stabbing by either Serrano, Espino, Pickell, or

---

[208] S.F. Trial, Volume 20, testimony of Maria Del Carmen Serrano, at pp. 42-45.

any combination thereof.  Moreover, petitioner has never alleged
any specific facts, much less furnished any admissible evidence,
showing petitioner was not guilty of the bar stabbing.  Finally,
as explained above, petitioner does not allege any specific facts
showing he has ever been ready, willing, or able to recant his
judicial confession to the stabbing or to withdraw his guilty
plea to the aggravated assault charge arising therefrom.

Petitioner does not allege that he was ready, willing, and
able to take the stand during the punishment phase of his trial
and deny making the inculpatory statements about which jail guard
Garcia had testified.  Nor does petitioner allege any facts
showing there was any other witness available at the time of
petitioner's trial who could have controverted the testimony of
Garcia about petitioner's confession or Serrano's punishment-
phase testimony identifying petitioner as the person who stabbed
Ayala.  Thus, petitioner has failed to allege any specific facts
showing that his trial counsel was ever placed in the posture of
having to choose whether to call witnesses or to present
admissible evidence which might have undermined Garcia's
testimony or the punishment-phase testimony of Serrano.
Petitioner has failed to allege specific facts showing that his
trial counsel had any viable means available with which to
challenge the punishment-phase testimony of Serrano or Garcia.
Under such circumstances, petitioner has failed to show that any

122

potential or hypothetical conflict of interest involving attorney
Pickell rose into an actual conflict of interest.  Accordingly,
petitioner's complaints of "conflict of interest" by his trial
counsel fall outside the situations in which the Fifth Circuit
applies the *Cuyler* test. *United States v. Garza*, 429 F.3d at 172;
*Perillo v. Johnson*, 205 F.3d at 781; *Hernandez v. Johnson*, 108
F.3d at 559; *Beets v. Scott*, 65 F.3d at 1268.

Petitioner also argues his trial counsel should have
attempted to impeach Serrano's guilt-innocence phase testimony in
which she recounted that petitioner called her and confessed to
having killed a man and then having raped the man's wife.[209]
However, petitioner has not offered this Court any fact-specific
allegations, much less an affidavit, indicating petitioner was
ready, willing, or able to take the stand at the guilt-innocence
phase of his trial and deny having made those inculpatory
statements to Serrano.  Petitioner does not allege any facts
showing how else it would have been possible for his trial
counsel to have "impeached" Serrano's guilt-innocence phase
testimony concerning petitioner's confession to Serrano about the
Lich murder and sexual assault.  Petitioner's confession to
Serrano of guilt in connection with the Glen Lich murder and Lera
Lich sexual assault was unrelated factually to the issue of
petitioner's involvement in the bar stabbing.

---

[209] *Amended Petition*, at p. 138 n.30.

In sum, petitioner has not identified any admissible evidence, available at the time of the punishment phase of petitioner's capital murder trial, which petitioner's trial counsel could have used to challenge the prosecution's evidence showing petitioner was guilty of the Ayala stabbing. Petitioner has alleged no specific facts, much less furnished any admissible evidence, showing petitioner was not responsible for the injuries Cesareo Ayala sustained on August 3, 1997.

(2) *Cronic* Inapplicable

Petitioner also seeks to invoke a second exception to the *Strickland* standard of review. In *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), decided the same day as *Strickland*, the Supreme Court held that a presumption of prejudice similar to that recognized in *Cuyler* arises in three narrow circumstances: first, when a criminal defendant is completely denied the assistance of counsel; second, when counsel entirely fails to subject the prosecution's case to meaningful adversarial testing; and finally, where the circumstances are such that even competent counsel very likely could not render effective assistance. *United States v. Cronic*, 466 U.S. at 659, 104 S.Ct. at 2047. As examples of the latter two situations, respectively, the Supreme Court cited the denial of effective cross-examination in *Davis v. Alaska*, 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974)(defendant was denied the

opportunity to cross-examine the prosecution's key witness for bias), and the incendiary circumstances surrounding the trial of the so-called "Scottsboro Boys" addressed in *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932)(no individual attorney was appointed to represent the defendants and trial proceeded after a volunteer attorney from another state appeared on the first day of trial but confessed he had not had an opportunity to prepare for trial). *United States v. Cronic*, 466 U.S. at 659-61, 104 S.Ct. at 2047-48. In a footnote, the Supreme Court recognized the continuing efficacy of its earlier holding in *Cuyler*, presuming prejudice where a defendant establishes an actual conflict of interest adversely affected his counsel's performance. *United States v. Cronic*, 466 U.S. at 661 n.31, 104 S.Ct. at 2048 n.31.

In *Bell v. Cone*, 535 U.S. 685, 695-96, 122 S.Ct. 1843, 1851, 152 L.Ed.2d 914 (2002), the Supreme Court reiterated that the second exception to the requirement of *Strickland* "prejudice" it had envisioned in *Cronic* was limited to situations in which defense counsel *completely* failed to subject the prosecution's case to meaningful adversarial testing. *See Bell v. Cone*, 535 U.S. at 697-98, 122 S.Ct. at 1851-52 (holding complaints about trial counsel's waiver of closing argument at the punishment phase of trial and failure to adduce mitigating evidence insufficient to create a presumption of prejudice absent a

125

showing trial counsel completely failed to challenge the prosecution's case throughout the sentencing proceeding).

The presumption of prejudice recognized in *Cronic* does not apply where the defendant complains of merely shoddy or poor performance by his trial counsel; for a defendant to be entitled to such a presumption, his attorney's failure must be complete. *See Bell v. Cone*, 535 U.S. at 697, 122 S.Ct. at 1851 (holding the presumption applicable only when counsel entirely failed to subject the prosecution's case to meaningful adversarial testing); *United States v. Griffin*, 324 F.3d 330, 364, 364 (5th Cir. 2003)("When the defendant complains of errors, omissions, or strategic blunders, prejudice is not presumed; bad lawyering, regardless of how bad, does not support the *per se* presumption of prejudice."); *Riddle v. Cockrell*, 288 F.3d 713, 718 (5th Cir. 2002)(holding "constructive denial of counsel" sufficient to support a presumption of prejudice arises only when counsel was absent from the courtroom, there was an actual conflict of interest, or there was official interference with the defense), *cert. denied*, 537 U.S. 953 (2002); *Gochicoa v. Johnson*, 238 F.3d 278, 284 (5th Cir. 2000)("'A constructive denial of counsel occurs in only a very narrow spectrum of cases where the circumstances leading to counsel's ineffectiveness are so egregious that the defendant was in effect denied any meaningful assistance at all.' We have found constructive denial in cases

involving the absence of counsel from the courtroom, conflicts of interest between defense counsel and the defendant, and official interference with the defense; and have stated that constructive denial will be found when counsel fails to subject the prosecution's case to any meaningful adversarial testing."(C*itations and footnote omitted*)).

At all times throughout his capital murder proceedings, petitioner was represented by his two defense counsel, attorneys Steven J. Pickell and J.A. Garcia. Thus, even assuming Pickell was somehow rendered constructively "absent" by virtue of Pickell's prior representation of Francisco Espino, petitioner was not completely devoid of legal representation; the first *Cronic* exception to *Strickland* has no application to petitioner's trial.

Petitioner's allegations that his trial counsel inadequately investigated the stabbing incident, failed to interview potential witnesses, failed to discover and develop exculpatory and mitigating evidence, and failed to present unspecified evidence showing petitioner was not guilty of the bar stabbing incident do not fall within the narrow scope of the presumed prejudice rule announced in *Cronic*. *Bell v. Cone*, 535 U.S. at 697, 122 S.Ct. at 1851 (holding the presumption applicable only when counsel entirely failed to subject the prosecution's case to meaningful

adversarial testing).  The second *Cronic* exception to *Strickland* does not apply to petitioner's trial.

Finally, petitioner presented the state habeas court (and presents this Court) with no admissible evidence showing Pickell's prior representation of Espino had any deleterious effects on Pickell's performance during petitioner's capital murder trial analogous to the extreme situations in which the Supreme Court has held the third *Cronic* exception to *Strickland* applicable.  On the contrary, the record before this Court establishes that, while represented by counsel other than attorney Pickell, petitioner entered a guilty plea to the aggravated assault charge arising from the bar stabbing incident and petitioner has never wavered in his adherence to the judicial confession petitioner made as a part of his guilty plea to that charge.

4.  <u>Conclusion</u>

Petitioner alleged no specific facts, much less furnished the state habeas court with any evidence, showing petitioner's trial counsel were unaware of petitioner's horribly abused and deprived childhood.  Dr. Martinez was certainly aware of those facts and freely consulted with petitioner's trial counsel about petitioner's mental health and background.  Therefore, the state habeas court's rejection on the merits of this aspect of petitioner's ineffective assistance claims herein represents an

eminently reasonable application of the first prong of
*Strickland*.  The state habeas court reasonably concluded the
scope of petitioner's trial counsel's investigation into
petitioner's background was itself objectively reasonable.

Moreover, this Court independently concludes petitioner's
complaint about his trial counsel's failure to present evidence
of petitioner's abused and deprived childhood, as opposed to
petitioner's complaint about his trial counsel's alleged failure
to investigate petitioner's background, fails to satisfy the
deficient performance prong of *Strickland*.  There were a host of
reasonable trial strategies available to petitioner's trial
counsel which would have involved not making a naked emotional
appeal for sympathy to the petitioner's capital sentencing jury.
Petitioner's trial counsel instead chose to employ a trio of
mental health experts who attempted to admit up front that
petitioner posed a risk of future dangerousness but that, with
proper medication and supervision, petitioner's threat of future
violence could be minimized in an institutional setting.
Petitioner's trial counsel did not abandon petitioner at the
punishment phase of trial.  They presented a trio of mental
health experts who attempted to explain to the jury in a rational
manner how petitioner could have committed such a brutal series
of criminal offenses.

Finally, this Court independently concludes there is no reasonable probability that, but for the failure of petitioner's trial counsel to present evidence detailing the conditions under which petitioner grew up, the outcome of the punishment phase of petitioner's capital murder trial would have been any different. Adopting the strategy petitioner now advocates would have essentially meant conceding an affirmative answer by the sentencing jury to the future dangerousness special issue and would have opened the door to the possible admission of further damaging evidence concerning (1) petitioner's brutal assault (with his brother Jorge) upon their pregnant, fifteen-year-old sister Adelita, (2) petitioner's abuse of alcohol starting at age thirteen, and (3) petitioner's abuse of inhalants beginning during his early teen years.

Petitioner procedurally defaulted on his complaint about his trial counsels' failure to challenge the prosecution;'s evidence showing petitioner stabbed Cesareo Ayala outside a bar on August 3, 1997. Moreover, this Court independently concludes this complaint fails to satisfy both prong of *Strickland* analysis.

Petitioner procedurally defaulted on his conflict of interest claim by virtue of the Texas Court of Criminal Appeals' summary dismissal of same in the course of petitioner's third state habeas corpus proceeding. Moreover, for the reasons discussed above, petitioner's conflict of interest complaint

fails to satisfy either the *Cuyler* or *Cronic* exceptions to the prejudice prong of *Strickland*.

Petitioner's second and third claims in his amended federal habeas corpus petition do not warrant federal habeas relief.

## V. Admission of Mexican Conviction

A.    The Claim

In his fourth claim in his amended federal habeas corpus petition, petitioner argues that the state trial court's admission of documents detailing petitioner's Mexican conviction for murder violated petitioner's right to a fundamentally fair trial and myriad of petitioner's rights recognized by the United States Constitution.[210]

B.    State Court Disposition

Over petitioner's objection, the trial court admitted State Exhibit no. 95, a pen packet from the State of Tamaulipas, Mexico,[211] detailing petitioner's conviction and twenty-five-year sentence, as well as petitioner's subsequent escape from custody while under guard at a hospital.[212]  In addition, Maria Del Carmen Serrano testified at the punishment phase of petitioner's trial that petitioner informed her he had escaped from prison in

---

[210] *Amended Petition*, at pp. 140-68.

[211] S.F. Trial, Volume 24.

[212] An English translation of the pen packet from Mexico appear as State Exhibit no. 94 in S.F. Trial, Volume 24.

Mexico.[213]  Petitioner's teenage rape victim testified petitioner
informed her he had killed people in Mexico.[214]  One of
petitioner's own experts, Dr. Arambula, testified petitioner
stated he had been in prison before for murder and had worked his
way up to become the leader of a prison gang.[215]

Petitioner challenged the admission of the Mexican pen
packet as his second point of error on direct appeal.  The Texas
Court of Criminal Appeals rejected this point of error on the
merits, citing the witnesses to whom petitioner had made
statements about his prior incarceration for murder and
concluding petitioner had alleged no facts showing he was
subjected to any deprivations in the Mexican judicial system of
the procedural protections available under the United States
Constitution.[216]

C.    Clearly Established Federal Law

A federal court may grant habeas relief based on an
erroneous state court evidentiary ruling only if the ruling
violates a specific federal constitutional right or is so

---

[213] S.F. Trial, Volume 20, testimony of Maria Del Carmen
Serrano, at p. 29.

[214] S.F. Trial, Volume 21, testimony of Rachel A.
Charnichart, at p. 29.

[215] S.F. Trial, Volume 21, testimony of Dr. Michael Arambula,
at p. 165.

[216] *Hernandez Llanas v. State*, No., 73,776 (Tex. Crim. App.
December 18, 2002), at pp. 23-24.

egregious it renders the petitioner's trial fundamentally unfair. *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720 (1991); *Darden v. Wainwright*, 477 U.S. 168, 179-83, 106 S.Ct. 2464, 2470-72, 91 L.Ed.2d 144 (1986); *Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007), *cert. denied*, 552 U.S. 1314 (2008); *Brown v. Dretke*, 419 F.3d 365, 376 (5th Cir. 2005), *cert. denied*, 546 U.S. 1217 (2006).

The question before this Court is not whether the state trial court properly applied state evidentiary rules but, rather, whether petitioner's federal constitutional rights were violated by the state trial court's rulings on evidentiary matters. *See Bigby v. Dretke*, 402 F.3d 551, 563 (5th Cir. 2005)(holding federal habeas review of a state court's evidentiary ruling focuses exclusively on whether the ruling violated the federal Constitution), *cert. denied*, 546 U.S. 900 (2005).

D.   AEDPA Analysis

This Court concludes the admission of petitioner's Mexican pen packet did not render petitioner's entire trial fundamentally unfair.  By virtue of the uncontradicted testimony of Dr. Arambula, Maria Del Carmen Serrano, and Rachel Charnichart, it was clear to the jury petitioner had made multiple representations that he had spent time in a Mexican prison. Petitioner did not present the state trial court with any specific factual allegations, much less any evidence, showing

there was anything factually inaccurate contained with his Mexican pen packet.  Petitioner did not allege any specific facts, much less present any evidence, before the state trial court showing he had been subjected to a violation of his individual constitutional rights in connection with the Mexican criminal proceeding that resulted in petitioner's conviction and 25-year sentence for homicide.  For instance, petitioner did not allege that he had been coerced or tricked into confessing or that he had been deprived of any right recognized under United States law, such as the rights to freedom from double jeopardy, etc.  Petitioner has not identified any clearly established federal law making admission of evidence of a criminal conviction from a Mexican court *per se* unconstitutional.

Under such circumstances, admission of the Mexican pen packet and English translation of same did not render petitioner's entire trial fundamentally unfair. *See United States v. Brito-Hernandez*, 996 F.2d 80, 81-82 (5th Cir. 1993)(holding admission of a evidence of a Mexican conviction to impeach a defendant was harmless despite allegations the Mexican conviction was obtained in violation of Double Jeopardy principles).

E.    Harmless Error

Any error in the admission of petitioner's Mexican pen packet was harmless under the applicable legal standard.  Any error made by the state trial court in the course of admitting

the Mexican pen packet was harmless as a matter of law. *See*
*Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 1722,
123 L.Ed.2d 353 (1993)(holding the test for harmless error in a
federal habeas corpus action brought by a state prisoner is
"whether the error had substantial and injurious effect or
influence in determining the jury's verdict").  Several witnesses
testified without contradiction that petitioner had stated he had
spent time in prison in Mexico and that he had killed people in
Mexico.  Petitioner does not allege any specific facts showing
that his Mexican conviction was the product of any procedure that
deprived petitioner of the rights to which he is entitled under
the United States Constitution.  Petitioner has not alleged any
facts showing there was anything factually inaccurate in his
Mexican pen packet or the English translation of same.  Admission
of the Mexican pen packet at the punishment phase of petitioner's
capital murder trial did not have a substantial and injurious
effect on the jury's verdict at that phase of trial.  The jury
was already aware from multiple witnesses of petitioner's
criminal misconduct in Mexico, as well as petitioner's many
violent crimes committed here in the United States.

F.    Conclusion

      The Texas Court of Criminal Appeals' rejection on the merits
in the course of petitioner's direct appeal of petitioner's
complaint about the admission of his Mexican pen packet was

135

neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence actually presented in the petitioner's trial and direct appeal proceedings. Admission of the Mexican pen packet was harmless error, if any. Petitioner's fourth claim herein does not warrant federal habeas corpus relief under the AEDPA.

## VI. *Brady* Claims

A. The Claims

In his fifth claim in his amended petition, petitioner argues the prosecution withheld from petitioner's counsel information showing (1) the victim of the August 3, 1997 bar stabbing incident, Cesareo Ayala, had never identified petitioner as the person who stabbed Ayala and had in fact, identified Francisco Espino as his assailant and (2) Lera Lich did not wish petitioner to receive the death penalty.[217]

B. State Court Disposition

Petitioner did not present either of these two complaints to the state courts until he included them as his second and third claims for relief in his third state habeas corpus application,[218]

---

[217] *Amended Petition*, at pp. 168-78.

[218] Transcript Third State Habeas Corpus Proceeding, at pp. 29-36.

which the Texas Court of Criminal Appeals dismissed under Texas writ-abuse principles. *Ex parte Ramiro Hernandez Llanas*, 2010 WL 1240353 (Tex. Crim. App. March 31, 2010).

C.  Clearly Established Federal Law

As this Court has noted on many occasions, few constitutional principles are more firmly established by Supreme Court precedent than the rule that "'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Banks v. Dretke*, 540 U.S. 668, 691, 124 S.Ct. 1256, 1272, 157 L.Ed.2d 1166 (2004); *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963); *Bartee v. Quarterman*, 574 F.Supp.2d 624, 690 (W.D. Tex. 2008), *CoA denied*, 339 Fed. Appx. 429 (5th Cir. July 31, 2009), *cert. denied*, ___ U.S. ___, 130 S.Ct. 1882, 176 L.Ed.2d 370 (2010); *Moore v. Quarterman*, 526 F.Supp.2d 654, 678-79 (W.D. Tex. 2007); *Berkley v. Quarterman*, 507 F.Supp.2d 692, 746 (W.D. Tex. 2007), *CoA denied*, 310 Fed. Appx. 665 (5th Cir. February 18, 2009), *cert. denied*, ___ U.S. ___, 130 S.Ct. 366, 175 L.Ed.2d 70 (2009).

The Supreme Court has consistently held the prosecution's duty to disclose evidence material to either guilt or punishment, i.e., the rule announced in *Brady v. Maryland*, applies even when there has been no request by the accused. *Banks v. Dretke*, 540

U.S. at 690, 124 S.Ct. at 1272; *Strickler v. Greene*, 527 U.S. 263, 280, 119 S.Ct. 1936, 1948, 144 l.Ed.2d 286 (1999); *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976). This duty also applies to impeachment evidence. *Strickler v. Greene*, 527 U.S. at 280, 119 S.Ct. at 1948; *United States v. Bagley*, 473 U.S. 667, 676 & 685, 105 S.Ct. 3375, 3380 & 3385, 87 L.Ed.2d 481 (1985).

The rule in *Brady* encompasses evidence known only to police investigators and not personally known by the prosecutor. *Strickler v. Greene*, 527 U.S. at 280-81, 119 S.Ct. at 1948; *Kyles v. Whitley*, 514 U.S. 419, 438, 115 S.Ct. 1555, 1568, 131 L.Ed.2d 490 (1995). "[T]he individual prosecutor has a duty to learn of any favorable evidence *known to the others acting on the government's behalf* in this case, including the police." *Strickler v. Greene*, 527 U.S. at 281, 119 S.Ct. at 1948 (emphasis added); *Kyles v. Whitley*, 514 U.S. at 437, 115 S.Ct. at 1567.

Under clearly established Supreme Court precedent, there are three elements to a *Brady* claim: (1) the evidence must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be "material," i.e., prejudice must have ensued from its non-disclosure. *Banks v. Dretke*, 540 U.S. at 691,

124 S.Ct. at 1272; *Strickler v. Greene*, 527 U.S. at 281-82, 119 S.Ct. at 1948. Evidence is "material" under *Brady* where there exists a "reasonable probability" that had the evidence been disclosed the result at trial would have been different. *Banks v. Dretke*, 540 U.S. at 698-99, 124 S.Ct. at 1276.

The Supreme Court has emphasized four aspects of the *Brady* materiality inquiry. First, a showing of materiality does <u>not</u> require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted in the defendant's acquittal. *See United States v. Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383 (expressly adopting the "prejudice" prong of the *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), analysis of ineffective assistance claims as the appropriate standard for determining "materiality" under *Brady*). Second, the materiality standard is *not* a sufficiency of the evidence test. *Kyles v. Whitley*, 514 U.S. at 434-35, 115 S.Ct. at 1566. Third, once materiality is established, harmless error analysis has no application. *Kyles v. Whitley*, 514 U.S. at 435-36, 115 S.Ct. at 1566-67. Finally, materiality must be assessed collectively, not item by item. *Kyles v. Whitley*, 514 U.S. at 436-37, 115 S.Ct. at 1567.

D. <u>Analysis</u>

    1. <u>Procedural Default</u>

The Texas Court of Criminal Appeals' dismissal on state writ-abuse principles of petitioner's *Brady* claims constitutes an insurmountable barrier to this Court's review of the merits of those claims. *See Moore v. Quarterman*, 534 F.3d at 464 (Texas' abuse of the writ doctrine is a valid state procedural bar, foreclosing federal habeas review); *Coleman v. Quarterman*, 456 F.3d at 542 (holding the same); *Aguilar v. Dretke*, 428 F.3d at 533 (the Texas abuse of the writ rule ordinarily is an adequate and independent procedural ground on which to base a procedural default ruling); *Matchett v. Dretke*, 380 F.3d at 848 (violation of the Texas writ-abuse rule ordinarily furnishes an adequate and independent procedural ground which bars federal habeas review of a claim).

2.  <u>No Merit</u>

Alternatively, this Court concludes the information allegedly withheld by prosecutors from petitioner's trial counsel does not satisfy the "materiality" prong of *Brady* analysis.

As was explained above, petitioner alleged no specific facts, and presented the state habeas court with no evidence, showing Cesareo Ayala or any other witness was available to testify at the time of petitioner's capital murder trial that Francisco Espino, rather than petitioner, had actually stabbed Ayala.  Petitioner entered a guilty plea to the charge of aggravated assault arising out of the stabbing of Ayala.  There

140

is no evidence in the record before this Court establishing petitioner has ever recanted his judicial confession or withdrawn his guilty plea to that charge.

Moreover, during the petitioner's capital murder trial, petitioner's jury heard uncontradicted testimony establishing petitioner (1) told multiple persons he had been incarcerated in Mexico, (2) planned to steal his boss's vehicle, (3) lured Glen Lich outside and, shortly thereafter, entered the Lich residence covered in blood, sexually assaulted Mrs. Lich, and threatened Mrs. Lich, her daughter, and elderly mother, (4) ransacked the Lich residence, gathering up valuables in several small bags, (5) violently resisted arrest the night of Glen Lich's murder, (6) abducted and sexually assaulted a fifteen-year-old girl only months before murdering Glen Lich, (7) had repeatedly been found in possession of homemade weapons while in custody, and (8) escaped from custody in Mexico while serving a 25-year sentence for homicide.

At best, the evidence showing that Cesareo Ayala initially identified Francisco Espino as his assailant on August 3, 1997 established only that Ayala was mistaken in his belief as to the identity of his assailant. Given the seriousness of Ayala's injuries (stab wounds to the abdomen and hand), such a mistake is hardly surprising. Moreover, given petitioner's subsequent confession and guilty plea to having stabbed Ayala, which

confession and guilty plea petitioner has never recanted, Ayala's identification of Espino as his assailant fades into virtual irrelevance in terms of the issues before the jury at the punishment phase of petitioner's capital murder trial. Either petitioner was guilty of having stabbed Ayala or petitioner was guilty of having committed perjury. There is absolutely no possibility, much less a reasonable probability that, but for the alleged failure of the prosecution to turn over to petitioner's defense counsel copies of the police reports showing Ayala initially identified Espino as his assailant, the outcome of the punishment phase of petitioner's trial could have been different.

Petitioner's complaint about the alleged failure of prosecutors to disclose to petitioner's trial counsel the feelings of Lera Lich concerning the propriety of petitioner receiving a death sentence likewise lacks any arguable materiality to the issues before the jury at the punishment phase of petitioner's capital murder trial. Contrary to the assumption underlying this aspect of petitioner's *Brady* claims herein, the wishes of a murder victim's family regarding a criminal defendant's sentence are not admissible at the punishment phase of a Texas capital murder trial. *See Simpson v. State*, 119 S.W.3d 26, 272 (Tex. Crim. App. 2003)("The wishes of the victim's family as to the defendant's fate fall beyond the parameters of victim-

impact evidence and are not admissible."), *cert. denied*, 542 U.S. 905 (2004).

Under such circumstances, neither police reports showing Ayala identified Espino as his assailant nor the testimony of Lera Lich regarding her personal wishes as to petitioner's fate were "material" within the meaning of *Brady* to any of the special issues before the jury at the punishment phase of petitioner's capital murder trial.

E.    Conclusion

Petitioner procedurally defaulted on his meritless *Brady* claims.  Petitioner's fifth claim herein does not warrant federal habeas relief.

## VII. Vienna Convention Claim

A.    The Claim

In his sixth claim for relief in his amended petition, petitioner argues Texas law enforcement officials violated petitioner's rights under the Vienna Convention on Consular Relations by (1) interrogating petitioner following petitioner's arrest without first advising petitioner of his right to contact the Mexican consulate immediately upon his arrest and (2) failing to timely notify the Mexican consulate of petitioner's arrest.[219]

B.    State Court Disposition

---

[219] *Amended Petition*, at pp. 178-81.

Petitioner argued in his sixth point of error on direct appeal that his confessions should have been suppressed because police failed to give him the warnings and notify the Mexican consulate as required by the Vienna Convention. The Texas Court of Criminal Appeals rejected this point of error on the merits, concluding the Vienna Convention did not furnish a basis for excluding petitioner's confession. *Hernandez Llanas v. State*, no. 73,776 (Tex. Crim. App. December 18, 2002), at p. 9.

Petitioner re-urged a similar argument as his eleventh claim in his first state habeas corpus application.[220] The state habeas trial court (1) found the prosecution did not introduce or otherwise make reference to petitioner's confessions during petitioner's trial and (2) concluded petitioner's Vienna Convention claim lacked any merit.[221] The Texas Court of Criminal Appeals adopted the foregoing finding and conclusion when it rejected petitioner's first state habeas corpus application. *Ex parte Ramiro Hernandez Llanas*, 2008 WL 4151813 (Tex. Crim. App. September 10, 2008).

C.   Clearly Established Federal Law

Neither the United States Supreme Court nor the Fifth Circuit has ever held the Vienna Convention, standing alone, confers any private right of action or individually enforceable

---

[220] State Habeas Transcript, Volume I, at pp. 59-65.

[221] State Habeas Transcript, Volume VI, at p. 7.

144

rights analogous to those arising from the United States
Constitution. *See Medellin v. Texas*, 552 U.S. 491, 507-13, 129
S.Ct. 1346, 1358-61, 170 L.Ed.2d 190 (2008)(holding Article 94 of
the United Nations Charter did not contemplate automatic
enforcement of the judgments of the International Court of
Justice in the domestic courts of signatory nations); *Leal Garcia
v. Quarterman*, 573 F.3d 214, 224-25 (5th Cir. 2009)(*citing
Medellin v. Texas*, 552 U.S. at 511, 128 S.Ct. at 1360: "The ICJ
Statute, incorporated into the U.N. Charter, provides further
evidence that the ICJ's judgment in *Avena* does not automatically
constitute federal law judicially enforceable in United States
courts."); *Gomez v. Quarterman*, 529 F.3d 322, 327-30 (5th
Cir.)(denying CoA on a Vienna Convention claim requesting
suppression of evidence after discussing at length the Supreme
Court's Vienna Convention jurisprudence), *cert. denied*, ___ U.S.
___, 129 S.Ct. 628, 172 L.Ed.2d 618 (2008); *Medellin v. Dretke*,
371 F.3d 270, 279-80 (5th Cir. 2004)(applying procedural default
principles to prevent merits review of a Vienna Convention claim
and, alternatively, concluding the Vienna Convention does not
create any individually enforceable rights), *cert. dism'd*, 544
U.S. 660 (2005); *United States v. Jimenez-Nava*, 243 F.3d 192,
195-98 (5th Cir.)(holding Article 36 of the Vienna Convention
does not create any individually enforceable rights), *cert.
denied*, 533 U.S. 962 (2001); *Flores v. Johnson*, 210 F.3d 456, 458

(5th Cir.)(holding *Teague v. Lane* foreclosed adoption of a rule
excluding evidence secured by police in violation of a
defendant's right to consular notification under Article 36),
*cert. denied*, 531 U.S. 987 (2000); *Faulder v. Johnson*, 81 F.3d
515, 520 (5th Cir.)(holding violation of a criminal defendant's
consular notification rights under the Vienna Convention was
harmless error), *cert. denied*, 519 U.S. 995 (1996).

D.    AEDPA Analysis

There is no clearly established federal law mandating
suppression of confessions obtained from a criminal defendant in
violation of the defendant's rights to consular notification
under Article 36 of the Vienna Convention.  In fact, the United
States Supreme Court has repeatedly rejected invitations to
recognize such individual rights. *See, e.g., Breard v. Greene*,
523 U.S. 371, 375-76, 118 S.Ct. 1352, 1354-55, 140 L.Ed.2d 529
(1998)(holding a criminal defendant had procedurally defaulted on
his Vienna Convention claim by failing to assert same in an
appropriate manner in the state courts).  Furthermore, because
petitioner's confessions, i.e., petitioner's audio-taped
statements given the day after the murder of Glen Lich, were
never offered into evidence at petitioner's trial, any error
which arose by virtue of the violation of petitioner's Vienna
Convention rights was harmless because it had no impact

whatsoever upon the outcome of either phase of petitioner's Texas capital murder trial.

E.    Conclusion

The Texas Court of Criminal Appeals' rejections of petitioner's Vienna Convention claims on the merits, during both petitioner's direct appeal and first state habeas corpus proceedings, were neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence actually presented in the petitioner's trial, direct appeal, and first state habeas corpus proceedings.  Petitioner's sixth claim herein does not warrant federal habeas relief.

**VIII.  "Narrow" Statutory Definition of Mitigating Evidence**

A.    The Claim

In his seventh claim in his amended petition, petitioner argues the Texas statutory definition of "mitigating evidence" is unconstitutionally narrow and precludes a capital sentencing jury's consideration of theoretical mitigating evidence.[222]

B.    State Court Disposition

At the punishment phase of petitioner's capital murder trial, the state trial judge instructed the jury, in pertinent part, as follows:

---

[222] *Amended Petition*, at pp. 181-83.

You are further instructed that in determining each of these Special Issues, you may take into consideration all of the evidence submitted to you in the full trial of the case, that is, all of the evidence submitted to you in the first part of this case wherein you were called upon to determine the guilt or innocence of the defendant, and all of the evidence, if any, admitted before you in the second part of the trial wherein you are called upon to determine the answers to Special Issues hereby submitted to you.[223]

The state trial court directed the petitioner's jury to answer the following Special Issue if and only if it returned an affirmative answer to the Special Issue inquiring whether there was a probability the petitioner would commit criminal acts of violence that would constitute a continuing threat to society:

Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?[224]

The state trial court also instructed the jury with regard to the second Special Issue, i.e., the mitigation or *Penry* special issue quoted above, as follows: "The jury shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness."[225]

Petitioner raised this same or similar arguments in his fourteenth point of error on direct appeal. The Texas Court of Criminal Appeals rejected these contentions on the merits, concluding the Texas capital sentencing special issues are

---

[223] State Habeas Transcript, Volume II, at p. 314.

[224] *Id.*, at p. 316.

[225] *Id.*, at p. 317.

sufficiently broad to permit petitioner to introduce mitigating evidence and to permit petitioner's capital sentencing jury to give mitigating effect to such evidence. *Hernandez Llanas v. State*, No. 73,776 (Tex. Crim. App. December 18, 2002), at p, 34.

Petitioner re-urged a variation upon the same themes as his fifth claim for relief in his first state habeas corpus application.[226] The state habeas trial court rejected this claim on the merits.[227] The Texas Court of Criminal Appeals adopted the foregoing legal conclusions when it rejected petitioner's first state habeas application on the merits. *Ex parte Ramiro Hernandez Llanas*, 2008 WL 4151813 (Tex. Crim. App. September 10, 2008).

C.   Clearly Established Federal Law

The Supreme Court has established the constitutional standard for evaluating the propriety of a jury instruction at the punishment phase of a capital murder trial as "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990).  The Supreme Court has consistently applied this standard to evaluate challenges to punishment-phase jury instructions. *See Abdul-Kabir v. Quarterman*, 550 U.S. 233, 262-63, 127 S.Ct. 1654, 1674, 167 L.Ed.2d 585 (2007)(holding proper test is whether there is a reasonable likelihood the jury applied the challenged instruction in a way that prevented its consideration of constitutionally relevant evidence); *Ayers v. Belmontes*, 549 U.S. 7, 13, 127 S.Ct. 469, 473-74, 166 L.Ed.2d 334 (2006)(holding the same); *Weeks v. Angelone*, 528 U.S. 225, 226, 120 S.Ct. 727, 729, 145 L.Ed.2d 727 (2000)(emphasizing the *Boyde* test requires a showing of a reasonable likelihood, as opposed to a mere possibility, the jury construed the jury instructions to preclude its consideration of relevant mitigating evidence).

The Supreme Court has clearly established the principle that "sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future." *Abdul-Kabir v. Quarterman*, 550 U.S. at 246, 127 S.Ct. at 1664.

This "reasonable likelihood" standard does not require the petitioner to prove the jury "more likely than not" interpreted the challenged instruction in an impermissible way; however, the petitioner must demonstrate more than "only a possibility" of an

---

[226] State Habeas Transcript, Volume I, at pp. 51-54.

[227] State Habeas Transcript, Volume VI, at p. 6.

impermissible interpretation. *Johnson v. Texas*, 509 U.S. at 367, 113 S.Ct. at 2669; *Boyde v. California*, 494 U.S. at 380, 110 S.Ct. at 1198.

This Court must analyze the challenged language included in the jury charge within the context of the overall jury charge. *Cupp v. Naughten*, 414 U.S. 141, 146-47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). "In evaluating the instructions, we do not engage in a technical parsing of this language of the instructions, but instead approach the instructions in the same way that the jury would--with a 'commonsense understanding of the instructions in the light of all that has taken place at the trial.'" *Johnson v. Texas*, 509 U.S. at 368, 113 S.Ct. at 2669; *Boyde v. California*, 494 U.S. at 381, 110 S.Ct. at 1198.

D.  AEDPA Review

Petitioner's seventh claim possesses no arguable merit. *See Bartee v. Quarterman*, 574 F.Supp.2d at 707-11 (rejecting a virtually identical claim); *Martinez v. Dretke*, 426 F.Supp.2d 403, 538-41 (W.D. Tex. 2006)(rejecting a virtually identical claim as lacking any arguable merit), *CoA denied*, 270 Fed.Appx. 277 (5th Cir. Mar. 17, 2008).

Petitioner's arguments in support of his seventh claim herein misconstrue the appropriate constitutional standard for evaluating the propriety of jury instructions at the punishment phase of a capital trial. The Supreme Court identified the proper inquiry as whether there is a reasonable likelihood the jury applied the challenged instructions in a way that prevented the consideration of constitutionally relevant evidence. *Boyde v. California*, 494 U.S. at 380, 110 S.Ct. at 1198. The federal constitutional issue properly before this Court in connection with petitioner's challenge to the statutory definition of "mitigating evidence" contained in Texas Code of Criminal Procedure Article 37.071, §2(f)(4) is *not* whether the statutory language in question satisfies some abstract definition of the term "mitigating evidence" but, rather, whether the jury instructions actually given during the punishment phase of petitioner's trial could reasonably be construed as precluding the jury from giving mitigating effect to any of the evidence properly before the jury at the punishment phase of petitioner's capital trial. *Id.*

Petitioner has identified no potentially mitigating evidence actually presented to the jury during petitioner's trial which petitioner claims was outside the effective reach of one or both of the Special Issues addressed by the jury at the punishment phase of petitioner's capital murder trial.

This claim is also *Teague*-barred because no federal court has ever held the Texas statute's definition of "mitigating evidence" precludes a capital sentencing jury's consideration of

any identifiable mitigating evidence. *Bartee v. Quarterman*, 574
F.Supp.2d at 708.

Petitioner presented evidence during the punishment phase of
his capital murder trial which, if believed, established (1)
petitioner suffers from a recognized mental illness, (2)
medications are available to help furnish treatment for
petitioner's mental illness, and (3) once properly medicated and
placed in an institutionalized setting, such as a prison,
petitioner would likely pose a much reduced risk of future
dangerousness.  This Court concludes all of this evidence could
have been more than adequately considered by petitioner's capital
sentencing jury within the context of the two Special Issues
submitted to the jury near the conclusion of the punishment phase
of petitioner's trial, i.e., the future dangerousness and
mitigating evidence Special Issues. *See Beazley v. Johnson*, 242
F.3d at 260 ("[V]irtually *any* mitigating evidence is capable of
being viewed as having some bearing on the defendant's 'moral
culpability' apart from its relevance to the particular concerns
embodied in the Texas special issues.")(*quoting Graham v.
Collins*, 506 U.S. 461, 476, 113 S.Ct. 892, 902, 122 L.Ed.2d 250
(1993)).

E.    Conclusion

The Texas Court of Criminal Appeals' rejections on the

merits, in the course of both petitioner's direct appeal and

first state habeas corpus proceeding, of petitioner's complaints

about the allegedly "narrow" statutory definition of "mitigating

evidence" contained in the Texas capital sentencing scheme was

neither contrary to, nor involved an unreasonable application of,

clearly established federal law, as determined by the Supreme

Court of the United States, nor based on an unreasonable

determination of the facts in light of the evidence actually

presented in the petitioner's trial, direct appeal, and first

state habeas corpus proceedings.  Petitioner's seventh claim

herein does not warrant federal habeas relief.

## IX. Open-Ended Discretion

A.    The Claim

In his eighth claim in his amended petition, petitioner argues the Texas capital sentencing scheme's mitigation or *Penry* Special Issue permits a Texas capital sentencing jury the type of unfettered, unbridled, open-ended discretion the Supreme Court condemned in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and, therefore, is unconstitutional on its face.[228]

B.    State Court Disposition

Petitioner raised essentially the same set of arguments as his sixth ground for relief in his first state habeas corpus application.[229]  The state habeas trial court rejected this argument on the merits.[230]  The Texas Court of Criminal Appeals adopted this conclusion when it denied petitioner's first state habeas corpus application. *Ex parte Ramiro Hernandez Llanas*, 2008 WL 4151813 (Tex. Cri. App. September 10, 2008).

C.    Clearly Established Federal Law

As was explained above, the Supreme Court's opinions in *Buchanan v. Angelone, supra,* and *Tuilaepa v. California*, *supra*, both recognize the Eighth Amendment authorizes a state to permit a capital sentencing jury to exercise virtually unfettered

---

[228] *Amended Petition*, at pp. 184-86.

[229] State Habeas Transcript, Volume I, at pp. 54-56.

[230] State Habeas Transcript, Volume VI, at p. 6.

discretion at the *selection* phase, i.e., when it determines whether to *withhold* a death sentence on a criminal defendant whom it has properly determined is eligible to receive same.

In *Tuilaepa*, the Supreme Court held states may adopt capital sentencing procedures which rely upon the jury, in its sound judgment, to exercise wide discretion. *Tuilaepa v. California*, 512 U.S. at 974, 114 S.Ct. at 2636. The Supreme Court held further, at the *selection* stage of a capital sentencing proceeding, states are not confined to submitting to the jury specific propositional questions but, rather, may direct the jury to consider a wide range of broadly-defined factors, such as "the circumstances of the crime," "the defendant's prior criminal record," and "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment." *Id.*, 512 U.S. at 978, 114 S.Ct. at 2638. The mitigation or *Penry* special issue submitted at the punishment phase of a Texas capital trial focuses exclusively on the *selection* decision, which the Supreme Court has held may involve a capital sentencing jury exercising unfettered discretion to withhold a death sentence from a defendant otherwise eligible to receive same. *See Buchanan v. Angelone*, 522 U.S. at 276, 118 S.Ct. at 761-62 (at the selection phase of a capital sentencing proceeding, "our decisions suggest that complete jury discretion is constitutionally permissible."); *Tuilaepa v. California*, 512 U.S. at 978-80, 114 S.Ct. at 2638-39

153

(at the selection phase, the States are not confined to submitting specific propositional questions; a capital sentencer need not be instructed how to weigh any particular fact; and discretion to evaluate and weigh the circumstances relevant to the particular defendant and the crime he committed is not impermissible).

D.    AEDPA Review

The virtually unfettered discretion exercised by a Texas capital sentencing jury to withhold the death penalty from defendants who have been determined eligible to receive same is fully consistent with the Eighth Amendment principles set forth in *Tuilaepa* and *Buchanan*. *See Turner v. Quarterman*, 481 F.3d at 299 (holding *Tuilaepa* permits capital sentencing juries to exercise "unbridled discretion").  Additionally, this claim is *Teague*-barred because no federal court has ever held the Texas capital sentencing scheme's mitigation Special Issue impermissibly grants a Texas capital sentencing jury too much discretion in deciding whether to withhold a sentence of death.

E.    Conclusion

The Texas Court of Criminal Appeals' rejection on the merits in the course of petitioner's first state habeas corpus proceeding of petitioner's complaint about the "open-ended discretion" exercised by Texas capital sentencing juries answering the "mitigation" Special Issue was neither contrary to,

154

nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial and first state habeas corpus proceedings. Petitioner's eighth claim herein does not warrant relief under the AEDPA. Furthermore, this claim is *Teague*-barred.

### X. No Burden of Proof on "Mitigation" Special Issue

A.   The Claim

In his ninth and final claim in his amended federal habeas petition, petitioner argues the Texas capital sentencing scheme's "mitigation" or *Penry* special issue violates the Eighth and Fourteenth Amendments because the State is not required to disprove beyond a reasonable doubt the existence of "mitigating evidence" sufficient to warrant a life sentence.[231]

B.   State Court Disposition

Petitioner presented essentially the same claim as his twelfth point of error on direct appeal. The Texas Court of Criminal Appeals rejected those arguments on the merits. *Hernandez Llanas v. State*, No. 73,776 (Tex. Crim. App. December 18, 2002), at p. 34.

---

[231] *Amended Petition*, at pp. 186-89.

Petitioner re-urged the same argument as his seventh ground for relief in his first state habeas corpus application.[232]  The state habeas trial court again rejected this argument on the merits.[233]  The Texas Court of Criminal Appeals adopted the foregoing conclusion when it denied petitioner's first state habeas corpus application. *Ex parte Ramiro Hernandez Llanas*, 2008 WL 4151813 (Tex. Crim. App. September 10, 2008).

C.    Clearly Established Federal Law

The Supreme Court has implicitly rejected the legal arguments underlying petitioner's complaint about the lack of an express burden of proof on the Texas capital sentencing scheme's "mitigation" special issue. *See Kansas v. Marsh*, 548 U.S. 163, 175, 126 S.Ct. 2516, 2525, 165 L.Ed.2d 429 (2006):

> In aggregate, our precedents confer upon defendants the right to present sentencers with information relevant to the sentencing decision and oblige sentencers to consider that information in determining the appropriate sentence.  The thrust of our mitigation jurisprudence ends here.  "[W]e have never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required."

D.    AEDPA Review

This claim possesses no merit.  The Fifth Circuit has repeatedly rejected the arguments underlying petitioner's ninth claim herein, concluding the federal Constitution does not

---

[232] State Habeas Transcript, Volume I, at p. 56.

[233] State Habeas Transcript, Volume VI, at p. 6.

mandate assignment of a burden of proof on the Texas capital
sentencing scheme's mitigation special issue. *See Ortiz v.
Quarterman*, 504 F.3d 492, 504-05 (5th Cir. 2007)(the Texas death
penalty scheme does not violate *Apprendi* or *Ring* by failing to
require the State to prove beyond a reasonable doubt the absence
of mitigating circumstances), *cert. denied*, 553 U.S. 1035 (2008);
*Scheanette v. Quarterman*, 482 F.3d at 828 (Texas death penalty
scheme did not violate either *Apprendi* or *Ring* by failing to
require the state to prove beyond a reasonable doubt the absence
of mitigating circumstances); *Granados v. Quarterman*, 455 F.3d at
536 (holding no burden of proof requirement applies because the
jury's answer to the Texas capital sentencing scheme's mitigation
special issue does not enhance the sentence to death but, rather,
reduces same from death to life).

Petitioner has identified no "clearly established" Supreme
Court precedent recognizing a constitutional requirement for an
express assignment of the burden of proof in connection with the
Texas capital sentencing scheme's mitigation special issue.  This
is most likely because the unique aspects of the Texas capital
sentencing scheme make the Texas scheme's mitigation Special
Issue readily distinguishable from the capital sentencing schemes
in the weighing jurisdictions addressed in the opinions relied
upon by petitioner herein.

As this Court has previously noted, the Texas capital sentencing scheme's "mitigation" or *Penry* Special Issue functions in a manner quite distinct from the schemes the Supreme Court found violated the Constitution in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). The Texas capital sentencing scheme's "mitigation" Special Issue serves not to render the defendant eligible for the death penalty or to "select" the defendant for execution; rather, it allows the capital sentencing jury unfettered discretion to dispense an act of grace to the otherwise condemned defendant. *Garcia v. Thaler*, 2009 WL 4931069, *42 (W.D. Tex. December 14, 2009), *CoA denied*, 389 Fed. Appx. 395 (5th Cir. August 9, 2010), *cert. denied*, ___ U.S. ___, 131 S.Ct. 1604, 179 L.Ed.2d 505 (2011).

This claim is also *Teague*-barred because no federal court has ever held it is constitutionally necessary for Texas to assign a burden of proof in connection with the Texas capital sentencing scheme's mitigation or *Penry* Special Issue.

E.    Conclusion

The Texas Court of Criminal Appeals' rejections on the merits in the course of petitioner's direct appeal and first state habeas corpus proceeding of petitioner's complaints about the absence of a burden of proof imposed upon the prosecution in connection with the Texas capital sentencing scheme's mitigation

or *Penry* Special Issue were neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's trial, direct appeal, and first state habeas corpus proceeding.  Petitioner's ninth claim herein does not warrant relief under the AEDPA.  Furthermore, this claim is *Teague*-barred.

## XI. <u>Certificate of Appealability</u>

The AEDPA converted the "certificate of probable cause" previously required as a prerequisite to an appeal from the denial of a petition for federal habeas corpus relief into a "Certificate of Appealability" ("CoA"). *See Hill v. Johnson*, 114 F.3d 78, 80 (5th Cir. 1997)(recognizing the "substantial showing" requirement for a CoA under the AEDPA is merely a change in nomenclature from the CPC standard); *Muniz v. Johnson*, 114 F.3d 43, 45 (5th Cir. 1997)(holding the standard for obtaining a CoA is the same as for a CPC).  The CoA requirement supersedes the previous requirement for a certificate of probable cause to appeal for federal habeas corpus petitions filed after the effective date of the AEDPA. *Robison v. Johnson*, 151 F.3d 256, 259 n.2 (5th Cir. 1998), *cert. denied*, 526 U.S. 1100 (1999); *Hallmark v. Johnson*, 118 F.3d 1073, 1076 (5th Cir. 1997), *cert. denied sub nom. Monroe v. Johnson*, 523 U.S. 1041 (1998).

Effective December 1, 2009, Rule 11(a) of the Rules Governing Section 2254 Cases in United States District Courts requires this Court to issue or deny a CoA when it enters an order adverse to a federal habeas corpus petitioner.

Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a CoA. *Miller-El v. Johnson*, 537 U.S. 322, 335-36, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); 28 U.S.C. §2253(c)(2). Likewise, under the AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted. *See Crutcher v. Cockrell*, 301 F.3d 656, 658 n.10 (5th Cir. 2002)(holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); 28 U.S.C. §2253(c)(3).

A CoA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke*, 542 U.S. 274, 282, 124 S.Ct. 2562, 2569, 159 L.Ed.2d 384 (2004); *Miller-El v. Johnson*, 537 U.S. at 336, 123 S.Ct. at 1039.

To make such a showing, the petitioner need *not* show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve

160

encouragement to proceed further. *Tennard v. Dretke*, 542 U.S. at 282, 124 S.Ct. at 2569; *Miller-El v. Johnson*, 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604; *Barefoot v. Estelle*, 463 U.S. at 893 n.4, 103 S.Ct. at 3394 n.4. This Court is required to issue or deny a CoA when it enters a final Order such as this one adverse to a federal habeas petitioner. *Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts*.

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. If this Court rejects a prisoner's constitutional claim on the merits, the petitioner must demonstrate reasonable jurists could find the court's assessment of the constitutional claim to be debatable or wrong. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Johnson*, 537 U.S. at 338, 123 S.Ct. at 1040 (*quoting Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604). *Accord Tennard v. Dretke*, 542 U.S. at 282, 124 S.Ct. at 2569. In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as

procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this Court was correct in its procedural ruling. *See Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor. *Avila v. Quarterman*, 560 F.3d 299, 304 (5th Cir.), *cert. denied*, ___ U.S. ___, 130 S.Ct. 536, 175 L.Ed.2d 350 (2009).

Nonetheless, a CoA is not automatically granted in every death penalty habeas case. *See* Miller-El v. Cockrell 537 U.S. at 337, 123 S.Ct. at 1040 ("It follows that issuance of a COA must not be *pro forma* or a matter of course."); *Sonnier v. Quarterman*, 476 F.3d at 364-69 (denying CoA on a wide variety of challenges to the Texas capital sentencing scheme).

Reasonable minds could not disagree over this Court's conclusions as to the lack of any arguable legal basis for

petitioner's challenges to the Texas capital sentencing scheme. As is explained in Sections VIII, IX, and X above, both this Court and the Fifth Circuit have repeatedly rejected those same claims as unworthy of a CoA. Furthermore, the Supreme Court's opinions in *Tuilaepa* and *Kansas v. Marsh, supra*, eliminate any arguable merit to any of petitioner's complaints about the Texas capital sentencing scheme. Petitioner's multi-faceted challenge to the Texas capital sentencing scheme consists of little more than a series of legal arguments which this Court and the Fifth Circuit have repeatedly held not only lack merit but are so lacking in any arguable merit as to be undeserving of a CoA. Petitioner's challenges to the Texas capital sentencing scheme appear to ignore the Supreme Court's holding in *Tuilaepa v. California, supra*, and its progeny, which recognize the significant distinction between the "eligibility" and "selection" aspects of a capital sentencing proceeding. Petitioner also ignores the fact the Texas capital sentencing scheme's punishment-phase Special Issues operate in a manner profoundly different from the statutory "aggravating and mitigating factors" juries are required to weigh in other jurisdictions.

Reasonable minds could not disagree over this Court's conclusions rejecting petitioner's ineffective assistance claims herein. Furthermore, the issue properly before this Court is not whether petitioner's trial counsel rendered ineffective

163

assistance but, rather, whether the state habeas court could have reasonably concluded petitioner's ineffective assistance claims lacked merit.  For the reasons set forth at length in Section IV above, the state habeas court reasonably concluded the conduct of petitioner's trial counsel did not fall below an objective level of reasonableness.  Under the highly deferential standard applicable to state court rejections on the merits of ineffective assistance claims under the AEDPA, petitioner is not entitled to a CoA on any of his ineffective assistance claims herein. *Harrington v. Richter*, ___ U.S. at ___, 131 S.Ct. at 788.

Moreover, reasonable minds cannot disagree with this Court's *de novo* conclusion that petitioner's complaints about his trial counsels' failure to present mitigating evidence showing petitioner's abused, deprived, childhood fail to satisfy either prong of *Strickland* analysis.  Given petitioner's well-documented history of violent criminal acts and the absence of any evidence showing petitioner has ever made a sincere expression of remorse or contrition for any of his criminal acts, there is no reasonable probability an emotional appeal to the jury's sympathies premised upon petitioner's abused, deprived, childhood would have produced a life sentence for petitioner.

Nor can reasonable minds disagree with this Court's conclusions that petitioner procedurally defaulted on his

conflict of interest and *Brady* claims by waiting until his third state habeas corpus proceeding to raise same.

Petitioner's complaints about the admission of evidence of his Mexican pen packet are likewise not subject to disagreement among reasonable jurists. Petitioner has identified no case law mandating the exclusion of evidence of a foreign criminal conviction absent evidence showing the defendant's rights were somehow violated in the foreign jurisdiction's criminal proceeding. Petitioner alleges no specific facts showing his rights were violated in connection with either his Mexican homicide conviction or resulting 25-year sentence.

Petitioner's Vienna Convention claim is legally frivolous in view of well-settled Supreme Court and Fifth Circuit case law.

In conclusion, despite the volume of petitioner's pleadings herein, petitioner has presented no issues in his second through ninth claims herein which warrant the issuance of a CoA.

However, petitioner's mental retardation claim presents a very different claim. Petitioner did support that claim during his first state habeas corpus proceeding with considerable expert opinion, as well as evidence which showed petitioner had consistently scored poorly on a wide variety of IQ test instruments. This Court concluded the state habeas court acted in a reasonable manner when it relied upon Dr. Coons' opinions and analysis suggesting (1) petitioner's test scores did not

accurately reflect petitioner's full intellectual capabilities
(because petitioner was apparently not giving his best efforts
thereon) and (2) petitioner's childhood functional difficulties
may have had more to do with the horrific environment in which
petitioner grew up than in any innate intellectual deficits.
Nonetheless, Dr. Puente and Dr. Martinez expressed firm opinions
that petitioner suffers from both significantly sub-average
intellectual functioning and significant deficits in a wide range
of adaptive behavior categories.  Finally, on the only full scale
IQ test instrument administered to petitioner that was reasonably
calculated to obtain an accurate measurement of petitioner's
intellectual functioning, i.e., the 2006 Spanish WAIS-III test
that was in Spanish and had been normed for the population of
Mexico City, petitioner scored arguably within the mentally
retarded range, i.e., he scored a 70.

Given petitioner's lack of formal education and severe
deficits in Spanish vocabulary, this Court believes it was
reasonable for the state habeas court to conclude even that score
may have under-assessed petitioner's true intellectual
capabilities.  After all, petitioner did manage to escape from
custody while serving a prison sentence for homicide, illegally
entered this nation while a wanted fugitive from justice, sought
and obtained gainful employment despite possessing virtually no
English vocabulary, and carried out at least two premeditated

crimes which required more than a modicum of planning. Nonetheless, there was considerable evidence before the state habeas court from which that court could rationally have concluded petitioner was, in fact, mentally retarded within the meaning of the Texas Health and Safety Code and the Supreme Court's holding in *Atkins*. Out of an abundance of caution, this Court will grant petitioner a CoA on his mental retardation claim herein.

## XII. **Request for an Evidentiary Hearing**

Petitioner has requested an evidentiary hearing to develop new facts and new evidence relevant to petitioner's ineffective assistance claim concerning his trial counsels' alleged failure to adequately investigate petitioner's background and present evidence showing petitioner's abused, deprived, childhood. *Docket entry no. 60.*

Petitioner presented that claim to the state habeas court during the course of petitioner's first state habeas corpus proceeding (as a part of his second ground for relief), along with substantial documentation supporting same. The Texas Court of Criminal Appeals rejected that ineffective assistance claim on the merits, concluding petitioner's trial counsel undertook an adequate investigation into petitioner's background. This Court has reviewed that conclusion under the deferential standard of Section 2254(d)(1) and independently concluded the Texas Court of

Criminal Appeals' rejection on the merits of that claim was itself objectively reasonable under the evidence then before the state habeas court (which necessarily including the evidence presented during petitioner's state habeas hearing).

Petitioner is not entitled to an evidentiary hearing to develop new facts and new evidence in support of those of his claims which the state habeas court rejected on the merits. *See Cullen v. Pinholster*, ___ U.S. at ___, 131 S.Ct. at 1398-1400 (holding an evidentiary hearing is unnecessary when a state court has rejected a claim on the merits and federal habeas review of that rejection is governed by §2254(d)(1)); *Pape v. Thaler*, 645 F.3d 281, 288 (5th Cir. 2011)(holding the same). Thus, petitioner is not entitled to a federal evidentiary hearing on his first claim, i.e., his *Atkins* claim. Petitioner is likewise not entitled to an evidentiary hearing on the *Wiggins* portion of his second claim, i.e., his complaint that his trial counsel rendered ineffective assistance by failing to adequately investigate petitioner's background and present additional mitigating evidence establishing the extremely abused and deprived circumstances of petitioner's childhood.[234]

---

[234] In the course of reviewing *de novo* the prejudice prong of *Strickland* in connection with this claim, this Court has accepted as credible all of the information included in the affidavits attached as Exhibit nos. 1-4 to petitioner's *Amended Petition*, as well as (in contrast to the state habeas court) all of the testimony concerning petitioner's horrific childhood offered by petitioner's siblings and neighbor during petitioner's state

Likewise, petitioner's un-excused procedural defaults on his third and fifth claims herein, i.e., petitioner's conflict of interest and *Brady* claims, make unnecessary a federal evidentiary hearing on those claims. The same holds for the procedurally defaulted portion of his second claim in which petitioner complained about the failure of his trial counsel to challenge the prosecution's evidence showing petitioner responsible for the stabbing of Cesareo Ayala on August 3, 1997. Petitioner's fourth and sixth through ninth claims herein present purely legal arguments which would not warrant an evidentiary hearing even under pre-AEDPA standards.

Thus, petitioner is not entitled to a federal evidentiary hearing to develop new facts and new evidence supporting any of his claims herein.

Accordingly, it is hereby **ORDERED** that:

1. All relief requested in petitioner's amended federal habeas corpus petition, filed July 16, 2010, docket entry no. 48, is **DENIED**.

---

habeas corpus hearing. Despite viewing all such evidence in the light most favorable to petitioner, in view of the prosecution's evidence (which showed petitioner's history of violent criminal conduct) and the absence of any evidence showing petitioner has ever made a sincere expression of contrition or remorse for his crimes, this Court remains convinced there is no reasonable probability that evidence of petitioner's abused, deprived, childhood would have had any impact on the jury's verdict on either of the two capital sentencing Special Issues submitted during the punishment phase of petitioner's capital murder trial.

2.   Petitioner is **GRANTED** a Certificate of Appealability on his first claim herein, i.e., his *Atkins* claim; petitioner is **DENIED** a Certificate of Appealability on his second through ninth claims herein.

3.   Petitioner's motion for an evidentiary hearing, filed April 12, 2011, docket entry no. 60, is **DENIED.**

4.   All other pending motions are **DISMISSED AS MOOT.**

5.   The Clerk shall prepare and enter a Judgment in conformity with this Memorandum Opinion and Order.

It is so ORDERED.

SIGNED this 23rd day of September, 2011.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE