IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF TEXAS

SAN ANTONIO DIVISION

| | | |
|---|---|---|
| RAMIRO HERNANDEZ LLANAS | ) | |
| *Petitioner*, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. SA-08-CA-805-XR |
| | ) | |
| RICK THALER, Director, | ) | |
| Texas Department of Criminal Justice, | ) | |
| Correctional Institutions Division, | ) | |
| | ) | |
| *Respondent*. | ) | |
| | ) | |

## MOTION TO ALTER OR AMEND THE JUDGMENT

Petitioner, Ramiro Hernandez Llanas, by and through undersigned counsel and pursuant to Rules 52 and 59(e) of the Federal Rules of Civil Procedure, hereby respectfully moves this Court to alter or amend the judgment in this action, entered on September 23, 2011, denying his Petition for Writ of Habeas Corpus.  The Court's order denying relief (cited herein as "Order") contains a number of factual errors which, if corrected, will compel a determination that Petitioner is a person

with mental retardation, and entitled to relief on Ground One.   Although the Order contains numerous legal conclusions that Petitioner believes are completely contrary to established federal law, this motion focuses on factual errors in the Order's treatment of Petitioner's mental retardation claim because they are so clear.   The most egregious such errors are described below.

I. GROUND A: PETITIONER'S MENTAL RETARDATION.

In Ground A of his Petition, Petitioner contends that under *Atkins v. Virginia*, 536 U.S. 304 (2002), his execution would violate the Eighth Amendment because he is a person with mental retardation.   *See* Petition at 22–73.   In support of this claim, Petitioner presented the state court with the results of five different reliable IQ tests, performed over almost a decade, each administered by competent professionals, all of which place Petitioner in the mental retardation range.   Petitioner also presented both lay and expert testimony describing significant limitations in adaptive functioning in all areas.   Despite the absence of any valid test score outside the mental retardation range, and despite the fact that the only expert who did not find Petitioner to be mentally retarded not only did not examine or interview Petitioner, but did not speak to anyone with personal knowledge of Petitioner's functioning either as an adult or during the developmental period, this Court found the state court's determination that Petitioner is not mentally retarded to be one that was neither an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States nor based upon an unreasonable determination of the facts in light of the evidence.

This Court's order denying relief both: 1) attributes to the state court credibility determinations it never made; and, 2) mischaracterizes, both through omission and commission, much of the critical evidence before the state court.   In the absence of these gross factual errors, the

conclusion that the state court's determination of the facts and its application of the law to the facts was reasonable becomes unsupportable.

A. Reliance on Credibility Determinations the State Court Did Not Make.

1. Contrary to this Court's Order, the state court *refused* to find the State's expert more credible than Petitioner's experts.

This Court's Order states that "the state habeas trial court reasonably gave more credence to Dr. Coons' opinions regarding petitioner's lack of adaptive functioning deficits over the opinions of Dr. Puente." Order at 78. But the state court did no such thing. In fact, at four separate points in its proposed order, the State specifically asked the state habeas court to disparage Dr. Puente's credibility, *and at all four points, the court crossed out the language making that finding.  See* State Court Order at 11 (crossing out and initialing a paragraph that criticized Dr. Puente's methodology, and concluded "This court did not find Dr. Puente to be credible"); *id.* at 15 (crossing out and initialing the sentence "The court finds that Dr. Puente's opinion regarding the applicant's malingering to lack credibility"); *id.* at 17 (crossing out and initialing the statement, "In summary, this Court finds Dr. Coons' opinion to be more credible and trustworthy than those of Dr. Puente and Dr. Martinez."); *id.* at 17–18 (crossing out and initialing the sentence "Dr. Puente improperly applied the law in his analysis by considering adaptive behavior only prior to 18 years of age to the exclusion of current behavior, thus making his opinion unreliable.").

2. The state court never found the lay witnesses' testimony concerning Petitioner's adaptive functioning deficits not credible.

According to the Order in this case, "Petitioner failed to present the state habeas trial court with any credible testimony from independent third parties with personal knowledge of petitioner's

3

developmental milestones or any documentation from reliable independent sources addressing petitioner's achievement or failure to achieve developmental childhood milestones. . . , [and consequently] *the state habeas trial court reasonably found the testimony of petitioner's siblings and neighbor regarding petitioner's childhood to be incredible*." Order at 79–80. The Order further asserts that " The state habeas trial court reasonably relied upon the information contained in the November, 2002 statement of Adelita Hernandez, [Petitioner's sister], regarding petitioner's developmental years when it rejected petitioner's Atkins claims." *Id.* at 67 n.153. The Order then states that in contrast to Adelita Hernandez's 2002 Affidavit, the testimony of Petitioner's siblings and a neighbor during the state court evidentiary hearing "are so extreme as to defy credibility." *Id.* However, these assertions about the state court credibility findings are also simply false. On the contrary, the state habeas trial court *specifically rejected* proposed findings by the state crediting Adelita Hernandez's 2002 statement and determining that the testimony of his relatives was not credible. The State proposed the following language:

> The court finds that the testimony of the above relatives of the applicant is not entirely credible as the demeanor exhibited indicates an attempt to assist the applicant's position, with the exception of Adelita who described the basis for her testimony being an attempt to heal a breach with the family over this issue. Each of these witnesses was interviewed prior to hearing by defense expert, Dr. Antonio Puente.

But rather than endorsing that proposed finding, the state court crossed out the entire paragraph and initialed that he struck it out. State Court Order at 12.

3.   The state court never relied upon a diagnosis of anti-social personality disorder to find credible Dr. Coons's concern that negative motivation caused inaccurate measurement of Petitioner's intellectual functioning.

According to this Court's order, "Given the . . . diagnosis of petitioner as possessing an anti-

4

social personality . . . the trial court reasonably credited Dr. Coons' concern over the likelihood that negative motivation may have caused petitioner's test scores to inaccurately under-measure petitioner's true level of intellectual functioning." Order at 75–76. However, the state court never relied upon antisocial personality disorder in *any* of its findings. Indeed, there is absolutely no discussion of antisocial personality disorder in the Findings of Fact and Conclusions of Law or the Supplemental Findings of Fact and Conclusions of Law.[1]

> 4.      The state court never rejected the contention of Drs. Martinez and Puente that Petitioner was too unsophisticated to have diminished his IQ scores by deliberately performing poorly during testing.

According to the Order, "[G]iven petitioner's high scores on a number of the tests administered by Dr. Puente, the state habeas trial court reasonably rejected the contentions of Dr. Martinez and Dr. Puente that Petitioner was too 'unsophisticated' to have "malingered by deliberately performing poorly on some IQ tests." Order at 76. Although Petitioner's experts *did* testify that he was too unsophisticated to malinger in a fashion that would be undetectable to experts, the state court *never* rejected these contentions, or even addressed them. Moreover, as addressed below, the state court could hardly reject this testimony on the basis of Petitioner's high scores—because he had none!

These four out-of-thin-air fabrications of state court findings are little short of astonishing. Moreover, they do not stem from false assertions in Respondent's brief, for Respondent did not

---

[1]Similarly, in the section entitled "Intellectual Functioning," this court stated, "The state trial court acted in a wholly reasonable manner when it placed far greater emphasis on petitioner's full scale score of 70 on the Spanish language version of the WAIS-III administered to petitioner by Dr. Puente in 2006." Order at 70. However, nowhere in the state court's findings of fact and conclusions of law is there any discussion emphasizing Petitioner's full scale score of 70 on the Mexican WAIS.

make them.

B. Mischaracterizations of Evidence in the State Court Record.

In addition to falsely ascribing a number of critical credibility determinations to the state court, the Order in this case is full of inaccurate and/or misleading assertions about the evidence in the state court record.  Petitioner addresses below only the most egregious errors.

1.    The consistency of Petitioner's scores.

In determining whether the state court was reasonable in determining that Petitioner is not a person with mental retardation, the Order fails to discuss, or even acknowledge, the most probative evidence that Petitioner's intellectual functioning is subaverage: *five* valid measures of IQ obtained over a ten year period, all of which place Petitioner in the mentally retarded range, all of which were presented to the state court.  Moreover, no valid test score—not even one—places Petitioner outside that range.

In 2000, in anticipation of trial, Dr. Gilbert Martinez, Ph.D., performed a neuropsychological evaluation of Petitioner, E.H. Vol. 3 at 145–47, administering two instruments designed to assess intelligence: the Wechsler Adult Intelligence Scale-III ("WAIS-III") performance subtests, and the Test of Non-Verbal Intelligence-II ("TONI-II").  *Id.* at 158.[2]  On the WAIS-III, Petitioner's performance IQ score was 54, Tr. Defendant's Exh. 1, Report of Neuropsychological Evaluation by Gilbert Martinez, Ph.D. at 4 (hereinafter "Martinez Report"), and on the TONI-II, Petitioner scored 57, *id.* at 5.

Dr. Antonio E. Puente, Ph.D., in anticipation of the *Atkins* hearing, administered a total of twenty different neuropsychological tests to Petitioner, including the Comprehensive Test of Nonverbal

---

[2] These were tests that could be administered to someone who did not speak English.

Intelligence ("CTONI") and the Beta III Intelligence Test ("Beta III") in 2003. Exh. 29, Affidavit of Antonio E. Puente [Sworn November 30, 2003] at 1, 4 (hereinafter "2003 Puente Affidavit"). On the CTONI, Petitioner's overall sum of standard score was 18, which produces a Nonverbal Intelligence Quotient ("NIQ") of 52; his pictorial standard score was 10, which produces a Pictorial Nonverbal Intelligence Quotient ("PNIQ") of 57; and his geometric standard score was 8, which produces a Geometric Nonverbal Intelligence Quotient ("GNIQ") of 53. *Id.* at 5. All three scores from the CTONI place Petitioner within the mentally retarded range. On the Beta III, Petitioner earned an IQ score of 64, which, while not quite as low, nonetheless ranks him within the lowest *one* percent of the population. 2003 Puente Affidavit at 5–6. In 2006, Dr. Puente administered the Spanish-language Wechsler Adult Intelligence Scale ("Spanish-language WAIS") to Petitioner. Because whether American or Mexican norms are appropriate in the capital sentencing context is disputed, *see* Hoi K. Suen & Stephen Greenspan, *Linguistic Sensitivity Does Not Require One to Use Grossly Deficient Norms: Why U.S. Norms Should Be Used With the Mexican WAIS- III in Capital Cases*, 34 PSYCHOL. INTELL. & DEVELOPMENTAL DISABILITIES (Am. Psychological Ass'n, Div. 33), Summer 2008, at 2–5, *available at* http://www.apa.org/divisions/div33/docs%5C34-1.pdf., Dr. Puente evaluated Petitioner's performance both ways. Under American norms, Petitioner's IQ was 62, and under Mexican norms, a 70—but both scores are in the range of mental retardation. E.H. Vol. 4 at 150–51; Exh. 30, Affidavit of Antonio E. Puente [Sworn May 16, 2008] at 2 (hereinafter "2008 Puente Affidavit"); *see also, Atkins v. Virginia*, 536 U.S. 309 n.5 ("It is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition.") Moreover, the only score that is even close to the mental retardation line is the

Mexican WAIS score evaluated under Mexican norms—and the major criticism of the Mexican norm score is that it normally overestimates I.Q.  *See* Suen & Greenspan, *supra*, at 2.  These five tests are the only valid measures of IQ that have been administered to Petitioner.[3]

The Order both fails to mention this unusually strong and consistent evidence of intellectual functioning in its determination that the state court decision was not unreasonable, and also endorses Dr. Coons's conclusion that the scores obtained by Petitioner's experts were unreliable, in part, because "there was an *inexplicably* wide difference (i.e., more than two standard deviations - 54 to 87) between the Performance Scales on the WAIS tests administered by Dr. Martinez and Dr. Puente. . . ."  Order at 52–53.  This factual assertion is repeated in stronger form later in the Order: "Furthermore, given the compelling observations of Dr. Coons regarding . . . the great inconsistencies between petitioner's scores on a wide array of tests designed to measure the same skill sets, it is perfectly reasonable for the state habeas court to conclude petitioner's actual level of intellectual functioning was greater than the score of 70 petitioner earned on the 2006 Spanish language WAIS III."  Order at  70–71.  This statement is simply wrong for two reasons.  First, the state court at no point stated such a conclusion, or indeed, discussed the Mexican WAIS/Mexican Norm score of 70 at all.  And, second, the difference is by no means inexplicable, but is the result of a comparison between apples and oranges, as the state court evidence makes clear.  Therefore this

---

[3]TDCJ administered two other "screening" tests,  the Revised Beta Test, on which Petitioner scored a 65, and the TONI (not to be confused with the CTONI, which stands for *Comprehensive* Test of Nonverbal Intelligence,which was administered by Dr. Puente, and *is* recognized as a valid measure of IQ), in which he score an 83.  For reasons laid out in the amended petition, neither of the TDCJ scores is a valid measure, and this Court's Order—appropriately—does not rely upon them.

purported difference not only *did not* in fact form the basis of the state court judgment, but *could not* reasonably have done so.

It is true that Dr. Coons did testify that the difference between the 54 score that Mr. Hernandez Llanas obtained *using U.S. norms* on the performance scale of the *WAIS III* that Dr. Martinez administered and the 87 score that Mr. Hernandez Llanas obtained using the *Mexican norms* on the performance scale of the *Mexican WAIS III* that Dr. Puente administered called into question the reliability of tests placing Mr. Hernandez Llanas in the mental retardation range. E.H. Vol. 5 at 61, 62. In crediting this statement however, the Order ignores three critical facts in the state court record that make reliance on that statement unreasonable. First, Dr. Coons's methodology of comparing two different instruments normed on widely divergent samples runs afoul of well understood scientific principles. *See generally* Motion to Strike Affidavits and Testimony of Richard Coons (filed May 19, 2008, Cause No. A97-364-1, 216th Judicial District Court, Kerr County). Second, and more remarkably, the Order *ignores Dr. Coons's own acknowledgment that he was uncertain as to whether a comparison between scores obtained using U.S. norms and Mexican norms was supported by scientific research.* E.H. Vol. 5 at 148. Finally, the Order fails to acknowledge that, as the state court was informed, the difference between the *performance scale* scores Mr. Hernandez Llanas obtained on tests administered by Dr. Puente and by Dr. Martinez is *statistically insignificant* when using the same norming samples. 2008 Puente Affidavit. Dr. Puente scored the test he administered using the U.S. norms in an effort to better understand the 33-point difference between the scores he and Dr. Martinez obtained, *and using U.S. norms( as Dr. Martinez had)*, he obtained a Performance Scale score on the Mexican WAIS of 59 (and a full scale score of 62). Thus, contrary to the misleading picture the Order draws, the performance scale IQ scores of

59 and 54 obtained by Dr. Puente and Dr. Martinez actually are strikingly consistent when a scientifically sound comparison is made.  Thus, as a factual matter, considering the evidence before the state court, reliance upon any purported inconsistency of scores to justify a finding that Petitioner's intellectual functioning is not subaverage would be unreasonable.

2.      The absence of evidence of malingering on IQ tests.

In denying Petitioner's mental retardation claim, the Order repeatedly makes references to purported evidence of malingering or lack of effort, references that include assertions that Petitioner's own witnesses agree that the likelihood of malingering renders his IQ scores unreliable. *See, e.g.*, Order at 57 ("Dr. Cantu expressed concern over the possibility petitioner was not giving his best efforts"); *id*. at 58 ("There is a high probability of malingering by petitioner in connection with his IQ tests"); *id*. at 73 ("[Dr. Cantu, Dr. Martinez, and Dr. Coons] agreed (unlike Dr. Puente) that a lack of effort by petitioner may have played a role in petitioner's low scores.")  The Order, however, relies on an erroneous generalization by the State's unqualified witness, fails to acknowledge significant hedging by that witness, distorts the statements of Petitioner's experts, and ignores affirmative evidence that Petitioner's scores were not the product of malingering, or lack of effort.  Contrary to the opinion, there is *no* credible evidence of malingering on cognitive tests.

First, the "compelling observations [of the state witness Dr.] Coons regarding the lack of any rational, reasonable, motivation on petitioner's part to perform at maximum effort . . .," Order at 70, were not only not compelling, they were not even *observations*.  Dr. Coons neither observed Petitioner taking an IQ test nor interviewed him concerning his motivation.  The speculation that Petitioner lacked motivation to perform well came from nothing more than his generalized situation as a person facing a death sentence—and as such, would apply in virtually all capital cases, leading

to the discounting of most test scores in *Atkins* claims, something clearly not anticipated by the *Atkins* opinion.  Moreover, that speculation incorporates both a factual error and ignorance of the relevant professional literature.  Dr. Martinez evaluated Petitioner in 2000, prior to the Supreme Court's decision in *Atkins*, obtaining scores on two different tests of 54 and 57, Martinez Report at 4,5, so any motivation to malinger would have been weaker than when he was evaluated by Dr. Puente after *Atkins* was decided.  Yet, Petitioner's scores did not fall, but if anything, rose a little for Dr. Puente.  More importantly, Dr. Coons seems completely unaware of the professional literature documenting the widespread phenomenon of the "cloak of competence": persons with mental retardation, by and large, are very strongly motivated to appear normal, and rather than malingering to present themselves as more impaired, attempt to present themselves as much more competent than they really are.  Thus, Dr, Coons made no "observation" specific to Petitioner, and the generalized speculation he offered was based upon his unfamiliarity with the literature relating to mental retardation.

Second, even Dr. Coons did at several points indicate uncertainty about Petitioner's motivation, E.H. Vol. 5 at 188("My impression is that he doesn't want to die . . . . I can't be certain of it.") and whether Petitioner was malingering and/or not putting forth full effort.  *See, e.g.*, *Id.* at 123 ("We have a fellow with limited intelligence who may well be malingering, or may well have little motivation on a test where he is—his life is at stake."); *id.* ("I'm saying some of that data is not reliable."); *id*. at 124 ("*I don't know whether he is malingering or not*. That is certainly one high on the list of possibilities of why he's had these different performances on these tests.") (emphasis added).  Most critically, he hedged on the size of the impact of any malingering that might have occurred, "Malingering, motivation were not extremely important factors."  *Id*. at 189.  The Order

11

entirely neglects to mention his hedging, which is particularly misleading, given that it emphasizes the far more modest qualification in Dr. Martinez's testimony.

Third, none of Petitioner's experts testified or believed that the fact that his IQ scores were in the mental retardation range was attributable to either malingering or lack of effort. Dr. Cantu's testimony is irrelevant to the mental retardation issue. He was not retained to assess Petitioner's intellectual functioning nor did he perform tests that measure intellectual functioning. Rather, he was retained solely to assess whether Petitioner was competent to stand trial. S.F. Vol. 21 at 147 ("[T]he Court asked me specifically to evaluate competency to stand trial . . . ."). Dr. Cantu did note that Petitioner "became progressively more passive and cognitively blunted when questions moved towards the issues surrounding *competency to stand trial*." E.H. Applicant's Exh. 16, Letter from Robert E. Cantu [Dated February 13, 1998] at 1 (hereinafter "Cantu Letter") (emphasis added). And at trial, Dr. Cantu did state that "there was a *portion* of that interview [with Petitioner] that [he] felt that [Petitioner] was *probably* malingering." S.F. Vol. 21 at 143 (emphasis added). Specifically, Dr. Cantu testified that on *competency* questions, Petitioner became slower to respond and seemingly failed to understand his questions. *Id.* at 147–48.

The Order's reliance on Dr. Cantu's findings is misleading for a number of reasons. First, his comments were not related to performance on standardized tests designed to measure intellectual functioning. Second, not only did those comments not reflect upon his own testing (since he did none), but they could not have reflected on any other intellectual functioning tests, because none had yet been performed. Dr. Cantu's evaluation took place more than one year *before* Dr. Martinez's evaluation of Petitioner, so Dr. Cantu clearly was not referring to whether Petitioner was feigning symptoms of mental retardation on an occasion that had yet to occur. Third and finally, the source

of Dr. Cantu's inference that Petitioner was not putting forth full effort on the competency exam was the assumption that even a recent immigrant should be familiar with the U.S. criminal justice system and that, therefore, Petitioner must have known the answers to questions about American legal proceedings.  S.F. Vol. 21 at 148.  But that inference was drawn *before Dr. Cantu was aware of Petitioner's I.Q. score*.  Given the extreme differences between criminal proceedings in Mexico and the United States, such as the absence of the right to a jury, *see* Exh. 24, Declaration of Juan Carlos Padron Sanchez (hereinafter "Sanchez Declaration"), a recent immigrant *laboring under Petitioner's cognitive impairments* might have been genuinely ignorant of matters such as the role of the prosecutor, judge, and jury in the American system.

With respect to Dr. Martinez, the Order court correctly states that Dr. Martinez opined that Mr. Hernandez Llanas did not malinger on IQ tests, but then emphasizes that Dr. Martinez "acknowledged that motivational factors likely played a role in petitioner's test scores."  Order at 45.  The resulting inference the Order draws—that Dr. Martinez, the defense's own expert, found Petitioner's IQ scores to be unreliable—is contradicted by the record.   Dr. Martinez appropriately—*professionally*—noted in his original report that the test data should be interpreted cautiously due to possible reduced motivation associated with secondary gain issues, *see* S.F. Vol. 21 at 110–12, *but then concluded that in Petitioner's case, his substandard performance on IQ tests was not consistent with malingering*:

> [W]hat I felt was inconsistent with malingering was the consistency of test scores across all different types of cognitive tests.  People who are malingering usually do poorly on one test and then do well on another, especially if they are relatively unsophisticated.  I believe Mr. Hernandez is unsophisticated, and people who are unsophisticated typically do not produce a very consistent profile.  His profile was consistently low on every cognitive test that was administered.

13

S.F. Vol. 21 at 130, 131.  During the evidentiary hearing, on the issue of Petitioner's mental retardation, Dr. Martinez reaffirmed his opinion that Petitioner was not malingering, stating, "I did not feel that he was malingering, or that malingering played a significant role in his low test scores at the time."  E.H. Vol. 4 at 66.

Fourth, the opinion ignores not only Dr. Martinez's affirmative conclusion that Petitioner's mental retardation- range scores were not attributable to malingering or lack of effort, but it also fails to mention the other affirmative evidence ruling out malingering.  Dr. Puente, who conducted extensive assessments of Petitioner's intellectual functioning, administering *twenty* tests, both concluded that Petitioner was not malingering, as the Order acknowledges and disparages, *and* provided reasons for his conclusions, reasons that the Order ignores.  Those reasons were grounded both in fact and expert assessment :

> The findings do not reflect malingering.  I based this on several independent sources. The tests of malingering do not provide support for the conclusion of malingering. The tests are internally reliable.  In addition, the tests reflect academic achievement as measured objectively as well as measured by academic achievement in vivo. These findings also corroborate with the clinical impression and finally, these findings corroborate independently information provided by a variety of sources including family members as well as others.  In addition to all of these, these findings corroborate my clinical judgment as administrator of objective appropriate tests of mental functioning as well as that of intellectual functioning.

2003 Puente Affidavit at 7.  During the evidentiary hearing to determine whether Petitioner meets the diagnostic criteria for mental retardation, Dr. Puente reiterated his opinion that there was no evidence that Petitioner malingered on tests he had administered.  E.H. Vol. 4 at 218–20.

The Order likewise ignores the evidence from Dr. Michael Arambula, M.D., who conducted a pretrial psychiatric evaluation of Petitioner.  Like Drs. Martinez and Puente, Dr. Arambula found

no evidence of malingering.  At trial, Dr. Arambula explained that malingering is a term that refers to individuals who engage in deceit for their own benefit.  S.F. Vol. 21 at 166.  Although Dr. Arambula questioned the *truthfulness* of some of Petitioner's claims due to their implausibility, he found no evidence to suggest that Petitioner was malingering, pointing out that Petitioner's apparent exaggerations were of the type that could harm, rather than help, him, and were therefore not indicative of malingering.  *Id.*

Thus, the Order's reliance on malingering or lack of effort as a basis for discounting petitioner's consistently low IQ was accomplished only through gross distortions of the record.

### 3.   The consensus among *qualified* experts that Petitioner is mentally retarded.

The Order relies heavily on the opinions of Dr. Coons in finding that the state court determination that Petitioner does not have mental retardation was a reasonable one.  But reliance upon Dr. Coons's opinion can only be reasonable if he was qualified to offer an opinion and followed clinically accepted principles in reaching his conclusions.  The Order is, by omission, inaccurate because it ignores the evidence that Dr. Coons was not qualified, as well as evidence that he ignored accepted professional principles.  In fact, Dr. Coons was not qualified, for he lacked knowledge, training, and experience in the field of mental retardation.  Dr. Coons admitted that *he had never administered a test for mental retardation and had never even scored a test for mental retardation*.  E.H. Vol. 5 at 95.  Moreover, his testimony revealed that he was unfamiliar with even the most basic principles of mental retardation.  *He was unable to state the AAMR definition of mental retardation*.  *Id.* at 127.  He was also unaware that the AAMR had altered the definition and guidelines for assessing adaptive functioning in 2002.  *Id.* at 196.  He appeared to be ignorant of the

15

definition, or even the existence, of risk factors for mental retardation as identified by the AAMR, and confused them with adaptive functioning assessment categories. *Id.* at 215–17.

In addition, Dr. Coons was particularly unqualified to render an opinion as to Mr. Hernandez Llanas's mental retardation because he does not speak or read Mr. Hernandez Llanas's native language. *Id.* at 56, 106. Although the Order acknowledges that Dr. Coons does not speak Spanish, it fails to note that this precluded Dr. Coons from reviewing much of the test data. *Id.* at 67, 142–43, 157. Muriel Lezak et al.'s seminal textbook, *Neuropsychological Assessment* (4th ed. 2004), states that "when not fluent in the client's language, ethical practice should lead the neuropsychologist to refer the patient to a colleague who is fluent in the patient's language *or to collaborate with a bilingual clinician—not necessarily a clinical neuropsychologist—if at all possible.*" Lezak, Howieson & Loring at 314. Dr. Coons failed to refer the State to someone fluent in Spanish or even consult with someone who speaks Spanish. Dr. Coons testified that he consulted a local neuropsychologist who reviewed the testing data, E.H. Vol. 5 at 143, but the neuropsychologist he consulted (who did not testify) also could not speak Spanish and, thus, was likewise unable to review all of the data. *Id.*

The Order also fails to acknowledge the gross disparities between the qualifications of Dr. Coons, and those of defense experts Dr. Puente and Dr. Martinez. Although the Order does describe Dr. Puente as "a neuropsychologist with extensive experience in the area of mental retardation, particularly with evaluating the neuropsychological functioning of Spanish speakers," Order at 47, it wholly ignores the qualifications of Dr. Martinez, who also specializes in Bilingual (Spanish) Neuropsychological Assessment of Adults and Children. Curriculum Vitae of Gilbert Martinez, Ph.D., E.H. Applicant's Exh. 3. Thus, unlike Dr. Coons who does not read or write the Spanish

16

language, Dr. Martinez and Dr. Puente are both native Spanish speakers.  And, unlike Dr. Coons, both  personally interviewed Petitioner and administered IQ tests to him.  *See* S.F. Vol. 21 at 102; E.H. Vol. 3 at 153, 158, 164; E.H. Vol. 4 at 101, 106.  Finally, unlike Dr. Coons, who testified he had *never administered or scored a mental retardation test,* Dr. Martinez has conducted hundreds of cognitive evaluations, averaging two or three assessments a week.  E.H. Vol. 4 at 68, 69.  Similarly, Dr. Puente has *personally* conducted *between two and four mental retardation exams every week since 1982* for the Social Security Administration.  *Id.* at 153.  Notably, Dr. Puente has also served as Project Director for the translation of the Wechsler Intelligence Scale.  E.H. Vol. 4 at 102.

Thus, both experts who concluded that Petitioner was a person with mental retardation were well qualified to do so, and one was extraordinarily well-qualified, while the only person who concluded that Petitioner does not have mental retardation was completely unqualified to make that assessment.

### 4.    Petitioner's low functioning within his "cultural group."

The Order notes that Dr. Coons testified, in part, that "[petitioner's] adaptive behavior as to communication is appropriate for petitioner's age and cultural group."  Order at 55.  The Order then relies upon Dr. Coons's testimony to conclude that Petitioner's extremely low functioning does not reflect adaptive functioning deficits, because, as the Order stresses, an adaptive functioning assessment must take into account the individual's "cultural group."  *Id*. At 82–83.  In so doing, the Order implies that Petitioner's adaptive functioning deficits are actually attributable to his "cultural group."  It introduces something of a red herring by stating, "Dr. Martinez and Dr. Coons agreed that consideration of a subject's cultural group was essential to accurately evaluating the subject's adaptive functioning.  In contrast, Dr. Puente appeared to argue that consideration of a subject's

17

cultural background in evaluating the subject's intelligence was tantamount to 'racism.'  The DSM-IV-TR recommends consideration of the suitability of any test instrument intended to measure the subjects's adaptive functioning 'to the person's socio-cultural background, education, associated handicaps, motivation, and cooperation.'"  Order at 82–83.  Of course, whether consideration of cultural background is racism or is appropriate practice depends upon the way in which that background is considered.

In this case, however, such issues of terminology and interpretation are beside the point.  Inexplicably, the Order fails to acknowledge that even within in his "cultural group," Petitioner's functioning was grossly subaverage.  If Petitioner's apparent adaptive functioning deficits were in fact attributable to his cultural group, then his siblings, who belong to the same "cultural group" and have the same "socio-economic background" as Petitioner, would also show deficient functioning in the employment realm, but they do not.  Instead, his siblings have attained levels of occupational achievement that far surpass those attained by Petitioner; one of his sisters is a teacher, E.H. Vol. 4 at 296; another sister opened a church with her husband, *id.* at 252; and a brother drives commercial trailers from Mexico to the United States, E.H. Vol. 3 at 12.  Moreover, unlike his siblings, who also scavenged trash, as a child Petitioner was unable to sort glass by color or pile cardboard properly.  Amended Petition at 60, 61.  And again, unlike his siblings, Petitioner was unable to succeed at school and was forced to leave in the third grade because he could not learn. *Id.* at 40–42.  And finally, it is his siblings who describe his inability to bathe, care for himself, travel alone, make change, sort waste, play sports, follow directions, prepare food, or perform adequately in school.  *See generally* E.H. Vol. 3 at 12–110; E.H. Vol. 4 at 230–313.

5. The menial nature of Petitioner's employment.

18

The order also notes with approval that "The state habeas trial court also pointed out petitioner had been able to obtain gainful employment and to obtain use of motor vehicle despite the fact petitioner was a fugitive from justice and an undocumented alien." Order at 84. What the order fails to acknowledge is the evidence that all jobs Mr. Hernandez Llanas held—including jobs with the victim, Mr. Lich—required only unskilled labor and involved menial tasks. At trial, there was testimony that a carpenter Mr. and Mrs. Lich had hired brought Petitioner as an assistant. There was also testimony that Mr. Lich had subsequently hired Petitioner to take care of a litter of puppies and that Petitioner was to be compensated for this work with a puppy—not exactly prime wages. Acknowledging these facts would render ridiculous any suggestion that Petitioner's employment was inconsistent with mental retardation.

6.      The absence of any sophisticated criminal activity.

This Court's order describes the state court's "focus[] on the complexity and planning required to carry out petitioner's adult criminal conduct, both in connection with the murder of Glen Lich and sexual assault of Mrs. Lich, as well as petitioner's prior abduction and sexual assault of a fifteen-year-old victim, and Petitioner's escape from custody in Mexico and illegal entry into this nation." Order at 84. The Order also notes that the state habeas trial court found that "Upon his arrest, petitioner furnished the name of a relative to law enforcement as his own; when later confronted with his misrepresentation, petitioner admitted he had deliberately misled officers;" *id.* at 58, implying that this deceit was evidence of intelligence. The order then concludes that "The state habeas trial court reasonably concluded the level of planning and preparation necessarily involved in petitioner's pattern of criminal conduct demonstrated a lack of significant limitations in adaptive functioning." *Id.* at 84. This is grossly misleading. It inexplicably omits undisputed

19

details, summarized in the amended petition, that makes each of these broadly described criminal actions ones that are well within the capability of a person with mental retardation.

        a.      Petitioner's escape from a hospital and entry into this country.

The Order refers to Petitioner as escaping while in "custody," which is not literally inaccurate, but is nonetheless misleading. Petitioner did not, as the term "in custody" implies, escape from prison, but from the Alfredo Pumarejo Hospital in Ciudad Victoria, Tamaulipas. He did not require any cleverness to do so. According to the penitentiary packet the state introduced into evidence, the guard at the hospital informed authorities that he "had fallen asleep for a moment and when he woke up, Ramiro Hernandez was not where he was supposed to be." State's Trial Exhibit 94, English Translation of Penitentiary Packet from Mexico. Thus, the circumstances of the escape did not require any ingenuity at all.

Moreover, in the only testimony relevant to this point, Maria del Carmen Serrano, a witness for the State during the penalty phase, stated that Petitioner had escaped from a Mexican prison either by going through a window or by going through a door and being "*helped by some relatives*." S.F. Vol. 20 at 29 (emphasis added). Likewise, Petitioner's "illegal entry into this country" demonstrates no sophistication. That Petitioner was "helped by some relatives" to escape suggests they may have helped him enter this country as well, but even *if* Petitioner had been able to make this trip without the assistance of his family members, without more information about how he had done so (Did he hitchhike? Rely on friends? Arrive at that destination after lengthy wandering? Pay someone to bring him across the border?), the unadorned fact of his illegal entry provides no evidence of normal intelligence.

        b.      Petitioner's capital offense.

No objective consideration of the details of Petitioner's capital offense permits any attribution of sophisticated planning.  Although there was testimony at trial that Mr. Hernandez Llanas expressed a desire to harm his employers prior to the commission of the crime, thus suggesting some forethought, there is nothing in the record that demonstrates either competent planning or complex design.  The method of killing—brute force—hardly requires significant acumen.  Indeed, had any significant planning been involved, Petitioner would not have been apprehended *asleep* at the crime scene.  He did not make even minimal attempts to avoid detection, nor did he take any steps to hide incriminating evidence.  Although he had plenty of time to flee the crime scene, he did not do so; although he started his employer's jeep, he did not follow through and leave.  S.F. Vol. 18 at 68.  Not only did he fail to flee, but his behavior during the offense defies any inference of the caution or care one would expect of a person with normal intelligence.  He made telephone calls from the scene of the crime itself prior to *falling asleep*.  *Id.* at 59, 60.  Thus, Petitioner's behavior before and after the capital offense was by no means inconsistent with the actions of a person with mental retardation.

c.      Petitioner's pathetic attempt to deceive the police.

The opinion also cites as evidence of Petitioner's adequate functioning that he attempted to mislead officers as to his true identity; it fails to acknowledge, however, the details that reveal the utter stupidity of his lie.  Upon his arrest, Petitioner was interviewed by Ranger de los Santos, and initially provided an alias, claiming to be "Ruben Salinas."  *Id*.  *Rather than providing a fictitious name that might have* actually fooled someone, Petitioner offered the name of his cousin*, Examining Trial (November 7, 1997) at 85, 86, and then, during the same interview, requested that Ranger de los Santos inform his aunt, Herminia *Salinas*, that he had been arrested, providing his aunt's true

address to Ranger de los Santos.  *Id*.  Not surprisingly, Ranger de los Santos went to Herminia Salinas's house following his interrogation of Petitioner, and not surprisingly, Herminia Salinas—the *mother* of the real "Ruben Salinas"—immediately informed Ranger de los Santos of Petitioner's true identity.  *Id*.  Armed with this new information, Ranger de los Santos returned to confront Petitioner, who then readily admitted his previous lie, and acknowledged his true name. Interrogation Transcript A-2.

This is a sequence of events that any person with normal intelligence would have anticipated—and avoided.  No shrewd individual, no *averag*e individual, when attempting to hide his identity would provide the name of an actual relative as an alias and in the next breath provide the name and address of that relative's mother.  Thus, had the Order acknowledged the details surrounding this pathetic attempt to deceive, it would have had to concede that the attempt was evidence of his limitations, rather than his competence.

7.     Petitioner's impaired communication ability while in custody.

This Court's order repeats with approval the state habeas trial court's finding that "Petitioner gave a coherent, articulate, and knowledgeable pair of confessions to law enforcement following his arrest."  Order at 58.  This characterization of Petitioner's communication abilities, however, is inconsistent with the transcripts of Ranger de los Santos's interviews with Petitioner and the contents of his prison writings.

With respect to his interrogation, Petitioner's answers were at times incoherent, erratic, and tangential, and related to the questions he was asked only marginally, if at all.  For example, the following exchange took place during the first interview when Ranger de los Santos asked Mr. Hernandez Llanas whether he had problems with his mother:

> G.D. Did you have problems with your mother?
>
> R.H. Yes . . . Yes . . . .  A small problem you know, I wanted everything to be the same right . . . except that only she wanted . . . not too much by force right . . . the monkey but, it's because I could also help her . . . and . . . the way to do it . . . .  Like I told you it might have been the alcohol or I don't know because I am not used to drinking alcohol . . . .  I'll only drink a beer or two but, it seemed or two but, it seemed easy to me right . . . to do it . . . the truth . . . .

Interrogation Transcript A-1.

Ranger de los Santos subsequently inquired about a knife the victim's wife had reported to be in Petitioner's possession during the crime, and again, Mr. Hernandez Llanas's response to Ranger de los Santos's question was tangential and incoherent:

> G.D. It's a big knife and when did you get the knife?
>
> R.H. Well I had it because the truth is like this because sometimes there were coyotes or something like that and like I couldn't have a firearm or nothing there, there was some there, there is firearms, but I couldn't use any of the firearms there because . . . well I respect him and I don't grab anything . . . well it just seemed easy for me to put the knife on my waist.

*Id.*

Moreover, Ranger de los Santos posed short questions, used simple language, spoke clearly, and sought concrete information.  Interrogation Transcripts A-1, A-2.  Petitioner's responses, even when coherent, were neither sophisticated nor abstract.  Absolutely nothing about the transcripts is inconsistent with a diagnosis of mental retardation.

Relatedly, the Order also declares that "petitioner was capable of following rules and making meaningful written (albeit in Spanish) requests for resources."  Order at 59.  But the evidence concerning Petitioner's ability to communicate in writing, like the evidence concerning his ability

23

to communicate orally, demonstrates only the ability to communicate simple thoughts, and at the same time establishes significant impairments.  The Order ignores this evidence, which was introduced by the State at the evidentiary hearing, and summarized in the amended petition.  *See* E.H. State's Exh. 1, Packet of Inmate Request Forms and Letters (hereinafter "State Packet").  The writings, which include Inmate Request Forms and letters that Petitioner wrote while incarcerated at the Kerr County Jail, are all in Spanish, and even in Spanish, those writings provide compelling evidence of communication deficits consistent with a diagnosis of mental retardation.  As demonstrated by samples reprinted in the amended petition, the letters and Inmate Request Forms are replete with punctuation, grammar, and spelling errors.  The Order's failure to acknowledge the contents of Petitioner's writings—which were before the state court—just as its failure to acknowledge the content of his interrogation statements, coupled with its touting of Petitioner's communication skills, constitutes either an extraordinarily careless review of the record, or a deliberate misrepresentation of the facts.[4]

Finally, in the broadest sense, the Order mischaracterizes the state court record by omitting all discussion of myriad other aspects of Petitioner's evidence of his limitations in adaptive functioning. In sum, this Court's analysis of Ground A both grossly mischaracterized the state court decision and the state court record.  For these reasons, the Court should rescind the Order entered on September 23, 2011, and prepare a new order accurately reflecting the record and granting relief on Petitioner's *Atkins* claim.

---

[4]Only if one accepted the most extreme (and inaccurate) stereotypes of mental retardation would the mere ability to speak and write be probative evidence that petitioner is not mentally retarded.  Acceptance of such stereotypes, however, would be contrary to accepted clinical definitions of mental retardation as adopted by the Supreme Court in *Atkins*.

II. CONCLUSION

Wherefore, for all of the foregoing reasons, and the reasons set forth in Petitioner's prior submissions, this Court should alter or amend its judgment, and enter a new order granting the writ of habeas corpus based on Ground One, or in the alternative, issue a new order correcting the factual errors described in this motion.

Respectfully submitted,

SHERI LYNN JOHNSON
Myron Taylor Hall
Cornell Law School
Ithaca, NY 14853
607 255 6478

NAOMI TERR
1927 Blodgett Street
Houston, Texas 77004
713 222 7788

By: /s/ Naomi Terr
Counsel for Petitioner

October 21, 2011

25

**CERTIFICATE OF CONFERENCE**

I certify that on October 21, 2011, I conferred with Ellen Stewart-Klein, counsel for Respondent. Ms. Stewart-Klein stated she opposes the filing of this motion. .

s/ Naomi E. Terr<br>_____

**CERTIFICATE OF SERVICE**

I hereby certify that on October 21, 2011 I electronically filed the foregoing with the Court using the ECF system which sent notification of the filing to Sheri Johnson, co-counsel for the Petitioner, and Ellen Stewart-Klein, counsel for the Respondent.

s/ Naomi Terr<br>_____

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| RAMIRO HERNANDEZ A/K/A | § | |
| RAMIRO HERNANDEZ LLANAS, | § | |
| | § | |
| Petitioner, | § | |
| | § | CIVIL NO. SA-08-CA-805-XR |
| V. | § | |
| | § | **DEATH PENALTY CASE** |
| RICK THALER, | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| | § | |
| Respondent. | | |

### ORDER

This Court has reviewed **Petitioner's Motion to Alter or Amend the Judgment.** It is hereby

ORDERED that Petitioner's Motion is GRANTED, the order RESCINDED, a new order ISSUED,

and the writ of habeas corpus is GRANTED.

Entered in San Antonio, Texas this _____ day of _____, 2011.


_____
Xavier Rodriguez
Federal District Judge

27