# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **RAMIRO HERNANDEZ a/k/a** | § | |
| **RAMIRO HERNANDEZ LLANAS,** | § | |
| **TDCJ No. 999342,** | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| **V.** | § | **CIVIL NO. SA-08-CA-805-XR** |
| | § | |
| **RICK THALER, Director,** | § | |
| **Texas Department of Criminal** | § | |
| **Justice, Correctional** | § | |
| **Institutions Division,** | § | |
| | § | |
| Respondent. | § | |

## ORDER DENYING MOTION TO ALTER OR AMEND JUDGMENT

Petitioner Ramiro Hernandez Llanas filed this federal habeas corpus action pursuant to 28 U.S.C. §2254 challenging his conviction for capital murder and sentence of death. This Court concluded Petitioner is not entitled to habeas corpus relief, but is entitled to a Certificate of Appealability regarding his claim that he is mentally retarded. *Hernandez Llanas v. Thaler*, 2011 WL 4437091 (W.D. Tex. Sept. 23, 2011).

On October 21, 2011, Petitioner filed a motion to alter or amend judgment arguing this Court's Memorandum Opinion and Order contains a number of "factual errors" regarding his mental retardation claim and "misrepresentations" regarding the evidence in the record which warrant granting Petitioner relief on his *Atkins* claim. *Docket entry no. 70.* After a second careful review of the state court record in this cause, consideration of the arguments contained in Petitioner's motion to alter or amend judgment and respondent's opposition thereto, and consideration of the arguments made by the parties during oral argument on January 4, 2012, this Court will modify some of the

language contained its Memorandum Opinion and Order but nonetheless concludes, under the AEDPA, Petitioner is still not entitled to federal habeas corpus relief from this Court on his *Atkins* claim.

## I.   <u>Background</u>

The circumstances of Petitioner's 1997 capital offense and subsequent state court trial, direct appeal, and state habeas corpus proceedings are set forth in detail in this Court's Memorandum Opinion and Order issued September 23, 2011 and will be repeated hereinafter only as necessary to address the arguments in support of the motion to alter or amend judgment.

## II.   <u>Overview of Petitioner's Motion to Alter or Amend Judgment</u>

Petitioner asserts in his motion to alter or amend judgment that this Court's Memorandum Opinion and Order contains what he terms "factual errors" and "misrepresentations." Having carefully reviewed Petitioner's motion and oral arguments, this Court concludes the vast majority of the alleged "factual errors" and "misrepresentations" identified are merely complaints about this Court's ultimate conclusions that the state habeas court's rejection on the merits of Petitioner's *Atkins* claim was both consistent with clearly established federal law and objectively reasonable in view of the evidence actually presented to the state habeas court.

Petitioner also appears to disagree with (1) many of the express and implied factual inferences the state habeas court drew from the evidence before that court and (2) this Court's conclusions that the express and implicit factual findings made by the state habeas court in the course of its rejection of his *Atkins* claim were reasonable in light of the evidence presented to that state court.

2

This Court's Memorandum Opinion and Order contains a detailed summary of all the relevant testimony and other evidence introduced during both the trial and first state habeas corpus proceeding presented by the parties with regard to the Petitioner's claim that he is currently mentally retarded within the meaning of *Atkins v. Virginia*, 536 U.S. 304 (2002). *Hernandez Llanas v. Thaler*, 2011 WL 4427091, *4-*5, *10-*15. Petitioner takes issue with this Court's summary of the evidence, much of which consisted of conflicting expert opinions regarding Petitioner's intellectual capabilities and alleged deficiencies in Petitioner's adaptive functioning. Petitioner also disagrees with this Court's ultimate conclusion that the state habeas court acted in an objectively reasonable manner.

## III.   <u>Clarifying the Issues Before this Court at this Juncture</u>

The issue properly before this Court in connection with Petitioner's mental retardation claim is not whether this Court believes as a matter of first impression the Petitioner is, in fact, mentally retarded; rather, because the state habeas court denied relief on Petitioner's *Atkins* claim on the merits after holding a full evidentiary hearing and reviewing extensive testimonial and documentary evidence, this Court's review of the *Atkins* claim is necessarily circumscribed by the AEDPA. *Hernandez Llanas v. Thaler*, 2011 WL 4437091, *7. *See also Hearn v. Thaler*, --- F.3d ----, 2012 WL 262618 (5th Cir. Jan. 30, 2012)("In determining whether reasonable jurists would debate the district court's assessment of Hearn's Atkins claim, we keep in mind that the district court's review of the CCA's decision must be conducted pursuant to AEDPA's highly deferential standards.").

Under the AEDPA, the issue before this Court is whether the state habeas court's rejection on the merits of Petitioner's *Atkins* claim either (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000); 28 U.S.C. § 2254(d).

Petitioner's complaints of alleged "factual errors" appear to be directed primarily at this Court's conclusion the state habeas court's express and implicit factual findings were premised upon reasonable determinations of fact in light of the evidence presented to the state habeas court.

Contrary to the suggestion contained in the motion to alter or amend judgment, this Court's Memorandum Opinion and Order did not include any *de novo* factual findings on the subject of Petitioner's *Atkins* claim. Rather, this Court determined (1) the factual inferences the state habeas trial court implicitly or expressly drew from the evidence actually before that court were objectively reasonable and (2) the state habeas court's ultimate rejection of Petitioner's *Atkins* claim was consistent with clearly established federal law. This Court did not attempt to resolve the underlying issue of whether Petitioner is mentally retarded. Under the AEDPA, that issue is properly reserved for the state habeas court and this Court's review of same is greatly circumscribed.

The determination of whether a capital murder defendant suffers from mental retardation involves issues of fact which are subject to a presumption of correctness that must be rebutted by clear and convincing evidence. *Maldonado v. Thaler*, 625 F.3d 229, 236 (5th Cir. 2010), *cert. denied*, ___ U.S. ___, 2011 WL 4530498 (Oct. 3, 2011); *Clark v. Quarterman*, 457 F.3d 441, 444 (5th Cir. 2006), *cert. denied*, 549 U.S. 1254 (2007); 28 U.S.C §2254(e)(1). Petitioner bears the burden of establishing that he is mentally retarded. *Maldonado v. Thaler*, 625 F.3d at 236. For the reasons discussed hereinafter, Petitioner has failed to persuade this Court that either the express

factual findings made, or the implicit factual inferences drawn, by the state habeas court in the course of that court's rejection of Petitioner's *Atkins* claim were incorrect.

## IV.   **Analysis of Alleged "Factual Errors"**

### A.   Overview

During oral argument, Petitioner focused primarily upon two alleged "factual errors" contained in this Court's Memorandum Opinion and Order. The Court will address those complaints first. Petitioner's remaining complaints of "factual errors" and "misrepresentations" will be addressed hereinafter roughly in the order in which they appear in Petitioner's motion to alter or amend judgment.

### B.   Lack of Express Credibility Findings on Experts' Relative Credibility

Petitioner argues this Court erroneously concluded the state habeas court gave more credence to Dr. Coons' opinions' regarding Petitioner's lack of adaptive functioning deficits over the opinions of Dr. Puente. *Hernandez Llanas v. Thaler*, 2011 WL 4437091, *16, *23. Petitioner correctly points out the state habeas trial court refused to include a number of *express* factual findings regarding the relative credibility of Petitioner's relatives and mental health experts vis-a-vis the state's mental expert that the state had included in its proposed findings of fact and conclusions of law.

The state habeas trial court issued two orders containing findings of fact and conclusions of law regarding the *Atkins* claim.[1] At several points in the latter of these two Orders, the state habeas

---

[1] The first Order, issued March 18, 2006 and styled Exhibit "A" - Supplemental Findings of Fact and Conclusions of Law as to Issue of Mental Retardation, appears in Volume V of the pleadings, motions, and other records filed in Petitioner's state habeas corpus proceeding (henceforth "State Habeas Transcript, Volume V"), at pp. 154-60. The state habeas court's second Order was issued May 20, 2008, was styled Supplemental Findings of Fact and

trial judge crossed through and initialed (thereby striking) proposed language which suggested the testimony of Petitioner's relatives and that of Petitioner's mental health experts (Dr. Antonio Puente and Dr. Gilbert Martinez) was either incredible or less credible and trustworthy than the opinions expressed by the state's mental health expert (Dr. Coons).[2]

During oral argument, both parties appeared to agree that the state habeas trial court made no *express* factual findings regarding the relative credibility of Dr. Puente's opinions and conclusions vis-a-vis those of Dr. Coons.  After further review of the state habeas trial court's findings of fact and conclusions of law, this Court agrees the state habeas court made no *express* factual findings regarding the relative credibility of Petitioner's mental health experts vis-a-vis the state's mental health expert.  This Court will modify the objectionable language from the Memorandum Opinion and Order issued September 23, 2011, i.e., the text following "(15)" contained at the end of the first paragraph of Section II.B.2.e., found at 2011 WL 4437091, *16.[3]

    C.    <u>Presence of Implicit Credibility Findings on Relatives' Testimony</u>

As explained above, the state habeas trial court struck through a proposed factual finding stating the Petitioner's relatives' testimony was incredible.[4]  Petitioner argued this fact compels the conclusion that the state habeas court made no factual findings whatsoever regarding the credibility

---

Conclusions of Law on Post-Conviction Application for Writ of Habeas Corpus [Mental Retardation Issue], and appears at State Habeas Transcript, Volume V, at pp. 137-53.

[2]  State Habeas Transcript, Volume V, at pp. 146, 147, 150, and 152-53.

[3]  The record citation and text contained in of footnote 148 will remain, however.

[4]  State Habeas Transcript, Volume V, at p. 147.

of Petitioner's relatives' testimony before that court. However, in the "Conclusions of Law" section

of the state habeas trial court's May 20, 2008 Order, that court concluded as follows:

1.      The applicant was not mentally retarded because the evidence failed to show that the applicant had a significantly subaverage general intellectual functioning.

2.      The level of the applicant's intellectual functioning is insufficient to support a finding of mental retardation. *Further, there was no evidence of significant limitations in adaptive functioning in any of the following skills areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health or safety.*

3.      *The court further finds that there is no credible evidence that any mental retardation manifested during the developmental period, or at any time prior [to] the applicant being 18 years of age, or any other age.*

4.      The applicant's expert, Dr. Puente testified that he discounted various factual accounts by witnesses dealing with the applicant's actions prior to being arrested and identified as not being significant indicators of adaptive behavior. (V 4, pp 190-205).

5.      The totality of the circumstances, from the position of the trial court and the jury as trier of fact, supports the determination, which this court hereby concludes, that the applicant was not mentally retarded, and thus the issue of unconstitutional execution of a person of such a class is not presented herein.[5]

This Court carefully reviewed and summarized the testimony of Petitioner's relatives, as well

as the opinions and conclusions expressed by Petitioner's mental health experts, Dr. Martinez and

Dr. Puente, regarding alleged deficits in Petitioner's adaptive functioning prior to age eighteen.

*Hernandez Llanas v. Thaler*, 2011 WL 4437091, *10-*14. Those witnesses testified that Petitioner

(1) suffered from extreme physical and emotional abuse and neglect at the hands of his parents, (2)

had a long history of drug, alcohol, and inhalant abuse starting at an early age, and (3) never achieved

much academically, leaving school after the third grade, and never learning to read or write his native

tongue. *Id.* Petitioner's relatives and a neighbor also testified the Petitioner (1) lagged behind his

_____

[5] State Habeas Transcript, Volume V, at pp. 152-53 (emphasis added).

siblings developmentally during his childhood in terms of his ability to dress, clean, and care for himself, (2) never learned to count money or cook his own meals, (3) was unable to follow simple directions or perform even menial tasks such as sorting glass by color, (4) could not learn the rules of baseball, learn to gamble intelligently, or follow the rules of other childhood games, and (5) was suspended from school because he fell asleep in class, would not do his homework, and constantly wanted to leave the classroom. *Id*.

This Court concludes the state habeas trial court's express conclusions of law quoted above necessarily included *implicit* credibility findings, i.e., the state habeas trial court implicitly rejected the testimony of Petitioner's siblings and neighbor regarding Petitioner's alleged deficits in adaptive functioning prior to age 18.  The state habeas court's express conclusions of law, which specifically referred to "no evidence" and "no credible evidence" supporting Petitioner's claims he suffered deficits in adaptive functioning prior to age 18, implicitly rejected the credibility of the testimony given by the relatives and neighbor on that subject.  For the reasons discussed at length in this Court's Memorandum Opinion and Order, that implicit credibility determination was reasonable in light of all the evidence then before the state habeas court.  *Hernandez Llanas v. Thaler*, 2011 WL 4337091, *22-*24.

D.    "Credence" Versus Weight and Persuasiveness

Petitioner complains this Court erroneously characterized the state trial court's analysis of his *Atkins* claim as one which basically came down to the resolution of a credibility question between the state's expert (Dr. Coons) and Petitioner's primary mental health expert (Dr. Puente): "There are several reasons why the state habeas trial court reasonably gave more credence to Dr. Coons'

opinions regarding Petitioner's lack of adaptive functioning deficits over the opinions of Dr. Puente." *Hernandez Llanas v. Thaler*, 2011 WL 4437091, *23.

For the reasons discussed in Section IV. B. above, this Court withdraws any suggestion the state habeas trial court *expressly* found Dr. Coons' opinions and conclusions more credible than those of Dr. Puente. Insofar as Petitioner argues the state habeas court's ultimate rejection of Petitioner's *Atkins* claim did not include at least an implicit rejection by the state habeas court of the conclusions and opinions expressly by Dr. Martinez and Dr. Puente, that argument is inconsistent with the record in Petitioner's state habeas proceeding. Whether the state habeas court's ultimate conclusion on Petitioner's *Atkins* claim is phrased in terms of a resolution of the relative "credibility" of Petitioner's experts versus the credibility of the state's expert is immaterial. What matters is the state habeas court's ultimate conclusion, i.e., its rejection on the merits of Petitioner's *Atkins* claim, necessarily included an *implicit* determination that the opinions and conclusions expressed by Dr. Coons were more persuasive, convincing, reliable, or compelling than those expressed by Petitioner's experts. No other rational interpretation of the state habeas court's ultimate conclusion is possible. It is not the province of this court to second-guess the state habeas court's thought processes; nor may this Court substitute its own independent analysis of the *Atkins* claim in lieu of the state habeas court's rejection on the merits of that claim. *See McDaniel v. Brown*, ___ U.S. ___, ___, 130 S.Ct. 665, 673, 175 L.Ed.2d 582 (2010)("A federal habeas court can only set aside a state-court decision as 'an unreasonable application of...clearly established Federal law,' §2254(d)(1), if the state court's application of that law is 'objectively unreasonable.'"). The sole issue before this Court is not whether Petitioner is mentally retarded or even whether the state habeas court's resolution of that issue was "correct," but, rather, whether the state habeas court's ultimate

9

conclusion was "objectively reasonable."  For the reasons discussed at length in this Court's Memorandum Opinion and Order, this Court concluded the state habeas court's rejection on the merits of Petitioner's *Atkins* claim was neither inconsistent with clearly established federal law, as promulgated by the Supreme Court, nor based upon an unreasonable determination of the facts in view of the record then before the state habeas court.  *Hernandez Llanas v. Thaler*, 2011 WL 4437091, *17-*24.  Simply put, the state habeas court acted in an objectively reasonable manner.

        E.      <u>The State Habeas Court Reasonably Applied the *Briseno* Factors and Drew Reasonable Inferences from the Evidence on the Ultimate Question of Mental Retardation</u>

Petitioner has raised a number of arguments suggesting the state habeas court drew incorrect inferences.  Having carefully considered these arguments, this Court respectfully declines to re-adjudicate the issue of whether Petitioner is, in fact, mentally retarded.  It is not the province of this Court to substitute its own inferences from the evidence for those reasonably drawn by the state habeas court in the course of its rejection on the merits of Petitioner's *Atkins* claim.

As was explained above, absent a showing by clear and convincing evidence establishing the erroneous nature of the state habeas court's factual findings and inferences, it is not the role of this Court to second guess the factual determinations made by the state habeas court. Despite Petitioner's invitation to do so, it is likewise not the proper role of this Court to re-weigh the competing expert testimony *de novo* on the ultimate issue of Petitioner's mental retardation.  Rather, under the AEDPA, the role of this Court is limited to ascertaining whether the state habeas court's ultimate conclusion, i.e., that Petitioner was not mentally retarded within the meaning of *Atkins*, was either (1) contrary to, or involved an unreasonable application of, clearly established federal law (as

determined by the Supreme Court) or (2) based upon an unreasonable determination of facts in light of the evidence actually presented to the state court. 28 U.S.C. §2254(d).

The possibility this Court might have drawn different factual inferences in a de novo review of the evidence before the state habeas court does not authorize this Court to substitute its judgment for that of the state habeas court if the inferences drawn by the state habeas court were objectively reasonable in light of the evidence before that court. This Court determined the state habeas court's implicit rejection of Dr. Puente's opinions and conclusions concerning the allegedly "stupid" and "retarded" circumstances of Petitioner's capital offense was objectively reasonable. Nothing in Petitioner's motion to alter or amend judgment compels this Court to reconsideration determination.

For instance, Petitioner argues, as did Dr. Puente during his testimony in the state habeas corpus proceeding, that Petitioner failed to flee the scene of the crime after murdering Glen Lich, and later fell asleep, somehow shows Petitioner's actions that night were, in Dr. Puente's words, "stupid."[6] This argument ignores the full scope of the criminal conduct in which Petitioner engaged on the night in question. Shortly after his arrest, Petitioner gave a recorded statement to a Texas Ranger in which Petitioner explained the reason he killed Glen Lich was because he wanted to steal Lich's jeep, drive the jeep to Laredo and sell it, and give at least a portion of the proceeds to his mother.[7] Furthermore, Glen Lich's widow, Lera, testified without contradiction during the trial that, in addition to repeatedly sexually assaulting her, Petitioner ransacked the Lichs' bedroom in an

---

[6] S.F. State Habeas Hearing, Volume 4 of 6, testimony of Dr. Antonio E. Puente, at p. 197 ("I mean, if you commit a crime, you need to leave the scene. But to fall asleep, it seems – it seems retarded.").

[7] Statement of Facts from Petitioner's Trial (henceforth "S.F. Trial"), Volume 2, State Exhibit 1, at pp. 8-10.

apparent search for jewelry and other valuables.[8]  Mrs. Lich also testified the Petitioner held a knife

to her neck, demanded money from her, and, when she told him her money was in the bank, persisted

in demanding money until she agreed to go to the bank in the morning and withdraw the amount he

demanded.[9]  Petitioner also told Mrs. Lich she would see her husband if she gave him the money.[10]

Thus, the evidence at trial showed there was a perfectly rational explanation for Petitioner's

failure to flee the crime scene as soon as he murdered Glen Lich: Petitioner wanted money and Lera

Lich had promised him she would get him money in the morning.  Petitioner's apparent plan to send

Lera Lich to the bank in the morning was likewise anything but "stupid."  Petitioner had a potential

hostage readily at his disposal if he had followed through with his apparent plan and released Mrs.

Lich in the morning to go to the bank - Lera's elderly mother, who was sleeping in a nearby room

and whom Petitioner had threatened at least once during the night.[11]  Petitioner also threatened to

hunt down Lera's adult daughter.[12]  Thus, there were perfectly rational reasons why Petitioner may

have believed he could compel Lera Lich to obtain money for him in the morning without fear she

would notify the authorities of his criminal actions the night before.   The state habeas court could

also reasonably have given less weight to Dr. Puente's opinions and conclusions based upon Dr.

Puente's attempts to minimize the planning and sophistication involved in Petitioner's capital

offense and related crimes.

---

[8] S.F. Trial, Volume 18, testimony of Lera Lich, at pp. 39, 43-48, 52, 63-66, 73-76, 88.

[9] S.F. Trial, Volume 18, testimony of Lera Lich, at pp. 52-54, 76.

[10] *Id.*, at p. 76.

[11] S.F. Trial, Volume 18, testimony of Lera Lich, at pp. 48, 62.

[12] *Id.*, at p. 106 (Petitioner threatened the Lich's daughter by name).

Dr. Puente initially testified Petitioner could not drive a car, but later withdrew that declaration when reminded of the uncontradicted trial testimony that Petitioner used a vehicle in another crime.[13]  Dr. Puente also described Petitioner's actions in that instance as "taking a young lady or girl out in the woods and having sex," and testified further it "sounds like poor judgment on his part."[14]  The state habeas court could have considered the facts of Petitioner's kidnaping and rape of a teenager (which included petitioner luring his victim from her home by falsely promising to take her out to eat, driving her to a ranch house, sexually assaulting her at knife point in a manner similar to Petitioner's sexual assaults on Lera Lich, and then driving his victim back home after successfully threatening her with retaliation if she reported his crimes against her)[15] when it evaluated the comparative reliability and weight to be given to Dr. Puente's conclusions and opinions.

Dr. Puente found "absurd" Petitioner's attempt to deceive law enforcement officers by giving his cousin's name as his own upon arrest.[16]  Dr. Puente also referenced that Petitioner only performed menial labor, once accepted a puppy in lieu of payment for his labor, and never obtained a driver's licence after coming to United States as further evidence supporting his conclusion

---

[13] S.F. State Habeas Hearing, Volume 4 of 6, testimony of Dr. Antonio E. Puente, at pp. 215, 223.

[14] *Id.*, at p. 214.

[15] S.F. Trial, Volume 21, testimony of Charnichart, at pp. 23-29.  Petitioner's teenage victim testified without contradiction that the Petitioner told her he had killed people in Mexico before and he would run back to Mexico and later kill her if she reported his crimes against her. *Id.*, at pp. 28-29.  She testified further she did not report Petitioner's crimes against her even after Petitioner's arrest for capital murder. *Id.*, at p. 30.

[16] S.F. State Habeas Hearing, Volume 4 of 6, testimony of Dr. Antonio E. Puente, at p. 196.

Petitioner was mentally retarded.[17]  Dr. Puente's observations, however, do not appear to take into consideration the fact the Petitioner was both a fugitive from Mexican justice as well as an illegal immigrant at the time of his post-arrest interrogations.  There was no evidence before the state habeas court suggesting Petitioner was ever eligible to receive a social security card, eligible to obtain a Texas driver's license, or possessed sufficient identification to obtain legitimate employment in the United States.  Thus, the state habeas court could reasonably have considered Dr. Puente's criticisms of Petitioner's failure to find employment of a more substantial kind than working as a carpenter's helper or a ranch hand less than persuasive.

The state habeas court also could reasonably have concluded that Petitioner furnished law enforcement officers with a fictitious name of an actual person (Petitioner's cousin) upon his arrest was more indicative of Petitioner's deceptive nature than suggesting Petitioner was intellectually challenged.  The state habeas court could reasonably have inferred the Petitioner's desire to avoid entanglements with federal immigration officials, and the possibility of his deportation to Mexico and a return to Mexican prison, was an outcome Petitioner could rationally have wished to avoid for as long as possible.  The state habeas court could have also reasonably inferred the Petitioner's attempted deception regarding his identity, despite the fact it was eventually discovered, was less indicative of diminished intellectual capability than a sign Petitioner was not a credible source of information upon which to base a mental health diagnosis.

After initially testifying he found Petitioner to be a more reliable historian than Dr. Martinez had found, even Dr. Puente admitted Petitioner was a less than *completely* reliable source of

---

[17] *Id.*, at pp. 158, 192, 211-12, 216, 223-25.

information on Petitioner's own background.[18]   Nonetheless, Dr. Puente testified he relied *exclusively* upon Petitioner's own accounts of his escape from custody in Mexico, Petitioner's entry into the United States, and Petitioner's trip from the border to Kerrville, Texas in evaluating Petitioner for mental retardation.[19]

Dr. Puente likewise sought to diminish Petitioner's intellectual capabilities based, in part, upon Petitioner's failure to earn a GED while incarcerated.[20]   But Petitioner presented the state habeas court with no evidence suggesting GED courses are available in the Texas prison system for those inmates who read and write only Spanish.

Dr. Puente presented the state habeas trial court with a Power Point presentation and testified he believed averaging the scores from all of Petitioner's IQ scores (despite his admissions there were vast differences between the many different types of tests in question and there was an absence of reliable information in the record about the qualifications of those administering same) was a scientifically valid means of ascertaining Petitioner's actual IQ, and resulted in a score of less than sixty.[21]   However, Dr. Puente also testified he believed a WAIS-III test (normed on a Mexican population and administered to Petitioner in 2006 by himself and his technicians, which resulted in

---

[18] S.F. State Habeas Hearing, Volume 4 of 6, testimony of Dr. Antonio E. Puente, at pp. 111, 196.

[19] *Id.*, at pp. 194-95.

[20] *Id.*, at p. 192.

[21] *Id.*, at pp. 151-52, 170-73.

15

a full scale score of 70 and possessed a 95 percent probability of accuracy) accurately showed Petitioner's IQ fell somewhere within the range of 65-75.[22]

This Court has previously explained there were other reasons apparent on the face of Petitioner's trial and state habeas record why the state habeas court could have reasonably determined Dr. Coons' opinions and conclusions regarding Petitioner's alleged mental retardation were more reliable, compelling, and convincing than those expressed by Dr. Puente and Dr. Martinez. *Hernandez Llanas v. Thaler*, 2011 WL 4437091, *20-*24.

The state habeas court could reasonably have concluded Dr. Puente's characterization of Petitioner's crimes as "stupid," his initially erroneous testimony suggesting Petitioner could not drive a motor vehicle, and his attempts to downplay the seriousness and sophistication required in Petitioner's prior crimes rendered Dr. Puente's opinions and conclusions less reliable, compelling, or convincing than those of Dr. Coons even if the state habeas court did not specifically determine Dr. Puente's testimony was less "credible" than Dr. Coons. In this Court's opinion, that is precisely what the state habeas court did.

---

[22] *Id.*, at pp. 171-75. Dr. Puente also testified he believed similarities between the performance or non-verbal portions of the two WAIS tests administered to Petitioner in 2000 and 2006 respectively may have caused Petitioner's 2006 score to be elevated slightly due to Petitioner's familiarity with at least portions of the two tests. *Id.*, at pp. 174, 176. Contrary to the representations made by Petitioner's counsel during oral argument herein, neither Dr. Puente nor Dr. Martinez testified during Petitioner's state habeas corpus proceeding that the WAIS-III administered by Dr. Puente in 2006 which yielded a score of 70 regularly inflates IQ scores by a significant number of points. On the contrary, Dr. Martinez testified it was the Eiwa Escala de Inteligencia Wechsler Para Adultos that was guilty of producing a score inflated by 15-20 points. S.F. State Habeas Hearing, Volume 3 of 6, testimony of Dr. Gilbert Martinez, at pp. 25-26. There was no evidence in the record before the state habeas court showing the version of the WAIS-III administered to Petitioner in 2006 by Dr. Puente produced such significantly inflated test scores.

As this Court explained in its Memorandum Opinion and Order, the state habeas trial court's factual findings and legal conclusions essentially tracked Dr. Coons' opinions (expressed in his testimony at Petitioner's state habeas corpus hearing) on the issue of Petitioner's alleged deficits in adaptive functioning.[23] *Hernandez Llanas v. Thaler*, 2011 WL 4437091, *16. The state habeas trial court expressly determined "there was no credible evidence that any mental retardation manifested during the developmental period or at any age prior to the applicant being 18 years of age, or any other age."[24] This latter finding implicitly rejected the contrary testimony of Dr. Puente and Petitioner's siblings and family friend. No other rational interpretation of the state habeas court's findings and conclusions is possible. Because Dr. Puente relied upon the same sources of history on Petitioner's childhood which the state habeas court implicitly rejected as incredible, the state habeas court's implicit credibility determination would necessarily have cast doubt upon the vitality of Dr. Puente's conclusions and opinions regarding Petitioner's alleged deficits in adaptive functioning prior to age 18.

As was explained in detail in this Court's Memorandum Opinion and Order, the state habeas court's resolution of Petitioner's *Atkins* claim came down principally to a choice between the divergent expert opinions of Petitioner's experts (Dr. Puente and Dr. Martinez) and the opinion of the state's mental health expert (Dr. Coons). While the state habeas trial court did refuse to include many of the *express* factual findings regarding the relative credibility of Dr. Puente's conclusions vis-a-vis Dr. Coons' conclusions requested by the state in its proposed findings of fact and conclusions of law, the state habeas trial court's factual findings and conclusions of law adopted

---

[23] State Habeas Transcript, Volume V, at pp. 137-52.

[24] State Habeas Transcript, Volume V, at p. 152.

17

practically verbatim the opinions expressed by Dr. Coons' during his testimony at Petitioner's state habeas hearing. While the state habeas trial court may have failed to adopt the state's proposed *express* factual findings regarding the credibility of the primary experts' conflicting opinion testimony, there is no rational basis for arguing the state habeas court failed to make an *implicit* determination that Dr. Coons' conclusions and opinions on the ultimate issue of Petitioner's alleged mental retardation were more convincing or reliable than those furnished by Dr. Puente and Dr. Martinez.

The state habeas court clearly chose to give more weight to the expert opinions of Dr. Coons than those of Dr. Puente and Dr. Martinez. No other rational construction of the state habeas trial court's findings of fact and conclusions of law is possible. For the reasons discussed above and in this Court's Memorandum Opinion and Order, the state habeas court's decision to do so was not based upon an unreasonable determination of the facts from the evidence before that court.

In conclusion, the state habeas court reasonably concluded the opinions of Dr. Coons on the ultimate issue of Petitioner's alleged mental retardation were entitled to greater weight than the opposing opinions of Dr. Puente and Dr. Martinez, even if the state habeas trial court failed to make *express* factual findings addressing the relative *credibility* of the parties' mental health experts. As modified by this Order, this Court's Memorandum Opinion and Order accurately reflects the state habeas court's determinations regarding the respective weight to be given the opinions and conclusions of the parties' dueling experts implicit within the state habeas court's ultimate rejection of Petitioner's *Atkins* claim on the merits.

F.     Implicit Credibility Findings Re Petitioner's Relatives

18

Petitioner faults this Court for observing that Petitioner failed to present the state habeas court with any credible testimony from "independent third parties with personal knowledge of Petitioner's developmental milestones or any documentation from reliable independent sources addressing Petitioner's achievement or failure to achieve developmental childhood milestones." Yet even Petitioner's chief expert, Dr. Puente, admitted there was an absence of school records or medical records relating to Petitioner's achievement of childhood developmental milestones of the nature usually relied upon in making a mental retardation determination.[25] Furthermore, at the time of Petitioner's trial, one of his sisters furnished the prosecution with an affidavit (which she subsequently recanted only partially) in which she stated there was essentially nothing about Petitioner's childhood that suggested to her he was mentally retarded. *Hernandez Llanas v. Thaler*, 2011 WL 4437091, *11 at n.49. Finally, the state habeas trial court expressly found Petitioner "failed to present any *credible* evidence of a significant deficit in the adaptive behavior areas of health & safety, self-care, use of community resources or self-direction."[26] In light of the testimony of Petitioner's siblings and family friend regarding the conditions of Petitioner's childhood, the foregoing factual determination constituted at least an implicit, if not explicit, rejection of the credibility of the testimony of Petitioner's siblings and family friend during Petitioner's state habeas hearing.

This Court's Memorandum Opinion and Order accurately reflects that the state habeas court determined the Petitioner failed to present that court with any *credible* evidence from *independent*

---

[25] S.F. State Habeas Hearing. Volume 4, testimony of Dr. Antonio E. Puente, at pp. 129, 136-37.

[26] State Habeas Transcript, Volume V, at p. 144 (emphasis added).

19

sources establishing that Petitioner suffered significant deficits in adaptive behavior during his childhood.  Under the circumstances of Petitioner's case, his siblings and family friend did not constitute "independent" witnesses as to Petitioner's achievement or failure to achieve childhood developmental milestones.

      G.      <u>Petitioner's Anti-Social Personality</u>

Petitioner faults this Court for mentioning Petitioner's anti-social personality in concluding the state habeas court reasonably gave more weight to Dr. Coons' opinions than those of Dr. Martinez and Dr. Puente regarding the possibility Petitioner had performed at a level below his maximum capabilities on a number of post-arrest standardized tests.  Petitioner complains the state habeas trial court did not expressly mention Petitioner's "anti-social personality disorder" in its findings of fact and conclusions of law.  Petitioner offers no legal authority supporting this objection. This Court is aware of no authority limiting this Court's analysis of a claim under the AEDPA to only the evidence specifically mentioned by a state court in its formal opinion or findings of fact and conclusions of law rejecting a constitutional claim on the merits.

Petitioner misconstrues the nature of this Court's review of Petitioner's *Atkins* claim under the AEDPA.  As this Court explained in its Memorandum Opinion and Order, it is not the role of this Court to parse the state habeas court's factual findings or conclusions of law for internal inconsistencies or to grade that court's paper. *Hernandez Llanas v. Thaler*, 2011 WL 4437091, *9. Instead, in this Circuit, a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to the AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's written opinion supporting its decision. *See Maldonado v. Thaler*, 625 F.3d at 239 (federal habeas

review of a state court's adjudication involves review only of a state court's decision, not the written opinion explaining the decision).

Under the AEDPA, the issue before this Court is whether it was *objectively reasonable* for the state habeas court to reject Petitioner's *Atkins* claim on the merits based upon (1) clearly established federal law and (2) *the evidence actually presented to that court*.  In so doing, this Court is not limited to reviewing and considering only the evidence expressly mentioned or specifically listed by the state court in its formal opinion or its findings of fact and conclusions of law.  During Petitioner's capital murder trial, Petitioner's own experts agreed Petitioner displayed an anti-social personality.[27]  That diagnosis, which neither Dr. Martinez nor Dr. Puente challenged during their subsequent testimony at Petitioner's state habeas corpus hearing, was properly before the state habeas court when it rejected Petitioner's *Atkins* claim on the merits.  In fact, the entirety of Petitioner's state trial court record was properly before the state habeas court when it considered and rejected on the merits Petitioner's mental retardation claim.  There was nothing inappropriate with this Court identifying the undisputed diagnosis of Petitioner's antisocial personality disorder, which was properly before the state habeas court, when explaining why the state habeas court's rejection of Petitioner's *Atkins* claim on the merits was objectively reasonable in light of clearly established federal law and *the evidence actually before that court.*

---

[27] At trial, Dr. Gilbert Martinez offered a tentative diagnosis of anti-social personality disorder. S.F. Trial, Volume 21, testimony of Dr. Gilbert Martinez, at p. 109.  Another of Petitioner's experts testified Petitioner (1) suffered from Schizophreniform Disorder, (2) was likely to commit future acts of violence unless properly medicated, and (3) nonetheless did not suffer from a mental condition which impaired Petitioner's ability to know right from wrong. S.F. Trial, Volume 21, testimony of Dr. Robert E. Cantu, at pp. 137, 139-40, 145-46.  Yet another of Petitioner's mental health experts testified it was obvious Petitioner possessed a "distinctive" antisocial personality. S.F. Trial, Volume 21, testimony of Dr. Michael Arambula, at p. 177.

H.     Petitioner's Lack of Sophistication

Petitioner complains this Court cited the testimony of Dr. Puente and Dr. Martinez suggesting Petitioner was too unsophisticated to have "malingered" as supporting the state habeas court's implicit rejection of Dr. Martinez and Dr. Puente's ultimate opinions regarding Petitioner's mental capabilities.  Petitioner also complains the state habeas trial court's findings of fact and conclusions of law did not expressly mention this evidence in support of the state habeas court's ultimate conclusion rejecting Petitioner's *Atkins* claim. In determining whether the state habeas court's rejection of Petitioner's *Atkins* claim was objectively reasonable in light of clearly established federal law and the evidence actually before the state habeas court, this Court's review is not limited to examination of only that evidence the state habeas court expressly or specifically mentioned in its formal opinion or findings of fact and conclusions of law. *Maldonado v. Thaler*, 625 F.3d at 239.

The test of reasonableness mandated by the AEDPA is an objective one, not a subjective one. It matters not whether the state habeas court specifically identified all the evidence in the record supporting its ultimate conclusions.  This Court's role is only to determine whether that ultimate conclusion reached by the state habeas court was objectively reasonable under clearly established federal law and all the evidence actually before the state habeas court. *Id.*

Petitioner admits that both Dr. Puente and Dr. Martinez expressed opinions during the state habeas corpus proceeding suggesting Petitioner lacked the kind of sophistication necessary to have "malingered" on any of the psychological testing they performed.[28]  Dr. Coons not only disagreed with their conclusion on this point, he had a very different approach to the entire subject, explaining

---

[28] S.F. State Habeas Hearing, Volume 4, testimony of Dr. Gilbert Martinez, at p. 66; S.F. State Habeas Hearing, Volume 4, testimony of Dr. Antonio E. Puente, at pp. 178-81, 218-21.

his belief that the concept of "malingering" as expressed by Dr. Martinez and Dr. Puente during their testimony at the state habeas corpus hearing was too narrow in that it failed to give adequate consideration to the very real possibility, even perhaps the probability, the Petitioner lacked the motivation to give his best efforts during the testing performed by Dr. Martinez, Dr. Puente, and their associates.[29]  In Dr. Coons' view, motivational factors likely played a significant role in explaining Petitioner's poor performance on a host of post-arrest standardized intelligence tests.[30]  This Court concluded the state habeas court could have reasonably relied upon what this Court perceived to be Dr. Coons' reasonable opinions on the possibility that motivational factors influenced Petitioner's low test scores when the state habeas court implicitly rejected the contrary opinions of Dr. Martinez and Dr. Puente.[31]

Petitioner argues Dr. Coons was incompetent to render any opinion regarding whether Petitioner was malingering because he did not personally observe Petitioner during the testing process.  Dr. Coons' opinions were based, however, upon what he perceived to be contradictory, conflicting, or inconsistent raw data generated during the testing process, not upon observation of Petitioner's demeanor during the testing process.  The state habeas court could reasonably have believed Dr. Coons' opinions regarding the inconsistencies in Petitioner's scores on specific tests were entitled to as much or more weight than the opinions of Dr. Puente and Dr. Martinez.

---

[29] S.F. State Habeas Hearing, Volume 5, testimony of Dr. Richard E. Coons, at pp. 63, 76, 116, 123, 158, 189.

[30] *Id.*

[31] Contrary to Petitioner's suggestion in his motion to alter or amend judgment, the state habeas court did expressly find the Petitioner scored a full scale 70 on a WAIS, with a performance IQ score of 87 and a verbal IQ score of 66. State Habeas Transcript, Volume V, at p. 149.

Dr. Martinez was less dogmatic on this subject than Dr. Puente during his testimony at Petitioner's state habeas corpus hearing.[32]  Dr. Martinez readily acknowledged that motivational factors had to be considered in connection with any psychological testing done on an incarcerated individual but believed, based upon his first hand observation of Petitioner's demeanor, that motivational factors had not played a significant role in producing Petitioner's low scores on the tests Dr. Martinez administered.[33]

In contrast, Dr. Puente appeared to equate "malingering" exclusively with a test subject's attempts at "faking" his answers, as opposed to a test subject merely failing to put forth maximum effort during testing and rejected out of hand any possibility a person as unsophisticated as Petitioner could have fooled him.[34]

Dr. Coons, on the other hand, did not suggest or imply the Petitioner had engaged in overtly deceptive behavior during testing; but, rather, asserted the vast discrepancies in Petitioner's scores on different tests designed to measure the same or similar skill sets suggested Petitioner had not given maximum efforts on all such tests.[35]  Thus, Dr. Coons did not attempt to express opinions based upon Petitioner's demeanor during the testing process, as did Dr. Martinez and Dr. Puente. Instead, Dr. Coons focused on what he perceived to be inconsistencies in the test scores and outright

---

[32] *Hernandez Llanas v. Thaler*, 2011 WL 4437091, *13 (particularly at notes 72-76 and accompanying text).

[33] S.F. State Habeas Hearing, Volume 3 of 6, testimony of Dr. Gilbert Martinez, at pp. 170-75; Volume 4 of 6, testimony of Dr. Gilbert Martinez, at pp. 41-45, 50-53, 65-66, 77.

[34] S.F. State Habeas Hearing, Volume 4 of 6, testimony of Dr. Antonio E. Puente, at pp. 181-83, 185-86, 219-20.

[35] S.F. State Habeas Hearing, Volume 5 of 6, testimony of Dr. Richard Coons, at pp. 61-63, 66-67, 70-71, 76, 116, 123, 176, 189.

contradictory test results.[36]  The state habeas court was not required to adopt Dr. Puente's more narrow view that only a test subject's intentional, deliberate, efforts to give false or incorrect answers qualified as "malingering."

Neither Dr. Martinez nor Dr. Puente attempted to respond to Dr. Coons' testimony about what Dr. Coons perceived as widely divergent, seemingly contradictory, results in the test scores. Thus, the state habeas court could rationally and reasonably have considered the discrepancies in Petitioner's test scores identified by Dr. Coons as evidence suggesting a lack of *consistent* maximum effort by Petitioner during the testing process without necessarily disbelieving Dr. Puente's and Dr. Martinez's testimony that they observed nothing in Petitioner's demeanor during testing which suggested to them the Petitioner was deliberately or intentionally attempting to "fake" his test answers.

I.    The AAMR's Definition of Mental Retardation & *Briseno*

The state court's decision to adopt Dr. Coons' opinions and conclusions over those of Dr. Puente on the ultimate question of Petitioner's alleged mental retardation was objectively reasonable for several reasons.  First, Dr. Puente employed a broad clinical definition of mental retardation which differed subtly, but significantly, from the legal definition employed by Texas courts to evaluate *Atkins* claims.  Second, Dr. Puente relied almost exclusively for information on Petitioner's alleged deficits in adaptive behavior prior to age 18 on sources the state habeas court implicitly, yet reasonably, concluded were not entirely credible.  Third, as is evident from the discussion above describing Dr. Puente's attempts to dismiss Petitioner's past criminal behavior as merely evidence of "poor judgment," Dr. Puente had a narrow view of the severity and seriousness of Petitioner's

---

[36] *Id.*

criminal behavior. Finally, Dr. Puente's approach to evaluating Petitioner's current adaptive behavior was based in part on (1) Petitioner's inability to participate in Spanish language Bible study or to earn a GED while in custody when there was no evidence such programs were than available within the Texas prison system and (2) Petitioner's inability to obtain substantial employment in the United States while a fugitive from Mexican justice and in an illegal alien status.

More specifically, Dr. Puente was asked by Petitioner's state habeas counsel to render an opinion on whether Petitioner was mentally retarded based *exclusively* upon the clinical definition of mental retardation promulgated American Association of Mental Retardation ("AAMR").[37] Dr. Coons, in contrast, based his opinions and conclusions upon the statutory definition of mental retardation found in the Texas Health and Safety Code which, while similar to the AAMR's definition, differs somewhat from the AAMR definition but nonetheless forms a portion of the legal definition of mental retardation utilized by the Texas Criminal courts to address *Atkins* claims.[38]

The Supreme Court's opinion in *Atkins* did not mandate a uniform *legal* definition of mental retardation but, instead, referenced a pair of clinical definitions - the one promulgated by the AAMR and another promulgated by the American Psychiatric Association in its *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition* ("DSM-IV-TR"). *See Hernandez Llanas v. Thaler*,

---

[37] S.F. State Habeas Hearing, Volume 4 of 6, testimony of Dr. Antonio E. Puente, at p. 164. On cross-examination, Dr. Puente referred to the AAMR's definition of mental retardation as the "foundation for the Texas statutes" and made clear he had employed the AAMR's definition in evaluating Petitioner's deficits in adaptive skills. *Id.*, at pp. 187, 192.

[38] S.F. State Habeas Hearing, Volume 5 of 6, testimony of Dr. Richard Coons, at p. 90. On cross-examination, Dr. Coons testified the AAMR's definition of mental retardation (1) was significantly broader than the Texas statutory definition, (2) failed to include consideration of the patient's cultural group in evaluating adaptive functioning, and (3) would render half the population of the Travis County Jail "mentally retarded." *Id.*, at pp. 128, 130, 133.

2011 WL 4437091, *18-*20 (*citing Atkins v. Virgina*, 536 U.S. at 308 n.3, 122 Sct. at 2245 no. 3). The Supreme Court left to the States the task of formulating a legal definition of mental retardation for Eighth Amendment purposes: "we leave to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences." *Atkins v. Virginia*, 536 U.S. at 317.   The Supreme Court did, however, note that state statutory definitions of mental retardation "generally conform to the clinical definitions set forth above in note 3, *supra*." *Atkins*, 536 U.S. at 517 n.22.

Subsequent to *Atkins*, the criminal courts of Texas have employed a legal definition of mental retardation for *Atkins* purposes which utilizes the AAMR clinical definition relied upon by Dr. Puente, the slightly different statutory definition relied upon by Dr. Coons found in Section 591.003(13) of the Texas Health and Safety Code, as well as a number of non-statutory, pragmatic, factors addressing the capital defendant's background and the circumstances of the defendant's capital offense. *See Hernandez Llanas v. Thaler*, 2011 WL 4437091, *18-*20 (discussing both Texas and Fifth Circuit case law and the factors announced by the Texas Court of Criminal Appeals in *Ex parte Briseno*, 135 S.W.3d 1, 7-9 (Tex. Crim. App. 2004)).   This Court concluded the state habeas court's express reliance on the legal standard set forth in *Briseno* in rejecting Petitioner's *Atkins* claim on the merits was an objectively reasonable application of legal principles fully consistent with clearly established law. *Hernandez Llanas v. Thaler*, 2011 WL 4437091, *20.   In an opinion issued subsequent to this Court's Memorabndum Opinion and Order, the Fifth Circuit validated the constitutional efficacy of the *Briseno* factors. *See Chester v. Thaler*, ___ F.3d ___, ___, 2011 WL 6846746, *6-*7 (5th Cir. Dec. 30, 2011)(recognizing the AAMR clinical definition was designed for purposes of providing social services, recognizing that determining deficits in adaptive behavior

is highly subjective, and concluding application of the *Briseno* factors was not an unreasonable application of *Atkins*' broad holding).

This Court concluded in its Memorandum Opinion and Order that the state habeas court's rejection on the merits of Petitioner's *Atkins* claim was an objectively reasonable application of the *Briseno* factors. *Hernandez Llanas v. Thaler*, 2011 WL 4437091, *18-*24. None of Petitioner's arguments contained in his motion to alter or amend judgment compel this Court to reconsider that conclusion.

### V.   Alleged "Mischaracterizations of Evidence"

Petitioner next argues this Court gave an inaccurate recitation of the evidence before the state habeas court. Petitioner argues this Court failed to adopt Petitioner's view of the evidentiary value which should have been ascribed to certain evidence before the state habeas court.

### A.   Petitioner's Test Scores

Petitioner argues this Court failed to give proper deference to, and reliance upon, what he perceives to be "the most probative evidence that Petitioner's intellectual functioning is subaverage." It is undisputed Petitioner has scored very low on many IQ tests over the years. That point was never subject to debate during the state habeas corpus proceeding. Both before and after his arrest Petitioner's scores on a variety of IQ tests placed him within the mentally retarded range. However, at least some IQ test scores placed him either above or at the top end of the mentally retarded range.

Petitioner argues this Court should disregard as "invalid" all the test scores which show him performing above the mentally retarded range. This argument ignores the reality that Petitioner scored a 70 on the WAIS-III administered in 2006 by Dr. Puente, a score which was significantly higher by a wide margin from the IQ scores in the mid-fifties which Petitioner argues were,

28

presumably, equally valid.  However, both Dr. Puente and Dr. Martinez characterized the TONI and CTONI tests administered to Petitioner as "screening" tests.  Likewise, both Dr. Puente and Dr. Martinez testified they lacked confidence in the IQ tests administered by others, including those test scores recorded by TDCJ personnel, because they lacked access to information regarding the testing protocols employed and the qualifications of the test administrators.

Petitioner was never administered a fully *complete* Spanish language WAIS-III normed on a Spanish-speaking population until Dr. Puente and his associates did so in 2006.  Dr. Martinez's previous partial WAIS-III was a translation of an English-language test and limited to the nonverbal portion of that test.  This Court concludes it was reasonable for the state habeas court to have treated Petitioner's 2006 WAIS-III test score as the most accurate of Petitioner's full scale IQ test scores.

The evidence, however, before the state habeas court included Dr. Coons' opinion testimony that Petitioner's poor performance on those post-arrest IQ evaluations could be the product of Petitioner's lack of formal education and a variety of significant anti-motivational factors, such as the Petitioner's knowledge he would likely be executed if he scored high on those tests, rather than on any true lack of intellectual capability on Petitioner's part. *Hernandez Llanas v. Thaler*, 2011 WL 4437091, *15, *20-*22.

Contrary to the implication underlying Petitioner's argument, neither this Court nor the state habeas court were required to accept at face value the test scores offered by Petitioner (and "averaged" in a unique manner by Dr. Puente in his Power Point presentation to the state habeas court) as *definitive* on the question of Petitioner's intellectual capabilities.  As this Court noted, there

were numerous rational reasons to suspect those test scores under-estimated Petitioner's true intellectual capabilities.[39]

More specifically, as this Court noted, there were numerous analytical problems with many of the test instruments employed to measure Petitioner's IQ.  Dr. Puente described the TONI tests administered by TDCJ personnel as unreliable measures of Petitioner's intelligence.[40] Dr. Martinez admitted the first WAIS test he administered to Petitioner was not available in Spanish at the time he administered same.[41]  For that reason, Dr. Martinez administered only the nonverbal portion of that test.[42]  Dr. Coons noted, without contradiction from Petitioner's experts, that (1) Dr. Puente and his staff administered a number of discrete tests to Petitioner which they apparently disregarded when he scored high on those instruments (apparently due to a lack of norming of those test scores against populations of Petitioner's age and ethnicity) and (2) there appeared to be inconsistencies and

---

[39]Those reasons included (1) Dr. Cantu's observations at trial about Petitioner's reluctance to cooperate during a clinical interview prior to Petitioner's trial; (2) Dr. Martinez's and Dr. Arambula's diagnoses at trial of Petitioner's anti-social personality disorder; (3) Dr. Coons' opinions suggesting motivational factors may have played a significant role in lowering Petitioner's test scores; (4) the vast inconsistencies between Petitioner's scores on multiple tests designed to measure the same or similar skill sets identified by Dr. Coons without refutation by Petitioner's experts; (5) Petitioner's demonstrated propensity for telling different clinicians significantly different versions of his own life story; and (6) the questionable reliability of many, if not most, of the standardized test instruments employed in an attempt to gauge Petitioner's intellectual capability in light of the unavailability of those test instruments in Spanish and the lack of norming of the scores on those tests for Hispanic populations.

[40] S.F. State Habeas Hearing, Volume 4, testimony of Dr. Antonio E. Puente, at pp. 117-20.

[41] S.F. State Habeas Hearing, Volume 4, testimony of Dr. Gilbert Martinez, at pp. 156-62.

[42] S.F. Trial, Volume 21, testimony of Dr. Gilbert Martinez, at pp. 103-07.

anomalies in the way Dr. Puente and his staff scored Petitioner's tests.[43] Dr. Puente admitted he and his technicians disagreed over how to evaluate the results of one test they administered to Petitioner.[44] Finally, Dr. Coons expressed rejected Dr. Puente's analytical approach in attempting to "average" Petitioner's scores on a variety of very different IQ test instruments administered to Petitioner over the years.[45]

Dr. Coons identified many tests (not just the Petitioner's widely divergent performance scales on different WAIS tests administered years apart by Dr. Martinez and Dr. Puente) on which Petitioner had vastly different scores despite the fact those tests were designed to measure the same or similar skill sets.[46] Insofar as Petitioner argues Dr. Puente testified the wide divergence between Petitioner's performance scale scores on the WAIS tests administered by Dr. Martinez and Dr. Puente was "statistically insignificant," Petitioner fails to appreciate that neither the state habeas court nor this Court were necessarily compelled to accept Dr. Puente's opinion on that point.  For the reasons discussed by Dr. Puente and Dr. Coons during their testimony at Petitioner's state habeas hearing, the state habeas court could have reasonably concluded (1) the 2006 WAIS test administered by Dr. Puente was a more accurate measurement instrument than the partial WAIS test administered by Dr. Martinez but (2) still under-estimated Petitioner's true intellectual functioning level.

---

[43] S.F. State Habeas Hearing, Volume 5 of 6, testimony of Richard E. Coons, at pp. 59-62, 65-68, 70-71, 103, 110, 112-14, 117-18, 123, 137-39, 140-41, 150, 154, 160, 164-66.

[44] S.F. State Habeas Hearing, Volume 4 of 6, testimony of Dr. Antonio E. Puente, at pp. 179-80.

[45] *Id.*, at p. 102.

[46] Dr. Coons' testimony in that regard is found at S.F. State Habeas Hearing, Volume 5, at pp. 59-62, 66-68, 70-71, 103, 111-14, 117-19, 137-41, 150, 152, 160, 164, 166.

Petitioner argues the state habeas court failed to mention petitioner's 2006 WAIS score of 70 "at all." This is incorrect. At page 14 of 18 of its May 20, 2008 Order, the state habeas trial court expressly summarized Dr. Puente's testimony as stating "according to his testing (verbal and performance), the applicant had an overall WAIS score of 70."[47] The state habeas trial court expressly held "The level of applicant's intellectual functioning is insufficient to support a finding of mental retardation."[48] What this Court concluded was that, given the wide range of scores on various tests and negative motivational factors identified by Dr. Coons, it was objectively reasonable for the state habeas court to conclude (implicitly if not expressly) that Petitioner's actual intellectual functioning level was not "significantly subaverage," i.e., 70 or below on a standard WAIS.

In conclusion, there was ample evidence properly before the state habeas court suggesting the test scores relied upon by Petitioner's mental health experts were not reliable indicators of Petitioner's true intellectual capabilities. Given the conflicting expert opinions in the record concerning Petitioner's intellectual capabilities, neither the state habeas court in rejecting Petitioner's *Atkins* claim on the merits nor this Court in reviewing that state court's rejection of his *Atkins* claim were bound to accept as conclusive the opinions on Petitioner's mental retardation expressed by his mental health experts.

B.     Evidence of "Malingering"

Next, Petitioner argues this Court erred in failing to accept as definitive the testimony of Dr. Martinez and Dr. Puente on the subject of whether Petitioner "malingered" on his IQ tests. As explained above, however, there was conflicting expert testimony before the state habeas court

---

[47] State Habeas Transcript, Volume V, at p. 149.

[48] State Habeas Transcript, Volume V, at p. 152.

regarding whether motivational factors or deliberately poor performance contributed to Petitioner's low test scores. Petitioner characterizes Dr. Puente and Dr. Martinez's testimony on this point as "compelling" and criticizes Dr. Coons' testimony on this point based upon the fact Dr. Coons did not personally observe Petitioner during testing.

As was explained above, it was reasonable for the state habeas court to credit the testimony of Dr. Coons regarding the possible impact of motivational factors (based upon conflicting test scores)[49] on Petitioner's test scores and still find credible the testimony of Dr. Martinez and Dr. Puente that they observed nothing in Petitioner's demeanor during testing which led them to believe he was deliberately attempting to "fake" his true level of intellectual functioning.

For the reasons discussed above, there was nothing either clear or convincing about the expert opinions expressed by Dr. Martinez and Dr. Puente on this subject during Petitioner's trial and state habeas corpus proceedings which rendered Dr. Coons' testimony about the possible impact of motivational factors on Petitioner's test scores incredible or "unqualified." On the contrary, the evidence before the state habeas court made it clear Petitioner suffers from an antisocial personality disorder. Dr. Cantu noted Petitioner appeared to slow his responses during his clinical interview. Dr. Coons noted a plethora of motivational factors which could reasonably have been expected to impact Petitioner's performance on many of the IQ tests. Dr. Coons also noted, without refutation by Petitioner's experts, that Petitioner had scored high on some tests which measured a particular skill set, yet low on other tests designed to measure the same skill set. Dr. Coons also identified several tests on which Petitioner scored extremely high but which Dr. Puente disregarded in reaching

---

[49] S.F. State Habeas Hearing, Volume 5 of 6, testimony of Dr. Richard Coons, at p. 165 ("If you have demonstrated an ability to have good attention and good short-term working memory on one test, you ought to be able to show a similar capability on another test.").

his conclusions regarding Petitioner's intellectual capabilities.  Given such evidence, the state habeas court's implicit determination the Petitioner's IQ test scores in the fifties or sixties did not accurately reflect his true intellectual capabilities was an objectively reasonable determination in light of the evidence actually presented to the state habeas court.

Petitioner presents this Court with a laundry list of reasons why Petitioner believes his experts' opinions on the subject of "malingering" should have been believed, in contrast to Dr. Coons' opinions on the same subject.  But, as explained above, the respective experts were, in large part, discussing apples and oranges.  Dr. Puente adamantly insisted he would have picked up on any attempt by Petitioner to "fake" his performance on standardized tests by deliberately answering incorrectly.   While Dr. Coons focused on Petitioner's inconsistent scores on test instruments designed to measure the same or similar skill sets and argued those inconsistencies suggested a lack of consistent maximum effort by Petitioner.  Contrary to Petitioner, it is possible both sets of experts were correct.  Petitioner may not have displayed any overt symptoms of "malingering" as defined by Dr. Puente, yet still have failed to give his best effort on all of the tests administered to him at various times by different persons employing different test instruments.

For the reasons discussed above, the state habeas court could have reasonably given more weight to Dr. Coons' opinions regarding motivational factors as a possible explanation for Petitioner's low scores on some tests but high scores on other tests designed to measure the same or similar skill sets.

C.    "Qualified" Experts

Insofar as Petitioner argues that Dr. Coons' opinions should be discounted or ignored because Dr. Coons did not personally administer any psychological tests to Petitioner, that argument lacks

34

any persuasive value.  Dr. Coons, like Dr. Cantu, is a licensed physician, i.e., a medical doctor, with considerable experience addressing a wide range of mental health issues, including diagnosis of mental retardation.  Dr. Coons was not asked to evaluate Petitioner but, rather, to review and comment upon the raw data, findings, and conclusions expressed by Dr. Martinez and Dr. Puente. The fact Dr. Coons does not speak Spanish (and could not, therefore, have personally interviewed Petitioner) did not disqualify Dr. Coons from reviewing the Petitioner's test results and the other evidence in the record before the state habeas court, consulting with an independent psychologist, listening to the testimony of Dr. Martinez and Dr. Puente, and then expressing his own opinions regarding the scientific validity of Petitioner's experts' testing methodologies and the soundness (or lack thereof) of their ultimate conclusions regarding Petitioner's alleged mental retardation.

Petitioner also argues that only his experts were "qualified" to render an opinion regarding Petitioner's mental retardation.  However, Dr. Coons was familiar with the Texas statutory definition of mental retardation, had reviewed the same testing data as Petitioner's experts, and testified without contradiction concerning his extensive experience addressing the issue of mental retardation in the course of his medical practice.  Contrary to Petitioner's repeated contentions, Dr. Coons was not "disqualified" from expressing his professional opinions concerning either (1) what he perceived to be the questionable testing and scoring methodologies employed by Dr. Puente and Dr. Martinez[50] or (2) his professional opinion that the evidence before the state habeas court (including the

---

[50] Dr. Coons testified it appeared to him that, Dr. Puente had deliberately ignored the Petitioner's perfect score on a test and engaged in questionable interpretation of at least one other test result. S.F. State Habeas Hearing, Volume 5, testimony of Dr. Richard E. Coons, at pp. 65-68.  Dr. Coons also testified it appeared Dr. Puente had failed to mention during his testimony any of the tests on which Petitioner scored well or any of the other things Petitioner had done well. *Id.*, at p. 100.

testimony of Dr. Martinez and Dr. Puente which Dr. Coons personally observed) failed to establish

that Petitioner satisfied the Texas Health and Safety Code's definition of mental retardation.[51]

Likewise, there was nothing "disqualifying" in the fact Dr. Coons rejected as scientifically

unsound the Petitioner's proffered definition of mental retardation, purportedly premised upon then-

recent amendments to the AAMR's definition of mental retardation.[52]   As was explained in this

Court's Memorandum Opinion and Order, Texas courts employ a rather pragmatic approach (known

as the *Briseno* factors) to the issue of resolving mental retardation claims raised by capital murderers

pursuant to *Atkins. Hernandez Llanas v. Thaler*, 2011 WL 4437091, *18-*20.   Contrary to the

implications underlying much of Petitioner's argument, the AAMR's current definition of mental

retardation is merely one piece in the analytical puzzle Texas criminal courts employ when

evaluating an *Atkins* claim. *See Chester v.* Thaler, ___ F.3d at ___, 2011 WL 6846746, *6 ("the

AAMR definition was designed for the purpose of providing social services, not for the purposes of

determining whether a person was 'so impaired as to fall within the range of mentally retarded

offenders about whom there is national concensus.'").

      D.    <u>Cultural Group</u>

---

[51] Dr. Coons expressed his own opinion, based upon a reasonable medical certainty, that Petitioner did not satisfy the statutory definition of mental retardation as set forth in the Texas Health and safety Code. S.F. State Habeas Hearing, Volume 5, testimony of Dr. Richard E. Coons, at pp. 90, 179.

[52] More specifically, Dr. Coons expressed the opinion that the AAMR's newly amended definition of "mental retardation" presented to him by Petitioner's state habeas counsel was (1) significantly broader than the statutory definition of mental retardation found in the Texas Health and Safety Code and (2) so overly broad that half the population of the Travis County jail would qualify as "mentally retarded" under that definition. S.F. State Habeas Hearing. Volume 5, testimony of Dr. Richard Coons, at p. 128.

Dr. Puente and Dr. Coons presented vastly different approaches to the state habeas court in terms of how Petitioner's "cultural group" was to be employed in evaluating Petitioner's adaptive functioning levels.[53]  Second, Dr. Puente appeared to disregard Petitioner's *current* cultural group when evaluating Petitioner's adaptive functioning, focusing, instead, almost exclusively on Petitioner's adaptive behavior prior to age eighteen.[54]  In contrast, Dr. Coons opined that, because the majority of Petitioner's adult life has been spent in various correctional institutions, it was appropriate to consider Petitioner's conduct while in prison when evaluating Petitioner's adaptive behavior functioning and suggesting Petitioner had adapted effectively to life in prison.[55]  Dr. Coons opined that Petitioner's purportedly low levels of adaptive skills displayed in childhood were likely the result of the conditions under which Petitioner grew up, Petitioner's lack of formal education, and Petitioner's extensive history of inhalant abuse, rather than a reflection of Petitioner's true adaptive behavior functioning.[56]  Dr. Coons also pointed out that, according to the test data furnished by Dr. Martinez and Dr. Puente, Petitioner was then reading at almost the sixth grade level in

---

[53] When questioned during Petitioner's state habeas corpus hearing about Petitioner's current adaptive skills behavior, Dr. Puente testified (1) he believed Petitioner's prison disciplinary records reflected Petitioner had received disciplinary sanctions reflecting Petitioner's inability to adjust to prison life, (2) Petitioner had not joined a prison Bible study group or earned a GED while incarcerated, (3) Petitioner's adapted skills had not improved since age 18, and (4) Petitioner would be considered a failure even within the Mexican cultural group. S.F. State Habeas Hearing, Volume 4, testimony of Dr. Antonio E. Puente, at pp. 163, 192-93, 215, 221-22, 226.

[54] S.F. State Habeas Hearing, Volume 4, testimony of Dr. Antonio E. Puente, at pp. 130, 146, 148, 160, 163-64, 192-93, 215-16, 221-22.

[55] S.F. State Habeas Hearing, Volume 5, testimony of Dr. Richard E. Coons, at pp. 71-74, 81-89, 191-92, 195, 200-02, 207-08, 214-15, 221-22.

[56] *Id.*, at pp. 69, 73-75, 77-78, 81-89, 191-92, 195, 200-05, 215.

Spanish, a considerable improvement over the levels one would expect to find in a mentally retarded person who had dropped out school in the third grade.[57]

As explained above, the state habeas court implicitly rejected the testimony of Petitioner's siblings and family friend regarding the circumstances under which Petitioner grew up.  Given their testimony, and the contrasting evidence in the record (which included the affidavit of Petitioner's sister Adelita reporting Petitioner told TDCJ officials he had successfully obtained employment in Laredo as a carpenter for over four years prior to his incarceration in Mexico) this Court concludes the state habeas court's implicit credibility determination was a reasonable determination of the facts in light of all the evidence then before the state habeas court.

E.     Menial Work

Petitioner argues this Court misrepresented that Petitioner obtained gainful employment in Texas following Petitioner's escape from custody in Mexico and his entry into the United States by failing to explain the allegedly "unskilled and menial" nature of Petitioner's work history.  The problem with this argument is that there was no evidence introduced at trial or presented during Petitioner's state habeas corpus proceeding establishing that, in fact, Petitioner's work history in the United States consisted solely of "menial" labor or that Petitioner was working at the Lich ranch *solely* in exchange for a puppy.  Even Dr. Puente admitted Petitioner was not exchanging his labor on a regular basis for a series of animals.[58]

---

[57] *Id.*, at pp. 70, 81, 87, 221-22.

[58] S.F. State Habeas Hearing, Volume 4 of 6, testimony of Dr. Antonio E. Puente, at p. 212 ("He did not barter for dogs.").

Petitioner did not testify at trial or at his state habeas corpus hearing.  When Petitioner's trial counsel attempted to cross-examine Lera Lich about the circumstances under which her late husband had hired Petitioner, she confessed to a lack of any personal knowledge of that arrangement, other than her testimony that (1) the Petitioner was permitted to sleep on the premises as part of his compensation, (2) Petitioner did not eat his meals with the Lich family, and (3) because she worked away from home during the day, she could not testify regarding Petitioner's work duties other than to express her understanding (apparently based on hearsay information) that the Petitioner assisted the carpenters working at the Lich ranch, helped her husband with some puppies, hauled brush, and may have worked on a generator and water pump.[59]  Apparently Petitioner told at least one of the clinicians who interviewed him that he had sold drugs at some point in his life because Dr. Coons made this observation without refutation by Petitioner's experts during Petitioner's state habeas hearing.[60]

Petitioner has argued that his "only" free-world work experience consisted of "menial" and "unskilled" labor, but there is no evidence in the record supporting that contention.  There was evidence in the records properly before the state habeas court establishing Petitioner informed TDCJ officials he had held employment as a "carpenter" for several years in Laredo prior to his arrest and incarceration in Mexico.  Petitioner's sister Adelita submitted an affidavit to prosecutors at or near the time of Petitioner's trial (and subsequently recanted portions of same during Petitioner's state habeas hearing but not the portion addressing Petitioner's work history) stating the Petitioner

---

[59] S.F. Trial, Volume 18, testimony of Lera Lich, at pp. 90-94, 101, 103.

[60] S.F. State Habeas Hearing, Volume 5, testimony of Dr. Richard E. Coons, at pp. 85, 89.

obtained gainful employment in Mexico from an early age and was capable of handling his own money.[61]

Other than Lera Lich's trial testimony summarized above, there was no evidence presented to the state trial court or the state habeas court detailing either the precise financial arrangement reached between Petitioner, or the unidentified carpenter with whom he worked on the Lich ranch, or the details of the arrangement under which Glen Lich hired Petitioner.

In sum, other than the work Petitioner performed "assisting" carpenters in some unspecified manner at the Lich ranch (and "possibly" also working on a water pump and generator) in the weeks prior to Petitioner's murder of Glen Lich, there is simply no evidence in the record before the state habeas court establishing with any degree of certainty the precise nature of the work Petitioner performed for compensation prior to his arrest in Mexico or following his escape from custody in Mexico and entry into the United States.  Nor is there any evidence establishing the precise manner or level of compensation for any of the work Petitioner performed at the Lich ranch.

Under such circumstances, there was nothing misleading about this Court's statement that Petitioner had been able to obtain "gainful employment" following his entry into the United States.

F.    Allegedly Unsophisticated Criminal Activity

Petitioner complains that this Court misrepresented as "sophisticated" a variety of Petitioner's criminal activities.  The state habeas trial court, however, cited to Petitioner's criminal

---

[61] Adelita's statement is quoted at length at *Hernandez Llanas v. Thaler*, 2011 WL 4437091, *11 n.49.

acts as evidence of conduct inconsistent with a finding of mental retardation and inconsistent with a finding of significantly subaverage intellectual functioning.[62]

This Court's Memorandum Opinion and Order summarized the state habeas trial court's factual findings that (1) Petitioner attempted to deceive law enforcement officers following his arrest for Glen Lich's murder by identifying himself as his own cousin, (2) following his arrest, Petitioner gave a statement to law enforcement officers that was "rational, coherent, articulate and knowledgeable," (3) Petitioner's murder of Glen Lich was premeditated, (4) prior to Lich's murder, Petitioner abducted, sexually assaulted at knife-point, and then threatened a fifteen year old girl, (5) Petitioner's threats against the girl were convincing enough that she refrained from reporting Petitioner's crimes against her until after Petitioner was arrested for Lich's murder, and (6) also prior to Lich's murder, Petitioner escaped from custody in Mexico while serving a sentence for homicide and entered the United States illegally.[63]

Petitioner essentially argues the foregoing summary is somehow inaccurate or misleading because those factual findings must necessarily be viewed in the light most favorable to Petitioner's *Atkins* claim.  More specifically, Petitioner argues (1) his escape from custody in Mexico did not involve any sophisticated criminal activity because he simply walked away from a hospital while a guard took a nap, (2) alternatively, his escape from custody in Mexico was unimpressive because it was accomplished with the assistance of unidentified relatives, (3) his entry into the United States was accomplished by Petitioner simply tagging along with unidentified friends when they crossed

---

[62] State Habeas Transcript, Volume V, at pp. 141-44.

[63] *Compare* State Habeas Transcript, Volume V, at p. 137-52 with *Hernandez Llanas v. Thaler*, 2011 WL 4437091, *16.

the border following Petitioner's escape from Mexican custody, (4) Petitioner's murder of Glen Lich, ransacking of the Lich residence, and multiple sexual assaults upon Lera Lich were not premeditated and involved only minimal planning and the application of brute force, (5) the fact Petitioner was found asleep at the crime scene belies any argument Petitioner's capital offense involved sophisticated planning, (6) the fact Petitioner failed to flee the scene, placed telephone calls from the Lich residence after killing Glen Lich, and fell asleep after repeatedly sexually assaulting Lera Lich demonstrates a lack of care on Petitioner's part inconsistent with "normal" intelligence, and (7) Petitioner's decision to identify himself as his own cousin after his arrest for Lich's murder demonstrates the "utter stupidity" of Petitioner's attempted deception, below the level of intellect for an "average" individual.   However, the only evidence supporting most of these arguments consists of Dr. Puente's testimony, which he candidly admitted was based almost exclusively on Petitioner's accounts of the relevant events.   The state habeas court was not required to accept such testimony from Dr. Puente without regard to the source of the information from which Dr. Puente obtained same.

While the foregoing arguments might have made arguably valid points for closing argument at Petitioner's state habeas corpus hearing, they do not constitute clear and convincing *evidence* showing the state habeas court's factual findings in question were erroneous.   The state habeas court was free to draw reasonable inferences from the evidence before it regarding Petitioner's escape from Mexican custody and subsequent criminal behavior.   This Court concluded the state habeas court could reasonably have inferred from the evidence before it that Petitioner's history of criminal behavior contradicted, or even completely controverted, Petitioner's mental retardation claim.

Petitioner's own cousin testified without contradiction at trial that, shortly before the murder, Petitioner told him he (Petitioner) wanted to harm his employer and steal his employer's vehicle.[64] This belies Petitioner's argument that his crimes on the night of October 14-15, 1997 were purely impulsive.

Based upon the evidence before the state habeas court, this Court concluded the state habeas court's express and implicit determinations that (1) the circumstances of Petitioner's crimes against the Lichs and his fifteen year old victim involved a degree of premeditation and planning inconsistent with a finding of mental retardation and (2) Petitioner's demonstrated abilities to escape from custody in Mexico, illegally enter this country, and obtain employment in the United States following his escape from Mexican custody were inconsistent with a showing of mental retardation both constituted objectively reasonable determinations of the facts based upon the evidence actually presented to the state habeas court. *See Wood v. Allen*, ___ U.S. ___, ___, 130 S.Ct. 841, 849, 175 L.Ed.2d 738 (2010)("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.").  Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), on habeas review, this does not suffice to supersede the trial court's factual determination. *Wood v. Allen*, ___ U.S. at ___, 130 S.Ct. at 849; *Rice v. Collins*, 546 U.S. 333, 341-42 (2006).

Petitioner's arguments concerning what he contends to have been the lack of sophistication and absence of planning involved in his criminal conduct do not compel this Court to alter or amend

---

[64] S.F. Trial, Volume 18, testimony of Martin Salinas, at pp. 222-24, 226, 231, 242-47.

its judgment herein.  The state habeas court was free to draw objectively reasonable inferences to the contrary from the evidence actually before it.

With regard to Petitioner's escape from custody in Mexico, the evidence presented to the state trial court and state habeas court concerning the circumstances of Petitioner's escape from custody in Mexico was far from clear in terms of establishing the precise details of Petitioner's escape from custody.  A Mexican pen packet admitted into evidence during the punishment phase of Petitioner's capital murder trial included a document containing, in pertinent part, the following information:

> I am writing to inform you that I was notified today that RAMIRO HERNANDEZ LLANAS, an inmate convicted in the court of equity, escaped from the "ALFREDO PUMAREJO" Hospital in this city while in the custody of VALENTE GALLEGOS VEGA, the guard assigned at Cesero.  Mr Gallegos notified the appropriate authorities who instituted a search for said inmate, which to date has been unsuccessful.  I am, likewise, reporting to you that said RAMIRO HERNANDEZ LLANAS was convicted from the crime of homicide and sentenced to a term of 25 years in state prison, according to criminal trial 46/89 in the docket of the Second Criminal District Court of Nuevo Laredo, Tamaulipas.  All we know at this time is what the guard, VALENTE GALLEGOS VEGA said in his preliminary statement to the State Judicial Police.  "That he had fallen asleep for a moment and when he woke up, RAMIRO HERNANDEZ LLANAS was not where he was supposed to be. he then alerted hospital security, who, in turn, notified the State Judicial Police, who then notified the District Attorney's Office, which is continuing the investigation." The aforesaid guard has been detained and will remain in custody until the proper authorities have determined responsibility.[65]

Additionally, prosecution witness Maria Del Carmen Serrano testified during the punishment phase of the capital murder trial that (1) Petitioner told her he had escaped from a Mexican prison, (2) Petitioner told her several different versions of how he escaped, (3) in one version, Petitioner said

---

[65] State Exhibit 95, found in S.F. Trial, Volume 24.

he went through a window, and (4) in another version, Petitioner told her he pretended to be sick and that he had gone out a door with the help of relatives.[66]

The foregoing, together with Dr. Puente's hearsay testimony regarding what Petitioner recounted about his escape, represents the totality of the evidence in the record before the state habeas court detailing how Petitioner escaped from custody in Mexico.  Depending upon which version of the Petitioner's different accounts, and the credibility of the guard who allegedly was asleep when Petitioner made good on his escape, Petitioner apparently either walked out of a hospital through a door or crawled out through a window while his guard slept.  In either circumstance, the state habeas court could reasonably have concluded Petitioner's actions necessarily involved the ability to perceive an opportunity for escape and to seize that opportunity when it did arise.  There is nothing about the foregoing evidence that necessarily compels a view that Petitioner's escape from custody in Mexico was such a simple and easy action that it reflected no sophistication whatsoever, as Petitioner argues.

The evidentiary record before the state habeas court regarding how Petitioner entered the United States following his escape from custody in Mexico and made his way to Kerrville, Texas is unclear.  Dr. Puente testified the Petitioner had informed him that he (Petitioner) "tagged along" with unidentified friends going to Texas after he escaped from custody in Mexico.[67]  Given Dr. Martinez's characterization of Petitioner as a "marginal historian," the state habeas trial court was not required to accept as wholly credible this hearsay account by Dr. Puente of Petitioner's illegal entry into the United States and travel from the border to Kerrville.  Additionally, the state habeas

---

[66] S.F. Trial, Volume 20, testimony of Maria Del Carmen Serrano, at p. 29.

[67] S.F. State Habeas Hearing, Volume 4, testimony of Dr. Antonio E. Puente, at p. 158.

trial court could reasonably have considered Petitioner's actions in avoiding apprehension (while a fugitive from justice in Mexico) during and after his entry into this country as objective *evidence* of (1) non-subaverage general intellectual functioning on Petitioner's part and (2) the absence of significant limitations in adaptive functioning.

The state trial court reasonably found both Petitioner's murder of Glen Lich and Petitioner's abduction and sexual assault of the minor female, the latter of which crimes involved Petitioner's acquisition and operation of a motor vehicle, involved planning and were inconsistent with either (1) significantly subaverage intellectual functioning or (2) any significant deficits in adaptive behavior consistent with mental retardation.[68]

Petitioner did not offer the state trial court or state habeas court any evidence showing how or where he obtained the vehicle he used in his crimes against his fifteen-year-old victim, how Petitioner located the abode where he sexually assaulted her, or how Petitioner knew that location would be available for his criminal use on the date in question.  There was nothing objectively unreasonable with the state habeas court's determinations that Petitioner's crimes involved at least a modicum of planning inconsistent with significantly subaverage intellectual functioning.  The state habeas court was free to draw reasonable inferences from the ambiguous evidence surrounding Petitioner's escape and illegal entry into the United States that were contrary to Petitioner's *Atkins* claim.

This Court concluded the state habeas court's conclusion that Petitioner had failed to demonstrate he suffered from significant limitations in adaptive functioning was within the meaning of *Atkins* was objectively reasonable. *Hernandez Llanas v. Thaler*, 2011 WL 4437091, *24 ("The

---

[68] State Habeas Transcript, Volume V, at pp. 143-45.

state habeas trial court reasonably concluded the level of planning and preparation necessarily involved in the Petitioner's pattern of criminal conduct demonstrated a lack of significant limitations in adaptive functioning.").  Nothing in Petitioner's motion to alter or amend judgment warrants altering that conclusion.

As explained above, Petitioner argues his attempted post-arrest deception of law enforcement officers (by claiming to be his own cousin) was an act of "utter stupidity."  During his second interview with Texas Ranger De Los Santos on the afternoon of October 15, 1997, Petitioner explained that he falsely identified himself as "Ruben Salinas" during his first interview in the hope of avoiding adverse action by "immigration" officials.[69]  The state habeas court did not venture a guess as to Petitioner's motivations for his action in falsely identifying himself but, instead, focused on the act of deception itself as indicating the Petitioner was able to engage in intellectual activity inconsistent with significantly subaverage intellectual functioning.[70]  With the approval of the Fifth Circuit, Texas courts have considered a capital murderer's ability to fashion deceptive statements, "hide facts," or "lie effectively," as relevant to the mental retardation determination. *Hernandez Llanas v. Thaler*, 2011 WL 4437091, *19.

### G.    Allegedly Impaired Communication Ability

It is undisputed Petitioner's formal education ended in either grade three or four in Mexico. No one, not even Dr. Coons, has ever suggested Petitioner's intellectual capabilities range very far above the mentally retarded range.  Dr. Martinez testified without contradiction that Petitioner

---

[69] S.F. Trial, Volume 2, State Exhibit no. 2, at p. 3.

[70] State Habeas Transcript, Volume V, at pp. 141-43.

47

suffers from severe auditory attention deficits.[71]  Those facts furnish the context for Petitioner's final argument.

Petitioner argues the state trial court erroneously described Petitioner's post-arrest statements to law enforcement officials as indicating Petitioner was "alert, rational, coherent, articulate and knowledgeable."[72]  Petitioner argues that this finding ignores what Petitioner contends is evidence showing at least some of Petitioner's answers during Petitioner's post-arrest interrogations were "incoherent, erratic, and tangential, and related to the questions he was asked only marginally, if at all."  The problem with Petitioner's argument is that the state habeas court's factual finding in question refer not exclusively to the Petitioner's statement itself but to the "evidence offered at the examining trial and pre-trial hearing on applicant's motion to quash the confession."[73]

During Petitioner's examining trial, Texas Ranger Gerardo De Los Santos testified, in pertinent part, that during his first interview with Petitioner on the morning of October 15, 1997 (during which Petitioner represented that his name was Ruben Salinas), Petitioner (1) appeared to understand the *Miranda* warnings Ranger De Los Santos furnished which Petitioner read aloud in Spanish, (2) did not appear to be under the influence of any substance such as alcohol or narcotics, (3) appeared to have full use of his faculties, (4) displayed no problems conversing, (5) displayed no "mental-type problems," and (6) requested that De Los Santos contact Petitioner's aunt who

---

[71] S.F. State Habeas Hearing, Volume 3 of 6, testimony of Dr. Gilbert Martinez, at p. 162-63; Volume 4 of 6, testimony of Dr. Gilbert Martinez, at pp. 45, 78.

[72] State Habeas Transcript, Volume V, at p. 142.

[73] State Habeas Transcript, Volume V, at p. 142.

resided in Kerrville.[74]   Ranger De Los Santos testified further that, following his discovery of Petitioner's true identity he conducted a second interview of Petitioner on the afternoon of October 15, 1997 during which Petitioner admitted (1) his real identity, (2) he planned to steal a vehicle from the Lich residence, (3) he escaped from custody in Mexico, and (4) he sexually assaulted Lera Lich.[75]

During the pretrial hearing on Petitioner's motion to suppress his statements, Ranger De Los Santos testified about the circumstances surrounding Petitioner's recorded interviews (specifically about the issuance of *Miranda* warnings, Petitioner's knowing and voluntary waiver of same, and Petitioner's apparent mental competence during the interviews in question) in the same manner as he did during Petitioner's examining trial.[76]

Petitioner argues the recorded and transcribed statements on October 15, 1997 include a number of answers given by Petitioner to Ranger De Los Santos' questions that were "incoherent," "erratic," "tangential," and only "marginally" related to the question asked.  As an example of same, on page 23 of his motion to alter or amend judgment, Petitioner purports to quote verbatim from an exchange that occurred during Petitioner's first interview on the morning of October 15, 1997 in which Petitioner's federal habeas counsel quotes Petitioner as having made a bizarre reference to a "monkey" during a rambling answer to a question about whether Petitioner had problems with his mother.  In fact, however, the transcript of Petitioner's first interview on October 15, 1997 (when Petitioner was pretending to be someone named Ruben Salinas) reflects the word in question was

---

[74] S.F. Trial, Volume 2, testimony of Gerardo De Los Santos, at pp. 79-85, 101-02, 104-05.

[75] *Id.*, at p. 88.

[76] S.F. Trial, Volume 5, testimony of Gerardo De Los Santos, at pp. 34-40.

49

actually "money" not "monkey."[77]  To put the quotation in proper context, during that first interview,

Ranger De Los Santos had just finished questioning Petitioner about how much Tequila Petitioner

had consumed immediately before the murder, when the following exchanges occurred:

> G.D.  AND THEN WHAT...WHAT HAPPENED?
> R.H.  RIGHT THEN IS WHEN I STARTED TO REMEMBER YOU KNOW...
> G.D.  REMEMBERING WHAT?
> R.H.  REMEMBER THINGS THAT HAVE HAPPENED IN MY LIFE, YOU KNOW EXPLAINING TO YOU RIGHT...THAT MY MOTHER WELL, I WANTED HER TO TALK TO ME...
> G.D.  DID YOU HAVE PROBLEMS WITH YOUR MOTHER?
> R.H.  YES...YES...A SMALL PROBLEM YOU KNOW, I WANTED EVERYTHING TO BE THE SAME RIGHT...EXCEPT THAT ONLY SHE WANTED...NOT TOO MUCH BY FORCE RIGHT...THE *MONEY* BUT...IT'S BECAUSE I COULD ALSO HELP HER...AND...THE WAY TO DO IT...LIKE I TOLD YOU IT MIGHT HAVE BEEN THE ALCOHOL...OR I DON'T KNOW BECAUSE I AM NOT USED TO DRINKING ALCOHOL...I'LL ONLY DRINK A BEER OR TWO BUT, IT SEEMED EASY TO ME RIGHT...TO DO IT...THE TRUTH...
> G.D.  AND SO YOU THOUGHT ABOUT, WHAT DID YOU THINK ABOUT DOING?  YOU WERE THINKING AND WHAT DID YOU THINK ABOUT DOING?
> R.H.  NO JUST LEAVE RIGHT...GO TO LAREDO...
> G.D.  AND HOW WERE YOU GOING TO LAREDO?
> R.H.  WELL...STEALING HIS VEHICLE...STEAL IT...START IT THAT WAY OR STEAL THE KEYS...[78]

As a second example of what Petitioner argues was his incoherent responses to De Los

Santos' questions, Petitioner points to an exchange concerning the knife he used to terrorize Lera

Lich.  That exchange came immediately after Ranger De Los Santos had elicited Petitioner's

---

[77] A complete verbatim transcription of Petitioner's first statement given on the morning of October 15, 1997 appears in the state courts records that were before the state habeas court as State Exhibit 1 admitted during Petitioner's examining trial, found as an appendix to S.F. Trial, Volume 2.

[78] S.F. Trial, Volume 2, State Exhibit 1, at pp. 5-6.

description of the fatal assault on Glen Lich (in which Petitioner claimed to remember striking Glen

Lich only once in the head) and Petitioner then began to recount his assault upon Lera Lich:

> G.D.  AND THEN?
> R.H.  AND THEN FROM THERE I LEFT TO GO INSIDE HIS HOUSE AND HIS WIFE WAS THERE IN A ROCKING CHAIR, SHE WAS THERE SITTING WATCHING THE NEWSPAPER...READING THE NEWSPAPER, LOOKING AT IT...AND SHE GOT UP AND WELL, I DON'T KNOW...I FEEL BAD SAYING THIS BUT, I'M SAYING THE TRUTH THAT I CAN REMEMBER...I GRABBED HER...
> G.D.  HOW DID YOU GRAB HER?
> R.H.  FROM THE CHEST, I GRABBED HER LIKE THIS FROM THE CHEST AND...
> G.D.  AND DID YOU HAVE, DO YOU HAVE A WEAPON WITH YOU?
> R.H.  WELL...
> G.D.  THE IRON OR WHAT DID YOU HAVE?
> R.H.  I HAD THE KNIFE...
> G.D.  WHAT KNIFE?
> R.H.  A KNIFE THAT I GOT FROM THE KITCHEN.
> G.D.  WHAT KIND OF KNIFE?
> R.H.  WELL IT'S A BIG KNIFE BUT, I DIDN'T USE IT...
> G.D.  IT'S A BIG KNIFE AND WHEN DID YOU GET THE KNIFE?
> R.H.  WELL I HAD IT BECAUSE THE TRUTH IS LIKE THIS BECAUSE SOMETIMES THERE WERE COYOTES OR SOMETHING LIKE THAT AND LIKE I COULDN'T HAVE A FIREARM OR NOTHING THERE, THERE WAS SOME THERE, THERE IS FIREARMS BUT, I COULDN'T USE ANY OF THE FIREARMS THERE BECAUSE...WELL I RESPECT HIM AND I DON'T GRAB ANYTHING...WELL AND IT JUST SEEMED EASY FOR MER TO PUT THE KNIFE ON MY WAIST.
> G.D.  AND DOES IT HAVE, THE KNIFE DOES IT COME IN A CARRYING CASE OR IS IT LOOSE?
> R.H.  YES IT WAS IN A CARRYING CASE BUT, I TOOK IT OUT...
> G.D.  SO WHEN DID YOU GET THE KNIFE, BEFORE YOU CALLED GLEN OR AFTERWARDS?
> R.H.  WELL, NO, I ALREADY HAD IT...WHEN WE WENT, ME AND MY EMPLOYER TO...ME AND GLEN...WHEN WE WENT DOWN TO THE LIGHT PLANT, I ALREADY HAD IT...
> G.D.  AND AFTER YOU HIT GLEN AND YOU CAME TO THE HOUSE, DID YOU GO STRAIGHT TO THE HOUSE WHERE LERA WAS AT OR WHAT DID YOU DO?

R.H.  NO I WENT AND...WHAT'S IT CALL...WELL I WENT AND SAT DOWN ON THE BED THAT I LAY IN AND I WENT AND FINISHED THE GLASS OF LIQUOR HE HAD SERVED ME...

G.D.  THE SECOND GLASS?

R.H.  YES...I FINISHED IT AND...

G.D.  AND THE BED OUTSIDE IN THE KITCHEN?

R.H.  YES...

G.D.  O.K....

R.H.  OUTSIDE AND I ALSO FINISHED THE BEER AND WENT AND THREW IT IN THE TRASH CAN BUT, I DON'T RECALL VERY WELL BUT I THINK THE GLASS HAD A LITTLE BIT MORE OF LIQUOR BECAUSE IT'S THERE ON ONE SIDE OF THE BED RIGHT....

G.D.  AND THEN...

R.H.   THE BEER I DOD GO AND THROW AWAY BECAUSE IT FINISHED...AND THEN THAT'S WHEN I WENT OVER WITH THE MISS...RIGHT...AND LIKE I WAS SAYING...

G.D.  WITH WHO?

R.H.  WITH MISS, THE LADY...

G.D.  THE LADY YOU CALL MISS?

R.H.  YES THAT'S WHAT I CALL HER MISS BECAUSE I DON'T CALL HER BY HER NAME NOR DO I CALL HER LADY YOU KNOW I JUST CALL HER MISS...

G.D.  O.K....

R.H.  OR...

G.D.  SHE IS GLEN'S WIFE?

R.H.  YES...

G.D.  O.K....

R.H.  YES SHE IS THE WIFE OF HIS...BUT IT'S LIKE...I FEEL VERY SORRY OF WHAT I DID...

G.D.  AND WHAT DID YOU DO WITH HER, YOU SAID YOU GRABBED HER FROM THE COLLAR...

R.H.  YES...NO I GRABBED HER FROM THE CHEST AND I SAT HER ON THE BED AND I TIED HER...UNDERSTAND...I TIED HER UP FROM THE CORNERS FROM BOTH ARMS AND FROM BOTH FEET AND THEN I GOT THE KEYS...

G.D.  WHEN YOU SAY THAT YOU TIED HER UP, THE HANDS WERE TIED TOGETHER?

R.H.  YES...BOTH OF THEM TOGETHER...

G.D.  WITH ONE CORNER OF THE BED?

R.H.  YES FROM ONE CORNER...

G.D.  AND THE FEET WERE TIED TOGETHER ON THE OTHER CORNER?

R.H.   YES WITH THE OTHER CORNER AND FROM THERE WELL...I REMEMBER THAT I SAT DOWN...THAT I SAT DOWN BUT...

G.D.  AND YOU DIDN'T ASK HER FOR ANYTHING?
R.H.  NO...NO...I DIDN'T TELL HER ANYTHING...NOTHING...I ASKED HER
NOTHING...I ONLY TOLD HER THAT...I HAD ALREADY THOUGHT ABOUT
IT WHAT HAD HAPPEN WITH MY MOTHER RIGHT...I FELT A LITTLE BIT
ILL RIGHT AND THEN WITH THE LIQUOR THAT I HAD NEVER HAD
INSIDE...MY HEAD WELL I FELT A LITTLE BIT MORE ILL RIGHT AND AT
THAT TIME I ASKED HER FOR THE KEYS AND IT SEEMED EASY TO...
G.D.  THE KEYS TO WHAT?
R.H.  OF THE JEEP...TO GRAB THEM RIGHT SO I ASKED HER WHERE
THEY WERE...
G.D.  YOU THOUGHT ABOUT TAKING THE JEEP?
R.H.  YES...YES TAKE IT AND...
G.D.  WHAT WERE YOU GOING TO DO WITH THE JEEP?
R.H.  WELL TAKE IT WITH ME TO LAREDO AND SELL IT AND HAVE A
LITTLE BIT OF MONEY AND GIVE SOME TO MY MOTHER....
G.D.  LAREDO OR NUEVO LAREDO?
R.H.  NUEVO LAREDO...
G.D. NUEVO LAREDO, TAMAULIPAS, MEXICO...
R.H.  YES...YES...THAT'S RIGHT...[79]

Viewed in proper context, Petitioner's comment about MONEY (not "monkey") in the

context of his answer to Ranger De Los Santos' question about Petitioner's problems with his

mother is perfectly comprehensible.  As Petitioner explained later in his first interview, he planned

to steal Glen Lich's jeep, sell it, and give some of the resulting *money* to his mother.  There was

likewise, nothing confusing or incoherent about Petitioner's testimony regarding the knife he

brandished during his sexual assaults on Lera Lich.

Unlike the state habeas court, this Court would not have independently chosen to employ the

adjective "articulate" to describe Petitioner's interviews with Ranger De Los Santos.  Nonetheless,

having independently reviewed the transcriptions of both of Ranger De Los Santos' interviews with

Petitioner, this Court agrees with the state habeas court that Petitioner's answers during those

interviews were coherent and comprehensible and demonstrated that Petitioner was alert and rational

---

[79] *Id.*, at pp. 8-10.

53

throughout his post-arrest interviews.  Petitioner's statements on October 15, 1997, reflected his awareness of the criminality of his conduct and perfectly rational desire to minimize his own culpability.

Viewed in proper context, the state habeas court reasonably concluded Petitioner's verbal communication skills demonstrated during the interviews in question did not support a finding the Petitioner was mentally retarded.  Given Petitioner's lack of formal education, it is likewise hardly a surprise Petitioner's handwritten messages to prison and jail officials (in Spanish) were replete with spelling, punctuation, and grammatical errors.  What is significant for purposes of the state habeas court's analysis of Petitioner's *Atkins* claim is that Petitioner, a purported third grade dropout whose siblings testified could not read or write when he left home, was reading (in Spanish) at grade level 5.8 when tested prior to his state habeas hearing.[80]

## VI.    Conclusions

This Court is not free to disregard the express or implied factual findings made by the state habeas court unless presented with clear and convincing evidence showing those findings were erroneous.  Petitioner has failed to satisfy this standard.

For the reasons set forth above, and in this Court's Memorandum Opinion and Order issued September 23, 2011, the state habeas court's rejection on the merits of Petitioner's *Atkins* claim was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination

---

[80] S.F. State Habeas Hearing, Volume 5, testimony of Dr. Richard E. Coons, at pp. 70, 222.

of the facts in light of the evidence actually presented in the Petitioner's trial and state habeas corpus proceedings.

Nonetheless, this Court has granted Petitioner a CoA on his *Atkins* claim.  The proper forum for any further litigation of the *Atkins* claim is, therefore, the Fifth Circuit.

A substantial portion of Petitioner's pleadings herein refer to new documentation Petitioner presented to this Court as attachments, exhibits, or appendices.  Insofar as Petitioner challenges the state habeas court with new evidence never presented to the state courts, under the AEDPA, that effort is not permitted.  *See Cullen v. Pinholster*, ___ U.S. ___, ___, 131 S.Ct. 1388, 1 398-99, 179 L.Ed.2d 557 (2011)(holding review under Section 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits and it would be contrary to the AEDPA's underlying purpose to permit a Petitioner to overcome an adverse state-court decision with new evidence introduced in federal habeas court and reviewed by that court in the first stance effectively *de novo*).

Accordingly, it is hereby **ORDERED** that:

1.  This Court hereby **STRIKES** and **WITHDRAWS** the language in its Memorandum Opinion and Order issued September 23, 2011 which appears following "(15)" at the end of the first paragraph of Section II.B.2.e., found at 20l1 WL 4437091, *16.  The text contained in footnote 148 remains in full force, however.  In lieu of the stricken language, the following language is **SUBSTITUTED**: "(15) Petitioner's conversational and communication skills are inconsistent with a diagnosis of mental retardation and with Petitioner's demonstrated abilities to engage in complex, premeditated, criminal activity involving the use of motor vehicles, weapons, sophisticated threats, and necessarily involving substantial advance planning."

55

2.  This Court hereby **STRIKES** and **WITHDRAWS** the sentence in its Memorandum Opinion and Order issued September 23, 2011 which appears at the beginning of the second paragraph of Section II.D.3., found at 20l1 WL 4437091, *23.  The following language is **SUBSTITUTED** as the new first sentence of that paragraph:  "There are several reasons why the state habeas trial court reasonably gave more weight to Dr. Coons' opinions regarding Petitioner's lack of adaptive functioning deficits over the opinions of Dr. Puente."

3.  Petitioner's motion to alter or amend judgment, filed October 21, 2011, docket entry no. 70, is in all other respects **DENIED**.

It is so ORDERED.

SIGNED this 6th day of February, 2012.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE